# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DOROTHY L. BIERY, and

GORDON HOLLOWAY, as successor and representative of decedent GEORGE A. HOLLOWAY,and

STACY E. JUDY Trust dated March 7, 1994, and

JULIA R. CHALFANT Etvir Trust,

K.A.K. FARMS, INC., and

AMERICAN PACKING CORPORATION, and

COLLINS INDUSTRIES, INC.,

Plaintiffs,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

No. 1:07-CV-693

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

MARK F. (THOR) HEARNE, II
LINDSAY S.C. BRINTON
MEGHAN S. LARGENT
Lathrop & Gage, LC
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
314.613.2500 (Phone)
314.613-2550 (fax)
Thornet@ix.netcom.com

ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

Page


I. SUMMARY OF THIS MOTION ..... 1

A. The four uncontested facts are ..... 1

B. The four points of settled law are ..... 2

II. PARTIAL SUMMARY JUDGMENT IS APPROPRIATE UNDER RULE 56 RCFC ..... 3

III. THE FACTS ..... 4

A. The Railroad Obtained Only and Easement To Use The Right-of-Way Property For The Operation Of A Railroad. ..... 4

B. The Plaintiffs Owned Fee Title to The Land Over Which the Right-Of-Way Ran. ..... 5

C. Railroad Use of the Right-Of-Way Was Abandoned ..... 5

D. The STB Issued a NITU Pursuant to The Trails Act That Precluded The Plaintiffs' Reversionary Right to Their Land ..... 6

IV. THE LAW ..... 7

A. The Federal Trails Act Operates To Preclude Or Preempt Property Owners "Reversionary" Right To Their Land And, When It Does, The Property Owners Have Suffered a Taking of Their Land For Which The Fifth Amendment Requires They Be Paid "Just Compensation". ..... 7

1. Congress Intended the 1983 Trails Act Amendments to Preclude Property Owners "Reversionary" Rights Under State Law ..... 7

2. The Supreme Court In *PRESEAULT I* Directed That State Law – In This Case Kansas Law - Determines The Nature Of The Property Interest Subject To The Trails Act ..... 11

3. When The Federal Trails Act Operates To Preclude Or Preempt The Abandonment And Reversion Of A Railroad Right-Of-Way It Is A Taking of The Land Owner's Property For Which The Federal Government Must Pay "Just Compensation" ..... 12

B. Under Kansas Law, The Plaintiff's Land Was No Longer Burdened By A Railroad Easement and, But For the Trails Act and The NITU, They Would Have Enjoyed The Right To Use and Possess Their Land ..... 18

1. Under Kansas Law, The Hutchinson, Oklahoma, and Gulf Railroad Company and the Hutchinson & Southern Railroad Company

Acquired Only an Easement for the Limited Purpose of a Railroad Right-of-Way ....19

2. The Condemnation Order Only Gave the Railroad an Easement ....20

3. Under Kansas Law, The Hutchinson, Oklahoma, and Gulf and The Hutchinson & Southern Railroad Right-of-Way Easement was Abandoned ....22

C. A Landowner's Claim For Compensation For A Taking Of Their Land Arises Upon The STB's Issuance Of The Original NITU ....24

D. The Trails Act and The STB's Issuance of A NITU Is A *Per Se* Physical Taking of The Plaintiff's Land. ....31

1. Railroad right-of-way easements are *sui generis*; the easement holder has a perpetual and exclusive right to possess the property while used for operation of a railroad ....31

2. The Trails Act takes from the fee owner their right to exclude others from the land and actually excludes the fee owners from their land, this is a per se physical taking of the land which occurs upon the STB issuing the NITU ....34

3. The Department of Justice agrees that, after *CALDWELL*, a landowners claim for a *per se* permanent physical taking of their land arises when the NITU is issued – even when a Trail Use Agreement has not been reached and no trail has been constructed ....36

V. CONCLUSION ....39

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abercrombie v. Simmons*,
71 Kan. 538, 81 P. 208 (1905) .......... 20, 21, 22, 30

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) .......... 4

*Armstrong v. United States*,
364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) .......... 17

*Barclay v. U.S.*,
127 S.Ct. 1328 (U.S. Feb. 20, 2007) .......... 27

*Barclay v. United States*,
443 F.3d 1368 (2006) .......... passim

*Beres v. United States*,
64 Fed. Cl. 403 (2005, Judge Horn) .......... 16

*Blendu v. United States*,
75 Fed. Cl. 543 (2007, Judge Hewitt) .......... 16

*Board of Regents v. Roth*,
408 U.S. 564 (1972) .......... 11

*Boyd v. U.S.*,
116 U.S. 616 (1886) .......... 34

*Brower v. County of Inyo*,
489 U.S. 593 (1989) .......... 34

*Brown v. Weare*,
348 Mo. 135, 152 SW 387 (1923) .......... 21

*Buhl et al v. U.S. Sprint Comm. Co.*,
840 S.W. 2d 904 (1992, Tenn) .......... 21

*Caldwell v. United States*,
391 F.3d 1226 (Fed. Cir. 2004) .......... passim

*Canton Co. of Baltimore v. Baltimore & O. R. Co.*,
1904, 99 Md. 202, 57 A. 637 .......... 22

*Celotex Corporation v. Cattrett*,
477 U.S. 317 (1986) .......... 4

*Dessureau v. Maurice Memorials, Inc.*,
132 Vt. 350, 318 A. 2d 62, 654 (1974) .......... 21

*Dickerman v. Town of Pittsford*,
116 Vt. 563, 80 A. 2d 29, 532 (1951) .......... 21

*Drazich v. Lasson*,
964 P.2d 324 (Utah App. 1998) .......... 18

*Ellamae Phillips Co. v. United States*,
77 Fed. Cl. 387 (2007, Judge Baskir) .......... 16

*Entick v. Carrington 19 Howell's State Trials 1029*,
95 Eng. Rep. 807 (C.P. 1765) .......... 34

*Glosemeyer v. United States*,
45 Fed. Cl. 771 (2000) .......... passim

*Grantwood Village v. United States*,
.......... 14, 37

*Hartford Fire Insurance Co. v. Chicago, Milwaukee & St. Paul Ry. Co.*,
175 U.S. 91 (1899) .......... 30

*Harvest Queen Mill & Elevator Co. v. Sanders*,
370 P.2d 419 (Kan. 1962) .......... 18, 20

*Hash v. United States*,
2007 WL 1309548 (Feb. 1, 2007) .......... 14

*Hash v. United States*,
403 F.3d 1308 (Fed. Cir, 2005) .......... 12, 14, 37

*Henry v. Columbus Depot Co.*,
135 Ohio St. 311, 20 N.E.2d 921 (1939) .......... 19

*Huff v. Langman*,
646 N.E.2d 730 (Ind. App. 1995) .......... 18

*Illig v. United States*,
98-934L, *see* July 27, 2005 .......... passim

*International News Service v. Associated Press*,
248 U.S. 215 (1918) .......... 33

*Jordan v. Stallings*,
911 S.W. 2d 653 (Mo. App. 1995) .......... 21

*Kaiser Aetna et al. v. United States*,
444 U.S. 164 (1979) .......... 33

*Lawson v. State*,
107 Wash. 2d 444, 730 P.2d 1308 (1986)........................................................................ 22

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982).................................................................................................. 33, 34

*Love v. U.S.*,
889 F. Supp. 1548 (E.D.N.C. 1994)................................................................................ 18

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992)....................................................................................................... 34

*Mahar v. Grand Rapids Terminal R. Co.*,
174 Mich 138 N.W. 2d 535 (1913).................................................................................. 21

*Mammoth Cave Nat. Pk. Ass'n v. State High. Comm.*,
261 Ky. 769, 88 S.W.2d 931) ........................................................................................ 22

*Michigan Dept. of Natural Resources v. Carmody-Lahti Real Estate, Inc.*,
699 N.W.2d 272 (Mich. 2005)..................................................................................... 18, 21

*Miller v. St. Louis, Southwestern Ry. Co.*,
239 Kan. 198, 718 P. 2d 610 (1986) .............................................................................. 21

*Miller v. United States*,
67 Fed. Cl. 542 (2005) .................................................................................................... 28

*Miller v. United States*,
No. 03-2489L (Fed. Cl.) ........................................................................... viii, 35, 36

*Moore v. Friends of Wabash Trace Nature Trail, Inc.*,
991 S.W. 2d 681 (Mo. App. W.D., 1999)......................................................................... 21

*Moore v. United States*,
.................................................................................................................................. 14, 37

*Nat'l Assoc. of Reversionary Property Owners v. Surface Transp. Bd.*,
158 F. 3d 135 (D.C. Cir. 1998)........................................................................................ 16

*Neider v. Shaw*,
65 P.3d 525 (Idaho 2003)................................................................................................ 18

*New Mexico v. United States Trust Co.*,
172 U.S. 171 .................................................................................................................. 31

*Oregon v. Elstad*,
470 U.S. 298 (1985)........................................................................................................... 3

*Penn Central Corp. v. U.S. Railroad Vest.*,
955 F.2d 1158 (7th Cir. 1992) ..................................................................................... 10, 18

*Pennsylvania Coal Co. v. Mahon*,
260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) ........................................................ 17

*Pollnow v. Department of Natural Resources*,
88 Wis. 2d 350, 276 N.W. 2d 738 (1979) ........................................................ 22

*Portsmouth Co. v. United States*,
260 U.S. 327 (1922) ........................................................ 33

*Pratt v. Griese*,
196 Kan. 182, 409 P2d 777 (1966) ........................................................ 21, 22

*Preseault v. United States*,
100 F.3d 1525 (Fed.Cir. en banc 1996) ........................................................ passim

*Preseault v. United States*,
24 Cl. Ct. 818 (1992) ........................................................ 30

*Preseault v. United States*,
494 U.S. 1 (1990) ........................................................ passim

*Pumpelly v. Green Bay & Mississippi Canal Company*,
80 U.S. 166 (1871) ........................................................ 33

*Renewal Body Works, Inc. v. United States*,
443 F.3d 1368 (2006) ........................................................ 27, 28, 33, 37

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ........................................................ 11

*Rutland Railroad Co. v. Chaffee*,
71 Vt. 84 (1899) ........................................................ 21

*Schmitt v. United States*,
203 F.R.D. 387 (S.D. Ind., 2001) ........................................................ 16

*Schnabel v. County of Du Page*,
101 Ill . App. 3d 553, 428 N.E. 2d 671 (1981) ........................................................ 22

*Swisher v. United States*,
176 F. Supp.2d 1100 (D. Kan, 2001) ........................................................ 16

*Toews v. United States*,
53 Fed. Cl. 58 (2002) ........................................................ 13, 18, 26, 27

*Towes v. United States*,
376 F. 3d 1371 (2004) ........................................................ 1, 13, 18, 37

*Transp. Co. v. Chicago*,
99 U.S. 635 (1878) ........................................................ 34

*Tulare Lake Basin Water Storage Dist. v. United States*,
49 Fed. Cl. 313 (2001) ........ 34

*U.S. v. Magnolia Petroleum Co.*,
110 F 2d 212 (1939, 10th Cir, (OK) ........ 21

*United States v. Causby*,
328 U.S. 256 (1946) ........ 33

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
449 U.S. 155 (1980) ........ 11

*Western Union Telegraph Co. v. Penn RR. Co.*,
195 U.S. 540 (1904) ........ 31

*Zoltek Corp. v. U.S.*,
442 F.3d 1345 (2006) ........ 3

**Statutes**

16 U.S.C. §1241 et seq. (Supp. II 1996) ........ 1

1901 Gen. Stat. 1901, §1362 ........ 20

1983 Trail Act ........ 17

28 U.S. C. § 1346 (a)(2) ........ 16

28 U.S.C. § 1491(a) ........ 3

49 C.F.R. § 1152.29(a)(2) ........ 32

Gen. Stat. 1901, §§ 1359 – 1365 ........ 19

Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub. L. 94-210,
90 Stat. 144, as amended, 49 U.S.C. 10906 (1982 ed.) ........ 10

Restatement of Property § 504 ........ 21

**Other Authorities**

David A. Thomas, *Why the Public Plundering of Private Property Rights is Still a Very Bad Idea*, 41 Real Property, Probate and Trust J. 25 (Spring 2006) ........ 17

Richard A. Epstein, *Takings: Private Property and the Power of Eminent Domain*,
Harvard Univ. P. (1985) ........ 33

U.S. House of Representatives, Judiciary Committee, Subcommittee on Commercial and Administrative Law, "Litigation and Its Effect on the Rails-to-Trails Program,"
June 20, 2002 ........ 8

**Rules**

49 C.F.R. § 1152.29(a)(3) .......... 32

RCFC 56 .......... 1

RCFC 56(c) .......... 4

**Appendix**

**Appendix A:** Reports of Commissioners Granting Rights-of-Way to the Hutchinson, Oklahoma, and Gulf Railroad Company and the Hutchinson & Southern Railroad Company

**Appendix B:** Brief of Appellee, The United States, CALDWELL V. UNITED STATES

**Appendix C:** Statement of Department of Justice and Department of Interior to U.S. Senate Subcommittee on National Parks of the Senate Committee on Energy and Natural Resources (April 23, 2008).

**Appendix D:** Brief of Appellee, The United States, BARCLAY V. UNITED STATES

**Appendix E:** Brief of Appellee, The United States, in Opposition to Rehearing *En Banc* in BARCLAY V. UNITED STATES

**Appendix F:** Supplemental Brief of Appellee, The United States, BARCLAY V. UNITED STATES

**Appendix G:** Court documents filed in MILLER V. UNITED STATES, No. 03-2489L (Fed. Cl.)

**Appendix H:** Brief of Appellee, The United States, in Opposition to Rehearing *En Banc* in CALDWELL V. UNITED STATES

# I. SUMMARY OF THIS MOTION

This case is a claim by seven property owners[1] seeking the "just compensation" they are due under the Fifth Amendment for the federal government's taking of their land in Reno County, Kansas. The Plaintiffs have filed this motion under Rules of the Court of Federal Claims ("RCFC") rule 56 requesting that this Court enter partial summary judgment against the Defendant on the issue of the government's liability for this taking of the Plaintiffs' property.

The federal government took the Plaintiffs' property when a Notice of Interim Trail Use or Abandonment ("NITU") issued by the Surface Transportation Board ("STB") pursuant to Section 8(d) of the 1983 Amendments to the federal National Trails System Act ("Trails Act")[2] precluded their "reversionary"[3] rights to land which they enjoyed under Kansas law, and imposed two new easements upon their land, one easement allowing for the creation of a public-access recreational trail, and a second easement allowing the Plaintiffs' property to be used in the future for operation of a railroad. Summary judgment should be entered against the Defendant on the basis of four uncontested facts and four points of settled law.

A. <u>The four uncontested facts are:</u>

(1) On July 24, 1889, and June 10, 1891, respectively, The Hutchinson, Oklahoma, and Gulf Railroad Company and the Hutchinson & Southern Railroad Company acquired by

---

[1] The property owners include a husband and wife, revocable family trusts, and businesses which jointly own a single parcel of land. We group these together as a common owner.

[2] Pub. L. 98-11, 97 Stat. 48, to the National Trails System Act, Pub. L. 90-543, 82 Stat. 919 (codified, as amended, at 16 U.S.C. §1241 et seq. (Supp. II 1996)).

[3] Plaintiffs use the term "reversionary" in the generic sense to describe the Plaintiff's property interest. We employ the term in this generic sense because it is commonly used in this manner by courts considering Trails Act taking cases. This is not a technically correct use of the term. As the Federal Circuit has noted, "as a matter of traditional property law terminology, a termination of the easements would not cause anything to "revert" to the landowner. Rather, the burden of the easement would simply be extinguished, and the landowner's property would be held free and clear of any such burden." *Towes v. United States,* 376 F. 3d 1371, 1376 (2004).

condemnation a 100-feet-wide easement for a right-of-way over which to operate a railroad near the city of Hutchinson, Kansas. A portion of this right-of-way crosses land now owned by the Plaintiffs. This easement was limited to the purpose of operating a railroad.

(2) The Plaintiffs are the successors in title to the original property owners that granted the rights-of-way to The Hutchinson, Oklahoma, and Gulf Railroad Company and the Hutchinson & Southern Railroad Company. Each of the Plaintiffs held fee title to land abutting and underlying the former The Hutchinson, Oklahoma, and Gulf Railroad Company and the Hutchinson & Southern Railroad Company right-of-way on April 5, 2004.

(3) The Hutchinson, Oklahoma, and Gulf Railroad Company's and the Hutchinson & Southern Railroad Company's successor, Burlington Northern and Santa Fe Railway Company ("BNSF"), ultimately abandoned railroad service on the corridor in 2004.

(4) On April 5, 2004, the STB, pursuant to the Trails Act, issued a NITU which precluded the Plaintiffs' reversionary rights to use and possess their property, provided for the creation of an easement for a public access recreational trail across the Plaintiffs' land, and imposed an easement for a future possible railroad right-of-way across the Plaintiffs' property. Subsequently a Trail Use Agreement was reached for the conversion of the abandoned right-of-way to a recreational trail as provided for in the NITU. Pursuant to the Trails Act, the NITU and the Trail Use Agreement, the City of South Hutchinson has taken possession of the land.

B. <u>The four points of settled law are:</u>

(1) The Trails Act operates to preclude or preempt property owners "reversionary right" to their land which they enjoyed under state law, and when it does, the landowner has suffered a taking of their property for which the Fifth Amendment requires the federal government to pay "just compensation".

(2) Under Kansas law the Plaintiffs' land was no longer burdened by an easement and, but for the Trails Act and the NITU, the Plaintiff's would have enjoyed their right to occupy their land, including the right to exclude others from the property.

(3) The Plaintiff's claim for "just compensation" arose upon the STB's issuance of the NITU.

(4) When the Trails Act precludes a property owner from enjoying that owner's "reversionary" right to their land and imposes new easements upon their land, it is a *per se* physical taking of that property owner's land for which the Fifth Amendment requires the federal government to pay "just compensation."

On the basis of these four uncontested facts and four points of well-settled law, judgment should be entered against the Defendant on its obligation to pay "just compensation" for the taking of Plaintiffs' property when the Trails Act precluded the Plaintiffs from enjoying their reversionary rights to property they owned under Kansas law and imposed upon that property an easement for a public-access recreational trail and an easement for a possible future railroad.

## II. PARTIAL SUMMARY JUDGMENT IS APPROPRIATE UNDER RULE 56 RCFC

On September 26, 2007, the Plaintiffs filed this action seeking "just compensation" for the taking of their property. The Fifth Amendment is self-executing.[4] This Court has jurisdiction to hear such a claim pursuant to the Tucker Act.[5]

The Plaintiffs have filed this motion for partial summary judgment on the question of the government's liability for taking their property in violation of the Fifth Amendment pursuant to Rule 56 RCFC.

---

[4] *OREGON V. ELSTAD*, 470 U.S. 298, 350 (1985); *ZOLTEK CORP. V. U.S.*, 442 F.3d 1345, 1376 (2006).

[5] Tucker Act, 28 U.S.C. § 1491(a).

Summary judgment is appropriate in cases when the pleadings, depositions, formal discovery requests, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[6] A "genuine issue" of fact exists only if a "reasonable jury" could find in favor of the non-moving party.[7]

As Plaintiffs demonstrate, there are no genuine issues of material fact and the Court should enter summary judgment finding that the federal government, by operation of the Trails Act and the STB's issuance of a NITU, has precluded the Plaintiff's reversionary property rights to their land and has taken two easements across the Plaintiffs' property without paying "just compensation," in violation of the Fifth Amendment to the U.S. Constitution.

## III. THE FACTS

In 1889 The Hutchinson, Oklahoma, and Gulf Railroad Company acquired an easement across land now owned by some of the Plaintiffs. In 1891, the Hutchinson & Southern Railroad Company also acquired an easement across land now owned by some of the Plaintiffs. Both easements was limited to the right of a railroad to operate a train across the land. When railroad operations were abandoned the easement was extinguished and the Plaintiffs land was no longer subject to either easement. Railroad operations over these easements were in fact abandoned. The STB, however, issued a NITU pursuant to the Trails Act that precluded the abandonment of these easements and provided for interim recreational trail use of the land.

### A. The Railroad Obtained Only and Easement To Use The Right-of-Way Property For The Operation Of A Railroad.

The Hutchinson, Oklahoma, and Gulf Railroad Company and The Hutchinson & Southern Railroad Company [herinafter "Railroads"] acquired the right to use a 2.88-mile long,

---

6 RCFC 56(c); *CELOTEX CORPORATION V. CATTRETT*, 477 U.S. 317, 323 (1986).

7 *ANDERSON V. LIBERTY LOBBY*, 477 U.S. 242, 248 (1986).

100 foot strip of land in Reno County, Kansas for a railroad right-of-way in 1889 and 1891, respectively.[8] The Railroads acquired the right to use the land by condemning an easement across the land that is now owned by the Plaintiffs. The condemnation was pursuant to Kansas Gen. Stat. 1901 §§ 1359-1365 and resulted in two Commissioners Reports. Over decades as railroad merged and consolidated their operations, the right-of-way became part of the Burlington Northern Santa Fe Railroad ("BNSF.")

B. The Plaintiffs Owned Fee Title to The Land Over Which the Right-Of-Way Ran

The Plaintiffs, Dorothy L. Biery, Gordon Holloway, The Stacy E. Judy Trust, The Julia R. Chalfant Trust, K.A.K. Farms, Inc., American Packing Corp. and Collins Industries, Inc., owned fee title to their property, which abuts and underlies the former Burlington Northern Santa Fe ("BNSF") right-of-way, on April 5, 2004.[9]

C. Railroad Use of the Right-Of-Way Was Abandoned

BNSF held a right-of-way that it sought to abandon in Reno County, Kansas, between milepost .62 and milepost 3.50 near South Hutchinson, Kansas.[10] In March 2004, the STB granted BNSF's request to abandon this 2.88-mile long stretch of right-of-way.[11] BNSF represented to the STB that there had been no traffic on the right-of-way in two years.[12] The

[8] The Report of Commissioners dated July 24, 1889 conveying a right-of-way to the Hutchinson, Oklahoma, and Gulf Railroad Company is attached at Appendix A. The Report of Commissioners dated June 10, 1891, conveying a right-of-way to the Hutchinson & Southern Railroad Company is also attached at Appendix A.

[9] See Plaintiffs' Proposed Findings of Uncontroverted Fact ¶¶7-13 and accompanying Tabs D through J.

[10] *Id.* at ¶

[11] *Id.* at ¶18-19, and accompanying Tabs K and K-1.

[12] *Id.* at ¶19, Tab K.

STB's order allowing BNSF to abandon the 2.88-mile long right-of-way allowed the possibility of conversion of the land to recreational trail use pursuant to the Trails Act.[13]

D. <u>The STB Issued a NITU Pursuant to The Trails Act That Precluded The Plaintiffs' Reversionary Right to Their Land</u>

On February 25, 2004, the City of South Hutchinson, Kansas ("The City"), filed a request that the STB issue a NITU for the 2.88-mile long right-of-way.[14] On April 5, 2004, the STB granted the City of South Hutchinson's request and issued a NITU for the 2.88 miles of right-of-way sought to be abandoned by BNSF.[15] The NITU provided that The City acknowledged that "the use of the right-of-way for trail purposes is subject to possible future reconstruction and reactivation for rail service, as required at 49 CFR 1152.29."[16] The NITU was set to expire on October 7, 2004.[17] On September 13, 2004, and September 14, 2004, both BNSF and The City requested that the STB extend the NITU for an additional 180 days.[18]

Pursuant to this NITU and the Trails Act, on March 23, 2005, a Trail Use Agreement was reached between BNSF and the City of South Hutchinson, Kansas. On February 17, 2006, pursuant to the Trails Act, BNSF consummated the Trails Use Agreement by transferring the former Hutchinson, Oklahoma, and Gulf and Hutchinson & Southern rights-of-way to the City of South Hutchinson, Kansas by Quitclaim Deed.[19] The Quit Claim Deed expressly provides that this conveyance was made pursuant to the Trails Act. To Wit: "Subject, to the terms of that certain Railbanking and Donation Contract, dated 3/23, 2005 ("Contract"), which terms shall be

---

[13] *Id.*, at Tab K.
[14] *Id.* at ¶21, and Tab L.
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.* at ¶¶23-24, and Tab M.
[19] *Id.* at ¶¶25-27, and Tab N.

incorporated herein, this conveyance is dependent upon and pursuant to the issuance of a Notice of Interim Trail Use ("NITU") in Surface Transportation Board ("STB") Docket No. Ab-6 *** Subject, to interpretation pursuant to and in conformity with Section 8(d) of the National Trails Systems Act, 16 U.S.C. 1247(d), and the rules and regulations of the STB related thereto, all as may be amended from time to time *** ." (*See* Exhibit N).[20]

The City is not a railroad and is not authorized by any state or by the federal Surface Transportation Board to operate a railroad. Plaintiffs own fee title to property in Reno County, Kansas that adjoins and underlies a portion of the railroad right-of-way originally established as an easement for the use of BNSF and was subject to the April 5, 2004, NITU.[21]

## IV. THE LAW

A. The Federal Trails Act Operates To Preclude Or Preempt Property Owners "Reversionary" Right To Their Land And, When It Does, The Property Owners Have Suffered a Taking of Their Land For Which The Fifth Amendment Requires They Be Paid "Just Compensation".

1. Congress Intended the 1983 Trails Act Amendments to Preclude Property Owners "Reversionary" Rights Under State Law

As Justice Brennan recounted in his introduction to the Court's opinion in *PRESEAULT v. UNITED STATES*, 494 U.S. 1 (1990) (*PRESEAULT I)*, Congress became concerned about the nation's loss of railroad right of way. It was Congress's intent to create a result under federal law (precluding a property owner's right to regain their property, the preservation of the railroad corridor for future railroad use and interim public recreational trail use) that was not possible under existing state law. Congress did this by preempting the fee owners "reversionary" right to regain possession of their land which would otherwise occur under state law upon the

---

[20] *Id.* at ¶27, Tab N.
[21] *Id.* at ¶¶27-30, Tabs D-J.

abandonment of railroad rights-of-way. This desire to preclude state law abandonment of railroad corridors was why Congress adopted section 8(d) of the Trails Act in 1983 providing, "that interim trail use shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."

The United States Congress itself has made clear that the 1983 Amendments to the Trails Act were intended to pre-empt state law and that, when the Trails Act operated to preempt property rights enjoyed by landowners under state law, "just compensation" would be paid to the land owners. Congressmen Barr, then Chairman of the House Judiciary sub-committee holding hearings into the Trails Act noted:

> "[a]t first glance, it may appear Congress did not consider the fact that if the railroad land was not transferred in fee simple it may belong to the property owner, and not the railroad. However, Congress intended the railbanking aspect of this Federal law would preempt State law and hold the land essentially in perpetuity, until possible rail reactivation. In the 1996 en banc decision in *PRESEAULT v. UNITED STATES*, involving the same plaintiffs as in the Supreme Court case I just mentioned, the U.S. Court of Appeals for the Federal Circuit held that railroad abandonment constituted a per se taking, and therefore would require payment of just compensation to the affected land owners, under the Fifth Amendment.[22]

The Supreme Court's landmark decision in *PRESEAULT* recognized that Congress intended to preclude property owner's 'reversionary rights' even though doing so was a compensable taking under the Fifth Amendment.

The Preseaults owned fee title to land underlying an abandoned railroad easement in Vermont.[23] The railroad was converted to interim trail use by the ICC's [now the STB] issuance of a Notice of Exemption pursuant to the Trails Act.[24] The Preseaults challenged this action by

---

22 U.S. House of Representatives, Judiciary Committee, Subcommittee on Commercial and Administrative Law, "LITIGATION AND ITS EFFECT ON THE RAILS-TO-TRAILS PROGRAM," Statement of Chairman Barr, June 20, 2002.

23 *PRESEAULT v. UNITED STATES*, 494 U.S. 1, 9 (1990).

24 *Id.*

claiming that Congress's preemption of state law by passing the Trails Act was an act beyond Congress's constitutional authority.[25] The Preseaults contended that the Trails Act preemption of the rights they enjoyed in their property under Vermont law violated the Commerce Clause and the Fifth Amendment.[26] The Supreme Court held that the Trails Act amendments were not an unconstitutional act by Congress but a constitutional exercise of eminent domain by Congress.[27] The Court further held that, to the extent the Trails Act preempted any property owner's reversionary right to land that they enjoyed under state law, the federal government was required to pay "just compensation."[28]

The Supreme Court then held that the Tucker Act provided this Court with jurisdiction to award "just compensation" when the Trails Act worked such a taking.[29] As the Court recognized,

> This language [the 1983 Trails Act Amendment] gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests *** .[30]

The Supreme Court noted Congress's intent to preclude the right of property owners to their property under state law, stating that,

> The key finding of this amendment is that interim use of a railroad right-of-way for trail use, when the route itself remains intact for future railroad purposes, shall not constitute an abandonment of such rights-of-way for railroad purposes. This finding alone should eliminate many of the problems with this program. The concept of attempting to establish trails only after the formal abandonment of a

---

[25] *Id.* at 10.
[26] *Id.*
[27] *Id.* at 17-19.
[28] *Id.*
[29] *Id.*
[30] *Id.* at 8.

> railroad right-of-way is self-defeating; once a right-of-way is abandoned for railroad purposes there may be nothing left for trail use. This amendment would ensure that potential interim trial use will be considered prior to abandonment.[31]

As the legislative history quoted by Justice Brennan notes, the "problems with this program" prior to the 1983 Amendment were that under state law a "railroad purpose" did not include "railbanking" or "interim trail use" and the fee owners of the property regained their right to the property when railroad service over the property was abandoned.[32] As Justice Brennan observed, "because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. *** [and] frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations."[33]

---

[31] *Id.* at 9, *citing* H. R. Rep., at 8-9.

[32] The word "abandonment" is a term of art in the context of railroad real estate title and regulation. "Abandonment" is used in very different ways depending upon the context.

First, "abandonment" is used in the context of state property rights to refer to the loss of a railroad's right to use specific property for the operation of a railroad. A railroad's right to use specific property is defined by the real estate and property law of the relevant state. If a railroad holds only an easement to use the property for a specific purpose – which is customarily the manner in which railroads obtained the right to use property for operation of a railroad – this right can be lost by being "abandoned". Whether the railroad has "abandoned" its right to use the property is determined by reference to the relevant state's real estate law. *See,* discussion, page 22 *infra*.

The second use of "abandonment" is in the context of federal regulation of interstate railroads. (*See*, RAILROAD REVITALIZATION AND REGULATORY REFORM ACT OF 1976 (4-R ACT), Pub. L. 94-210, 90 Stat. 144, as amended, 49 U.S.C. 10906 (1982 ed.).) In this context the term "abandonment" refers not to the railroad's title or interest in the real estate over which it provides railroad service but to the obligation of the railroad to provide interstate railroad service over a given corridor or route. A railroad may not cease, or "abandon", its obligation to provide railroad service over a given railroad corridor without first obtaining the permission of the STB to terminate such interstate railroad service. *See, PENN CENTRAL CORP. v. U.S. RAILROAD VEST.*, 955 F.2d 1158 (7th Cir. 1992).

[33] *PRESEAULT, supra*, note 31, at 9.

Congress's intent to preserve these otherwise abandoned railroad corridors was being frustrated by state law. So, Congress adopted the 1983 amendments to preclude the operation of state law. This preclusion or forestalling of state law property rights is what gives rise to a taking.

Justice O'Connor noted the means by which the Trails Act takes a property interest when she wrote:

> "The Commission's actions may delay property owners' enjoyment of their reversionary interests, but that delay burdens and defeats the property interest rather than suspends or defers the vesting of those property rights."[34] Any other conclusion would convert the ICC's power to pre-empt conflicting state regulation of interstate commerce into the power to pre-empt the rights guaranteed by state property law, a result incompatible with the Fifth Amendment. See *RUCKELSHAUS v. MONSANTO CO.*, 467 U.S., 986, 1012, (1984) ("If Congress can `pre-empt' state property law in the manner advocated by EPA, then the Taking Clause has lost all vitality. [A] sovereign, `by ipse dixit, may not transform private property into public property without compensation . . . . This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent.')"[35]

2. The Supreme Court In *PRESEAULT I* Directed That State Law – In This Case Kansas Law - Determines The Nature Of The Property Interest Subject To The Trails Act.

It is a long-settled point of law that "state law creates and defines the scope of the reversionary or other real property interests affected by the ICC's actions pursuant to the Trails Act." In *PRESEAULT I*, the U.S. Supreme Court stated,

> In determining whether a taking has occurred, "we are mindful of the basic axiom that '[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" [Citations omitted.] *** Determining what interest petitioners would have enjoyed under Vermont law, in the absence of the ICC's recent actions, will establish whether petitioners possess

[34] *Id.* at 22.

[35] *Id.* at 23 (concurring opinion of O'Connor, quoting *WEBB'S FABULOUS PHARMACIES, INC. v. BECKWITH*, 449 U.S., 155, 164, (1980))

the predicate property interest that must underlie any takings claim. *See* *RUCKELSHAUS V. MONSANTO CO.*, supra, at 1001-1004.[36]

3. When The Federal Trails Act Operates To Preclude Or Preempt The Abandonment And Reversion Of A Railroad Right-Of-Way It Is A Taking of The Land Owner's Property For Which The Federal Government Must Pay "Just Compensation".

The Federal Circuit succinctly summarized the Supreme Court's holding, "[i]n *PRESEAULT [I]*, the Court held that if abandonment of railway use and application of the Trails Act effects a taking when the easement would otherwise revert to the owner of the servient estate, the landowner may sue for compensation under the Tucker Act. 494 U.S. at 4-5, *** *See also* *PRESEAULT v. UNITED STATES,* 100 F.3d 1525 (Fed.Cir.1996) (*en banc*) [(*PRESEAULT II*)] (applying state law of reverter to determine rights of the owner of the servient estate)." *HASH v. UNITED STATES*, 403 F.3d 1308 (Fed. Cir, 2005).

Every court to consider the issue has held that when the Trails Act precludes a property owner from regaining the "reversionary" rights which the owner possesses under state law it is a *per se* physical taking of the owner's property for which the federal government must pay "just compensation."

a. *The Federal Circuit Has Repeatedly Held That The Federal Government is Obligated to Pay "Just Compensation" in Similar Trails Act Taking Cases.*

The Federal Circuit has repeatedly held that when the Trails Act precludes a property owner from regaining the "reversionary" rights that the owner possesses under state law, it is a taking of the owner's property for which the federal government must pay "just compensation."

---

[36] *Id.* at 20-21 (concurrence by Justice O'Connor joined by Justices Scalia and Kennedy); *see also*, *BOARD OF REGENTS v. ROTH*, 408 U.S. 564, 577 (1972) (holding that "[p]roperty interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law).

In *PRESEAULT II*,[37] the Federal Circuit identified two alternative means by which the Trails Act had taken the landowner's interest in their property. Judge Plager wrote,

> [I]f the Preseaults have interests under state property law that have traditionally been recognized and protected from governmental expropriation, and if, over their objection, the Government chooses to occupy or otherwise acquire those interests, the Fifth Amendment compels compensation. The record establishes two bases on which the Preseaults are entitled to recover. One, if the [recreational trail] easements were in existence in 1983 when, pursuant to ICC Order, the City of Burlington established the public recreational trail, its establishment could not be justified under the terms and within the scope of the existing easements for railroad purposes. The taking of possession of the lands owned by the Preseaults for use as a public trail was in effect a taking of a new easement for that new use, for which the landowners are entitled to compensation. As discussed previously, some courts consider that the establishment of a use outside the scope of an existing easement has the effect of causing an abandonment, and thus termination, of the existing easement. Either way, the result is the same-a new easement for the new use, constituting a physical taking of the right of exclusive possession that belonged to the Preseaults.
>
> Two, as an alternative basis, in 1983 when the ICC issued its Order authorizing the City to establish a public recreational biking and pedestrian trail on Parcels A, B, and C, there was as a matter of state law no railroad easement in existence on those parcels, nor had there been for more than ten years. The easement had been abandoned in 1975, and the properties were held by the Preseaults in fee simple, unencumbered by any former property rights of the Railroad. When the City, pursuant to federal authorization, took possession of Parcels A, B, and C and opened them to public use, that was a physical taking of the right of exclusive possession that belonged to the Preseaults as an incident of their ownership of the land.[38]

More recently, the Federal Circuit affirmed Judge Bruggink's decision in *TOEWS v. UNITED STATES*, 53 Fed. Cl. 58 (2002). The government appealed Judge Bruggink's decision. The Federal Circuit rejected the government's argument on appeal and noted,

> [t]he Government contends that, as a matter of California law, use of these railroad rights of way for railbanking and interim use as a recreational trail did not go beyond the scope of the easements. Further, it is the Government's view that, under California law, there was no abandonment or extinguishment of the

---

[37] *PRESEAULT v. UNITED STATES*, 100 F.3d 1525 (Fed. Cir. 1996) (*en banc*).

[38] *Id.*

> easements caused by the federal actions under § 8(d) of the National Trails System Act. And thirdly, the Government states that these questions should not be subject to decision by the federal courts but should be referred to the California courts for resolution.[39]

The Federal Circuit rejected all three of the government's contentions. The Federal Circuit reaffirmed the analysis to be applied in a Trails Act taking as follows.

> It is elementary law that if the Government uses (or authorizes the use of-a point to be considered later) an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use. The consent of the railroad to the new use does not change the equation-the railroad cannot give what it does not have.
>
> And it appears beyond cavil that use of these easements for a recreational trail-for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway-is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different burdens. In the one case there was an occasional train passing through (no depots or turntables or other appurtenances are involved on these rights of way). In the other, individuals or groups use the property, some passing along the trail, others pausing to engage in activities for short or long periods of time. ***
>
> Some might think it better to have people strolling on one's property than to have a freight train rumbling through. But that is not the point. The landowner's grant authorized one set of uses, not the other. Under the law, it is the landowner's intention as expressed in the grant that defines the burden to which the land will be subject.[40]

The Federal Circuit reaffirmed this in *HASH*.[41]

---

[39] TOWES v. UNITED STATES 376 F.3d 1371, 1375 (2004).

[40] *Id. at* 1376-77.

[41] In *HASH*, The Federal Circuit held that the fee title Idaho land owners acquired under their title going back to the original land patents "were taken for public use in accordance with the principles set forth in the *PRESEAULT* cases." when the Trails Act precluded these land owners form regaining their reversionary interest to the land underlying an abandoned right-of-way. The Federal Circuit remanded the case back to the district court to determine the amount of "just compensation" that the federal government owed each of these landowners for the taking of their property. *HASH v. UNITED STATES*, 2007 WL 1309548 (Feb. 1, 2007)

b. *The U.S. Court of Federal Claims Has Repeatedly Held that The Federal Government is Obligated to Pay "Just Compensation" in Similar Trails Act Taking Cases.*

Similarly, this Court has held that property owners are entitled to "just compensation" for the taking of the Property when their state law "reversionary" rights are precluded or forestalled by the Trails Act.

*GLOSEMEYER v. UNITED STATES,* 45 Fed. Cl. 771 (2000), involved three Missouri cases consolidated for decision on the question of the government's liability. In addition to the class of property owners in *GLOSEMEYER*, the decision included the claims of the class in *MOORE v. UNITED STATES* and *GRANTWOOD VILLAGE v. UNITED STATES.* In *GLOSEMEYER*, this Court considered and rejected the government's contention that under Missouri law, "railbanking" is a "railroad purpose" permitted within the scope of an easement for railroad use.[42] In *GLOSEMEYER*, this Court rejected the government's argument that a public-access recreational trail was the same as a railroad.

In *GLOSEMEYER*, Judge Bruggink entered summary judgment against the government on the government's constitutional obligation to pay "just compensation" for taking the plaintiffs' property. Judge Bruggink described the relevant question as simply, "[h]aving established that the easements would have been extinguished, and thus that, but for the application of the Rails-to-Trails Act, the plaintiffs would have been seized of their lands without any restrictions, we have little difficulty concluding that a taking has occurred."[43] This same question is now before this Court on the facts of this case.

In *ILLIG v. UNITED STATES*, 58 Fed. Cl. 619 (2003), this Court explained the nature of the easement imposed upon the owner's property. "What [the Trails Act] imposed on plaintiff's land was a new easement which purported to preserve railroad use. The Trails Act was enacted

[42] *GLOSEMEYER v. UNITED STATES,* 45 Fed.Cl. 771, 780 (2000).
[43] *Id.* at 781.

in order to 'to preserve established railroad rights-of-way for future reactivation of rail service, [and] to protect rail transportation corridors."[44] Although this Court has found that interim trail use, or "railbanking," was not a legitimate railroad purpose,[45] the government's stated intent in creating the Trails Act was to preserve railroad rights-of-way as they existed.[46] "Although interim trail use of the railroad corridor was authorized by the Trails Act through the NITU issued here, the use of the easement for trail purposes is subject to the future restoration of rail services."[47]

In other Trails Act taking cases, this Court has held that when property owners trace their chain of title to a homesteading statute, which conveyed title after the railroad had already acquired its right-of-way traversing public land, the property owner still held fee title and the railroad held only an easement. The government did not retain fee to the property underlying the right-of-way.[48] In all three cases, this Court affirmed the principle that the Trails Act effects a compensable taking of a landowner's property when it precludes the owner's state law reversionary right to their property.[49]

---

[44] *ILLIG,* 58 Fed. Cl. 619, 631; *see* 16 U.S.C. § 1247(d).

[45] *GLOSEMEYER*, 45 Fed.Cl. 771.

[46] *See* 16 U.S.C. § 1247(d) (stating that "if ... interim trail use is subject to restoration and reconstruction for railroad purposes, such interim use shall not be treated ... as an abandonment of the use of such rights-of-way for railroad purposes.")

[47] *ILLIG*, 58 Fed. Cl. at 629.

[48] *ELLAMAE PHILLIPS CO. v. UNITED STATES*, 77 Fed. Cl. 387 (2007, Judge Baskir), *BLENDU v. UNITED STATES*, 75 Fed. Cl. 543 (2007, Judge Hewitt), *BERES v. UNITED STATES*, 64 Fed. Cl. 403 (2005, Judge Horn).

[49] Similar result has been reached in federal district court. Federal district courts also have jurisdiction to consider Trails Act taking claims under the "Mini-Tucker Act." 28 U.S. C. § 1346 (a)(2). In *SCHMITT v. UNITED STATES*, 203 F.R.D. 387 (S.D. Ind., 2001), the court found that landowners adjoining an abandoned railroad right-of-way held fee title to property underlying a railroad right-of-way subject to the Trails Act. The court found that the railroad held only easement and certified the matter as a class action. The court then granted the Plaintiff's motion for summary judgment and found the government liable for a taking of the Plaintiff's property for which "just compensation" was due. The court found, "[h]aving established that the easements would have been extinguished, and thus, but for the application of the Rails-to-Trails

c. *The Fact That the Trails Act is intended to accomplish worthy public policy goals does not excuse the government from its Constitutional obligation to pay "just compensation" to those property owners whose land has been taken.*

The Plaintiffs add their voice to the chorus lauding the noble goals of Congress in passing the 1983 Amendments to the Trails Act preserving abandoned railroad right-of-ways for public hiking and biking trails for the benefit of greater society. This, however, as Justice Bruggink noted in GLOSEMEYER, "is immaterial." When property owners' land is taken for the benefit of society as a whole, they are entitled to "just compensation." As Justice Bruggink explained, "The likelihood that the Rails-to-Trails Act was motivated by a commendable interest in public recreation or was an exercise in great foresight is immaterial. Rights in private property are more durable than the current majority's notion of what constitutes a worthy cause. As Justice Holmes said in *PENNSYLVANIA COAL CO. v. MAHON*, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." 260 U.S. 393, 416, (1922). *See also ARMSTRONG v. UNITED STATES*, 364 U.S. 40, 49, (1960) (the "Fifth Amendment's guarantee ... [is] designed to bar

---

Act, the railroad corridor would have reverted back to the Plaintiffs in fee, the court finds that a taking under the Fifth Amendment has occurred." *SCHMITT v. UNITED STATES*, 2003 WL 21057368, *8 (2003).

In *SWISHER v. UNITED STATES*, 176 F. Supp. 2d 1100 (Kan. 2001) the court held, "under the Trails Act, the conversion from railroad use to trail use blocks the abandonment of the right-of-way even though conditions for abandonment under state law may otherwise be met. 'But for the negotiation of a trail use agreement, state property law would be revived and, possibly, trigger extinguishment of rights-of-way and the vesting reversionary interest.' In such circumstances, when a reversionary interest is blocked, the interim trail is deemed a taking. Accordingly, the holder of a reversionary interest that does not vest because of trail use (such as the plaintiffs in this case) is entitled to compensation." *Id.* at 1101-02, *citing*, *NAT'L ASSOC. OF REVERSIONARY PROPERTY OWNERS v. SURFACE TRANSP. BD.*, 158 F. 3d 135, 139 (D.C. Cir. 1998), *PRESEAULT II*, at 1550, 1551 and *GLOSEMEYER V. UNITED STATES*, 45 FED. CL. 771, 781 (2000).

government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.")"[50]

The Supreme Court noted that even though Congress possesses eminent domain authority by which to accomplish this taking of Plaintiffs' property, the taking is not free of the government's constitutional obligation to pay "just compensation" to the Plaintiffs.

As the U.S. Supreme Court held in *PRESEAULT I*, "if the rails-to-trails statute gives rise to a taking, compensation is available to petitioners under the Tucker Act…and the requirements of the Fifth Amendment are satisfied."[51]

As Justice Plager wrote for the Federal Circuit in *TOWES*, "[t]he Government has the legal power and is thus free to impose such new uses upon the fee interests held by the adjacent landowners. But the private property interests taken are not free; the Government must pay the just compensation mandated by the Constitution."[52]

The protection of an individuals' right to their property is a foundational concept upon which our Republic is formed. It finds expression in the Fifth Amendment which succinctly provides, "private property [shall not] be taken for public use, without just compensation."

B. <u>Under Kansas Law, The Plaintiff's Land Was No Longer Burdened By A Railroad Easement and, But For the Trails Act and The NITU, They Would Have Enjoyed The Right To Use and Possess Their Land.</u>

The conveyance of a strip of land to a railroad conveys only an easement to use the land for the purpose of operating a railroad. It is a general principle of law that the conveyance of a

---

[50] *GLOSEMEYER*, 45 FED.CL. at 782; see also David A. Thomas, *Why the Public Plundering of Private Property Rights is Still a Very Bad Idea*, 41 REAL PROPERTY, PROBATE AND TRUST J. 25 (SPRING 2006)

[51] *PRESEAULT,* 494 U.S. at 4 (internal citation omitted).

[52] *TOEWS*, 376 F.3d at 1279.

strip of land to a railroad company for a right-of-way does not vest an absolute fee title in the railroad company.[53] The interest conveyed is limited by the use for which the land is acquired.

1. Under Kansas Law, The Hutchinson, Oklahoma, and Gulf Railroad Company and the Hutchinson & Southern Railroad Company Acquired Only an Easement for the Limited Purpose of a Railroad Right-of-Way.

The title to railroad rights-of-ways in Kansas is the same as in most other states where, as Justice Brennan observed in *PRESEAULT I*, "many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property

---

[53] *HARVEST QUEEN MILL & ELEVATOR CO. v. SANDERS*, 370 P.2d 419 (Kan. 1962); *MICHIGAN DEPT. OF NATURAL RESOURCES v. CARMODY-LAHTI REAL ESTATE, INC.*, 699 N.W.2d 272, 279-84 (Mich. 2005); *NEIDER v. SHAW*, 65 P.3d 525, 529-30 (Idaho 2003); *LOVE V. U.S.*, 889 F. Supp. 1548, 1580-81 (E.D.N.C. 1994); *DRAZICH v. LASSON*, 964 P.2d 324, 327 (Utah App. 1998); *HUFF v. LANGMAN*, 646 N.E.2d 730 (Ind. App. 1995). See especially, *PENN CENT. CORP. v. U.S. R.R. VEST CORP.*, 955 F.2d 1158, 1159-60 (C.A.7 (Ind.) 1992) (Posner, J.)

> "The land in question was acquired for railroad use by predecessors of the Penn Central up to a century ago or more under deeds that do not always make crystal clear the nature of the interest conveyed to the railroad. The presumption is that a deed to a railroad or other right of way company (pipeline company, telephone company, etc.) conveys a right of way, that is, an easement, terminable when the acquirer's use terminates, rather than a fee simple. [citations omitted.] Transaction costs are minimized by undivided ownership of a parcel of land, and such ownership is facilitated by the automatic reuniting of divided land once the reason for the division has ceased. If the railroad holds title in fee simple to a multitude of skinny strips of land now usable only by the owner of the surrounding or adjacent land, then before the strips can be put to their best use there must be expensive and time-consuming negotiation between the railroad and its neighbor-that or the gradual extinction of the railroad's interest through the operation of adverse possession. It is cleaner if the railroad's interest simply terminates upon the abandonment of railroad service. A further consideration is that railroads and other right of way companies have eminent domain powers, and they should not be encouraged to use those powers to take more than they need of another person's property-more, that is, than a right of way." (citing *HENRY v. COLUMBUS DEPOT CO.*, 135 Ohio St. 311, 20 N.E.2d 921 (1939) and other authorities.)

reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests . . . ."[54]

The entire right-of-way at issue was created by condemnation. The Hutchinson, Oklahoma, and Gulf Railroad Company and the Hutchinson & Southern Railroad Company acquired the right of way easement by condemnation.

2. The Condemnation Order Only Gave the Railroad an Easement.

Kansas law, like the law of other states, provides that a railroad may obtain land by the exercise of eminent domain or condemnation. Gen. Stat. 1901, §§ 1359 – 1365. When a railroad acquires title to land by condemnation, it acquires only what interest in the land the condemnation statute authorizes the Commissioners to take. In Kansas, the statute limits the Commissioners authority to condemning only an easement for railroad operations and no more.

The Kansas statute authorizing condemnation of railroad rights-of-way provides,

> If such company shall cause the copy of the report, so certified, to be, within ten days after such certifying, filed and recorded in the office of the register of deeds for such county, **it shall have the right to occupy the land so embraced within such route, for the purposes necessary to the construction and use of its road;** and to such portions of such road over which a railroad shall be actually constructed within such time, the **perpetual use of such lands shall vest in such company, its successors and assigns, for the use of the railroad,** as soon as so much of such railroad shall have been constructed fit for use. 1901 Gen. Stat. §1362 (emphasis supplied).

The Kansas Supreme Court held in *HARVEST QUEEN MILL & ELEVATOR v. SANDERS,* 189 Kan. 536, 541-42, 370 P.2d 419, 423-24 (Kan. 1962):

> We have held that when land is devoted to railroad purposes it is immaterial whether the railway company acquired it by virtue of an easement by condemnation, right-of-way deed, or other conveyance. If or when it ceases to be used for railway purposes the land concerned returns to its prior status as an integral part of the freehold to which it belonged prior to its subjection to use for

[54] *Id.* at 8.

> railway purposes. This court has uniformly held that railroads do not own fee title to narrow strips taken as right-of-way, regardless of whether they are taken by condemnation or right-of-way deed. The rule is in conformity with this state's long-standing public policy and gives full effect to the intent of the parties who execute right-of-way deeds rather than going through lengthy and expensive condemnation proceedings. * * *
>
> Generally, a railroad company in acquiring land for railroad right-of-way, whether it be by grant or condemnation proceedings, is held to take not the fee, but only a special interest therein usually termed an "easement," which special interest or title is taken for railroad purposes, that is, public purposes, so that the railroad has no right to take from such right-of-way any underlying minerals and appropriate them to its own use or convey them to others. (citations omitted)

The Condemnation Order that created the Hutchinson, Oklahoma, and Gulf Railroad Company's and the Hutchinson & Southern Railroad Company's right-of-way created only an easement pursuant to the authority of the Kansas condemnation statutes which did not authorize the condemnation of any interest in land greater than an easement for railroad purposes.

In *ABERCROMBIE v. SIMMONS*, 71 Kan. 538, 81 P. 208 (1905), the Kansas Supreme Court issued its seminal decision defining what interest a railroad acquired in property for a right-of-way. "The grant does not ordinarily vest a fee in the company, but vests such an estate, usually an easement, as is requisite to effect the purpose for which the property is required. *** Whatever its name, the interest was taken for use as a right of way, it was limited to that use, and must revert when the use is abandoned." *ABERCROMBIE*, 71 Kan. 538, 81 P. 208.

The well-settled rule in Kansas is that "when a railroad acquires land by virtue of an easement, condemnation, right-of-way or other conveyance, the railroad does not obtain a fee simple title to the right of way." *MILLER v. ST. LOUIS, SOUTHWESTERN RY. CO.*, 239 Kan. 198, 201, 718 P. 2d 610, 612 (1986).[55]

---

[55] Kansas law on this point is in accord with that of virtually every other state. See, for example, *BUHL ET AL v. U.S. SPRINT COMM. CO.*, 840 S.W. 2d 904 (1992, Tenn), *RUTLAND RAILROAD CO. v. CHAFFEE*, 71 Vt. 84 (1899) (followed and affirmed by *DESSUREAU v. MAURICE MEMORIALS, INC.*,

3. Under Kansas Law, The Hutchinson, Oklahoma, and Gulf and The Hutchinson & Southern Railroad Right-of-Way Easement was Abandoned.

The Federal Circuit in *PRESEAULT II* noted that, "[t]he usual way in which such an easement ends is by abandonment, which causes the easement to be extinguished by operation of law."[56] The *PRESEAULT II* court held that, upon an act of abandonment, the then owner of the fee estate is relieved of the burden of the easement.[57] In most jurisdictions, the reversion is automatic upon abandonment.[58]

In *PRATT v. GRIESE*, 196 Kan. 182, 409 P2d 777 (1966), the Kansas Supreme Court ruled that Kansas law is consistent with the Federal Circuit's observation in *PRESEAULT II.* Namely, that when a railroad ceases railroad operations over a right-of-way, the easement is abandoned and extinguished and the "property reverts to the owner of the servient estate." The *PRATT* court wrote,

> However created, an easement for a railroad right of way is limited by the use for which the easement is acquired, and when that use is abandoned the easement is terminated and the property reverts to the owner of the servient estate. *** In 74 *C.J.S.* Railroads § 117, pp. 541-542, it is stated: 'Whether a right of way has been abandoned by a railroad company is largely a question of intent, and it is generally held that in order to constitute an abandonment there must be an intent to relinquish, together with external acts by which the intent is carried into effect.'
>
> A rule found in the overwhelming majority of cases on the subject is that evidence of an intention to abandon an easement for a railroad right of way may be found in the deliberate removal of tracks rendering the operation of a railroad impossible.

---

132 Vt. 350, 351, 318 A. 2d 62, 654 (1974), *DICKERMAN v. TOWN OF PITTSFORD,* 116 Vt. 563, 566, 80 A. 2d 29, 532 (1951)), *BROWN v. WEARE*, 348 Mo. 135, 152 SW 387 (1923), *MOORE v. FRIENDS OF WABASH TRACE NATURE TRAIL, INC.*, 991 S.W. 2d 681 (Mo. App. W.D., 1999), *JORDAN v. STALLINGS*, 911 S.W. 2d 653 (Mo. App. 1995), *Mich. DNR v. Carmody-Lahti Real Estate, Inc.*, 472 Mich 359, 699 N.W. 2d 272 (Mich, 2005), *MAHAR v. GRAND RAPIDS TERMINAL R. CO.*, 174 Mich 138, 140 N.W. 2d 535 (1913), *U.S. v. MAGNOLIA PETROLEUM CO.*, 110 F 2d 212 (1939, 10th Cir, (OK)).

[56] 100 F.3d at 1543 (*citing* RESTATEMENT OF PROPERTY § 504).

[57] *Id.*

[58] *Id.*

> *** "' A cesser of the use, coupled with any act clearly indicative of an intention to abandon the right, would have the same effect as an express release of the easement, without any reference whatever to time.' And this seems to be in accordance with authority as well as reason." ***
>
> Other conduct may be indicative of abandonment. In the oft-cited *Abercrombie* case, wherein a railroad company failed to construct a railroad on a right of way obtained by it and later by deed conveyed the right of way to plaintiff, a private individual..." *** a railway company operated its railroad on the right of way in question until June, 1931; it removed the track later that year and in 1935 attempted to convey the right of way to an association for the purposes of a national park. It was held by these acts to have abandoned the right of way. *PRATT*, 409 P.2d at 780-81.[59]

In *GLOSEMEYER* Judge Bruggink considered the railroad's filing with the STB of a statement of its intent to abandon railroad service over the corridor as an expression of its intent to abandon the easement to use the land for railroad operations. Judge Bruggink stated:

> [t]he railroads' applications to the ICC for authority to abandon are clear evidence of intent to abandon their easements. The applications are full of statements which unequivocally signify intent to abandon. When a railroad's application for abandonment states that there is 'no feasible alternative' to abandonment, that it seeks to 'physically' abandon a rail line, or that it is 'not possible to operate [a] line profitably in the future,' a reader is left with no choice but to conclude that the railroad intends to abandon the rail line. ***
>
> The fact that no trains have been run over these easements for years is strong evidence of abandonment. '[A railroad right-of-way] easement is extinguished when the railroad ceases to run trains over the land.'
>
> These facts compel the court to find that the railroads intended to abandon, and in fact did abandon, their easements. There is no contrary evidence offered of any

---

[59] Citing, *ABERCROMBIE, CANTON CO. OF BALTIMORE v. BALTIMORE & O. R. CO.*, 1904, 99 Md. 202, 218, 57 A. 637, 639, and *MAMMOTH CAVE NAT. PK. ASS'N v. STATE HIGH. COMM.,* 261 Ky. 769, 88 S.W.2d 931). See also, *LAWSON v. STATE*, 107 Wash. 2d 444, 730 P.2d 1308 (1986) in which the Washington State Supreme Court, *en banc*, held, "a change in use of a railroad right of way to a recreational trail or nature trail is a change in use evidencing abandonment of the right of way." *POLLNOW v. DEPARTMENT OF NATURAL RESOURCES*, 88 Wis. 2d 350, 276 N.W. 2d 738 (1979) and *SCHNABEL v. COUNTY OF DU PAGE*, 101 Ill . App. 3d 553, 428 N.E. 2d 671 (1981).) Both *POLLNOW* and *Lawson* were cited as authority by the Federal Circuit in *PRESEAULT II.*

> intent to begin the rebuilding process that would be necessary to run trains once again.[60]

In this case, there is no question that the railroad has abandoned the right-of-way easement. Most obviously, the railroad has conveyed its interest in the land to a non-railroad for a non-railroad use as a public recreational trail[61], the STB found that no railroad traffic had used the right-of-way in more than two years[62] and BNSF sought permission from the STB to abandon railroad service over the right-of-way[63].

C. <u>A Landowner's Claim For Compensation For A Taking Of Their Land Arises Upon The STB's Issuance Of The Original NITU.</u>

Major-General William B. Caldwell, III and his family owned property in Columbus, Georgia.[64] A portion of the Caldwell family property was subject to a railroad easement that the Norfolk Southern used for operation of a railroad.[65] The Norfolk Southern abandoned this easement but the federal government appropriated the Caldwell property by operation of the Trails Act to be part of the "CATS" plan, which included construction of pedestrian walkways and bikeways across the Caldwell property and also created an easement for operating a railroad or light rail across the Caldwell property in the future.[66]

The Justice Department successfully prevented the Caldwell family from receiving "just compensation" for this taking of their property by arguing that the statute of limitations had run on the Caldwell's ability to make a claim for "just compensation". The Caldwell's case provided

---

[60] *GLOSEMEYEr*, 45 Fed.Cl. at 777. (citations omitted).
[61] *See* Plaintiffs' Proposed Findings of Fact, at ¶25-27, and Tab N.
[62] *Id.*. at ¶19, and Tab K.
[63] *Id.*, at ¶18, and Tab K.
[64] *See CALDWELL V. UNITED STATES*, 391 F.3d 1226 (Fed. Cir. 2004).
[65] *Id.*
[66] *Id.*

the Federal Circuit opportunity to determine at what point the Trails Act takes a property owner's land and at which time the property owner's claim for compensation arises.[67]

The Caldwell's argued that their claim for a taking of their property accrued when the deed from the railroad to the trail sponsor – The Public Trust for Land - was recorded.[68] "Caldwell asserts that his claim did not accrue until title to the rail corridor changed hands in October, 1996. *** On appeal, Caldwell contends that the potential taking occurs when 'the railroad actually turns the easement over to trail use.'"[69]

The Justice Department argued that a property owner's claim for a taking of their property by operation of the Trails Act occurred when the NITU was consummated by the trail user and railroad reaching a Trail Use Agreement. "[T]he government's liability (if a taking occurred) was fixed when the City and Norfolk Southern entered into a trail use agreement, not when the ICC issued the NITU and not when the deed to the corridor changed hands."[70]

Judge Christine Miller ruled, "that the statute of limitations began to run on Caldwell's taking claim on July 5, 1996, when the City notified the ICC that it had reached a trail use agreement with Norfolk Southern." The court reasoned that "the NITU takes effect only if the right-of-way meets the criteria for abandonment and negotiation of trail use occurs.' It is when the parties reach a trail use agreement that the "taking becomes fixed * * *. Before that date the outcome of the Government action is not certain, so the taking has not been effected."[71]

---

[67] This statement of the facts in *CALDWELL* is taken from the Department of Justice brief, which they filed with the Federal Circuit in *CALDWELL V. UNITED STATES*, 391 F.3d 1226 (Fed. Cir. 2004).

[68] *CALDWELL*, 391 F.3d 1226.

[69] Appendix B, Brief of Appellee, The United States, in *Caldwell* v. U.S., at 23.

[70] *Id.* at 16-17.

[71] *Id.* at 12.

The Justice Department agreed. "The trial court held correctly that Caldwell's taking claim accrued when Norfolk Southern and the City reached a trail use agreement, no later than July 5, 1996. It is when the parties reach a trail use agreement (if ever) that the underlying landowner's reversionary rights are preempted by federal law."[72]

"In other words, the NITU provides time for the parties to negotiate, but until they reach an interim trail use agreement the NITU is effectively inchoate; the underlying landowner's reversionary rights might still vest after the negotiation period ends if there is no trail use agreement and the rail carrier abandons the line. Accordingly, the CFC held correctly that it is when the parties reach a trail use agreement that the underlying landowner's reversionary rights are preempted, if ever."[73] "Here, however, there was no agreement when the NITU was issued, and, therefore, the CFC held correctly that the taking claim accrued (if at all) when the parties reached a trail use agreement. It was then (if ever) that federal law preempted Caldwell's reversionary rights under state law."[74]

The Justice Department argued that, while its position may deny General Caldwell and his family "just compensation", it nonetheless was in the best interest of other property owners. The Justice Department argued that, "Under Caldwell's view [that a taking occurred only after the deed from the railroad to the trail user had been recorded], land owners might be forced to wait for years after a Trails Act agreement is reached until a trail is fully developed before they can file takings claims alleging that their reversionary interests have been preempted. That

---

[72] *Id.*
[73] *Id.* at 18.
[74] *Id.* at 20.

approach might be in Caldwell's interest in this case, but it does not benefit land owners whose attorneys file timely complaints."[75]

The Federal Circuit did the unexpected. On December 14, 2004 it rejected Judge Christine Miller's and the Justice Department's position that the taking occurs when a Trail Use Agreement is reached. The Federal Circuit also rejected General Caldwell's position that the taking did not occur until the deed was recorded and title to the property transferred. Judge Dyk, joined by Judge Prost, wrote,

> Caldwell urges that a taking under the Trails Act did not occur until the railroad line right-of-way was actually converted into a trail for interim trail use *** We disagree. The taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when the state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. The question, then, is in the context of an exemption proceeding, when are state law reversion interests forestalled by operation of section 8(d) of the Trails Act? We conclude that this occurs when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d). (citing *PRESEAULT* and *TOEWS*).[76]

Judge Dyk reiterated this conclusion when he wrote, "We hold that the Fifth Amendment taking, if any, under the Trails act is accomplished when an NITU is issued and state law reversionary interest that would otherwise take effect pursuant to normal abandonment proceedings are forestalled."[77]

---

[75] *Id.* at 25.

[76] *CALDWELL*, 391 F.3d at 1233.

[77] *CALDWELL*, 391 F.3d at 1236. Judge Newman disagreed. She authored a dissent which concluded that, "All authority is contrary to this position [of the majority]". General Caldwell sought re hearing *en banc* which was denied by the Federal Circuit. General Caldwell then appealed to the U.S. Supreme Court. The Supreme Court denied cert. 546 U.S. 826 (2005) (mem.). After the *CALDWELL* decision was issued, the Justice Department abandoned its view that the Trail Use Agreement was the "date of taking" in a Trails Act case. The Justice Department embraced the view of the *CALDWELL* majority and applied that ruling retroactively to

The same panel (Judges Dyk, Prost and Newman) had opportunity to reconsider this question in two cases consolidated for appeal. *BARCLAY v. UNITED STATES*, 443 F.3d 1368 (2006) and *RENEWAL BODY WORKS, INC. v. UNITED STATES*, 443 F.3d 1368 (2006). These cases concerned Trails Act taking cases in California (in the case of *RENEWAL BODY WORKS*) and Kansas (in the case of the *BARCLAY* property owners).[78]

In *BARCLAY*, Judge Dyk again authored the majority decision joined by Judge Prost over Judge Newman's dissent. The majority reaffirmed, "we adhere to *CALDWELL* and hold that the issuance of the original NITU triggers the accrual of the cause of action."[79] The court held to the original NITU as establishing the date of taking even though it was modified by subsequent NITU's and subsequent decisions of the STB:

> The Barclay appellants contend that their claim did not accrue until the petition to reopen [abandonment proceedings] was finally denied on May 8, 2001, even though the original NITU as extended by the replacement NITU never ceased to be effective. This is merely another version of the argument – rejected in Caldwell – that the original NITU should not be viewed as the taking because subsequent events might render the NITU only temporary. The [property owner's] claims accrued when the original NITU issued, regardless of the petition to reopen.[80]

---

defeat the right of property owners to receive "just compensation" in three other Trails Act cases that were pending when *Caldwell* was decided. To wit: *ILLIG v. UNITED STATES*, 98-934L, *see* July 27, 2005 order filed by Judge Bruggink, *BARCLAY v. UNITED STATES*, 443 F.3d 1368 (2006) and *RENEWAL BODY WORKS, INV. v. UNITED STATES* 6443 F.3d 1368 (2006). Counsel for the property owners in this case are also counsel for the property owners in *Illig*. The position of counsel in this case acknowledging that *CALDWELL, BARCLAY* and *RENEWAL BODY WORKS* are the current law of the Federal Circuit does not mean that counsel agrees with the decision of the majority in *CALDWELL, BARCLAY* and *RENEWAL BODY WORKS*.

[78] *RENEWAL BODY WORKS* involved a stretch of the same abandoned railroad easement that was involved in *Toews*.

[79] *BARCLAY*, 443 F.3d at 1378.

[80] *Id.* Judge Newman again dissented. The *BARCLAY* property owners appealed to the U.S. Supreme Court but cert was denied. *BARCLAY V. U.S.*, 127 S.Ct. 1328 (U.S. Feb. 20, 2007) (No. 06-816)).

Recently, on April 23, 2008, the Department of Justice along with the Department of Interior submitted to the U.S. Senate Subcommittee on National Parks of the Senate Committee on Energy and Natural Resources a statement against legislation pending before the Senate – Senate Bill 2073.[81] In its statement the Department of Justice argued:

> The appeals court [in *Caldwell*] found the triggering event to be when the STB issued the NITU because that decision forestalled the abaondonment proceedings and precluded any state law reversionary interests from taking effect. *** As a result of the Caldwell and Barclay decisions, no confusion remains in the law regarding accrual of rails-to-trails takings claims.[82]

All parties agree that the "date of taking" is important not only to determine the date when a cause of action accrues for purposes of the statute of limitations but the question of when the taking occurred, however, also relates to the amount of compensation and the calculation of pre-judgment interest. Thus, the issue in this case extends beyond the narrow circumstances presented here.[83]

In *CALDWELL, BARCLAY* and *RENEWAL BODY WORKS*, the Federal Circuit has clearly concluded that the federal government takes an interest in property owners land and that property owner has a claim for "just compensation" upon the STB's issuance of the original NITU. In this case, that occurred on September 13, 2004.

The Federal Circuit affirmed its holding in *CALDWELL* in *BARCLAY*, a case dealing with several trails in the State of Kansas. In its brief to the Federal Circuit in that case, the Department of Justice argued, "Binding Circuit precedent establishes the accrual date of a taking

---

81 A copy of this Statement to the U.S. Senate Subcommittee on National Parks of the Senate Committee on Energy and Natural Resources dated April 23, 2008, is attached at Appendix C.

82 *Id.* at p. 2.

83 See also *MILLER V. UNITED STATES*, 67 Fed. Cl. 542 (2005) (J. Bruggink) where the "change in the law" announced by the Federal Circuit in *Caldwell* required that the class be recertified with a new date of taking and new notice and entry by those property owners which held title on the date of the NITU not the later date of the Trail Use Agreement, as had been earlier certified in the case prior to *Caldwell*. This was so even though a statute of limitations question was not involved in that case.

claim for trail conversion under the Trails Act as the date when the STB issues a Notice of Interim Trail Use."[84]

In that brief, the government wrote, "Unlike the usual physical occupation case, the landowners in a Trails Act takings case is already deprived of possession. Thus, the question is not when the owner loses the right to possess the property (since he is already not in possession), but rather when he would otherwise have recovered ownership of the easement were it not for the operation of the Trails Act."[85]

Furthermore, the Department of Justice took the position that the *CALDWELL* decision created "a favorable rule for property owners", stating that under *CALDWELL* Landowners "have legal recourse much earlier."[86]

The *BARCLAY* plaintiffs, who were ultimately barred from receiving compensation for their property because they were found to have filed their claim outside the statue of limitations, argued that the claim for a permanent taking should not accrue until a Trail Use Agreement was reached. The government argued to the Federal Circuit that such a rule would be a "disservice" to property owners and in some cases "future landowners would have to wait years in some cases in order for their takings claims to be ripe by waiting until abandonment is completed or the right-of-way is transferred."[87] Finally, the government stated that waiting until a Trail Use Agreement was reached before bringing a takings claim "would require landowners to delay their suits unnecessarily until a trail use agreement is reached, which could potentially take years during which the landowners' property rights have been interfered with."[88]

---

84 Appendix C, Brief of Appellee, The United States, in *BARCLAY V. U.S.*, 443 F.2d 1368 (2005).
85 Appendix D., Brief of Appellee, The United States, in Opposition to Rehearing *En Banc* in BARCLAY V. UNITED STATES, at p. 5.
86 Appendix C, p. 31, fn. 10.
87 *Id.*
88 Appendix E, Appellee's Brief in Response to *Amicus Curiae* in *BARCLAY V. UNITED STATES.*

The Federal Circuit has determined that the original NITU gives rise to a taking claim notwithstanding whether the railroad and the trail user have reached an agreement to use the abandoned right-of-way for a public access recreational trail in the future. According to the Federal Circuit, the federal government's taking of the Plaintiff's property occurred when the NITU was issued. In this case, that means every property owner in Reno County, Kansas whose land was in this case subject to the original April 5, 2004, NITU had their "reversionary" right to their property taken by operation of the Trails Act. All these property owner's are entitled to "just compensation."

D. <u>The Trails Act and The STB's Issuance of A NITU Is A *Per Se* Physical Taking of The Plaintiff's Land.</u>

1. Railroad right-of-way easements are *sui generis*; the easement holder has a perpetual and exclusive right to possess the property while used for operation of a railroad.

So long as the easement is in force, a railroad easement is a unique type of interest in land that grants the holder of the easement the perpetual and exclusive right to use and possess the property for the operation of a railroad. This right allows the holder of a railroad easement to exclude others, including the fee owner from the land.[89]

---

[89] See, *HARTFORD FIRE INSURANCE CO. V. CHICAGO, MILWAUKEE & ST. PAUL RY. CO.* 175 U.S. 91 (1899) at 98, "A railroad corporation holds its station grounds, railroad tracks, and right of way for the public use for which it is incorporated, yet as its private property, and to be occupied by itself or by others in the manner which it may consider best fitted to promote, or not to interfere with, the public use. It may, in its discretion, permit them to be occupied by others with structures convenient for the receiving and delivering of freight upon its railroad, so long as a free and safe passage is left for the carriage of freight and passengers. *** But it is not obliged, and cannot even be compelled by statute, against its will, to permit private persons or partnerships to erect and maintain elevators, warehouses, or similar structures for their own benefit, upon the land of the railroad company." (citations omitted).

See also, *PRESEAULT V. UNITED STATES*, 24 Cl. Ct. 818 (1992) in which Judge Nettesheim noted, "Although it is clear that ownership of a perpetual easement may offer rights similar to those held by owners of fee simple, the property interest held by the railroad is not the same as a fee simple. Obviously, a railroad company must have exclusive access to its tracts and machinery.

This unique exclusive and perpetual nature of railroad easements was recognized by the Kansas Supreme Court in *ABERCROMBIE*, 71 Kan. at 546, 81 P. at 211:

> A [railroad] right of way, although commonly designated as an easement, is an interest in land of a special and exclusive nature, and of a high character. In speaking of its character the Supreme Court of the United States said: 'A railroad right of way is a very substantial thing. It is more than a mere right of passage. It is more than an easement. We discussed its character in *NEW MEXICO V. UNITED STATES TRUST CO.*, 172 U.S. 171. We there said that if a railroad's right of way was an easement it was 'one having the attributes of the fee, perpetuity and exclusive use and possession; also the remedies of the fee, and, like it, corporeal, not incorporeal, property.[90]

Judge Eric Bruggink had before him in *ILLIG*[91] the question of what right the fee owners of land had to use property which had been taken by operation of the Trails Act during the period it was subject to interim trail use. Judge Bruggink answered this question by holding that the land – even while used for a trail – was still a "virtual railroad" and the trail sponsor held the same right to the land – and to exclude the fee owners form the land – that was held by a railroad.

Judge Bruggink recognized that the purpose of the Trails Act was to perpetuate a railroad easement, even during the interim when the land was available for use as a public recreational trail. As such, the Trails Act perpetuated the unique and exclusive nature of the railroad easement in favor of the easement holder and against the fee owner.

What was imposed on plaintiffs' land was a new easement which purported to preserve railroad use. The Trails Act was enacted in order to "to preserve established railroad rights-of-way for future reactivation of rail service, [and] to protect rail transportation corridors." 16 U.S.C. §1247(d). Although we have previously found that interim trail use or railbanking, was

---

The ingress and egress of the general public, however, are limited by the nature of the use of the easement. The conveyance remains an easement, and either the grantor or his successors retains reversionary rights therein." At 826.

[90] See also, *WESTERN UNION TELEGRAPH CO. V. PENN RR. CO.* 195 U.S. 540, 570 (1904).

[91] *Infra* at n. 47.

not a legitimate railroad purpose, *GLOSEMEYER V. UNITED STATES*, 45 Fed. Cl. 771 (2000), the stated intent of the government in creating the Trails Act was to preserve railroad rights-of-way as they existed. *See* 16 U.S.C. §1247(d) (stating that "if . . . interim trail use is subject to restoration and reconstruction for railroad purposes, such interim use shall not be treated . . . as an abandonment of the use of such rights-of-way for railroad purposes."). Although interim trail use of the railroad corridor was authorized by the Trails Act through the NITU issued here, the use of the easement for trail purposes is subject to the future restoration of rail services. *See id.*; 49 C.F.R. § 1152.29(a)(3). The clear implication is that defendant wished to maintain the status quo, securing for Trailnet whatever rights MoPac previously held in the easement.

The new easement, in short, was intended to be capable of functioning at a later date as a railroad easement. The Trails Act and its implementing regulations require trail sponsors to assume "full responsibility" for managing the right-of-way and for any legal liability arising out of the right-of-way. 49 C.F.R. § 1152.29(a)(2). As part of this responsibility, a trail sponsor must also make assurances that the right-of-way is kept available for "future reconstruction and reactivation . . . for rail service." *Id.* § 1152.29(a)(3). In order to meet these requirements, we believe the Trails Act and its implementing regulations require that a trail sponsors must have the same control over the entire right-of-way corridor that would be held by a railroad in order that the trail sponsor can ensure that any and all uses made of the right-of-way are consistent with the restoration of rail service. As discussed above, under Missouri law, such control is exclusive. We therefore conclude that the Trails Act imposed a new easement across plaintiffs' properties which retained essentially the same characteristics as the original easement, both in location and exclusivity. *ILLIG*, Order (December 3, 2002) (J. Bruggink).

Thus, when the STB issued the NITU, it had the effect of perpetuating an exclusive railroad easement and precluding the fee owners "reversionary" right to the property. The fee owners had no more right to access or possess the land after the issuance of the NITU than they

did before the NITU when the right-of-way was being actively used for a railroad. As the Justice Department itself noted, "Unlike the usual physical occupation case, the landowners in a Trails Act takings case is already deprived of possession. Thus, the question is not when the owner loses the right to possess the property (since he is already not in possession), but rather when he would otherwise have recovered ownership of the easement were it not for the operation of the Trails Act."[92]

The Federal Circuit has made it clear in *CALDWELL*, *BARCLAY* and *RENEWAL* that the fee owners lose their right to "recover ownership" of the land when the STB issues the NITU.

2. The Trails Act takes from the fee owner their right to exclude others from the land and actually excludes the fee owners from their land, this is a per se physical taking of the land which occurs upon the STB issuing the NITU.

One of the most fundamental aspects of property ownership is the right to exclude others. In *KAISER AETNA ET AL. v. UNITED STATES*, 444 U.S. 164 (1979) the Supreme Court wrote, "[W]e hold that the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation.[93] This is not a case in which the Government is exercising its regulatory power in a manner that will cause an insubstantial devaluation of petitioners' private property; rather, the imposition of the navigational servitude in this context will result in an actual physical invasion of the privately owned marina. And even if the Government physically invades only an easement in property, it must nonetheless pay just compensation. See *UNITED STATES v. CAUSBY*,

[92] Appendix D, p. 9.

[93] See generally Richard A. Epstein, TAKINGS: PRIVATE PROPERTY AND THE POWER OF EMINENT DOMAIN, Harvard Univ. P. (1985).

328 U.S. 256, 265 (1946); *PORTSMOUTH CO. v. UNITED STATES*, 260 U.S. 327 (1922)." (Several other citations omitted).[94]

In *LORETTO v. TELEPROMPTER MANHATTAN CATV CORP.*, 458 U.S. 419 (1982), Justice Marshall, writing for the Court, said: "We affirm the traditional rule that a permanent physical occupation of property is a taking. In such a case, the property owner entertains a historically rooted expectation of compensation...." *LORETTO*, 458 U.S. at 441 (cited by the Federal Circuit in *PRESEAULT II*, 100 F.3d at 1540; see also *PUMPELLY v. GREEN BAY & MISSISSIPPI CANAL COMPANY*, 80 U.S. 166 (1871).

The Supreme Court has recognized the right to exclude is a fundamental feature of property ownership. See *BOYD V. U.S.,* 116 U.S. 616, 630 (1886) *quoting*, *ENTICK v. CARRINGTON 19 Howell's State Trials 1029*, 95 Eng. Rep. 807 (C.P. 1765), and adopted by U.S. Supreme Court in *BROWER v. COUNTY OF INYO*, 489 U.S. 593, 596 (1989).

The Supreme Court has made it clear that a "physical taking occurs when the government's action amounts to a physical occupation or invasion of the property, including the functional equivalent of a 'practical ouster of [the owner's] possession.' *TRANSP. CO. v. CHICAGO*, 99 U.S. 635, 642 (1878); *LORETTO*, 458 U.S. 419. When an owner has suffered a physical invasion of his property, courts have noted that 'no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation.' *LUCAS V. S.C. COASTAL COUNCIL*, 505 U.S. 1003, 1015 (1992)." *TULARE LAKE BASIN WATER STORAGE DIST. v. UNITED STATES*, 49 Fed. Cl. 313, 318 (2001).

The right to exclude others is important in the context of Trails Act takings because the Trails Act not only "forestalls" or "precludes" a property owner from enjoying their state law

---

94 Citing for additional authority at footnote 11, "As stated by Mr. Justice Brandeis, '[a]n essential element of individual property is the legal right to exclude others from enjoying it.' *INTERNATIONAL NEWS SERVICE v. ASSOCIATED PRESS*, 248 U.S. 215, 250 (1918).

"reversionary" right to their property (including the right to exclude others from their property). But, the STB's issuance of the NITU converts a property owner's right to exclude others from their land to the situation where the trail sponsor (in this case the City of South Hutchinson) gains the right to exclude the fee owner from that fee owner's land. Excluding a property owner from their land is a *per se* physical taking.

But, the Trails Act also imposes two new servitudes upon the fee owners' property. The first new easement is for a public-access recreational trail and the second is a new easement for a potential future railroad across the land. Both of these are an additional *per se* physical taking of the owners' property. The owner's property (for many a portion of their residence) is now subject to a right of the general public to physically occupy and use the property for a recreational trail as well as a future possibility of a railroad being built on the property. This is a very substantial *per se* physical intrusion into an owner's property.

Under Kansas law Dorothy Biery and the other Plaintiffs enjoyed the right to possess and occupy their land when the railroad easement was abandoned. However, by operation of the Trails Act, they have lost this right and are now excluded from their own property. The trail sponsor, the City of South Hutchinson, has asserted exclusive possession of the right-of-way. This is a *per se* physical taking of the Plaintiffs' land and one for which they are entitled to "just compensation."

3. The Department of Justice agrees that, after *CALDWELL*, a landowners claim for a *per se* permanent physical taking of their land arises when the NITU is issued – even when a Trail Use Agreement has not been reached and no trail has been constructed.

The *MILLER v. UNITED STATES*[95] Trails Act class action taking case was pending at the time the Federal Circuit issued its decision in *CALDWELL*. *MILLER* was a class action premised

[95] *See* Appendix F, which contains the following documents filed in *MILLER V. UNITED STATES*, No. 03-2489L (Fed. Cl.) (1) Defendant's Status Report and Motion to Stay; (2) Defendant's

upon the pre-*Caldwell* understanding that the "date of taking" in a Trails Act taking case, occurred upon the railroad and a trail sponsor reaching a Trail Use Agreement. In *MILLER* the STB issued the NITU on August 18, 1999, but a Trail Use Agreement was not reached until almost two years later. The "date of taking" was used to determine: (1) the date upon which a property owner must hold title, (2) was the date upon which the property interest was valued, (3) was the date when the government's interest obligation began to run.

In *MILLER* the government did not dispute its liability for a permanent *per se* physical taking of the class members land by operation of the Trails Act. *MILLER* was proceeding to the damages and property valuation stage when the Federal Circuit issued its decision in *CALDWELL,* On the basis of *CALDWELL* the Justice Department filed a motion to reopen the *MILLER* class and amend the "date of taking" to be the date of the NITU not the later date of the Trail Use Agreement.[96] Judge Bruggink reopened the class, ordered a new notice to be sent and those landowners that held title on the later date of the Trail Use Agreement but not on the date of the NITU were dismissed from the case. Other landowners that held title to the land on the date of the NITU but not the later date of the Trail Use Agreement were allowed to join the class.[97] When the property was valued and interest calculated, the date of the NITU was used.

*MILLER* is noteworthy because it involved a permanent *per se* physical taking of the property owner's land. The Department of Justice agreed (in fact, they were the moving party that sought to have) the landowner's claims for a permanent *per se* physical taking determined on the date that the NITU was issued – even though on this date no Trail Use Agreement had been reached and even though no trail had been constructed. Those landowners who held title to

---

Motion to Dismiss and Memorandum in Support; and (3) Judge Eric Bruggink's Order issued November 2, 2005.

[96] See, Appendix F, Defendant's Status Report and Motion to Stay, at ¶ 13; and Defendant's Motion to Dismiss and Memorandum in Support, at p. 2.

[97] See, Appendix F, Judge Bruggink's Order issued November 2, 2005, at ¶ 4.

property on the NITU date, even though they no longer owned the land on the later date of the Trail Use Agreement, received full "just compensation" for a permanent *per se* taking of their land. This was a result that the Department of Justice not only agreed to, but sought. As noted in their motion, the Justice Department took this position because they believed it was compelled by the *Caldwell* decision. Judge Bruggink agreed and so do the Plaintiffs in this case.

The Justice Department continues to embrace the Federal Circuit's holding in *Caldwell.* Recently, on April 23, 2008, Daniel Wenk, Deputy Director of the National Park Service at the Department of Interior, submitted to the U.S. Senate Subcommittee on National Parks of the Senate Committee on Energy and Natural Resources a statement (incorporating by reference a letter written by Assistant Attorney General William E. Moschella on behalf of the Department of Justice) arguing against legislation, Senate Bill 2073, the Trails Act Technical Correction Act of 2007.[98] In its statement, a letter to House Committee Chairman Nunes, Mr. Wenk stated:

> The appeals court [in *Caldwell*] found the triggering event to be when the STB issued the NITU because that decision forestalled the abandonment proceedings and precluded any state law reversionary interests from taking effect. *** As a result of the Caldwell and Barclay decisions, no confusion remains in the law regarding accrual of rails-to-trails takings claims.[99]

So long as *CALDWELL* (and *BARCLAY* and *RENEWAL)* are binding precedent a similar result should occur here. A permanent *per se* physical taking of a property owner's land occurs upon the STB' issuance of a NITU.[100]

---

[98] A copy of this Statement of Daniel Wenk to the U.S. Senate Subcommittee on National Parks of the Senate Committee on Energy and Natural Resources dated April 23, 2008, is attached at Appendix C.

[99] *Id.* at p. 2.

[100] The Federal Circuit allowed for the possibility of a temporary physical taking if the NITU was not consummated with a Trail Use Agreement. However, in this case there is both a NITU and a Trail Use Agreement.

## V. CONCLUSION

We began this memorandum by noting that summary judgment can be entered against the federal government on the basis of four points of uncontested fact and four settled principles of law. This motion presents this court with precisely the same question that a similar motion presented Judge Bruggink in the Missouri cases of *GLOSEMEYER*, *GRANTWOOD VILLAGE*, *MOORE*, and *ILLIG*. It presents this court with the same question presented to the Federal Circuit in *TOWES, HASH,* and *PRESEAULT II*. We are not asking this Court to plow new ground. The law and facts are settled.

Namely, in Judge Bruggink's straightforward formulation, "[h]aving established that the easements would have been extinguished, and thus that, but for the application of the Rails-to-Trails Act, the plaintiffs would have been seized of their lands without any restrictions, we have little difficulty concluding that a taking has occurred."

As we have demonstrated above, a similar result is warranted in this case. However, under Kansas law the Plaintiffs would have been seized of their lands without any restrictions after railroad service over the easement was abandoned. The Defendant, by operation of the Trails Act, has taken the Plaintiffs' property. The Fifth Amendment requires that the federal government to pay the Plaintiffs "just compensation" for this taking. This entry of partial summary judgment rests upon uncontroverted facts and settled law.

The Plaintiffs request that this Court enter judgment against the Defendant on the issue of the Defendant's obligation to pay "just compensation" to the Plaintiffs for the taking of the Plaintiff's property. The Plaintiffs further request that this court order this case to proceed to the damage phase and determine the value of the property that the federal government has taken from the Plaintiffs.

Respectfully submitted,

LATHROP & GAGE, L.C.

*<u>/s/ Mark F. (Thor) Hearne, II</u>*
MARK F. (THOR) HEARNE, II
LINDSAY S.C. BRINTON
MEGHAN S. LARGENT
The Equitable Building
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
Telephone: (314) 613-2500
Facsimile: (314) 613-2550
Thornet@ix.netcom.com

Attorney for Plaintiffs