IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DOROTHY L. BIERY, et al., | |
| and | |
| JERRAMY PANKRATZ and ERIN PANKRATZ, et al., | |
| | Case No. 1:07-cv-693 |
| Plaintiffs, | |
| | (consolidated with: Case No. 07-675L) |
| v. | |
| | Honorable Nancy B. Firestone |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

KRISTINE S. TARDIFF
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL:(603) 230-2583/FAX: (603) 225-1577
E-MAIL: kristine.tardiff@usdoj.gov

AYAKO SATO
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
60 D Street, N.W., 3rd Flr. Room 3133
Washington, DC 20004
TEL:(202) 305-0239/FAX: (202) 305-0506
E-MAIL: ayako.sato@usdoj.gov

Dated: June 2, 2008

# TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF ARGUMENT. . . . . . 1

II. STATUTORY BACKGROUND: THE TRAILS ACT. . . . . . 3

III. FACTUAL BACKGROUND. . . . . . 6

A. The Right-of-Way at Issue in Pankratz . . . . . . 6

B. Right-of-Way at Issue in Biery. . . . . . 8

IV. ARGUMENT. . . . . . 10

A. All of Plaintiffs' Claims Are Timely, But the Claim Accrual Dates Advanced by Plaintiffs for the Permanent Takings Claims on Which They Seek Summary Judgment Are Incorrect . . . . . . 10

1. The Biery Plaintiffs' Claims Accrued on April 8, 2004. . . . . . 11

2. The Pankratz Plaintiffs' Takings Claims Accrued on June 2, 2005. . . . . 12

B. Plaintiffs Have the Burden of Proving That They Own the Property Allegedly Taken, and They Have Not Met That Burden With Respect to All of Their Claims.. . . . . . 16

1. Under Applicable Kansas Law, the Railroads Acquired an Easement to Those Segments of the Subject Rights-of-Way Acquired by Condemnation. . . . . . 18

2. The Railroads Acquired Segments of the Subject Rights-of-Way by Voluntary Grant. . . . . . 19

a. Railroads May Acquire Fee Title by Voluntary Grant. . . . . . 20

b. In Pankratz, the Original Voluntary Grant Tied to the Colling Property Conveyed An Easement to the Railroad. . . . . . 21

3. In Biery, the Railroad Acquired Tracts of Property Along the Rail Corridor in Fee Title. . . . . . 22

4. In Biery, the Railroad Acquired Fee Title to One Segment of the Subject Right-of-Way Over Which It Originally Acquired an Easement by Condemnation. . . . . . 23

C. With One Exception, Plaintiffs Have Not Met Their Burden of Proving That They Own the Servient Estate Subject to the Railroad's Easement . . . . . . . 24

1. Under Kansas Law, An Abandoned Right-of-Way is Returned to the Owner of the Adjacent Freehold *From Which It Derived*. . . . . . . . . . . . . 25

2. The Biery Plaintiffs Have Not Met Their Burden of Establishing That They Have an Ownership Interest in the Right-of-Way. . . . . . . . . . 26

3. Collins Industries, Inc., (Biery) Has No Ownership Interest in the Right-of-Way Lands.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

4. The Pankratz Plaintiffs Have Not Met Their Burden of Establishing That They Have an Ownership Interest in the Right-of-Way. . . . . . . . . . 30

5. The Mar Plaintiffs (Pankratz) Have Met Their Burden of Establishing an Ownership Interest in the Right-of-Way Lands. . . . . . . . . . . . . . . . . . . . . 32

D. The Determination of the Nature and Scope of the Property Interests at Issue in This Case is a Question of Kansas State Law. . . . . . . . . . . . . . . . . . . . . . . . . . . 32

E. The Scope of the Easements Acquired by Condemnation is Determined By Reference to the State Laws Authorizing the Condemnation and the Reports Issued by the Condemnation Commissioners. . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1. The Railroads Acquired the Perpetual Right to Use the Lands Condemned for the Construction, Operation, Maintenance and Accommodation of Its Railway. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

a. Kansas Condemnation Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

b. The Commissioners' Reports.. . . . . . . . . . . . . . . . . . . . . . . . . . . 38

2. Under Kansas Law, a Railroad Company's Right to Use Condemned Lands for the Construction, Operation, Maintenance and Accommodation of Its Railway Includes the Right to Maintain Easements That May Be Needed in the Future for Rail Use. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

F. The Preservation of Railroad Easements Through the Railbanking Process Is Permissible Under Kansas Law and Does Not Further Burden the Servient Estate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

G. Under Kansas Law, Interim Trail Use is Also a Permissible Use of the Subject Railroad Easements .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

H. Under Kansas State Law, the Railroad Has Not Abandoned the Right of Way. . . . . 46

1. Under Kansas Law Abandonment Requires Both Intent to Abandon and Action to Carry Out That Intent. . . . . 46

2. The Railroads Lack the Requisite Intent to Abandon . . . . . 47

3. The Railroads' Actions Are Consistent With Preserving the Rights-of-Way. . . . . 49

4. For There to Be An Abandonment, the Railroads' "Original Use" Must Be Rendered Impossible Or Highly Improbable.. . . . . 51

5. Alternatively, a Shift in Public Use Will Not Constitute an Abandonment . . . . . 54

V. CONCLUSION. . . . . 56

# TABLE OF AUTHORITIES

## FEDERAL CASES

Air Pegasus of D.C., Inc. v. United States,
424 F.3d 1206 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Amaliksen v. United States,
55 Fed. Cl. 167 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Barclay v. United States,
443 F.3d 1368 (Fed. Cir. 2006), cert. denied, 127 S. Ct. 1328 (2007). . . . . . . . . . . . 10-14

Birt v. STB,
90 F.3d 580 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Caldwell v. United States,
391 F.3d 1226 (Fed. Cir. 2004), cert. denied, 546 U.S. 826 (2005). . . . . . . . . . . . . passim

Caldwell v. United States,
57 Fed. Cl. 193 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Chevy Chase Land Co. v. United States,
230 F.3d 1375 (Table), 1999 WL 1289099 (Fed. Cir. Dec. 17, 1999),

cert. denied, 531 U.S. 957 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Chevy Chase Land Co. v. United States,
37 Fed. Cl. 547, 584 (1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,
450 U.S. 311 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Cienega Gardens v. United States,
331 F.3d 1319 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Citizens Against Rails-To-Trails v. STB,
267 F.3d 1144 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 42

Colorado v. United States,
271 U.S. 153 (1926).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Creppel v. United States,
41 F.3d 627 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Goos v. ICC,
911 F.2d 1283 (8th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Grantwood Village v. Mo. Pac. R.R.,
95 F.3d 654 (8th Cir. 1996), cert. denied, 519 U.S. 1149 (1997). . . . . . . . . . . . . . . . . . . . 4

Hayfield N. R.R. v. Chicago & N.W. Transp. Co.,
467 U.S. 622 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

King County v. Rasmussen,
299 F.3d 1077 (9th Cir. 2002), cert. denied, 538 U.S. 1057 (2003). . . . . . . . . . . . . . . . . 16

Moore v. United States,
58 Fed. Cl. 134 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Nat'l Ass'n of Reversionary Property Owners v. STB,
158 F.3d 135 (D.C. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

Nat'l Wildlife Fed. v. ICC,
850 F.2d 694 (D.C. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 17, 42

Neb. Trails Council v. STB,
120 F.3d 901 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Preseault v. United States,
100 F.3d 1525 (Fed. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Preseault v. ICC,

494 U.S. 1 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

RLTD Ry. v. STB,
166 F.3d 808 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 43

Toews v. United States,
376 F.3d 1371 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**STATE CASES**

Abercrombie v. Simmons,
81 P. 208 (Kan. 1905). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Atchinson, T. & S. F. Ry. v. Conlon,
63 P. 432 (Kan. 1901). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Atchinson, Topeka & Santa Fe Ry. Co. v. Humberg,
675 P. 2d 375 . . . . . . . . . . 41, 50

Atchison, Topeka & Santa Fe Ry. Co. v. O'Leary,
100 P. 628 (Kan. 1909). . . . . . . . . . 44

Barker v. Lashbrook,
279 P. 12 (Kan. 1929). . . . . . . . . . 25

Barney v. Burlington N.R.R.,
490 N.W.2d 726 (S.D. 1992). . . . . . . . . . 33

Bowers v. Atchison, T&S.F. Ry. Co.,
237 P. 913 (Kan. 1925). . . . . . . . . . 25, 27

Chevy Chase Land Co. v. United States,
733 A.2d 1055 (Md. 1999). . . . . . . . . . 33

Danielson v. Woestemeyer,
293 P. 507 (Kan. 1930). . . . . . . . . . 20, 22

Earlywine v. Topeka, S & W Ry,
23 P 940 (Kan. 1890) . . . . . . . . . . 40

Fed. Farm Mortg. Corp. v. Smith,
89 P.2d 838 (Kan. 1939). . . . . . . . . . 25, 26

Gauger v. Kansas,
815 P.2d 501 (Kan. 1991). . . . . . . . . . 46

Grainland Farms, Inc. v. Ark. La. Gas Co.,
722 P.2d 1125 (Kan. Ct. App. 1986). . . . . . . . . . 18

Harvey v. Mo. Pac. R.R.,
207 P. 761 (Kan. 1922). . . . . . . . . . 40

Horkman v. Borchardt, 777 P.2d 282, No. 63,188, 1989

Kan. App. LEXIS 504, (Kan. Ct. App. July 14, 1989)... . . . . . . . . . 21

Kan. Cent. Ry. v. Allen,
22 Kan. 285, 1879 WL 836, *5 (Kan. 1879). . . . . . . . . . 18, 20

Kansas Power and Light Co. v. Walker,
51 P.2d 1002 (Kan. 1935). . . . . . . . . . 54

Kan. Power and Light Co. v. Ritchie,
722 P.2d 1120 (Kan. Ct. App. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 35

Martell v Stewart,
628 P. 2d 1069 (Kan. Ct. App. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Matlack v. City of Wichita,

407 P.2d 510 (Kan. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 55

McClure v. Mo. River, F. S. & G. R. Co.,
9 Kan. 373, 1872 WL 639, *6 (Kan. 1872). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Miller v. St. Louis Southwestern Ry. Co.,
718 P.2d 610 (Kan. 1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 50

Nott v. Beightel,
122 P.2d 747 (Kan. 1942). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Platt v. Woodland,
246 P. 1017 (Kan. 1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Pratt v. Griese,
409 P.2d 777 (Kan. 1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50-52

Rieger v. Penn Central Corp.,
No. 85-CA-11, 1985 WL 7919 (Ct. App. Greene County, Ohio, May 21, 1985). . . . . . . 33

Riverside Drainage Dist. of Sedgwick County v. Hunt,
99 P.3d 1135 (Kan. Ct. App. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52-54

Schoenberger v. Mo. Pac. R.R. Co.,
26 P.3d 700 (Kan. Ct. App. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

Stone v. USD, No. 222,
91 P.3d 1194 (Kan. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Washington Wildlife Pres., Inc. v. Minnesota,
329 N.W.2d 543 (Minn. 1983), cert. denied, 463 U.S. 1209 (1983). . . . . . . . . . . . . . . . . 33

Williams Telecomms. Co. v. Gragg,
750 P.2d 398 (Kan. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Winkel v. Kansas Dep't of Transp.,
131 P.3d 570 No. 94,008, 2006 WL 903159, *2 (Kan. Ct. App. Apr. 7, 2006) . . . . . . . . 51

**FEDERAL STATUTES**

16 U.S.C. § 1247(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

28 U.S.C. § 2501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

49 U.S.C. § 10502. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

49 U.S.C. § 10903. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

49 U.S.C. § 10904. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

49 U.S.C. § 10906 (1982 ed.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Transportation Act of 1920 (41 Stat. 477-78). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATE STATUTES**

Gen. Stat. 1868.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Kan. Stat. Ann. § 66-501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 39

**FEDERAL REGULATIONS**

49 C.F.R. § 1152.29.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

49 C.F.R. § 1152.50.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7-11

## ndex of Defendant's Exhibits

| Exhibit No. | Description |
|---|---|
| | **Pankratz – Documents from STB Docket No. AB-870X** |
| 1 | Excerpt of Exemption Notice filed by Butler County, Kansas, with the Surface Transportation Board ("STB"), dated June 15, 2004 |
| 2 | Excerpt of Environmental Report filed by Butler County as Exhibit D to Abandonment Exemption |
| 3 | Excerpt of Historic Report filed by Butler County as Exhibit E to Abandonment Exemption |
| 4 | Letter dated July 30, 2004, from Prairie Travelers, Inc., to Vernon A. Williams, Secretary, STB – requesting issuance of public use condition and notice of interim trail use |
| 5 | Letter dated September 9, 2004, from Karl Morell, Attorney for Butler County, to Vernon A. Williams, Secretary, STB – stating willingness to negotiate with Prairie Travelers. |
| 6 | Letter dated April 26, 2005, from Butler County Economic Development (BCED) to Vernon A. Williams, Secretary, STB – requesting issuance of a notice of interim trail use. |
| 7 | Letter of May 16, 2005, from Karl Morell, Attorney for Butler County, to Vernon A. Williams, Secretary, STB – notifying the STB that the County has not consummated abandonment of the line and that it intends to railbank the line. |
| 8 | Letter of May 23, 2005, from Karl Morell, Attorney for Butler County, to Vernon A. Williams, Secretary, STB – notifying the STB that the County is willing to negotiate for interim trail use. |

| Exhibit No. | Description |
|---|---|
| 9 | Letter of June 3, 2005, from Karl Morell, Attorney for Butler County, to Vernon A. Williams, Secretary, STB – notifying the STB that a railbanking and interim trail use agreement has been reached between Butler County and BCED. |
| | **Pankratz – Title Documents** |
| 10 | Declaration of Cindi A. R. Straup ("Pankratz Straup Decl.") |
| 10-1 | Exhibit 1: Commissioner's Report dated Nov. 4, 1879 recorded in Book S, Page 466 |
| 10-2 | Exhibit 2: Quitclaim deed dated November 3, 1879 from William and Ann Chase to St. Louis Wichita & Western Railway Co., recorded at Deed Book V, Page 5 |
| 10-3 | Exhibit 3: Pankratz parcel map |
| 10-4 | Exhibit 4: Wedell parcel map |
| 10-5 | Exhibit 5: Colling parcel map |
| 10-6 | Exhibit 6: Mar Trust parcel map |
| 10-7 | Exhibit 7: Wood parcel map |
| 10-8 | Exhibit 8: Myers parcel map |
| 10-9 | Exhibit 9: Pankratz Plaintiffs overview map (all parcels) |
| 11 | Quitclaim Deed from Burlington Northern and Santa Fe Railway Company, to Butler County, dated December 21, 2001, and recorded January 7, 2002 (Butler County Book 1037, Page 67). |

| Exhibit No. | Description |
|---|---|
| 12 | No Exhibit 12 |
| 13 | General Warranty –Deed, dated December 10, 1992, from Thad J. Collings to Thad J. Collings and Jennifer L. McLaughlin as joint tenants, recorded on January 6, 1993, at Book 656, page 585. |
| | **Biery – Documents from STB Docket No. AB-6, Sub No. 406X** |
| 14 | Excerpt of Abandonment Exemption filed by Burlington Northern & Santa Fe Railroad with the STB, filed February 20, 2004 |
| 15 | Excerpt of Environmental Report and Historic Report filed by BNSF as Exhibits to Notice of Exemption |
| 16 | Letter from City of South Hutchinson, dated Jan. 30, 2004, received by the STB on Feb. 25, 2004 – containing the City's Statement of Willingness to Assume Financial Responsibility |
| 17 | Letter dated March 24, 2004, from BNSF – stating that BNSF has no objection to the City's request for the issuance of a NITU |
| 18 | Letter dated September 10, 2004, from the City of South Hutchinson, to the STB – requesting extension of the NITU |
| 19 | Letters dated September 10, 2004, from BNSF to the STB – requesting extension of the NITU |
| 20 | Railbanking and Donation Contract, dated March 23, 2005, between BNSF and the City of South Hutchinson, and Exhibit A to Contract (other exhibits to the contract excluded) |
| 21 | Letter dated March 24, 2005, from BNSF to the STB – notifying the STB that the parties had reached an agreement. |

| **Exhibit No.** | **Description** |
|---|---|
| | **Biery – Title Documents** |
| 22 | Declaration of Cindi A.R. Straup ("Biery Straup Decl.") |
| 22-1 | Exhibit 1: Commissioner's report dated Oct. 27, 1899 recorded in Book Misc. 5, 209 |
| 22-2 | Exhibit 2: Warranty deed dated April 20, 1895, from the Atchison, Topeka & Santa Fe Railroad Company, to Rose Arnold, recorded at Deed Book 55, Page 192 |
| 22-3 | Exhibit 3: Commissioner's report dated Aug. 1, 1889 recorded in Book 2, Page 501 |
| 22-4 | Exhibit 4: Quitclaim deed dated Nov. 22, 1899 from Julia Ann Fair to the Hutchinson & Southern Railroad Company recorded in Book 66, Page 552 |
| 22-5 | Exhibit 5: Quitclaim deed dated Mar. 22, 1901 from the Irrigation Loan and Trust Company to the Atchison, Topeka and Santa Fe Railway Company recorded in Book 70, Page 143 |
| 22-6 | Exhibit 6: Quitclaim deed dated Sept. 1, 1896 from E.L. Rowland to the Hutchinson & Southern Railroad Company recorded in Book 56, Page 483 |
| 22-7 | Exhibit 7: Quitclaim deed dated Nov. 1, 1901 from the Irrigation Loan and Trust Company to the Atchison, Topeka and Santa Fe Railway Company recorded in Book 73, Page 204 |
| 22-8 | Exhibit 8: Except of schedule of Lands Owned or Used for Purposes of a Common Carrier ("Valuation Schedule"), prepared by The Atchison Topeka & Santa Fe Ry. Co., Panhandle Division, Reno County, Kansas – Sheet No. 4 of 30, Val Section No. Kansas 36-A, Map No. S1A, Parcel No. 17) |

| Exhibit No. | Description |
|---|---|
| 22-9 | Exhibit 9: Biery parcel map |
| 22-10 | Exhibit 10: Holloway parcel map |
| 22-11 | Exhibit 11: Stacy E. Judy Trust parcel maps |
| 22-12 | Exhibit 12: Julia R. Chalfant parcel map |
| 22-13 | Exhibit 13: K.A.K. Farms, Inc. parcel map |
| 22-14 | Exhibit 14: American Packaging Corporation parcel map |
| 22-15 | Exhibit 15: Collins Industries, Inc. parcel map |
| 22-16 | Exhibit 16: Biery Plaintiffs' overview map (all parcels) |
| 23 | Excerpt of schedule of Lands Owned or Used for Purposes of a Common Carrier ("Valuation Schedule"), prepared by The Atchison Topeka & Santa Fe Ry. Co., Panhandle Division, Reno County, Kansas, Sheet 12 of 30, Valuation Section No. Kansas 36-A, Map No 1, Parcel No. 9 & 10 ("Val Schedule") |
| 24 | Special Warranty Deed dated October 26, 2006, from The City of South Hutchinson, to Collins Bus Corporation, recorded on November 9, 2006, in Book 587, page 295. |
| 25 | General Corporation Warranty Deed dated October 31, 2006, from Collins Bus Corporation, to Collins Industries, Inc., recorded on November 9, 2006, in Book 587, page 292 |

# I. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs in these consolidated cases[1] allege that they possess ownership interest in two railroad rights-of-way located in Butler County and Reno County, Kansas. Plaintiffs' claims are premised on the allegation that they are the fee simple owners of lands that are subject to a railroad easement. Plaintiffs allege that these easements were abandoned or extinguished by operation of Kansas state law, and that the decision of the Surface Transportation Board ("STB") permitting the "railbanking" of the subject rights-of-way for future rail use and interim trail use pursuant to the National Trails System Act, 16 U.S.C. § 1247(d) ("Trails Act"), constitutes a taking of their property interests in the right-of-way. In their motions for partial summary judgment, Plaintiffs seek summary judgment on the issues of title and liability.

Defendant opposes Plaintiffs' motions for summary judgment and cross-moves for summary judgment in its favor. This supporting memorandum addresses three issues raised in Plaintiffs' motions: (1) the proper claim accrual date for Plaintiffs' claims; (2) Plaintiffs' general failure to meet their burden of proof on the issue of title; and (3) the question of liability.

The claim accrual issue is addressed in Section IV.A. Although there is no dispute that the permanent takings claims alleged in the Plaintiffs' complaints are timely, the claim accrual date advanced by Plaintiffs is based on a misinterpretation of the Federal Circuit's precedential rulings. Under those rulings, the Biery Plaintiffs' permanent takings claims accrued on April 8, 2004, and the permanent takings claims alleged by the Pankratz Plaintiffs accrued on June 5, 2005.

The second issue addressed in this memorandum is title. As set forth in Section IV.B.,

[1] The term "Plaintiffs" is used herein to refer to both the Pankratz Plaintiffs and the Biery Plaintiffs. When referencing a specific group of plaintiffs, "Pankratz Plaintiffs" or "Biery Plaintiffs" will be used as appropriate.

Plaintiffs have the burden of proving that they own the property alleged to have been taken by operation of the Trails Act. This requires Plaintiffs to prove: (1) that the railroads acquired only an easement in the rights-of-way at issue, and (2) that each named Plaintiff is the fee owner of some or all of the lands burdened by that easement. On the first point, there are segments of the subject rights-of-way that the railroads acquired in fee. Plaintiffs have no ownership interest in these segments and summary judgment must be granted in favor of Defendant on the claims that relate to those segments. In addition, as set forth in Section IV.C., even for those segments in which the railroad acquired only an easement, Plaintiffs (with one exception) have not met their burden of proving that they are the fee owners of the land subject to that easement. Moreover, one of the Biery Plaintiffs has no ownership interest whatsoever. The absence of proof on this aspect of the title issue requires the denial of Plaintiffs' motions for partial summary judgment.

The third issue presented by Plaintiffs' motion and addressed in this memorandum is the question of liability. As set forth in Sections IV.D. through H., for those portions of the subject rights-of-way that were held by the railroads as easements, the railbanking and interim trail use of the rights-of-way does not constitute a taking of the fee owners' interest in the rights-of-way for several reasons. To begin with, under Kansas law, a railroad's use of the easement for the construction, operation, maintenance and accommodation of its railway, includes the right to maintain easements that may be needed in the future for rail use. Railbanking – which is simply the preservation or maintenance of a railroad right-of-way for future rail use – is a permissible present use of the subject rights-of-way under Kansas law and therefore does not result in a taking of the Plaintiffs' property. Interim trail use, which is a public use that facilitates railbanking, is also a permissible use of a railroad right-of-way under Kansas law.

In addition, contrary to Plaintiffs' assertions, the railroads have not abandoned the subject rights-of-way. Under Kansas law, in order for an abandonment to be effectuated, there must be a unity of intent and action. Here, the actions of the railroads are fully consistent with an intent to preserve and maintain the rights-of-way (which is permissible under Kansas law), and to retain the right to re-enter the rights-of-way for the purpose of restoring rail service. Under Kansas law, these actions demonstrate the railroads' intent to preserve the rights-of-way, rather than to abandon them. Alternatively, there is no liability in this case because, under Kansas law, a right-of-way acquired for a public purpose can be converted from one public use to another without causing an abandonment of the right-of-way. Here, the railbanking and interim trail use of the subject rights-of-way preserves the corridor so that it is available for future rail use.

For all of these reasons, Plaintiffs' motions for partial summary judgment should be denied, and Defendant's cross-motion should be granted.

## II. STATUTORY BACKGROUND: THE TRAILS ACT

Stemming from the Interstate Commerce Act of 1887, as amended and revised, and the Transportation Act of 1920 (41 Stat. 477-78) and subsequent statutes, the STB has exclusive and plenary authority over the construction, operation and abandonment of virtually all of the nation's rail lines. Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311-12 (1981); see also RLTD Ry. v. STB, 166 F.3d 808, 810 (6th Cir. 1999) (general discussion of the history of railroad regulation). Consequently, a railroad cannot be relieved of its legal obligation to offer service on a particular rail line without first obtaining the express consent of the STB. See Colorado v. United States, 271 U.S. 153, 167 (1926); Nat'l Ass'n of Reversionary Property Owners ("NARPO") v. STB, 158 F.3d 135, 137 (D.C. Cir. 1998).

The termination of active rail service by a railroad generally occurs in one of two ways.

First, a railroad can apply for permission to discontinue service. This authority allows the railroad to decide "to cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service in the future." Preseault v. ICC, 494 U.S. 1, 6 n.3 (1990); see also NARPO, 158 F.3d at 137 n.1 ("A line that is no longer in use, but has not been officially abandoned, may be reactivated later and is termed 'discontinued.'"). Second, a railroad may seek permission to terminate its service over a corridor through an abandonment proceeding. If authority to abandon is granted by the STB, and the railroad "consummates" the abandonment, the rail line is removed from the national transportation system and the STB's jurisdiction generally comes to an end. Hayfield N. R.R. v. Chicago & N.W. Transp. Co., 467 U.S. 622, 633 (1984); Preseault, 494 U.S. at 6 n.3; Birt v. STB, 90 F.3d 580, 585 (D.C. Cir. 1996).

In 1976, Congress passed legislation to address concerns about the loss of railroad rights-of-way nationwide. See Preseault, 494 U.S. at 5-6. The provisions of the 1976 legislation authorized the STB to delay disposition of lines subject to abandonment for a period of time in order to allow the sale of the line for public purposes and recreational use. 49 U.S.C. § 10906 (1982 ed.). However, Congress subsequently found that these provisions "ha[d] not been successful in establishing a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes." H.R. Rep. No. 98-28, p. 6 (1983) (quoted in Preseault, 494 U.S. at 6). Accordingly, in 1983, Congress acted once again, this time passing the Trails Act and providing railroads seeking to either abandon or discontinue their use of a rail line with a third option: railbanking.[2] See RLTD Ry., 166 F.3d at

---

[2] The term railbanking refers to "the preservation of railroad corridor for future rail use." Neb. Trails Council v. STB, 120 F.3d 901, 903 n.1 (8th Cir. 1997). See also Caldwell v. United States, 57 Fed. Cl. 193, 194 (2003) (under the railbanking process, "[t]he right-of-way is 'banked' until such future time as railroad service is restored"), aff'd, 391 F.3d 1226 (Fed. Cir. 2004), cert. denied, 546 U.S. 826 (2005).

811 ("Railbanking is an alternative to abandonment."); Grantwood Village v. Mo. Pac. R.R., 95 F.3d 654, 659 (8th Cir. 1996) ("Congress determined that interim trail use was to be treated like discontinuance rather than as an abandonment."), cert. denied, 519 U.S. 1149 (1997). The railbanking provision of the Trails Act states that,

> . . . Consistent with the purposes of [the Railroad Revitalization and Regulatory Reform Act of 1976], and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for the purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.

16 U.S.C. § 1247(d); see also 49 C.F.R. § 1152.29 (implementing regulations).

In order for a railroad corridor or right-of-way to be railbanked, the railroad must first engage in the STB's regulatory abandonment process, which involves either the filing of an abandonment application under 49 U.S.C. § 10903, or the filing of a Notice of Exemption from that process under 49 U.S.C. § 10502 (previously 49 U.S.C. § 10505); 49 C.F.R. § 1152.50. Caldwell v. United States, 391 F.3d 1226, 1228 (Fed. Cir. 2004), cert denied, 546 U.S. 826 (2005); see also 49 C.F.R. § 1152.29. This case involves Notices of Exemption.

Once a railroad requests authorization to abandon through the filing of a Notice of Exemption, a party interested in acquiring or using the right-of-way for railbanking and interim trail use may then request the issuance of a notice of interim trail use or "NITU." 49 C.F.R. § 1152.29(c)-(d). The STB's regulations require a qualified party interested in "acquiring or using" a right-of-way proposed to be abandoned for railbanking and interim trail use to file a request or petition that includes, *inter alia*, a statement of willingness to assume responsibility for the right-of-way, and an acknowledgment that interim trail use of the right-of-way is subject to the

"possible future reconstruction and reactivation of the right-of-way for rail service" (railbanking). 49 C.F.R. § 1152.29(a)(1)–(3). Interim trail use is voluntary on the part of the railroad, see Nat'l Wildlife Fed. v. ICC, 850 F.2d 694, 702 (D.C. Cir. 1988), but if the railroad indicates that it is willing to negotiate a Trails Act agreement, the issuance of the NITU is required. Citizens Against Rails-To-Trails ("CART") v. STB, 267 F.3d 1144, 1150-53 (D.C. Cir. 2001).

The NITU operates to preserve the STB's jurisdiction, thereby preempting the application of applicable law that would otherwise apply in the event that the railroad were to fully abandon its rail line. Caldwell, 391 F.3d at 1229-30. If a railbanking and interim trail use agreement is reached, the NITU automatically authorizes the interim trail use, and the trail sponsor may then assume management of the right-of-way, subject only to the right of a railroad to restore active rail service. Goos v. ICC, 911 F.2d 1283, 1295 (8th Cir. 1990); Birt, 90 F.3d at 583. If a railbanking and trail use agreement is not reached, the railroad may, in accordance with any requirements ordered in the STB's decision, exercise its authority to abandon the rail line. Preseault, 494 U.S. at 7; Caldwell, 391 F.3d at 1230; 49 C.F.R. §§ 1152.29(d)(1), (e)(2).

## III. FACTUAL BACKGROUND

### A. The Right-of-Way at Issue in Pankratz

The property at issue in Pankratz is a 10.6-mile right-of-way that extends between milepost 483.62 in Augusta, Kansas and milepost 494.22, near Andover, Kansas. The rail line was originally constructed by the St. Louis, Wichita & Western Railway Company ("SLW&W") and formed a part of the Oswego to Wichita line. Def. Ex. 3 at 3 (Historic Report). The railroad acquired its interests in the segments of this 10.6-mile right-of-way that are at issue in this case by means of two written instruments. The first is the condemnation instrument, which includes

segments of the subject right-of-way that abut the lands allegedly owned by the six Plaintiffs.[3] See Def. Ex. 10 at ¶ 5 (Pankratz Straup Decl.); id., Ex. 10-1) The second is a quitclaim deed by which the railroad acquired a portion of the right-of-way that abuts the property owned by Plaintiff Colling. Id., Ex. 10-2.

Construction of this railroad began in 1879 and was completed by May 1880. Def. Ex. 3 (Historic Report). Through a series of railroad mergers, ownership of the subject right-of-way was transferred to the Burlington Northern Santa Fe Railway Company ("BNSF") in 1995. Id. In 2001, Butler County (the "County") acquired the railway line by donation from the BNSF. The County intended to rehabilitate the line and locate an operator in order to preserve the rail service in the area. Id. at 1. When the County was unable to locate an operator, it filed a Notice of Exemption under 49 C.F.R. § 1152.50 seeking authority to abandon the 10.6 miles of rail line. See Pankratz Pls.' Proposed Facts, Tab M. The exemption became effective on August 4, 2004, meaning that on that date, and absent any further orders from the STB, the County would be authorized to abandon the rail line. Id.

Before the County exercised its authority to abandon the line, Prairie Travelers, Inc. ("PTI") expressed an interest in negotiating a railbanking and interim trail use agreement with the County. The County agreed to negotiate and, on September 14, 2004, the STB issued a NITU which provided a 180-day period during which the parties could negotiate a voluntary agreement. Id., Tab C. However, Butler County and PTI were unable to reach such an agreement, the NITU expired on March 13, 2005, and the County was once again fully authorized to abandon the line.

[3] The named Pankratz Plaintiffs have indicated that they plan to file a motion for class certification but have not done so yet. Plaintiffs' motion for partial summary judgment is limited to the claims of the named Plaintiffs, as is this cross-motion.

Id., Tab C at 2.

On May 2, 2005, Butler County Economic Develop ("BCED"), late-filed a request for the issuance of a second NITU.[4] Id., Tab D. Because the County had not yet abandoned the line and agreed to negotiate a railbanking agreement, the STB issued a new NITU on June 2, 2005. On June 3, 2005, the County and BCED executed a trail use/railbanking agreement for the line.[5] See Def. Ex. 21.

### B. Right-of-Way at Issue in Biery

The property at issue in Biery is a 2.88-mile stretch of railroad right-of-way between milepost 0.62 and milepost 3.50, near South Hutchinson, in Reno County Kansas. This railroad line was originally acquired by the Hutchinson & Southern Railroad ("H&S") between 1896 and 1899. Def. Ex. 15 (BNSF Historical Report, p. 2). The railroad acquired its interests in the segments of the corridor by way of six conveyance instruments. Two of these instruments are condemnation instruments in the form of commissioners' reports. See Def. Ex. 22 (Biery Straup Decl.) In addition, the railroad acquired portions of the right-of-way that abut the properties owned by the Biery Plaintiffs by various voluntary grants. Id. at ¶ 5. Through a series of railroad mergers, ownership of this rail line was transferred to BNSF in 1995.[6]

---

[4] In Aban. and Discon. of R. Lines and Transp. under 49 U.S.C. § 10903, 1 S.T.B. 894 (1996) and 2 S.T.B. 311 (1997), the STB retained the policy of accepting filings after the due date when good cause is shown.

[5] Defendant has been informed by BCED that BCED plans to request a voluntary partial revocation of the NITU. However, as of the date of the brief, no such request has been filed with the STB. Defendant raises this issue to alert the Court that, in the event the Court concludes Defendant is liable for a permanent taking on the facts presented, a partial revocation of the NITU would render that taking temporary. No temporary takings claims have been made and do not presently exist and therefore, Defendant will not address the merits of any such claim.

[6] The McPherson, Texas & Gulf and the Hutchinson, Oklahoma & Gulf Railroads were consolidated under the name of the Hutchinson & Southern ("H&S"), and the articles of

On February 20, 2004, BNSF filed a verified Notice of Exemption under 49 C.F.R. § 1152.50 seeking authority to abandon or discontinue service for the 2.88 miles at issue in this case. Biery Pls.' Proposed Facts, Tab K. On April 8, 2004, the STB issued a NITU at the request of the City of South Hutchinson, KS (the "City"), which allowed a 180-day period during which BNSF and the City could negotiate an agreement for railbanking and interim trail use. Biery Pls.' Proposed Facts, Tab L. On September 13, 2004, and September 14, 2004, the BNSF and the City, respectively, filed requests to extend the NITU negotiating period for an additional 180 days in which to complete negotiations. Id., Tab M. On March 23, 2005, the City and BNSF entered into a railbanking/interim trail use agreement. Def. Ex. 20. The City subsequently acquired the right-of-way and other property through a quitclaim deed. Biery Pls.' Proposed Facts, Tab N. Relevant portions of the railbanking agreement read as follows:

> Donee acknowledges that any interim trail use by Donee or its assigns shall be subject to the possibility of future restoration of rail service pursuant to federal law and/or BNSF's retained interests . . . It is agreed and understood that the use of the Property by Donee (or its assignees) shall not impair future restoration of rail service pursuant to the National Trails System Act and Donee acknowledges that BNSF reserves the right to reactivate and restore rail service on the Property. Should BNSF or any such assignee of BNSF exercise this right at any time, Donee (or its assigns) shall allow reactivation of rail service on the terms and conditions herein.

Def. Ex. 20 at 2. Similarly, the quitclaim deed states, in relevant part, that "Donee acknowledges that any interim trail use by Donee or its assigns shall be subject to the possibility of future restoration of rail service and/or BNSF's retained interests . . ." Biery Pls.' Proposed Fact, Tab N at 1. The deed goes on to state that "Donee's obligation that interim trail use by Donee shall not

incorporation were filed with the secretary of state on October 7, 1889. Byers, Otto, *The Conceptions and Growth of a Kansas Railroad* in KANSAS HISTORICAL COLLECTIONS, vol. XI (1911-1912). The H&S was the predecessor railroad to The Atchison Topeka and Santa Fe Railway Company ("ATSF"). Id. In 1995 the ATSF merged with the BN to become the BNSF Railway Company. Id.

impair future restoration of rail service pursuant to the National Trails Systems Act, as amended." Id.

## IV. ARGUMENT

### A. All of Plaintiffs' Claims Are Timely, But the Claim Accrual Dates Advanced by Plaintiffs for the Permanent Takings Claims on Which They Seek Summary Judgment Are Incorrect

The question of when a takings claim arising under the Trails Act accrues for the purposes of the applicable six-year statute of limitations, 28 U.S.C. § 2501, has been the subject of extensive prior litigation. When the Federal Circuit addressed this question for the first time in Caldwell v. United States, it held that such claims accrue when the STB issues a NITU. Caldwell, 391 F.3d 1226. In so holding, the Federal Circuit explained that,

> "the NITU operates as a single trigger to several possible outcomes. It may, as in this case, trigger a process that results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked. . . . Alternatively, negotiations may fail, and the NITU would then convert into a notice of abandonment. In these circumstances, a temporary taking may have occurred."

Id. at 1234 (internal citations and footnote omitted). The Caldwell court further noted that "[i]t is not unusual that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues." Id. (citations omitted).[7] The claim accrual rule set forth in Caldwell was reaffirmed by the Federal Circuit in Barclay v. United States, 443 F.3d 1368 (Fed. Cir. 2006) ("we adhere to Caldwell and hold that the issuance of the original NITU triggers the accrual of the cause of action"), reh'g en banc denied (Sept. 5, 2006), cert. denied, 127 S. Ct. 1328 (2007).

[7] With respect to the accrual of temporary takings claims arising out of the Trails Act, the Caldwell court expressly noted that "[t]his case does not involve, and we do not herein address, whether the issuance of the NITU in fact involves a compensable temporary taking when no agreement is reached." Id. at 1234 n.7.

Here, there is no dispute in this case that the permanent takings claims alleged in the Biery Complaint and the Pankratz Complaint were timely filed. However, the parties disagree over the date on which those claims accrued. Applying the precedential rulings from Caldwell and Barclay to the undisputed facts of this case, the Court should rule that the permanent takings claims alleged by the Biery Plaintiffs accrued on April 8, 2004, and the permanent takings claims alleged by the Pankratz Plaintiffs accrued on June 2, 2005.

### 1. The Biery Plaintiffs' Claims Accrued on April 8, 2004

In Biery, a NITU was issued ("served") by the STB on April 8, 2004. Biery Pls.' Proposed Facts, Tab L. The NITU gave BNSF and the City 180-days to negotiate a railbanking and interim trail use agreement, and those parties subsequently requested and were granted one extension of time to continue their negotiations. On March 23, 2005, prior to the expiration of the negotiating period, BNSF and the City reached a Trails Act agreement. See Def. Ex. 20. Under the claim accrual rule set forth in Caldwell, any takings claims arising out these events accrued on April 8, 2004, the date that the NITU was issued. See Caldwell, 391 F.3d at 1235; Barclay, 443 F.3d at 1378. The April 5, 2004, date used by Plaintiffs was the decision date for the NITU in Biery. However, the NITU was not *issued* until April 8, 2004, the date it was served on the parties and made available to the public. Biery Pls.' Proposed Facts, Tab L. Under Caldwell and Barclay, Plaintiffs' claims accrued on the date that the NITU was issued.[8]

[8] Defendant notes that Plaintiffs' analysis confuses the issue of claim accrual with the question of whether a taking actually occurred. Caldwell and Barclay both involved appeals from decisions dismissing takings claims arising out of the Trails Act on statute of limitations grounds. The Federal Circuit's decisions in both cases deal with the question of claim accrual, and do not reach the question of whether a taking may have occurred. Indeed, the Federal Circuit specifically noted in Barclay that the "merits question" in these cases are "distinct from the issue of claim accrual." Barclay, 443 F.3d at 1374 n.4. Accordingly, Plaintiffs' assertion that the Federal Circuit has determined that a taking of their property "occurred" when the NITU was issued incorrectly conflates the claim accrual question with the liability analysis in these cases. See

### 2. The Pankratz Plaintiffs' Takings Claims Accrued on June 2, 2005

In their first Amended Complaint, the Pankratz Plaintiffs alleged that a taking of their property "occurred when the STB issued the NITU on June 1, 2005." Pankratz Amended Compl. ¶ 29. Plaintiffs subsequently sought leave to "amend the date of the Notice of Interim Trail Use to reflect the original Notice of Interim Trail Use issued by the Surface Transportation Board on September 13, 2004. (Currently the Complaint references the STB's extension of this NITU, which occurred on June 1, 2005)." Pankratz Pls.' Mot. for Leave to Amend at 2 (Apr. 10, 2008) (Doc. 28). Contrary to Plaintiffs' assertions, the second NITU by the STB was not an "extension" of the original NITU but a new NITU issued after a lapse in time when initial Trails Act negotiations had failed. As explained below, there is a gap in time between the two NITUs during which there was no regulatory restriction that precluded the County from abandoning the subject rail line. Plaintiffs' analysis improperly ignores this fact.

Specifically, as a result of the Notice of Exemption filed by Butler County with the STB, the County was authorized to abandon the subject rail line as of August 4, 2004, when the Notice of Exemption became effective. Pankratz Pls.' Proposed Facts, Tab C (Doc. 33-2) and Tab M (Doc. 33-3). A potential trail operator, PTI, subsequently requested the issuance of a NITU. At that point, the County indicated that it had not exercised its authority to abandon the line, and that it was willing to negotiate for trail use with PTI. Accordingly, the STB issued the requested NITU on September 14, 2004. Id., Tab C. That NITU provided the County and PTI until March 13, 2005, to negotiate a railbanking and interim trail use agreement. Id., Tab C. If no such agreement was reached by that date, the NITU provided that "the County may fully abandon the

---

Pankratz Brief at 30-31. Defendant's acknowledgment that the permanent takings claims alleged in the Biery and Pankratz complaints have accrued is not a concession that a taking actually occurred in these consolidated cases.

line." Id., Tab C.

The County and PTI failed to reach an agreement. Id., Tab D (Doc. 33-2). Consequently, the NITU expired and the County was once again authorized to fully abandon its line. Id. Accordingly, as of March 13, 2005, there was no longer any regulatory restriction in place that prevented the County from abandoning its rail line. This remained the case until June 2, 2005, when the STB issued a new NITU that authorized the County and BCED to negotiate a railbanking and interim trail use agreement. The County and BCED notified the STB that they had reached such an agreement on June 3, 2005, and the right-of-way has remained railbanked since that time. Def. Ex. 9 (Letter of June 3, 2005).

The Pankratz Plaintiffs assert that their permanent physical takings claims accrued on September 13, 2004, the date of the first NITU.[9] Pankratz Brief at 25-31. This assertion is premised on Plaintiffs' argument that, under the rulings in Caldwell, Barclay and Renewal Body Works,[10] takings claims arising under the Trails Act accrue "upon the STB's issuance of the *original* NITU." Pankratz Brief at 29 (emphasis added). However, Plaintiffs' analysis fails to consider the lapse of time between the expiration of the first NITU and the issuance of the second NITU, and the fact that two different trail sponsors were involved. These facts distinguishes this case factually from the decisions relied on by Plaintiffs.

In Caldwell, the "original" NITU was issued on August 31, 1994, for 7.4-mile segment of

[9] There is no temporary takings claim presently before the Court in this case. The Pankratz Plaintiffs did not allege a temporary taking of their properties based on the first NITU (issued September 14, 2004) in their Second Amended Complaint, nor have they moved for summary judgment with respect to such a claim. Accordingly, Defendant has not attempted herein to address the merits of such a claim.

[10] The separately filed appeals in Barclay v. United States and Renewal Body Works, Inc. v. United States were consolidated before the Federal Circuit for oral argument and decision. See Barclay, 443 F.3d 1368 (Fed. Cir. 2006).

a railroad right-of-way. 391 F.3d at 1231. Prior to the expiration of the 180-day negotiating period, the parties filed for an extension of time to continue their negotiations and also asked that the NITU be extended to cover an additional 3.2-mile segment of the same right-of-way. Id. The STB granted both requests and, on June 2, 1995, issued a new NITU that consolidated the proceedings involving both segments. Id. Having determined that the Caldwell plaintiffs' claims accrued on the date a NITU is issued, the Federal Circuit held that the plaintiffs' claims were barred by the applicable statute of limitations because both NITUs were issued more than six years before the plaintiffs filed their complaint. Id. at 1235.

In Barclay, the plaintiffs sought to avoid the dismissal of their claims as time-barred under Caldwell by arguing that the original NITUs issued for the "Flint Hills" trail were vacated and that a second taking occurred when a new NITU was issued naming a new trail operator. Barclay, 443 F.3d at 1374. After explaining that the substitution of trail users is contemplated as part of the railbanking, the court rejected the plaintiffs' claim accrual argument, noting that "[t]here is no gap between the original and replacement NITUs. Though formally 'vacat[ing]' the original NITUs, the STB makes clear that, in substance, it is 'substituting' trail users 'in the [same] proceedings.'" Id. at 1375. Accordingly, the Barclay decision clarifies that "any extensions or modifications of the original NITU [are] not separate potential takings."[11] Id. at 1376.

In contrast to the factual scenarios presented in Caldwell and Barclay, the first NITU issued in Pankratz expired according to its terms on March 13, 2005. As a result of the

[11] The Barclay court reached the same conclusion as to the Sunflower Trail, where a request to extend the negotiating period and substitute a new trail operator was filed on the date the original NITU was set to expire. The court rejected the argument that the NITU issued in response to this request (which came 10 days later) resulted in the accrual of a new takings claim, and found instead that the second NITU "in substance merely extended the original NITU." Id. at 1376.

expiration of that NITU, with no pending request for an extension of the negotiation period, the railroad was fully authorized to consummate abandonment of its rail line as of March 13, 2005. As the Federal Circuit explained in Caldwell, under these circumstances, any takings claim that accrued with the issuance of the first NITU was, at most, a temporary one. See Caldwell, 391 F.3d at 1234 ("negotiations may fail, and the NITU would then convert into a notice of abandonment. In these circumstances, a temporary taking may have occurred."). See also Creppel v. United States, 41 F.3d 627, 632-34 (1994) (finding that the government's regulatory actions involving the plaintiffs' properties gave rise to a temporary takings claims preceding and separated by a 4-month gap from a permanent takings claim)

Although the County was authorized to fully abandon, it did not exercise that authorization and consummate the abandonment. Instead, approximately 2 ½ months after the original NITU expired, the County – acting through its Economic Development office – requested the issuance of a new NITU. Def. Ex. 6 (Letter of Apr. 4, 2005); see also Def. Ex. 7 & 8 (Letters of May 16 and May 23, 2005). The STB issued a new NITU on June 2, 2005, a Trails Act agreement was reached, and the 10.6-mile right-of-way is now railbanked. Accordingly, under Caldwell, the second NITU gives rise to a potential permanent takings claim. See Caldwell, 391 F.3d at 1234 ("the NITU operates as a single trigger to several possible outcomes. It may, as in this case, trigger a process that results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked").

In sum, any takings claim that accrued with the issuance of the first NITU was rendered temporary when that NITU expired according to its own terms on March 13, 2005. After that date, there was no regulatory restriction in place that affected, in any way, the County's right to fully abandon its lines or precluded the vesting of any state law reversionary interests. Caldwell,

391 F.3d at 1233-34. The subsequent issuance of a new NITU on June 2, 2005, which resulted in a railbanking and interim trail use agreement, thus gives rise to a permanent takings claim that relates back (and accrues on) June 2, 2005. Accordingly, the correct claim accrual date for the permanent takings claims alleged in Plaintiffs' Second Amended Complaint and on which Plaintiffs have moved for partial summary judgment is June 2, 1995, the date on which the second NITU was issued.

### B. Plaintiffs Have the Burden of Proving That They Own the Property Allegedly Taken, and They Have Not Met That Burden With Respect to All of Their Claims

In order to establish a taking, Plaintiffs bear the burden of establishing that they had an ownership interest in the private property alleged to have been taken from them on the date of that taking. See Cienega Gardens v. United States, 331 F.3d 1319, 1328 (Fed. Cir. 2003) ("For any Fifth Amendment takings claim, the complaining party must show it owned a distinct property interest at the time it was allegedly taken"); Amaliksen v. United States, 55 Fed. Cl. 167, 171 (2003) ("Establishing title to the property allegedly taken is essential to asserting a taking"). This is a threshold issue in all takings claims, and a court does not reach the question of whether a taking occurred "without first identifying a cognizable property interest." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir. 2005).

In the context of Fifth Amendment takings claims arising out of the Trails Act, it is well established that if the railroad "obtained fee simple title to the land over which it was to operate . . . the [abutting landowners] today would have no right or interest in those parcels and could have no claim related to those parcels for a taking." Preseault, 100 F.3d at 1533. See also King County v. Rasmussen, 299 F.3d 1077, 1088-89 (9th Cir. 2002) (affirming dismissal of rail-trail takings claims where railroad held fee simple title to the right-of-way), cert. denied, 538 U.S.

1057 (2003); Nat'l Wildlife Fed'n, 850 F.2d at 703 (rights-of-way held by the railroad in fee simple interests "are not affected by the takings clause aspect of this case"). Similarly, such takings claims filed by owners of land abutting a railroad right-of-way are subject to dismissal if the railroad owns the right-of-way lands in fees or if the plaintiffs are unable to prove that they have an ownership interest in the servient estate that is subject to that right-of-way. See Moore v. United States, 58 Fed. Cl. 134, 138-39 (2003) (granting summary judgment in favor of defendant as to certain plaintiffs who failed to establish that their properties abutted the subject right-of-way and thus "could not claim ownership to the lands affected by the Trails Act"); Amaliksen, 55 Fed. Cl. at 175 (granting summary judgment in favor of defendant where plaintiffs were unable to establish title to the right-of-way abutting their properties).

Plaintiffs' takings claims in this case are premised on the allegation that they own fee title to land underlying the subject railroad rights-of-way. See Biery Brief at 5; Pankratz Brief at 5. In order to prove this allegation, Plaintiffs must establish (1) that the railroads acquired only an easement in the subject rights-of-way, and (2) that they are the fee owners of some or all of the land subject to that easement. With respect to the first question, as set forth below in Section IV.B, the railroads acquired certain segments of the subject rights-of-way as easements, but other segments were acquired in fee. For those segments of the rights-of-way that the railroads acquired in fee, Plaintiffs' motion for partial summary judgment should be denied, and Defendant's cross-motion for summary judgment should be granted.

With respect to the second question, as set forth below in Section IV.C, the title evidence submitted by Plaintiffs establishes that some of Plaintiffs are the owners of land that abut the subject rights-of-way. Notably, one Biery Plaintiff did not have a property interest at the time of the record date. Additionally, (with one exception) the evidence does not establish that each

Plaintiff owns some or all of the servient estate subject to that right-of-way.[12] Because proof of ownership of the property alleged to have been taken is a threshold element of Plaintiffs' claim on which they bear the burden of proof, Plaintiffs' motion for summary judgment should be denied at this time due to their failure to prove this essential element.

**1. Under Applicable Kansas Law, the Railroads Acquired an Easement to Those Segments of the Subject Rights-of-Way Acquired by Condemnation**

Most of the segments of the rights-of-way at issue in Biery and Pankratz were acquired by the railroad through condemnation proceedings between 1879 and 1899. As set forth below, under state law then in effect, the railroads acquired an easement to these segments by condemnation.[13]

There is no dispute that under Kansas law railroads had authority to acquire land and interests in land by eminent domain or condemnation. See Gen. Stat. 1868, ch. 23, § 81-86; see also Biery Brief at 20; Pankratz Brief at 20.[14] Under Kansas law, prior to 1868 a railroad

---

[12] Defendant notes that there is no dispute that the ownership of a servient estate subject to a railroad's right-of-way or easement is a "property right" under Kansas law. The title question in this case is whether the Plaintiffs have met their burden of establishing that they are the owners of that property right.

[13] The fact that the railroad acquired an easement by condemnation does not end the title inquiry in this case, nor is its outcome determinative with respect to liability. As discussed in Section IV.B.4, *infra*, the railroad subsequently acquired fee title to certain segments of the right-of-way over which it had previously acquired an easement by condemnation. In addition, the question of liability in this case turns in part on the scope of the easement acquired by the railroad. As discussed in Section IV.E, *infra*, Defendant disagrees with Plaintiffs' narrow interpretation of the nature and scope of the easements at issue in this case.

[14] Under Kansas law, as elsewhere, "[e]minent domain is the right or power to take private property for public use; the right of the sovereign, or of those to whom the power has been delegated, to condemn private property for public use, and to appropriate the ownership and possession thereof for such use upon paying the owner a due compensation." Grainland Farms, Inc. v. Ark. La. Gas Co., 722 P.2d 1125, 1127 (Kan. Ct. App. 1986) (citing Busch v. City of Augusta, 674 P.2d 1054 (Kan. Ct. App. 1983)). The purpose of the condemnation process

company could acquire absolute title in fee simple to lands acquired by condemnation, including rights-of-way. See Atchinson, T. & S. F. Ry. v. Conlon, 63 P. 432, 432 (Kan. 1901) (holding that a railroad company acquired fee-simple title to a right of way condemned in 1864 under "the law as it then existed," citing Chapter 124, Laws 1864); Kan. Cent. Ry. v. Allen, 22 Kan. 285, 1879 WL 836, at *5 (Kan. 1879) ("the [state] law of 1864 provided that a title in fee-simple might be acquired by railroad companies by virtue of their compulsory powers in taking land."). However, the applicable statute changed in 1868, after which the interest a railroad acquired by condemnation in its right-of-way was limited to an easement. Id. Accordingly, Defendant does not dispute that, under Kansas law in effect at that time, the railroads acquired an easement to those segments of their rights-of-way acquired by condemnation in 1879 and 1899.

### 2. The Railroads Acquired Segments of the Subject Rights-of-Way by Voluntary Grant

Although large portions of the subject rights-of-way were acquired by the railroads through condemnation proceedings, certain segments were acquired by voluntary grant. Under Kansas law railroads may acquire real estate and other property by voluntary grant. See Gen. Stat. 1868, ch. 23, § 47 (currently codified as Kan. Stat. Ann. § 66-501); see also Pankratz Brief at 21. Plaintiffs make a general statement that "a railroad acquiring a right-of-way by voluntary grant acquires only an easement." Pankratz Brief at 21. Defendant takes issue with this overly broad statement. As discussed in further detail below, a railroad may acquire more than a mere easement by voluntary grant.

---

followed by the railroad was "to provide just compensation to the landowner when his property is appropriated for a public use." Id., 722 P.2d at 1129; see also Kan. Const., art. 12, § 4.

**a. Railroads May Acquire Fee Title by Voluntary Grant**

The statute authorizing voluntary grants has been interpreted by Kansas courts as allowing a railroad company to acquire a fee simple interest in land. See McClure v. Mo. River, F. S. & G. R. Co., 9 Kan. 373, 1872 WL 639, * at 6 (Kan. 1872) (finding that Kansas General Statute allows railroads to acquire fee title in right-of-way for railroad purposes); see also Schoenberger v. Mo. Pac. R.R. Co., 26 P.3d 700, 701 (Kan. Ct. App. 2000) ("That statute also clearly provides a railroad company has the power to purchase and hold with power to convey, real estate. We take that language to clearly mandate that a railroad may purchase land in fee simple absolute (to hold with power to convey).") (emphasis in original). Thus, Plaintiffs' assertion that a railroad acquires only an easement by voluntary grant is incorrect.

The question of whether a railroad has acquired fee title or only an easement by a voluntary grant depends on the interpretation of the deed. As explained by the Supreme Court of Kansas,

> "A railroad company may acquire a fee in lands by grant, unless forbidden by statute or by some rule of law. Where there is authority to receive and hold real estate by private grant, and there is neither an express nor an implied limitation upon the authority, a fee may be taken. But where there is an implied restriction, as is often the case in regard to the right of way, or the like of a railroad company, the grant does not ordinarily vest a fee in the company, but vests such an estate, usually an easement, as is requisite to effect the purpose for which the property is required. *** Where the fee is acquired it may, of course, be transferred, and so, in general, may any other estate."

Danielson v. Woestemeyer, 293 P. 507, 511 (Kan. 1930) (quoting 1 Elliott, on Railroads (3d Ed.) § 461, old edition, § 400); see also Abercrombie v. Simmons, 81 P. 208, 210 (Kan. 1905) (same). In one recent case, the Supreme Court of Kansas summarized the application of these principles as follows:

> In Abercrombie, Harvest Queen, and Humberg, all of the deeds referred to the land being used as a right-of-way or for some other railroad purpose, and all of the cases found that the land had been conveyed as an easement. In contrast, Danielson, Nott, and Schoenberger all found that property which was conveyed by deed that did not limit the use of the land to right-of-way purposes had been conveyed in fee simple. This was true despite the fact that the land in Nott and Danielson was used for railroad purposes, and the land in Danielson and Schoenberger was, in both cases, small in size.

Stone v. U.S.D. No. 222, 91 P.3d 1194,1204 (Kan. 2004).[15]

In sum, under Kansas law, a railroad can acquire fee title to land by a voluntary conveyance if the deed lacks any restrictions on the railroad's use of the lands conveyed by the deed. On the other hand, if the conveyance instrument contains a use limitation, the deed will be interpreted as conveying only an easement. Accordingly, the question of whether the railroad acquired the fee or only an easement to those segments of the subject rights-of-way it acquired by voluntary conveyance depends on the interpretation of the deeds in question.

#### b. In Pankratz, the Original Voluntary Grant Tied to the Colling Property Conveyed An Easement to the Railroad

In Pankratz, the railroad acquired a small portion of the right-of-way abutting the property owned by Thad J. Colling by a quitclaim deed. See Def. Ex. 10-2 (Pankratz Straup Decl.). Applying the deed interpretation principles discussed above to this deed, Defendant concedes

---

[15] The referenced cases in which the state court found that the railroad acquired fee title to lands by a voluntary grant are: Danielson, 293 P. at 511 (finding that deed to southern 100-foot strip conveyed only an easement where the deed clearly limited the railroad's use to a right-of-way but finding that deed to northern 100-foot strip conveyed fee title where the deed contained no use limitation); Nott v. Beightel, 122 P.2d 747, 749 (Kan. 1942) (distinguishing from Abercrombie where the contract of conveyance clearly showed that land was for right-of-way purposes); and Schoenberger, 26 P.3d at 701 (concluding that railroad acquired fee title because of the lack of any express or implied use restriction in the deed); see also Horkman v. Borchardt, 777 P.2d 282, No. 63,188, 1989 Kan. App. LEXIS 504, at * 4 (Kan. Ct. App. July 14, 1989) ("[W]here a railroad company received a fee simple title without limitation as to the use of the real estate and no provision for reversion exists, the title does not revert to the original grantor or his heirs when the railroad abandons the property for railroad purposes.").

that the railroad acquired only an easement with regard to this small segment of the subject right-of-way because the legal description of the deed clearly shows that that the use of the land was restricted for railroad purposes and the deed contains a reversionary clause. Id.

### 3. In Biery, the Railroad Acquired Tracts of Property Along the Rail Corridor in Fee Title

In Biery, all of the lands currently owned by the Biery Plaintiffs, with the exception of the Holloway property, were originally acquired by the railroad through condemnation and voluntary grant. See Def. Ex. 22 at ¶ 5 (Biery Straup Decl.). To illustrate the complexity of the title issue, an analysis of the lands owned by American Packaging Corp. ("APC") is particularly illuminating. The parcels associated with this property were originally acquired by the railroad by no less than four different conveyance instruments. See id. The right-of-way (rail corridor) in this instance was acquired by condemnation as evidenced by the commissioners' report. See Def. Ex. 22-1 (commissioner's report).

However, along the corridor and overlapping the length of the right-of-way, are tracts of land that were later acquired by three different quitclaim deeds. See Def. Ex. 22 at ¶ 5; Def. Ex. 21-14 (APC map). Two of the quitclaim deeds convey various lots described in Blanchard's Third Addition to the City of Hutchinson. See Def. Ex. 22-6 (Sept. 1, 1896 Quitclaim deed) & 22-7 (Nov. 1, 1901 Quitclaim deed). These same tracts are referenced in the quitclaim deed that transferred title of the subject corridor from the BNSF Railway to the City. Compare Biery Pls.' Proposed Facts, Tab N, Exhibit A with Def. Ex. 22-6 & 22-7. The legal description of the third quitclaim deed from the Irrigation Loan and Trust Co. to the Atchison, Topeka and Santa Fe Railway Company does not reference the lots in Blanchard's Third Addition, but merely reads "the West sixty-six (66) feet of the west half (1/2) of the South East quarter (1/4) of Section

number Twenty-three (23) in Township number Twenty-three, Range number six (6) East in Reno County, Kansas." Def. Ex. 22-5 (Mar. 22, 1901 Quitclaim deed).

None of these original source quitclaim deeds contains any use restriction or reversionary clause. See Def. Ex. 22-5, 22-6, 22-7. Thus, under Kansas law, the railroad acquired fee title to these tracts. Because parts of the properties owned by APC abut the tracts that the railroad acquired, APC has no right or property interest in these parcels. See Def Ex. 22-5, 22-6, 22-7, 22-14 (APC map).

### 4. In Biery, the Railroad Acquired Fee Title to One Segment of the Subject Right-of-Way Over Which It Originally Acquired an Easement by Condemnation

Although the railroads initially acquired only an easement by condemnation, in some cases the railroads subsequently acquired the fee to those same lands. In Biery, for example, in 1889 the railroad obtained an easement by condemnation for its right-of-way across all of Section 35 of Township 23 Range 6 West in Reno County from Thomas Fair for $645.70 for the land and an additional $30 for land damages. Def. Ex. 22-3 (1889 commissioner's report); Def. Ex. 23 (Val Schedule). A decade later, Julia Ann Fair, the widow of Thomas Fair, executed a quitclaim deed conveying a "strip of land one hundred <100> feet wide being fifty <50> feet on each side of the centerline of the railroad . . . as the same is now located and constructed over and across section Thirty-five <35> . . . ." Def. Ex. 22-4 (Biery Straup Decl.). By this 1899 quitclaim deed from Julia Ann Fair, the railroad paid an additional $3,500, or approximately $296 per acre, to acquire fee title to the land over which it already held an easement.[16] Id.; Def. Ex. 23.

---

[16] A "section" of land is a square area consisting of 640 acres. The length and width of the section are approximately 5,155 feet. Accordingly, the strip of land that is 100 feet in width and runs the full length of a section (5,155 feet) is approximately 515,500 square feet in size or approximately 11.83 acres. Accordingly, the $3,500 paid by the railroad to Julia Ann Fair translates to approximately $296 per acre. The average price of land in Kansas in 1900 was only

Under Kansas law, "'a quitclaim deed to land will convey to the grantee all the rights, interests, title and estate of the grantor in and to the land, unless otherwise specified by the deed itself.'" Platt v. Woodland, 246 P. 1017, 1019 (Kan. 1926) (quoting Johnson v. Williams, 14 P. 537, 538 (Kan. 1887)). Here, the quitclaim deed executed by Julia Ann Fair in 1899 contained no use restrictions or other limitations on the interest conveyed. Accordingly, under Kansas law, this deed conveyed fee title to the segment of the subject right-of-way that traverses Section 35.

The lands owned by Plaintiffs KAK Farms, Inc. and Julia R. Chalfant Trust that abut the subject right-of-way are located in Section 35. See Biery Pls.' Proposed Facts, Tab G; id., Tab H; see also Def. Ex. 22-13; 22-12 (maps). Because Julia Ann Fair conveyed fee title to the right-of-way lands to the railroad in 1899, she had no remaining interest in those lands to convey to her successors-in-title. Accordingly, KAK Farms and the Julia R. Chalfant Trust have no ownership interest in the right-of-way that traverses Section 35 and abuts their properties, and summary judgment must be entered in favor of Defendant with respect to their claims.

### C. With One Exception, Plaintiffs Have Not Met Their Burden of Proving That They Own the Servient Estate Subject to the Railroad's Easement

Where the railroad acquired only an easement, Plaintiffs still have the burden of proving that they are the fee owners of some or all of the land subject to that easement. As set forth below, each Plaintiff (with the exception of Collins Industries, Inc., see Section IV.C.3, *infra*) is the owner of a parcel of land that abuts the subject rights-of-way, although the title evidence submitted by Plaintiffs does not establish that each Plaintiff owns some or all of the servient estate to that right-of-way.

---

$15 per acre. Clifton, Ivery & Crowley, William D., Jr., *Farm Real Estate Historical Series 1850-1970* at 25 (June 1973). The substantial consideration paid by the railroad further supports the conclusion that it acquired fee title to the segment of the right-of-way that traverses Section 35.

### 1. Under Kansas Law, An Abandoned Right-of-Way is Returned to the Owner of the Adjacent Freehold *From Which It Derived*

As discussed in Section IV.B.1, *supra*, the railroad rights-of-way at issue in this case were established, largely by condemnation, between 1879 and 1899. Under Kansas law in effect at that time, the railroad acquired only an easement by condemnation, meaning that the "land condemned for a right of way for a railroad or other public purposes continues to be the property of its fee owner." Fed. Farm Mortg. Corp. v. Smith, 89 P.2d 838, 839 (Kan. 1939). Consequently, when the public purposes which authorized the condemnation are terminated, "the burden of servitude is lifted from the land and the owner of the basic fee returns to full dominion." Id. The same rule is applied when a railroad acquires an easement by deed. Further, because land ownership changes over time and public policy in Kansas historically disfavored "separate ownership of long, narrow strips of land distinct from the territory adjoining on each side[,]" Bowers v. Atchison, T&S.F. Ry. Co., 237 P. 913, 913 (Kan. 1925), the following rule of deed interpretation is applied to determine ownership of the fee subject to a railroad right-of-way:

> "When owner conveys a tract of land abutting on a railroad right of way tract, *in which such grantor owns the servient estate* and the railroad the dominant estate for right of way purposes, his conveyance passes to his grantee such servient estate, unless the intention not to do so be clearly indicated."

Barker v. Lashbrook, 279 P. 12, 14 (Kan. 1929) (emphasis added) (quoting Roxana Petroleum Corp. v. Sutter, 28 F.2d 159, 161 (8th Cir. 1928)). See also Fed. Farm Mortg., 89 P.2d at 841 ("The ultimate title to land subjected to railway purposes does not cease to be in the owner of the adjacent freehold *from which it was derived*, and the termination of its use for railway purposes has no effect upon the fee title. It merely relieves the underlying fee of the dominant estate . . . ." (emphasis added)).

Here, there is no dispute that if the segments of the subject right-of-way that were

acquired as easements (by condemnation or by deed) were abandoned as a matter of state law, those segments would be returned to the fee owner of those lands (i.e., the owner of the servient estate). Plaintiffs' takings claims are premised on the assertion that they are the owners of that servient estate or fee interest, and they have the burden of proving that ownership. Plaintiffs have not met this burden.

### 2. The Biery Plaintiffs Have Not Met Their Burden of Establishing That They Have an Ownership Interest in the Right-of-Way

The Biery Plaintiffs allege that they owned fee title to property "which abuts and underlies the former Burlington Northern Santa Fe ("BNSF") right-of-way, on April 5, 2004." Biery Brief at 5. Defendant does not dispute that each of the Biery Plaintiffs (with the exception of Collins Industries Inc., see Section IV.C.3, *infra*) owned a parcel of land that abuts the subject right-of-way as of April 5, 2004. However, as detailed below, Plaintiffs provide no evidence that their land "underlies" the subject right-of-way, or that they own the servient estate right-of-way itself by virtue of their ownership of an abutting parcel.[17]

For example, Dorothy Biery owns a parcel of land east of the subject right-of-way. See Biery Pls.' Proposed Facts, Tab D; see also Def. Ex 22-9. The legal description of this parcel contained in Biery's deed describes that parcel as "[b]eginning at a point 2395 feet west of the southeast corner of the Northwest Quarter (NE/4) of Section 23, Township 23 South, Range 6 West of the 6th P.M., thence west 193-1/3 feet; thence north 450 feet; thence east 193-1/3 feet; thence south 450 feet to the place of beginning, containing 2 acres." Biery Pls.' Proposed Facts, Tab D. The conveyance expressly excepts and is subject to "[e]asements and restrictions of record." Id. Because the legal description in this deed does not expressly encompass the lands

[17] The one exception is the Mar Trust, discussed *infra* in Section IV.C.5.

within the right-of-way, and because Plaintiffs have not submitted any other deeds in Biery's chain-of-title, it is impossible to determine from the evidence before the Court whether Biery owns any portion of the servient estate subject to the railroad easement that abuts her property.

Plaintiff APC acquired a parcel of property east of the subject right-of-way by a warranty deed dated April 30, 1987. The deed describes the parcel as extending "*to a point on the East right-of-way line of the A.T. & S.F. R.R.* that is 645.0 feet North of the South line of said Southeast 1/4; thence South *along the said right-of-way line* 645.0 feet to the place of beginning[.]" Id., Tab I (emphasis added). This deed conveys land that abuts the right-of-way, but the legal description does not purport to convey any ownership interest in the subject right-of-way. In order for APC to establish an ownership interest in the right-of-way itself, Plaintiffs must produce further evidence from their chains-of-title.[18]

The conveyance instrument for the Holloway parcel is a probate order entered on July 17, 1992, containing a legal description of several parcels of land, including the following parcel: "[t]he Northwest Quarter Southeast Quarter (NW/4 SE/4) Section Twenty-six (26), Township Twenty-three (23) South, Range Six (6) West of the 6th P.M., Reno County, Kansas, containing 40 acres, more or less, *except for the 100 feet of right-of-way of the railway along the West side thereof*[.]" Id., Tab E (emphasis added). It is not clear from this deed alone whether the 100-feet of right-of-way excepted from the conveyance is actually part of the parcel conveyed to Holloway, or whether the right-of-way "along the West side" of the parcel is referenced to

[18] For example, if the deed transferring ownership of the lands across the right-of-way from the APC parcel also uses the right-of-way as a boundary line, then APC may be able to establish its ownership of one-half of the right-of-way (to the centerline) under a legal presumption applied under Kansas law in such situations. See Bowers v. Atchison, T. & S.F. Ry., 237 P. 913, 914 (Kan. 1925). However, the evidence submitted by Plaintiffs to support their motion is insufficient to invoke this legal presumption.

identify the western boundary of the Holloway parcel. Plaintiffs' briefing on this point is equally ambiguous. Plaintiffs do not specify in their summary judgment brief whether Holloway is claiming ownership of the servient estate beneath the entire right-of-way by virtue of this deed (or earlier deeds in the chain-of-title), or whether Holloway is only claiming ownership to the centerline. However, because the Stacy Judy Trust owns the parcel of land situated west of the right-of-way and directly across from the Holloway parcel pursuant to a deed that includes no reference to the right-of-way (id., Tab F), Defendant assumes that Holloway only claims title to the east one-half of the right-of-way, and that the Stacy Judy Trust is claiming to own the west one-half of the right-of-way. In any event, the evidence presented by Plaintiffs is insufficient to prove whether ownership of the servient estate at this location is split between the abutting landowners or whether one of the abutting landowners owns the servient estate beneath the entire right-of-way.[19]

In sum, Plaintiffs' proof of ownership is limited to the deeds by which they each acquired land that abuts the subject rights-of-way. This evidence, standing alone, is insufficient to establish that their predecessors-in-title were: (1) the owners of the servient estate; and (2) conveyed some or all of that interest to them. Plaintiffs' failure to close the evidentiary gap between the conveyances to the railroad in the late 1800's and their acquisition of abutting land in more recent years constitutes a failure of proof on the threshold element of their takings claims

[19] With respect to those Plaintiffs that own land on opposite sides of the subject right-of-way (such as Holloway and the Stacy Judy Trust), it may be possible to resolve the question of who owns the servient estate subject to the railroad's easement by stipulation if the Plaintiffs in question are willing to stipulate that their ownership interest in the servient estate extends only to the centerline, thereby waiving any claim that each Plaintiff might have to ownership of the entire servient estate. However, Plaintiffs' present motion does not include such a stipulation.

that requires the Court to deny Plaintiffs' motion for summary judgment.[20]

### 3. Collins Industries, Inc., (Biery) Has No Ownership Interest in the Right-of-Way Lands

Plaintiffs allege that Collins Industries Inc. ("Collins Industries") owned fee title to property "which abuts and underlies the former Burlington Northern Santa Fe ("BNSF") right-of-way, on April 5, 2004." Biery Brief at 5. In support of this assertion Plaintiffs submit a warranty deed dated July 31, 1984, by which Collins Industries conveyed a parcel of property west of the subject right-of-way to the City of South Hutchinson, Kansas. Biery Pls.' Proposed Facts, Tab J. Accordingly, this deed only shows that Collins Industries owned a parcel of property abutting the right-of-way prior to July 31, 1984, and that Collins Industries conveyed that parcel to the City of South Hutchinson on that date. This evidence contradicts Plaintiffs' assertion that Collins Industries owned property abutting and underlying the subject right-of-way in April of 2004.

Moreover, a review of the deeds in the chain-of-title for this property after July 1, 1984, shows that the parcel of land abutting the right-of-way was conveyed by the City of South Hutchinson to Collins Bus Corporation by a Special Warranty Deed dated October 26, 2006. Def. Ex. 24 (Oct. 26, 2006 Warranty Deed). Then, by a General Corporation Warranty Deed dated October 31, 2006, the Collins Bus Corporation conveyed this property to Collins Industries, Inc. Def. Ex. 25 (Oct. 31, 2006 Warranty Deed). Accordingly, the available title evidence demonstrates that Collins Industries did not own a parcel of land abutting and/or underlying the subject right-of-way as of April 8, 2004, which is the relevant claim accrual date

[20] The resolution of the title issues in this case does not necessarily require the filing of further cross-motions for summary judgment. Defendant notes that in most rails-to-trails takings cases where the railroad is found to have acquired only an easement, questions regarding ownership of the servient estate subject to that easement usually can be resolved by stipulation following an examination of the conveyance instruments in the chains-of-title.

in this case.

#### 4. The Pankratz Plaintiffs Have Not Met Their Burden of Establishing That They Have an Ownership Interest in the Right-of-Way

The Pankratz Plaintiffs allege that they "all owned fee title to land underlying the former St. Louis Wichita & Western right-of-way on September 13, 2004, the day the STB issued a NITU." Pankratz Brief at 5. Defendant does not dispute that each of the Pankratz Plaintiffs owned a parcel of land that abuts the subject right-of-way as of September 13, 2004, although the correct claim accrual date for the permanent takings claims alleged by the Pankratz Plaintiffs is June 2, 2005.[21] Regardless of the correct claim accrual date, for the same reasons set forth above with respect to the Biery Plaintiffs, all but one of the Pankratz Plaintiffs (Mar Plaintiffs, see Section IV.C.5, *infra*) have failed to meet their burden of proving that their land "underlies" the subject right-of-way, or that they own the servient estate subject to that right-of-way by virtue of their ownership of an abutting parcel. This failure of proof on a threshold element of the Plaintiffs' claim requires denial of Plaintiffs' motion for summary judgment.

Plaintiffs Jerramy and Erin Pankratz ("Pankratz") submit the warranty deed by which they acquired their property on April 27, 2004. Pankratz Pls.' Proposed Facts, Tab B (Doc. 33-2, p. 6 of 20). The legal description of the property they acquired by this deed is "Lot 4, Block B, Prairie Meadow, Butler County, Kansas." Id. This parcel is conveyed "[s]ubject to all easements, restrictions, reservations and covenants, if any, now of record." Id. However, the deed does not identify any such easements. For the same reasons detailed above with respect to the deeds in Biery, this description is insufficient to establish whether Pankratz owns land

[21] See Section IV.C, *supra*, Defendant does not dispute that Pankratz Plaintiffs owned land abutting the subject right-of-way on June 2, 2005.

underlying the entire right-of-way, the land underlying half of the right-of-way (to the center line), or none of land underlying the right-of-way (because that land is owned by the abutting landowner on the other side of the right-of-way). It is Plaintiffs' burden to establish their ownership of the lands underlying the right-of-way and they have not met their burden in connection with their motion for summary judgment.

The deeds relied on by the Wedells, Colling, Woods and Myers to establish that they own land underlying the right-of-way itself suffers from the same evidentiary defect. The warranty deed submitted by Plaintiffs for the Wedell property identifies the property conveyed by the lot number in a particular block of an existing subdivision. Id., Tab E (Doc. 33-2, pp. 15-16). There is no reference to the subject right-of-way in the legal description of the lot conveyed, nor anywhere else in the deed. The quitclaim deeds for the Myers property and the warranty deeds for the Colling and Wood properties use similar legal descriptions, also with no reference to the railroad right-of-way. Id., Tab I (Doc. 33-3, p. 3); Tab F (Doc. 33-2, pp. 17-18); Tab H (Doc. 33-3, p. 2). The Colling and Woods deeds convey the property subject to "easements, restrictions, covenants of record if any," or "easements, restrictions, reservations and rights-of-way of public records[,]" but the railroad right-of-way is not specifically identified in these deeds as such an easement or right-of-way. Id., Tab F (Doc. 33-2, pp. 17-18) and Tab H (Doc. 33-3, p. 2).

As with the deeds presented in Biery, the deeds relied on by the Pankratz Plaintiffs to establish that they own the land underlying the railroad right-of-way establish only that they own a parcel of land that abuts that right-of-way. In order to establish ownership of the lands underlying the right-of-way, Plaintiffs must produce additional documents from their chains-of-title establishing that their predecessors-in-title owned the lands underlying the right-of-way and that such land was conveyed to them. Because Plaintiffs have the burden of proof on this

threshold element of their claims, Plaintiffs' failure to meet that burden requires denial of their motion for summary judgment. See n. 20, *supra*.

### 5. The Mar Plaintiffs (Pankratz) Have Met Their Burden of Establishing an Ownership Interest in the Right-of-Way Lands

The deed relied on by the Thick Gon Mar Trust to establish that they own the land underlying the subject right-of-way also contains no specific reference to the right-of-way. See Tab G (Doc. 33-2, pp. 19-20). However, Defendant's review of the legal description of the Mar Trust's property and the county maps showing the location of that property confirm that the right-of-way traverses that property (i.e., the Mar Trust owns the property on both sides of the right-of-way). See Def. Ex. 10-6. Accordingly, Defendant does not dispute that under Kansas law, the Mar Trust is the fee owner of land subject to a railroad easement.

## D. The Determination of the Nature and Scope of the Property Interests at Issue in This Case is a Question of Kansas State Law

For those Plaintiffs who have met their burden of establishing an ownership interest in the subject rights-of-way, the determination of whether the United States is liable turns on whether the operation of the Trails Act has interfered with those interests in a manner that rises to the level of a "taking" under the Fifth Amendment. As Plaintiffs acknowledge in their briefs, the nature and scope of the property interests allegedly taken in this case is a question of Kansas state law. See Pankratz Brief at 11; Biery Brief at 11. Although Plaintiffs acknowledge that the Kansas law controls these issues, Plaintiffs' liability arguments rest heavily on decisions from the Federal Circuit and the Court of Federal Claims involving the law of other states.

A number of courts have considered the question of whether railbanking and/or interim trail use fall within the scope of a railroad easement created under state law. In some of those cases, the courts have found that railbanking and interim trail use fall within the scope of a

railroad easement. For example, in Chevy Chase Land Company v. United States, the Court of Appeals of Maryland, answering questions of state law certified to it by the Federal Circuit, held:

> We believe it indisputable that use of the right-of-way as a trail is consistent with its essential nature relating to the "pass[ing] over land of another" and is a reasonable use of a general right of way. Accordingly, the scope of the right-of-way in the instant case encompasses use as a hiker/biker trail.

Chevy Chase Land Co. v. United States, 733 A.2d 1055, 1076 (Md. 1999), answering questions certified by 158 F.3d 576 (Fed. Cir. 1998). Applying the state court's ruling on the questions of state law, the Federal Circuit affirmed the trial court's holding that railbanking and interim trail use of the railroad easement at issue in Chevy Chase did not constitute a taking of the servient estate holder's property interests. Chevy Chase, 230 F.3d 1375 (Table), 1999 WL 1289099 (Fed. Cir. Dec. 17, 1999), cert. denied, 531 U.S. 957 (2000). Courts applying the law of other states have reached the same conclusion. See e.g., Washington Wildlife Pres., Inc. v. Minnesota, 329 N.W.2d 543, 547 (Minn. 1983) (Under Minnesota law, "[r]ecreational trail use of the land is compatible and consistent with its prior use as a rail line, and imposes no greater burden on the servient estates"), cert. denied, 463 U.S. 1209 (1983); Barney v. Burlington N.R.R., 490 N.W.2d 726, 733 (S.D. 1992) (holding under South Dakota law that use of a railroad right-of-way for hikers, bikers, skiers and snowmobilers are "public highway" uses that are "compatible and consistent with its prior use as a public railway. No greater burden has been placed upon the servient estate"), cert. denied, 507 U.S. 914 (1993); Rieger v. Penn Central Corp., No. 85-CA-11, 1985 WL 7919 (Ct. App. Greene County, Ohio, May 21, 1985) (finding that under Ohio law a railroad easement had not been extinguished and could be transferred to the state for trail use "because the proposed use is similar to that originally contemplated and 'because the general purpose to which the easement was and is applied, are the same; to wit, . . . a public way to

facilitate the transportation of persons and property. Means and appliances are different, but the objects are similar . . . .").

In other cases, such as those relied upon by Plaintiffs, the courts have concluded that railbanking and/or trail use exceeds the scope of a railroad's easement and that the authorization of those uses under the Trails Act constitutes a taking. Significantly, however, these decisions do not purport to rule on liability in all cases. Instead, the decisions in the cases relied upon by Plaintiffs turned on an interpretation of specific conveyance instruments under the law of the state in question. As the Federal Circuit emphasized in Preseault v. United States, which involved Vermont state law, "[w]e do not hold that every exercise of authority by the Government under the Rails-to-Trails Act necessarily will result in a compensable taking." Preseault, 100 F.3d at 1552. In particular, the Preseault court expressly acknowledged that even when a railroad acquires only an easement, "if the terms of the easement when first granted are broad enough under then-existing state law to encompass trail use, the servient estate holder would not be in a position to complain about the use of the easement for a permitted purpose." Id. Similarly, in Toews v. United States, 376 F.3d 1371 (Fed. Cir. 2004), the Federal Circuit concluded that interim trail use exceeded the scope of easements conveyed to a railroad by the deeds at issue *as a matter of California state law*.

In sum, it is undisputed that the determination of whether railbanking and interim trail use fall within the scope of the easements that the railroads acquired in this case by condemnation or by voluntary grant turns on Kansas state law rather than the law of any other state. Accordingly, while the Federal Circuit's decisions in cases such as Chevy Chase, Preseault and Toews and the Court of Federal Claims' decisions cited by Plaintiffs provide useful guidance on the appropriate analytical framework in these cases, the decisions in those cases turned on the interpretation of

different conveyance instruments under the law of other states. Accordingly, those decisions do not control the outcome in this case.

### E. The Scope of the Easements Acquired by Condemnation is Determined By Reference to the State Laws Authorizing the Condemnation and the Reports Issued by the Condemnation Commissioners

Although Defendant does not dispute that the segments of the subject rights-of-way acquired by condemnation are easements, that fact is not outcome-determinative with respect to the question of liability in this case. Instead, the question of whether the Trails Act effects a taking depends "upon the nature of the state-created property interests that [plaintiffs] would have enjoyed absent the federal action and upon the extent that the federal action burdened that interest." Preseault, 494 U.S. at 24 (O'Connor, J., concurring). In other words, if railbanking and interim trail use – the two present uses of the subject easements authorized by the Trails Act – are permissible uses of those easements as a matter of Kansas law, then the operation of the Trails Act does not result in the taking of the interest of the servient estate holder. See Preseault, 494 U.S. at 16 n.9 (citing cases in which "state courts have held that trail use does not constitute abandonment of a right-of-way for public travel so as to trigger reversionary rights"); Preseault, 100 F.3d at 1552 (if the terms of the railroad's easement are broad enough to encompass trail use, then "the servient estate holder would not be in a position to complain about the use of the easement for a permitted purpose").

Under Kansas law, the scope of an easement acquired by a railroad company through a condemnation proceeding is determined by examination of both the state statute that authorizes the condemnation and the commissioners' report (sometimes referred to as the appraisers' report). See Kan. Power and Light Co. v. Ritchie, 722 P.2d 1120, 1123 (Kan. Ct. App. 1986) (determining the rights acquired by a utility through a condemnation proceeding by looking at the

statute that authorized the condemnation and the appraiser's report "show[ing] what the condemner takes and what the landowner parts with"). See also id. ("The extent of the easement acquired and the extent of its use are determined 'as a matter of law from the language used in the appraisers' report.'" (citation omitted)).

In this case, Plaintiffs assert that the easements acquired by condemnation were "limited to the right of a railroad to operate a train across the land." Biery Brief at 4; Pankratz Brief at 4; see also Pankratz Brief at 19 (Kansas law "limits the Commissioners authority to condemning only an easement for railroad operations and no more"); Biery Brief at 20 (same). Contrary to Plaintiffs' assertion, the easements acquired by condemnation are not strictly limited to the operation of a train across the land. Instead, these public easements may be used, in perpetuity, for the construction, operation, maintenance and accommodation of a railway. Kansas case law reveals that these purposes are broadly defined, consistent with the public purpose for which the easements were condemned.

### 1. The Railroads Acquired the Perpetual Right to Use the Lands Condemned for the Construction, Operation, Maintenance and Accommodation of Its Railway

#### a. Kansas Condemnation Law

The statute authorizing the condemnations at issue in Biery and Pankratz is found in Chapter 23 of the General Statutes of 1868, the relevant portions of which were unchanged as of 1899.[22] Then, as now, railway corporations were authorized to take property under the power of eminent domain, as well as to take and hold voluntary grants of real estate, for the purpose of aiding in the construction, maintenance and

[22] Plaintiffs cite to the Kansas General Statues of 1901. Although that version of the General Statutes post-dates the condemnations at issue in this case, the provisions setting out the process for railroad condemnations are the same.

accommodation of its railway. Kan. Gen. Stat. 1868, ch. 23, § 47 (currently codified as Kan. Stat. Ann. § 66-501). The process by which a railroad exercises its authorization to "take" real estate for such purposes is set in Kansas General Statutes 1868, chapter 23, sections 81 through 86. This law provides that a railway corporation may

> apply to the board of county commissioners of any county through which such corporation proposed to construct its road, to lay off, along the line of such proposed railroad, as located by such company, a route for such proposed railroad, not exceeding one hundred feet in width, except for the purposes of cuttings and embankments it shall be necessary to take more for the proper construction and security of the road, . . . and also such land as may be deemed necessary for side-tracks, depots and workshops, and water stations, materials for construction, except timber, a right of way over adjacent lands sufficient to enable such company to construct and repair its roads and stations, and a right to conduct water by aqueducts, and a right of making proper drains.

Kan. Gen. Stat. 1868, ch. 23, § 81. Upon such application, the county commissioners are required to lay off the route requested by the corporation, have that route surveyed, determine the quantity of land necessary, "and appraise the value of such portion of any such quarter-section or other lot of land, and assess the damages thereto[.]" Id., § 82. The board's determinations are to be set forth in a written report, which is filed with the county clerk. Id. The county clerk then files the report with the county treasurer, who certifies the report upon the railroad corporation's payment in full of the appraisement. Id., § 83. Upon filing a copy of this certified report with the register of deeds for the county in question, the railroad

> shall have the right to occupy the land so embraced within such route, for the purposes necessary to the construction and use of its road; and to such portions of such road over which a railroad shall be actually constructed within such time, the perpetual use of such lands shall vest in such company, its successors and assigns, for the use of the railroad, as soon as so much of such railroad shall have been constructed fit for use.

Id., § 84.

Thus, the state laws that authorized the condemnations in this case provided that each railroad could acquire real estate and other property "to aid in the construction, maintenance and accommodation of its railway." Further, when the condemnation process has been followed (and there is no dispute here that it was), "the perpetual use" of the lands condemned vests in the railroad, its successors and assigns, for those purposes.

**b. The Commissioners' Reports**

The condemnation process for the right-of-way at issue in Biery began on May 16, 1889, with the application of the Hutchinson, Oklahoma & Gulf Railroad for the appointment of condemnation commissioners in Reno County, Kansas. Def. Ex. 22-1. The commissioners were duly appointed, notice of the condemnation proceeding was published, and on June 29, 1889, the commissioners "proceeded to lay off according to law" the route for the proposed railroad. Id. Through this process, the commissioners ascertained the quantity of land required by the railroad and "appraised the value and assessed the damages of each owners interest[.]" Id. The commissioners' report, dated July 24, 1889, was filed with the Reno County Clerk on August 1, 1899, and was filed for the record with the Register of Deeds on October 27, 1899 in Book 5, page 218. Id. The language of the 1899 commissioners' report is consistent with the authorizing statute and does not impose any additional restrictions or limitations on the railroad's use of the condemned land. After the Hutchinson, Oklahoma & Gulf Railroad and the McPherson, Texas & Gulf consolidated to form the Hutchinson & Southern Railroad Co., the railroad acquired additional parcels through a different but almost identical condemnation proceeding. The commissioners' report to the Hutchinson & Southern Railroad was filed in the County Clerk's Office for the County of Reno, KS on July 13, 1891 and filed with the Register of Deeds on October 27, 1899, in Book Misc. 5, page 209. See Def. Ex. 22-3.

According to the commissioners' report applicable in Pankratz, the St. Louis, Wichita and Western Railway Company filed its application for the appointment of county commissioners in Butler County, Kansas, on August 1, 1879. See Def. Ex. 10-1. The commissioners were duly appointed by the district court for the county, notice of the condemnation proceedings was published beginning on September 4, 1879, and the commissioners then met beginning on October 13, 1879, to "lay off the Route of said Railway and make the appraisement and assessment of damages as provided by law[.]" Id. The commissioners' report contains that appraisal and assessment, identifying each landowner, the land taken (by location and acreage), the value per acre and the additional damages. Id. This report was filed with the Butler County clerk on October 25, 1879 and filed with the County Treasurer on October 29, 1879. Id. The County Treasurer certified the receipt of the total assessment from the railroad on the same day, and the report was then filed with the Register of Deeds on November 4, 1879. Id. As with the commissioners' reports at issue in Biery, this 1879 report is consistent with the authorizing statute and does not impose any additional restrictions or limitations on the railroad's use of the condemned land.

**2. Under Kansas Law, a Railroad Company's Right to Use Condemned Lands for the Construction, Operation, Maintenance and Accommodation of Its Railway Includes the Right to Maintain Easements That May Be Needed in the Future for Rail Use**

The nature and scope of the right acquired by a railroad to a right-of-way condemned under Kansas law has been the subject of numerous court decisions. The Supreme Court of Kansas has described the right of the railroad to use lands acquired by condemnation as:

> the right to use the land for its purposes. This includes the right to employ the land taken for the purposes of constructing, maintaining, and operating a railroad thereon. Under this right the company has the free and perfect use of the surface of the land as far as necessary for all its purposes, and the right to use as much above and below

the surface as may been needed.

Earlywine v. Topeka, S. & W. Ry., 23 P. 940, 940-41 (Kan. 1890). Correspondingly, the right of the owner of the land subject to a railroad right-of-way acquired by condemnation has been described by the Supreme Court of Kansas as follows:

> One whose property is subjected to condemnation for railway or other public uses is none the less the owner of the fee and holder of the ultimate title. He has what the law calls the servient estate. The party for whose use the condemnation was made has what is called the dominant estate. And, while the fee holder, after condemnation and compensation, may not interfere with the rights of the holder of the dominant estate, yet as owner he may still continue to use the property for any purpose which does not frustrate the public aims and ends for which the property was condemned.

Harvey v. Mo. Pac. R.R., 207 P. 761, 762 (Kan. 1922). Applying these general principles to specific factual situations, it is clear that a railroad's use of land acquired by condemnation is not strictly limited to the actual running of trains across the land, as Plaintiffs' contend.

For example, in Harvey v. Missouri Pacific Railroad, the owners of land burdened by a railroad easement sought to quiet their title to certain portions of the land based on the railroad's failure to make any use of that land for "railway purposes," and based on the plaintiffs' corresponding use of the lands in question during the same period. 207 P.2d at 762. The court rejected that claim, noting that "[i]t was not necessary for the condemnation commissioners in 1879 to limit the amount of land to be condemned for railway purposes to the actual acreage required at that time. In the exercise of their discretion they could look to the future, and to the gradually expanding need for switchyards, sidings, workshops, and the like, and condemn such amount as seemed reasonable to them." Id. The court explained that the railroad's nonuse of portions of its easement imposed "no hardship" on the owner of the servient estate because he was already "paid for the land taken[.]" Id. In summarizing its holding, the Harvey court

emphasized that,

> when it is kept in mind that these condemnation proceedings are authorized not as a mere special privilege to the persons who form the railway corporation nor for its private profit, but are in fact an exercise of the state's power of eminent domain to provide the public with a modern system of transportation and a modern commercial highway, it seems more logical to hold that rights acquired under such proceedings are not lost through lapse of time and nonuse, so long as the railway has a potential need of them, and, where there has been in fact no adverse, hostile, inconsistent use, nor prejudicial exclusion of the holder of the dominant estate. If at some future time the hitherto unused property condemned in 1879 should be required for railway purposes, it would seem illogical to say that the state's power of eminent domain would have to be reinvoked, and that condemnation proceedings would have to be undertaken again. If the property in dispute is never needed for railway purposes, the plaintiff remains not only the owner of the fee, but will continue as heretofore to possess and enjoy it. Under the circumstances, however, he has established no cause of action against the railway company.

Id. at 763 (emphasis added).

The Harvey decision makes it clear that, under Kansas law, when a railroad company acquires an easement by condemnation for the purposes of constructing, maintaining and operating its railway or railroad, the company need not be actively operating a railroad at all times in order to maintain that easement. Instead, Kansas law allows railroad easements to be maintained "so long as the railway has a potential need of them" in the future. Id. Moreover, railroads are not required to specifically identify when in the future they will need easements that are not in active use. In Harvey, the railroad acquired its easement by condemnation in 1879 and still was not using the portions of that easement at issue in the case as of the time of the court's decision in 1922, a period of over 40 years. See id. at 762-63. Likewise, in Atchinson, Topeka & Santa Fe Railway v. Humberg, the court held that the railroad's nonuse of easements acquired and "held as possible railroad expansion areas in the future" for more than thirty years did not constitute an abandonment of those easements. 675 P.2d 375, 379 (Kan. App. 1984). Accordingly, a railroad company's right to use easements acquired by condemnation for the

construction, operation, accommodation and maintenance of its railway or railroad includes the right to maintain easements that are not presently required for active rail use, but that may be needed in the future.

### F. The Preservation of Railroad Easements Through the Railbanking Process Is Permissible Under Kansas Law and Does Not Further Burden the Servient Estate

The NITU permits two distinct present uses of railroad rights-of-way: (1) railbanking, and (2) interim trail use. Preseault, 494 U.S. at 10, 17-18; see also CART v. STB, 267 F.3d at 1153 (D.C. Cir. 2001) ("Congress' stated purposes in enacting the Trails Act were twofold: to preserve rail corridors for future railroad use and to permit public recreational use of trails"); Nat'l Wildlife Fed'n, 850 F.2d at 707 (declining to find that railbanking is a fiction, noting that "Congress specifically identified rail banking as a goal in the test of § 8(d)" of the Trails Act). Plaintiffs do not dispute that railbanking and interim trail use are distinct present uses of the subject railroad rights-of-way. Indeed, Plaintiffs contend that the United States has imposed two new easements upon their land, one for railbanking and a separate one for trail use. See Biery Brief at 1; Pankratz Brief at 1.

Contrary to Plaintiffs' arguments, however, railbanking is a permissible use of the easements acquired by a railroad for the construction, operation, accommodation and maintenance of its railway. The term "railbanking" refers to the "preservation of railroad corridor for future rail use." Neb. Trails Council, 120 F.3d at 903 n.1; Chevy Chase Land Co. v. United States, 37 Fed. Cl. 545, 584 (1997) (railbanking is "preserving the rail corridor for future railroad use"). The railbanking mechanism furthers "the national policy to preserve established railroad rights-of-way for future reactivation of rail service" and protects rail transportation corridors. 16 U.S.C. § 1247(d). Railbanking thus provides railroads with an alternative to

abandonment of their rights-of-way, which can result in the extinguishing an any easements that comprise the right-of-way and the loss of the right-of-way corridor as part of the national transportation system. Preseault, 494 U.S. at 5 n.3; RLTD Ry., 166 F.3d at 811.

As explained by the Supreme Court of Kansas in Harvey, railroad easements acquired by eminent domain are acquired for public use. The rights acquired are for the "perpetual use" of such easements. Kan. Gen. Stat. 1868, ch. 23, § 84. As set forth above, a railroad company's right to use easements acquired by condemnation for the construction, operation, accommodation and maintenance of its railway or railroad includes the right to maintain easements that are not presently required for active rail use but that may be needed in the future. Railbanking – which is simply the preservation or maintenance of a railroad right-of-way for future rail use – falls squarely within a railroad company's rights as the owner of a railroad easement. Accordingly, a railroad's decision to maintain its easements for future rail use is a permissible exercise of the railroad's rights as a matter of Kansas state law. Whether that action is taken directly under Kansas state law (as in Harvey and Humberg, *supra*), or under the railbanking provisions of the Trails Act (as occurred in this case), that action is a permissible use and does not exceed the rights acquired by the railroad through the condemnation proceedings or by voluntary conveyance. Accordingly, the railbanking of the railroad's easement in this case does not infringe upon the rights of the servient estate owner and therefore does not constitute a taking of any property rights held by that owner.

**G. Under Kansas Law, Interim Trail Use is Also a Permissible Use of the Subject Railroad Easements**

The second use of the subject rights-of-way that is authorized by the Trails Act is interim trail use. Because public trail use is a permissible use of the subject rights-of-way under Kansas

law, that use also does not infringe upon the interests of the servient estate owners and does not constitute a taking.

Interim trail use falls within the scope of the easements acquired by the railroads for at least two reasons. First, interim trail use furthers and serves the original purpose of the easement by allowing the preservation of the subject rights-of-way for possible future rail use through the railbanking process. Specifically, the applicable provision of the Trails Act operates by authorizing a third party (the trail sponsor) to assume management responsibility and liability for the corridor for the duration of the railbanking and interim trail use period, along with the costs associated with those responsibilities. Relieving the railroads of such responsibilities (and costs) during the railbanking period encourages railroad companies to preserve their rights-of-way so that they are available for future rail use. See H.R. Rep. 28, 98th Cong., 1st Sess., 1983 WL 25294 (1983) (stating that the Trails Act "will protect railroad interests by providing that the right-of-way can be maintained for future railroad use even though service is discontinued and tracks removed, and by protected railroad interests from liability or responsibility in the interim period").

Second, interim trail use falls within the scope of the easements because it is a permissible public use of the easements under Kansas law. This point is illustrated in the case of Atchison, Topeka & Santa Fe Railway Company v. O'Leary, 100 P. 628 (Kan. 1909). There, the railroad sought to enjoin the paving of a 30-foot strip of land located within its 200-foot wide right-of-way that had been used by the public as a road for over 20 years. O'Leary, 100 P. at 628. The railroad company conceded that the paving of the strip would not interfere with its use of the land in question for railroad purposes at the present time, but was concerned instead about the loss of its right to make use of the lands in the future for railroad purposes. Id. The Supreme

Court of Kansas allowed the road use of the railroad right-of-way to continue, and also allowed that road to be paved. In so ruling, the court noted that "[i]f the company has occasion to use this part of its right of way for railroad purposes, the presence of this pavement will not prevent it. Public convenience and safety will in the meantime be promoted by the improvement." Id. at 629. The court thus held that the lower court's order on the matter should be modified

> to allow the improvements to be made, but with a clear statement to the effect that it shall not give to the city or to the public any title to the land, or any interest that can ripen into a title by user, or obstruct the company in the use of its right of way for the purposes for which it was granted, or impair its title thereto.

Id.

In O'Leary, the Kansas Supreme Court allowed a right-of-way acquired for railroad purposes to be put to other public uses provided those uses do not interfere with the original public purpose for which the right-of-way was acquired. The interim trail use at issue here, like the road use at issue in O'Leary, is a public use of an existing railroad right-of-way. That use facilitates the preservation of the corridor for future rail use and does not interfere with railroad's use of the right-of-way. Indeed, under the terms of the NITUs, any interim trail use that is made of the subject rights-of-way is expressly subject to the future restoration of rail service. Accordingly, interim trail use is a permissible public use of an existing railroad right-of-way and, as such, does not exceed the scope of the railroad's easement and does not constitute a taking of any interest allegedly held by the Plaintiffs.[23]

### H. Under Kansas State Law, the Railroad Has Not Abandoned the Right of Way

[23] Although Defendant submits that both railbanking and interim trail use are permissible uses of the subject rights-of-way under Kansas state law that do not result in a taking in this case, should the Court conclude that only one of those uses falls within the scope of the easements acquired by the railroads, liability would be limited to the additional burden imposed on the existing right-of-way by the use that is found to exceed the scope of the easements.

Plaintiffs argue that the two railroads abandoned the subject rights-of-way under Kansas law and that, but for the Trails Act, those rights-of-way would have reverted to Plaintiffs. See Pankratz Brief at 25; Biery Brief at 22. Contrary to Plaintiffs' assertions, the railroads' actions in this case demonstrate that the railroads have not abandoned the subject rights-of-way. Instead, the railroads' actions are entirely consistent with an intent to preserve the rights-of-way so that the corridor remains intact and is available for rail use in the future. Under Kansas law, such acts do not constitute abandonment. To the contrary, as set forth below, the undisputed facts of this case demonstrate that the subject rights-of-way have not been abandoned under Kansas law. Accordingly, the application of the Trails Act does not result in a taking of Plaintiffs' interest in those rights-of-way.

**1. Under Kansas Law Abandonment Requires Both Intent to Abandon and Action to Carry Out That Intent**

Kansas law recognizes the "unitary rule" as the "cardinal principle" to follow in determining when a railroad has abandoned a right-of-way. Miller v. St. Louis Southwestern Ry. Co., 718 P.2d 610, 612 (Kan. 1986). As explained by the Kansas courts, "[t]o constitute abandonment of a railroad right-of-way there must be a uniting of intent to renounce all interest in the right-of-way with a clear and unmistakable act to carry out that intent." Gauger v. Kansas, 815 P.2d 501, 503 (Kan. 1991). See also Miller, 718 P.2d at 612. Moreover, abandonment is not recognized by mere intent and action alone without something more, as the Court of Appeals of Kansas explains:

> American Jurisprudence treats the [unitary] principle a bit differently. It states that the acts "must be of a character so decisive and conclusive as to indicate a clear intent to abandon" and that intent "may be proved by an infinite variety of acts. Further, it states the intent must be "neither to use nor to retake the property and the act must be clear and unmistakable and it must show a purpose to repudiate . . . ownership." It claims that "relinquishment of the possession" is not an abandonment

as the act must indicate a lack of any interest in the property.

Martell v. Stewart, 628 P.2d 1069, 1070-71 (Kan. Ct. App. 1981) (citing 25 AM. JUR. 2D *Easements and Licenses* § 103 and 1 AM. JUR. 2D *Abandoned, Property* § 16) (internal citations omitted).

In this case, as explained below, not only do the railroads lack the requisite intent to abandon the rights-of-way, they have not taken the necessary affirmative acts to constitute an abandonment.

**2. The Railroads Lack the Requisite Intent to Abandon**

Plaintiffs allege that "when a railroad ceases railroad operations over a right-of-way, the easement is abandoned." See Biery Brief at 24; Pankratz Brief at 25. However, the railroads' actions in this case, when viewed as a whole, do not support that conclusion.

Plaintiffs first point to the railroads' participation in regulatory abandonment proceedings before the STB. See Biery Brief at 24; Pankratz Brief at 25. However, the fact that the railroads participated in such proceedings and negotiated with qualified trail groups does not indicate that the railroads had the necessary intent to abandon their property interests. Under Kansas law, a railroad's intent to abandon must be unmistakable. See Martell, 628 P.2d at 1071. When a railroad files a Notice of Exemption with the STB, it is merely requesting authorization to cease active rail service on the lines. If the railroad's exemption becomes effective, the railroad may then proceed to consummate the abandonment of the rail line. See 49 C.F.R. § 1152.29(e)(2) (requiring a railroad to file a "notice of consummation" if it chooses to abandon the corridor). Abandonment authority issued by the STB is permissive, but lines authorized for abandonment can be acquired for future rail service, under the offer of financial assistance provisions under 49 U.S.C. § 10904. Where there is no offer of financial assistance, the Trails Act offers the

possibility of future rail use by railbanking. Thus, by no means does the filing of a Notice of Exemption require the railroad to abandon the rail line.

Moreover, the filing of a Notice of Exemption is a prerequisite to obtaining a NITU that authorizes the railroad and a qualified trail sponsor to negotiate a railbanking agreement that will preserve the right-of-way for future rail use. Chevy Chase Land Co., 733 A.2d at 1080. Here, the railroads chose not to exercise their abandonment authority. Instead, the railroads agreed to the issuance of a NITU and subsequently entered into railbanking and interim trail use agreements with qualified trail sponsors. As a result, the railroads do not have an unmistakable intent to abandon, but rather have acted to preserve the right-of-way. In addition, under the terms of the NITUs, the railroads have a right to re-enter the subject rights-of-way for the purposes of restoring rail service. Pankratz Pls.' Proposed Facts, Tab D; Biery Pls.' Proposed Facts, Tab M; see also Def. Ex. 20. The NITUs expressly provide that "[i]nterim trail use/rail banking is subject to the future restoration of rail service and to the user's continuing to meet the financial obligations of the right-of-way." See Pls.' Tab M and Tab D; see also 49 C.F.R. § 1152.29(a)(3). Under Kansas law, when a railroad expressly retains the right to retake the right-of-way, it lacks the intent to abandon. See Martell, 628 P.2d at 1071 ("[T]he intent must be neither to use nor to retake the property . . .") (internal citations and quotations omitted).

Additionally, the conveyance of title for the right-of-way from the railroad to the trail user and the railbanking/interim trail use agreement often contains language alerting all parties to the fact that the railroad retains the right of re-entry over the right-of-way. By way of example in Biery, the BNSF conveyed title to the subject right-of-way to the City of South Hutchinson by quitclaim deed. The deed specifies that the "Donee acknowledges that any interim trail use by Donee or its assigns shall be subject to the possibility of future restoration of rail service and/or

BNSF's retained interests . . ." Biery Pls.' Proposed Facts, Tab N. The deed goes on to state that "Donee's obligation that interim trail use by Donee shall not impair future restoration of rail service pursuant to the National Trails Systems Act, as amended." Id. The railbanking/interim trail use agreement between the City of South Hutchinson (the trail user) and BNSF contains similar language, in which the railroad retains the right of re-entry over the subject corridor for future rail reactivation. Def. Ex. 20. Thus, the totality of the railroads' actions demonstrate an intent to keep the subject rights-of-way available for future railroad use, and to retain the right to re-enter the rights-of-way for the purpose of restoring rail service. Under Kansas law, such actions do not support the conclusion that the railroads intended to abandon their property interests.

### 3. The Railroads' Actions Are Consistent With Preserving the Rights-of-Way

Not only do the railroads lack the intent to abandon the rights-of-way, their actions have been consistent with the desire and intent to preserve the corridors for future rail use. Plaintiffs make much of the fact that the railroads have ceased operation of the rail line, the rails and ties have been removed,[24] and no railroad traffic has been used on the right-of-way for over two years. See Biery Brief at 24; Pankratz Brief at 25. However, under Kansas law, mere nonuse of land condemned for public purposes is not enough to constitute abandonment. See Pratt v. Griese, 409 P.2d 777, 780 (Kan. 1966) (rejecting argument that mere non-use without more constitutes an abandonment); see also Williams Telecomms. Co. v. Gragg, 750 P.2d 398, 400 (Kan. 1988) ("It is well settled in Kansas that an easement is not abandoned by mere nonuse."). Indeed, even where a railroad right-of-way has laid dormant for significant stretches of time, the

[24] Only the Pankratz Plaintiffs allege that the rails and ties have been removed. The Biery Plaintiffs do not raise this issue.

courts in Kansas have been unwilling to recognize that the right-of-way has been abandoned. Miller, 718 P.2d at 613 (finding plaintiffs' argument that non-use of the railroad from 1968 to 1984 constituted abandonment unpersuasive); see also Humberg, 675 P.2d at 379 (holding that the railroad's nonuse of easements acquired and held for possible future railroad expansion for more than thirty years did not constitute an abandonment).

Defendant does not dispute that the rails and ties have been removed from the subject rights-of-way, but such action is not inconsistent with the railroads' efforts to preserve the rights-of-way for potential active rail service in the future through the railbanking process. See 16 U.S.C. § 1247(d); 49 C.F.R. § 1152.29. Indeed, the NITUs issued by the STB states that,

> [c]onsistent with the public use and interim trail use/railbanking conditions imposed in this decision and notice, [the railroads] may discontinue service and salvage track and relevant materials. [The railroads] shall otherwise keep intact the right-of-way underlying the tracks, including bridges, trestles, culverts, and tunnels . . . to enable any state or local government agency, or other interested person, to negotiate the acquisition of the line for public use.

Biery Pls.' Proposed Facts, Tab M; Pankratz Pls.' Proposed Facts, Tab D. Further, Kansas law does not support the blanket proposition that removal of rails and ties from a right-of-way constitutes abandonment. See Martell, 628 P.2d at 1071 (rejecting claim that railroad was abandoned with the removal of tracks as "track removal alone is not sufficient to support a finding of abandonment.") Abandonment would be recognized if the "deliberate removal of tracks render[ed] the operation of the railroad impossible." Pratt, 409 P.2d at 781 (emphasis added). Here, as the NITUs fully contemplate, the removal of the rails and ties does not render operation of a railroad impossible because the underlying rights-of-way are kept intact, thus preserving the opportunity to reactivate rail service.

In sum, the railroads' actions do not evince an intent to abandon. The mere non-use of

the railroad corridor or the removal of ties and tracks, without more, does not demonstrate that the railroads sought to relinquish their interests in the rights-of-way. Instead, their actions demonstrate a clear intent to preserve the rights-of-way and to retain their rights to re-enter those corridors for the purpose of restoring rail service in the future. Accordingly, the actions of the railroads in this case do not support a finding that, but for the application of the Trails Act, the subject rights-of-way would be deemed abandoned under Kansas law.

#### 4. For There to Be An Abandonment, the Railroads' "Original Use" Must Be Rendered Impossible Or Highly Improbable

Plaintiffs rely on Pratt v. Griese, for the proposition that "when a railroad ceases railroad operations over a right-of-way, the easement is abandoned . . ." Biery Brief at 22; Pankratz Brief at 23-24. Pratt stands for no such proposition. Rather, it is well established under Kansas law that an easement on land "condemned for a public use does not revert to the fee owner unless its use for the . . . condemned purpose has become impossible, or so highly improbable as to be practically impossible." Matlack v. City of Wichita, 407 P.2d 510, 511 (Kan. 1965); Winkel v. Kansas Dep't of Transp., 131 P.3d 570, No. 94,008, 2006 WL 903159, at *2 (Kan. Ct. App. Apr. 7, 2006) (citing Matlack, 407 P.2d at 511). The Pratt decision is consistent with these Kansas cases.

In Pratt, the court determined that the easement was limited to the specific purpose of providing a "railroad spur track to a military airfield and for related military purposes." Pratt, 409 P.2d at 782 (emphasis in original). The court found that when the government discontinued the military airfield, removed the ties and tracks, and conveyed the airfield to a private individual, the original public use had been rendered impossible, and thus, the government had abandoned the easement. See id. The court focused on the impossibility of the easement ever

being used for its original purpose, and stated:

> These are acts of a decisive character. By them the government has conclusively rendered it impossible for the easement to be used for the purpose for which it was taken, viz., any military purpose thereby constituting an abandonment of the easement and causing defendant's land to be relieved of it.

Id.

In Riverside Drainage Dist. of Sedgwick County v. Hunt, 99 P.3d 1135 (Kan. Ct. App. 2004), the Court of Appeals of Kansas noted that the Pratt court's focus on the impossibility of the original use was determinative in its finding of abandonment. 99 P.3d at 1140 ("Of particular note in Pratt is the specific finding that the government's acts conclusively rendered it impossible for the easement to be used for the purpose for which it was taken . . .") (internal citations and quotations omitted). In distinguishing Pratt from the case before it, the court found that a drainage right-of-way easement that had been left unused from 1974 until the time of the court's decision in 2004, had not been abandoned because the "impossible, or so highly improbable as to be practically impossible rule of Matlack" had not been satisfied. Id. (internal citations and quotations omitted.)

Thus, mere termination of active rail service is not enough to constitute an abandonment as the Plaintiffs contend. The determinative question is whether or not the railroads' action rendered the "original use"[25] impossible, or so highly improbable as to be practically impossible. As discussed below, the unequivocal answer is no.

Here, Plaintiffs assert that the following acts by the railroads are indicative of

[25] The scope of the railroads' easements extends beyond the mere "running of trains across the land." The railroad may make any use it wants of those segments of the rights-of-way it acquired in fee. In addition, it may use those segments over which it acquired an easement for the construction, operation, maintenance and accommodation of its railway. As detailed in Section E.2, *supra*, such "original uses" include the right to maintain a corridor for future rail use even though the corridor is not presently needed for the "running of trains."

abandonment: (1) that the railroads sought permission from the STB to abandon railroad service over the right-of-ways; (2) that the railroads conveyed their interests in the right-of-way to a non-railroad for public recreational trail use; (3) that there has been no railroad traffic for more than two years; and (4) the rails and ties have been removed from the right-of-way. See id. However, none of these acts, taken alone or in total, show that it is impossible for the railroads' "original use" to resume.

In fact, the railroads' actions contemplate that future rail service is a real possibility. By entering into railbanking/interim trail use agreements with qualified trail sponsors, the railroads have preserved the rights-of-way for possible future rail reactivation. For example, the language of the railbanking/interim trail use agreement entered by the City of South Hutchison and the BNSF reflects the possibility that rail service may be restored. See Def. Ex. 20 at 2 ("Donee acknowledges that any interim trail use by Donee or its assigns shall be subject to the possibility of future restoration of rail service . . ."); see also Biery Pls.' Proposed Facts, Tab N ("Donee acknowledges that any interim trail use by Donee or its assigns shall be subject to the possibility of future restoration of rail service . . ."). Even the removal of rails and ties from the subject rights-of-way does not denote an impossibility that future active rail service will resume. The NITUs issued by the STB requires the railroads to keep intact the right-of-way underlying the tracks, including bridges, trestles, culverts, and tunnels, which leave open the possibility of future rail service. See Biery Pls.' Proposed Facts, Tab M; Pankratz Pls.' Proposed Facts, Tab D. Moreover, as the trail use agreement entered into by the City of South Hutchinson and the BNSF makes clear, the trail group's use of the property cannot impair the possible future restoration of rail service. See Biery Pls.' Proposed Facts, Tab N ("It is agreed and understood that the use of the Property by Donee (or its assignees) shall not impair future restoration of rail service . . .").

Thus, the railroads' actions do not render the "original use" impossible but rather keep alive the possibility that active rail service can be reinstated.

**5. Alternatively, a Shift in Public Use Will Not Constitute an Abandonment**

Alternatively, under Kansas law, the right-of-way can be converted from one public use (active rail service) to another (railbanking and interim trail use) without causing a termination of the right-of-way and a corresponding reversion of any underlying interests in the land. As discussed *supra* at Section IV.G., trail use falls within the scope of the easement. If, however, the Court finds that it does not, the Court should still find that the railroads have not abandoned the rights-of-way because, under Kansas law, a shift in public use does not extinguish a railroad right-of-way. Here, the railroad rights-of-way at issue were acquired in the late 1800's. Even at that time, adaptation of a railroad's right-of-way to accommodate new public use was generally understood not to trigger an abandonment:

> The property [taken by railroad] is, however, to be deemed taken for a public use itself, rather than for the peculiar use and enjoyment by the party to whose possession it passes. It does not therefore revert to the owner upon a mere transfer of the railroad to another company, nor upon its appropriation to another similar public use.

E. Pierce, A Treatise on the Law of Railroads 158 (1881).

Kansas law follows this principle and allows a shift in use for a right-of-way so long as that use continues to be of a public nature. For example, in Kansas Electric Power Company v. Walker, the court was faced with the question of whether or not a change in the method of transportation and motive power constituted an abandonment of a right-of-way. 51 P.2d 1002, 1003 (Kan. 1935). There, the shift in public use involved a change from electric street car service to gasoline driven busses. The appellants argued that this shift in use amounted to an abandonment of the right-of-way. In declining to find an abandonment, the Supreme Court of

Kansas adopted the logic of the district court, which stated:

> Much is said about the franchise granted by the city to use the streets of the city for one purpose and later agreeing to a change, but it must be conceded that the granting of the privilege of making such change and the right to use the streets of the city in the new and different way will not in any way affect the rights of these parties as to the passageway over private property within the city limits.

Id. at 1002.

Again, the determinative factor in deciding whether a shift in the public use of an easement amounts to an abandonment rests on whether the "original use" has been rendered impossible or so highly improbably as to be practically impossible. In Matlack v. City of Wichita, *supra*, the tract of land in dispute had been condemned by the City of Wichita for the purpose of opening and widening a local street. However, only portions of the condemned property were used for street purposes, and the remainder was used to house commercial buildings and retail gasoline service stations. 507 P.2d at 511. The appellant claimed that the City lost its easement because it was not being used for specific street purposes for which it was originally condemned. Id. As to the portions used for non-street purposes, the court held that the City had not abandoned the tract of land and explained that "an easement on land dedicated to or condemned for a public use does not revert to the fee owner unless its use for the dedicated or condemned purpose has become impossible, or so highly improbable as to be practically impossible." Id. Even though structures now occupied the land in dispute, the court found "nothing in the record to indicate that the use of the land for some street purpose is impossible or even highly improbable." Id.

Thus, Kansas law dictates that public use of an easement may shift and an abandonment does not result when there remains a possibility that the original use will resurrect. In the cases

of Biery and Pankratz, assuming that trail use goes beyond the scope, there has been a shift in use from active rail service to trail use.[26] However, because of the railbanking feature, the railroads can, at any time, re-enter the land for the purposes of restoring active rail service over the subject right-of-way. Because the "original use" can resurrect at anytime, the railroads have not abandoned the easement by allowing another public use to be made of the easement in the interim.

## V. CONCLUSION

For the reasons discussed herein, Defendant respectfully requests that the Court deny Plaintiffs' motions for partial summary judgment and grant Defendant's cross-motion. First, the Court should grant Defendant's motion with respect to the proper claim accrual date for the permanent takings claims alleged in the Plaintiffs' respective complaints, and hold that the Biery Plaintiffs' claims accrued on April 8, 2004, and that the Pankratz Plaintiffs' claims accrued on June 5, 2005. Second, Plaintiffs' motion for partial summary judgment should be denied in its entirety because (with one exception), Plaintiffs have failed to meet their burden of proving that they are the fee owners of lands subject to a railroad easement. In addition, for those segments of the right-of-way that the railroad acquired in fee, Plaintiffs have no ownership interest and summary judgment should be entered in favor of Defendant. Finally, Defendant should be granted summary judgment with respect to liability because the uses of the subject rights-of-way authorized by the Trails Act – railbanking and interim trail use – are permissible present uses of those rights-of-way under Kansas law. In addition, the railroads have not abandoned their property interests in the subject rights-of-way, and alternatively, a right-of-way can be coverted

[26] Defendant notes that neither right-of-way is presently being used as a public trail. However, such use is authorized in accordance with the terms of the NITU and the Trails Act.

to another public use without infringing upon the rights of the servient estate holder and without causing an abandonment of the right-of-way.

Respectfully submitted this 2nd day of June, 2008,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

s/ Kristine S. Tardiff
KRISTINE S. TARDIFF
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL: (603) 230-2583
FAX: (603) 225-1577
E-MAIL: kristine.tardiff@usdoj.gov

AYAKO SATO
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
60 D Street, N.W., 3rd Flr. Room 3133
Washington, DC 20004
TEL: (202) 305-0239
FAX: (202) 305-0506
E-MAIL: ayako.sato@usdoj.gov

Attorneys for Defendant

Of Counsel:

ELLEN D. HANSON, General Counsel
EVELYN KITAY, Attorney
Surface Transportation Board
Office of General Counsel
395 E Street, SW
Washington, DC 20024