> [W]hen land is devoted to railroad purposes it is immaterial whether the railroad company acquired it by virtue of an easement, by condemnation, right-of-way deed or other conveyance. If or when it ceases to be used for railway purposes, the land returns to its prior status as an integral part of the freehold to which it belongs prior to its subjection to use for railway purposes. This court has uniformly held that railroads do not own fee titles to narrow strips taken as right-of-way, regardless of whether they are taken by condemnation or right-of-way deed. The rule is in conformity with this state's long-standing public policy and gives full effect to the intent of the parties who execute right-of-way deeds rather than going through lengthy and expensive condemnation proceedings."[56]

The Federal Circuit has interpreted similar instruments as conveying only an easement and not a fee estate in the land.[57] The Plaintiffs further show that the government's citation to cases in which a railroad obtained fee title to land acquired for stations, depots, grain elevators and similar structures is distinguished from the present situation in which a strip of land was used as a right of way upon which only rails and ties were laid.

### *C. Did the railroad's right to use the Plaintiffs' land for operation of a railroad include the ability of a non-railroad to use the land as a public-access recreational trail and indefinitely "railbank" this land under the federal Trails Act?*

The government claims that: (a) "The uses of the subject rights-of-way authorized by the Trails Act – railbanking and interim trail use – are permissible present uses of those rights-of-way under Kansas law."[58] (b) "The railroads have not abandoned their property interest in the subject rights-of-way" because under the Trails Act some railroad at some indefinite time in the

---

[56] *Harvest Queen Mill & Elevator Co. v. Sanders*, 189 Kan. 536, 370 P.2d 419 (Kan., 1962) (citing *Abercrombie v. Simmons*, 71 Kan. 538, 81 P. 208 (Kan., 1905), *Bowers v. Atchinson, T. &S. Rly. Co.* 119 Kan. 202, 237 P. 913 (Kan., 1925), *Federal Farm Mortg.* Supra, 149 Kan at 792 and *Disney v. Lang*, 90 Kan. 309, 313, 133 P. 572 (Kan. 1913)).

[57] See, discussion of Manwell Deed in *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir., en banc, 1996), *(Preseault II)* at 1535 and the conveyance in *Toews v. United States,* 376 F.3d 1371 (Fed. Cir., 2004) and Judge Bruggink's interpretation of deed at issue which was approved by Federal Circuit on appeal. *Toews v. United States*, 53 Fed. Cl. 58 (2002) at 61–62.

[58] Govt's Motion, p. 3.

future may restore active railroad service on this corridor.[59] And, (c) under the so-called "shifting Public Use Doctrine" "a right-of-way acquired for a public purpose can be converted from one public use (active rail use) to another (railbanking and interim trail use) without infringing upon the rights of the servient estate holder and without causing an abandonment of the right of way."[60]

The Plaintiffs show that this argument - "public recreational trail use and "railbanking" is a railroad purpose" – is an argument that the government repeatedly makes and which has been repeatedly rejected by every court to ever consider the argument. This argument has been repeatedly rejected by the Federal Circuit including the *PRESEAULT I en banc* decision. This argument is flatly contrary to United States Supreme Court's Fifth Amendment takings jurisprudence and directly contrary to more than a century of Kansas law including numerous decisions of the Kansas Supreme Court. It also makes absolutely no sense as a matter of linguistics, logic or law to claim that a hiking and biking trail operated by a county park department is a "railroad."

### D. *Did the Pankratz Landowners claim for a taking of their land arise when the STB issued the original NITU invoking the Trails Act and authorizing conversion of the right of way to trail use or did this claim arise when the STB issued the second NITU?*

For the *Biery* landowners, the parties agree that the Plaintiffs claim arose on April 8, 2004, the service date of the original NITU issued by the STB.[61] However, the government spills a great deal of ink contending that the *PANKRATZ* landowners' claim accrued on June 2, 2005, the date of the second NITU, not September 14, 2004, the date of the original NITU. The government contends that "any takings claim that accrued with the issuance of the first NITU

---

[59] Govt's Motion, p. 3 and Govt's Memo, p. 49.

[60] Govt's Motion, p. 3.

[61] The Plaintiffs previously referenced this NITU by the April 5, 2004 decision date. The Plaintiffs agree with the government that the effective date of the NITU is the April 8, 2004 Service Date.

was, at most, a temporary one."[62] Because the first NITU expired without a trail use agreement being reached with the original trail sponsor, the government claims that "the correct claim accrual date for the permanent takings claims alleged [by the *PANKRATZ* landowners] is June 2, 1995 [sic], the date on which the second NITU was issued."[63]

The Plaintiffs respond by noting that – whether one agrees with the decisions or not – the Federal Circuit has clearly and unequivocally held in three Trails Act cases that there is a single Trails Act taking claim and that single claim accrues upon the STB's issuance of the original NITU.[64] The Federal Circuit was presented with precisely the argument that the taking claim did not arise until a subsequent NITU was issued because the original NITU had expired without a trail use agreement being reached with the original trail sponsor. The Federal Circuit in *BARCLAY V. UNITED STATES* 443 F.3d 1368 (Fed. Cir., 2006) wrote,

> The Barclay appellants argue that the original NITUs issued to the Flint Hills trail were vacated and that a second taking occurred when a new NITU was issued. *** it is common that, if after issuance of the NITU the trail operator named in the original NITU becomes unwilling or unable to assume responsibility for the trail, a new operator will be able to be formally substituted by issuance of a new NITU before an agreement with the railroad is reached. *** the series of STB NITU orders must be viewed as part of a single and continuous government action rather than as a new taking. Any other approach would result in multiple potential takings of the same reversionary interest.[65]

Later in its decision the court reaffirmed this point, "This is merely another version of the argument - rejected in Caldwell - that the original NITU should not be viewed as the taking

---

[62] Govt's Memo, p. 15.

[63] Govt's Memo, p. 16. The reference to the date "1995" is an apparent typographical error because there is no dispute that the date of the second NITU is 2005 and the government in the previous sentence refers to the date of the "new" or second NITU as "June 2, 2005."

[64] The government's contention at p. 8, fn. 8, asserting that a claim can accrue for purposes of the statute of limitations without liability for the claim having yet accrued is, frankly, an absurd statement. See, *JAPANESE WAR NOTES V. UNITED STATES*, 178 Ct. Cl. 630, 373 F. 2d 356 (1967) ("A claim first accrues when all events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action." *Id.* at 358.)

[65] *BARCLAY*, 443 F.3d at1375.

because subsequent events might render the NITU only temporary. The Sunflower Trail claims accrued when the original NITU issued, regardless of the petition to reopen. *** We adhere to Caldwell and hold that the issuance of the original NITU triggers the accrual of the cause of action."[66]

This fourth point of contention is largely academic for purpose of this motion. As both parties agree, the *PANKRATZ* landowners' claim was timely filed whether their claim accrued on the first or second NITU.[67] The date of taking does determine the date when the value of the land taken is determined and the date when the government's obligation to pay interest on the value of the property begins to run. So for two points the date of September 14, 2004 or June 2, 2005 is substantively important but concerns the damage phase of this case. The date of taking is also substantively important as it is the date upon which the plaintiff must have a property interest. However, because all the *PANKRATZ* landowners held title on both September 14, 2004 and June 2, 2005, the choice of the first or second NITU date as the date of taking makes no substantive difference on the issue of liability presently before this Court.

### *E. The Plaintiffs' Response to the Government's Argument Is Presented In Two Parts.*

The Plaintiffs respond in Part One by discussing the government's contentions concerning the ownership of the land upon which the Reno County and Butler County Rights of Way were located and, specifically, whether the Plaintiffs owned the land underlying the railroad right of way and whether the railroad obtained an easement to use this land or obtained a fee estate in some segments of land upon which the right of way was located. In Part Two, the Plaintiffs' respond to the government's contention that a public-access recreational trail and "railbanking" constitute a "railroad purpose" under Kansas law.

We do not believe any response (beyond that noted above) is necessary to the address the government's contention that the second NITU was the date of taking in the *PANKRATZ* case.

---

[66] *Id.* at 1378.

[67] "All of the Plaintiff's claims are timely." Govt's Memo, p. 10

# IV. Part One: Point One. All The Plaintiffs Own The Land Upon Which The Former Railway Right Of Way Was Located

## *A. The government agrees that all the landowners hold title to the land abutting the right of way but argues that several of them have not carried the burden of establishing title to the land under the right of way because the deed by which they acquired title references the edge of the right of way as the boundary.*

As we noted above in our summary of the agreed facts, the Defendant does not dispute that all the Pankratz and Biery Landowners hold a fee simple estate in the land abutting the right of way.[68] Each named Plaintiff has provided a deed recorded with the Recorder of Deeds' Office by which they obtained title to their land prior to the STB's issuance of the NITU. Each Plaintiff has also provided tax records from the Butler and Reno County Assessors Offices showing that for the year 2004 and subsequent years they were assessed and paid real estate tax for their property abutting the right of way. The government does not dispute the Plaintiffs' land records establishing their ownership.[69] Indeed, the government expressly admits that the Plaintiffs own fee title to the land abutting the former right of way.[70]

The government contends, however, that the legal description in the deeds by which the Plaintiffs acquired title to their land only describes the land as a plat abutting the right of way or

---

[68] The Plaintiffs rely on the government's express statements (referenced above in notes 14 and 38) for the point that the government has acknowledged the Plaintiffs' ownership of the land abutting the respective right of way. Should the government later dispute the Plaintiffs' ownership of this abutting property, the Plaintiffs would note that under 56 the defendant is foreclosed from challenging the Plaintiffs' ownership of the abutting land and, to the extent that this Court may allow the government to raise such challenge, the Plaintiffs reserve the right under RCFC 56 to submit additional supporting evidence. Further, the Plaintiffs note that the Defendant – apart from bald allegations that the Plaintiffs do not own the land underlying the right of way – has not presented any evidence to support a claim that anyone other than the Plaintiff owns the land abutting and underlying the right of way.

[69] See Notes 14 and 38 *supra.*

[70] *Id.*

by a metes and bounds description with the right of way as the edge of the property boundary.[71] As such, the government argues that the deeds by which the challenged Plaintiffs acquired their land "establish only that they own a parcel of land that abuts that right-of-way. In order to establish ownership of the lands underlying he right-of-way, Plaintiffs must produce additional documents from their chains-of-title establishing that their predecessors-in-title owned the lands underlying the right-of-way and that such land was conveyed to them."[72]

### *B. It is a long-established principle of real estate law that a conveyance describing land, whether described by metes and bounds or by Plat and Block, as abutting a railroad is presumed to carry fee title to the center of the adjoining railroad.*

Title to land described as bordering upon a road, right-of-way, river or similar physical boundary extends to the centerline of the referenced road, right-of-way or river. This is a longstanding presumption and principle of real estate law. Thus (as applied to this case) those landowners who acquired their title to land by a deed which describes the land conveyed as, for example, "the parcel as extending' to a point on the East right –of-way line of the A.T. & S.F. RR *** thence South along the said right-of-way line"[73] are presumed to have acquired fee title to the land extending to the centerline of the referenced right of way.

Before he became President and Chief Justice, Taft served on the Court of Appeals for the Sixth Circuit. Judge Taft had before him a case presenting this exact issue and articulated the rule and the policy underlying the rule that a conveyance describing land with a boundary as the edge of a road or similar "monument" carried title to the center of that "monument." Judge Taft went on to note that this rule was of longstanding recognition in the common law from England and recognized by the U.S. Supreme Court in earlier decisions of Justice Chase.

---

[71] Govt's Memo, pp. 26-32.

[72] Govt's Memo, p. 31.

[73] Govt's Memo, p. 27, quoting from the deed to APC as an illustration of the government's argument.

By the common-law rule of construction, a deed of trust which describes it as bounding upon a street carries the fee of the grantor to the middle line of the street. 3 *Washb.Real Prop.*(5th Ed.) 635, where all the authorities are collected. ***

In *BANKS V. OGDEN*, 2 Wall. 68, Chief Justice Chase, speaking for the supreme court, said:

'It is a familiar principle of law that a grant of land bordering on a road or river carries the title to the center of the river or road, unless the terms or circumstances of the grant indicate a limitation of its extent by exterior lines.' ***

The reasons for the rule in one case apply equally to the other. The existence of 'strips or gores' of land along the margin of nonnavigable lakes, to which the title may be held in abeyance for indefinite periods of time, is as great an evil as are 'strips and gores' of land along highways or running streams. The litigation that may arise therefrom after long years, or the happening of some unexpected event, is equally probable, and alike vexatious in each of the cases, and that public policy which would seek to prevent this by a construction that would carry the title to the center of a highway, running stream, or nonnavigable lake that may be made a boundary of the lands conveyed applies indifferently, and with equal force, to all of them. It would seem, also, that whatever inference might arise from the presumed intention of the parties against the reservation of the land underlying the water would be as strong in one case as in either of the others.' ***

In *NEWHALL V. IRESON*, 8 Cush. 595, it was held, Chief Justice Shaw delivering the opinion, that where the land conveyed was described as bounding upon a road, the deed carried the fee in the road to the center line, although the calls by distance carried the lot only to the road side. In *PECK V. DENNISTON*, 121 Mass. 17 the same court, speaking by Chief Justice Gray, made the same ruling on a similar state of facts. See, also, *COX V. FREEDLEY*, 33 Pa. 124, and *CHATHAM V. BRAINERD*, 11 Conn. 60-85. The evils resulting from the retention in remote dedicators of the fee in gores and strips, which for many years are valueless because of the public easement in them, and which then become valuable by reason of an abandonment of the public use, have led courts to strained constructions to include the fee of such gores and strips in deeds of the abutting lots. And modern decisions are even more radical in this regard than the older cases. For a very good statement of the present condition of the law on the subject, reference may be had to the new and valuable work of Mr. Dembitz on Land Titles, Sec. 11.

After citing several more recent cases Judge Taft noted the practice of modern courts as "treat[ing] the highway or private way in the description of a lot as a monument, and in

obedience to the rule that a reference to monuments controls descriptions by courses and distances it has carried the lot to the center line of the monument."[74]

### *C. Kansas has expressly adopted the presumption that a deed describing land with a railroad right of way as a boundary carries title to the centerline of the adjoining railroad right of way.*

The Supreme Court of Kansas, drawing expressly upon the common law of England referenced by Judge Taft and embracing Judge Taft's opinion, held in *BOWERS V. ATCHISON, T. & S. F. RY. CO.* that since 1343 in the case reported in *YEAR BOOK OF 17 EDWARD III,* A.D. 1343,

> When ways commenced to mark boundaries between holdings, the presumption was that a way forming a boundary had originally been established equally on the land of each proprietor, and consequently that each had the *fee usque as medium filum viae*. The presumption was rebuttable that the way was wholly or chiefly on the land of one. The presumption of ownership to the middle of the road was applied to conveyances, and a deed of general words bounding land on a highway presumptively carried title to the center of the way.[75]

The *BOWERS* court applied this to land in which a railroad and an abandoned public highway boundary were in dispute. This was followed and similarly applied by the Kansas Supreme Court in *FEDERAL FARM MORTG V. SMITH, . CORP* -at 840.[76] "The courts are generally agreed that when the long narrow strips of land taken from the adjacent freehold for a highway, railroad right of way, or for other public purpose, are no longer used for such purpose, the full dominion over then returns to the holder of the underlying fee. The public policy concerned in the legal aspects of this matter was well stated by Judge Taft in *PAINE V. CONSUMER'S FORWARDING & STORAGE*."[77]

---

[74] *PAINE, ET AL. V. CONSUMERS' FORWARDING & STORAGE CO, ET AL.*, 71 F. 626, 630-31, 632 (6th Cir. 1895).

[75] *BOWERS V. ATCHISON, T. & S. F. RY. CO.* 119 Kan. 202, 237 P. 913, 914 (Kan., 1925).

[76] *FEDERAL FARM MORTG V. SMITH* , 149 KAN. 789, 89 P.2d 838 (Kan., 1939)

[77] *FEDERAL FARM MORTG. CORP* at 840. See also, *BARKER V. LASHBROOK*, 128 Kan. 595, 279 P. 12 (Kan., 1929).

### D. *The Defendant Is Aware Of This Presumption of Real Estate Law And Has Acknowledged this Presumption In This As Well as Other Trails Act Taking Cases.*

The Defendant is aware of this fundamental principle that title describing land abutting a railroad right of way actually carries fee title to the center line. In a similar Trails Act taking case, the government initially made the same argument that the land owners' title to the land abutting an abandoned railroad right of way did not include title to the property underlying the right of way. See, *ILLIG V. UNITED STATES*, 58 Fed. Cl. 619 (2003). The government sought summary judgment on this basis. However, even before the Court had opportunity to consider this point, the government *sua sponte* withdrew its motion on this point and noted that its argument was contrary to this settled presumption and principle of real estate law.[78]

### E. *All the Plaintiffs Have Satisfied the Presumption That They Hold Title To The Land Abutting AND Underlying The Right Of Way and the Government has Not Rebutted this Presumption.*

In this case, the Plaintiffs – as the undisputed owners of the abutting land – have established that, under Kansas law, they also own the fee estate in the land to the centerline of the abutting railroad right of way. For those owners holding title to land abutting each side of the right of way, they hold title to the entire right of way.[79]

The Plaintiffs filed their complaints seeking "just compensation" in September 2007, and their motions for summary judgment in April 2008. In their initial complaints, the Plaintiffs claimed to own fee title to the land abutting as well as underlying the Butler County and Reno County Rights of Way. The government was granted an enlargement of time during which they could conduct any title research the government deemed necessary to defeat the Plaintiffs' claims that the Plaintiffs owned the land underlying the Butler County and the Reno County Rights of Way. The government retained Cindi A.R. Straup who in two separate affidavits states

---

[78] See Appendix K – Copy of Government's motion withdrawing boundary line argument.

[79] The government has acknowledged this point for the *PANKRATZ* landowners Thick Gon Mar Trust. Similarly, the government has acknowledged this presumption for the *PANKRATZ* landowners Holloway and Stacy Judy Trust. See, Govt's Memo, p. 28, note 19 and p. 32.

that she is an experienced claims administrator with more than a decade of experience for the U.S. Justice Department in more than forty lawsuits and has researched the Plaintiff's claims in this case using Valuation Schedules and Maps filed with the Interstate Commerce Commission, county and municipal tax maps, tax maps and tax cards obtained from Butler and Reno County, Kansas and documents from the Butler and Reno County Recorder of Deeds' Office.[80]

Neither the U.S. Department of Justice nor Ms. Straup have provided any document, instrument or other basis upon which they dispute the Plaintiffs' claim to own fee title to the land underlying the Butler County and Reno County Rights of Way.[81]

The government makes the bald conclusory statement that, "the evidence does not establish that each Plaintiff owns some or all of the servient estate subject to the right of way."[82] As we show above and in our statement of uncontradicted facts, each Plaintiff has established ownership of a fee simple estate in the land abutting as well as underlying the right of way and the government has failed to dispute this fact.

## V. Part One: Point Two The Five Specific Conveyances Referenced By The Government Did Not Convey A Fee Simple Estate In The Land To The Railroad.

### *A. As A General Matter Of Kansas Law, A Conveyance to A Railroad for a "Right of Way" grants the railroad only an Easement to use the land and does not convey a fee estate in the land itself.*

There is no dispute that the railroad held only an easement over the entirety of the Pankratz Right of Way. As such, the following discussion concerns only small segments of the

---

[80] Govt's Memo, Exhibit 10 and 22. (Affidavits of Cindi Straup).

[81] The government's rebuttal of the Collins Industries claim referenced in note 38 *supra* illustrates that he government has investigated the chain of title and, where they have found any instrument that rebuts a plaintiff's claim, they have addressed that claim. Collins Industries is the only plaintiff for which the government has found any instrument in the chain of title disputing any plaintiff's claim of ownership.

[82] Govt's Memo, p. 18.

Biery Right of Way. The government contends that the railroad acquired a fee simple estate in small segments of the land upon which portions of the Biery Right of Way was located. In making this argument the government is making a claim – that a Kansas railroad acquired fee simple absolute title to a strip of land upon which only tracks and ties were located for a right of way – that no court has ever accepted. Literally, every court that has ever considered this question – including the Kansas Supreme Court on multiple occasions – has uniformly held that a railroad acquired only an easement to use the land for railroad purposes, not a fee simple estate in the land itself. To say the least, in making this argument the government is swimming up-stream.

As Justice Brennan observed in *PRESEAULT V. UNITED STATES,* 494 U.S. 1 (1990) ("*Preseault I*"), "many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. *** [and] frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations."[83] As noted by the court in *DAVIS V. MCI* 606 So. 2d 734, 738 (1992), "Except to site a station house or similar land use here and there, the railroads had no need or desire for any interest except 'right-of-way.'"

Judge Posner noted the fundamental presumption (recognized in Kansas as well as most other states) that a railroad's interest in land used for a right of way is only an easement. Judge Posner also noted the public policy underlying this presumption in *PENN. CENT. CORP. V. U.S.R.R. VEST CORP.* 955 F. 2d 1158, 1160 (1992, 7th Cir, Ind.):

> The presumption is that a deed to a railroad or other right of way company (pipeline company, telephone company, etc.) conveys a right of way, that is, an easement, terminable when the acquirer's use terminates, rather than a fee simple. Transaction costs are minimized by undivided ownership of a parcel of land, and such ownership is facilitated by the automatic reuniting of divided land once the reason for the division has ceased. If the railroad holds title in fee simple to a multitude of skinny strips of land now usable only by the owner of the surrounding or adjacent land, then before the strips can be put to their best use there must be expensive and time-consuming negotiation between

---

[83] *PRESEAULT*, 494 U.S. at 9.

> the railroad and its neighbor-that or the gradual extinction of the railroad's interest through the operation of adverse possession. It is cleaner if the railroad's interest simply terminates upon the abandonment of railroad service. A further consideration is that railroads and other right of way companies have eminent domain powers, and they should not be encouraged to use those powers to take more than they need of another person's property-more, that is, than a right of way.[84]

This presumption that a grant of a right-of-way to a railroad conveys only an easement has been long-established in Kansas. This is so even when the form of the instrument used to convey the right of way to the railroad purports to be a deed conveying a fee simple estate in the land. Indeed, it is difficult to find a state in which this principle has been more firmly established than in Kansas.

Gary and Danielle Stone owned land in Washington County, Kansas. Their land adjoined a parcel of land that the school district claimed to own. The school district had acquired title to the land from the BNSF railroad by a deed which described the land as a "trapezoid parcel" that had been part of the railroads "right–of-way and station ground property." (These are two important points – that the property was "trapezoid-shaped" and was used for "station grounds" not just a right of way – to which we return in a moment.) Both the Stones and the BNSF traced their common title back to Hugh and E.J. Little who had originally granted a large tract of land to the BNSF's predecessor railroad in 1883. (Again it is a significant point to which we return in a moment that the railroad originally obtained a large tract of land.) The railroad conveyed most of this large parcel to others – including the Stone's predecessors in title. The railroad retained the trapezoid-shaped parcel that it used for a right of way and station grounds. This land was subsequently conveyed by the railroad to the school district when the railroad

---

[84] Citing, *Brown v. Penn Central Corp.*, 510 N.E.2d 641, 644 (Ind.1987); *Ross, Inc. v. Legler*, 245 Ind. 655, 199 N.E.2d 346 (1964); *Highland Realty Co. v. City of San Rafael*, 46 Cal.2d 669, 678, 298 P.2d 15, 20 (1956); *Sherman v. Petroleum Exploration*, 280 Ky. 105, 132 S.W.2d 768 (1939); *Johnson v. Ocean Shore R.R.*, 16 Cal.App.3d 429, 94 Cal.Rptr. 68 (1971), *Henry v. Columbus Depot Co.*, 135 Ohio St. 311, 20 N.E.2d 921 (1939). Judge Posner allowed that there is nothing preventing a farmer from conveying fee simple title to a railroad for the construction of a rail line, but observed that this is not commonly the manner in which a railroad will take title to land used for a right of way.

abandoned the associated rail line. These facts created a confrontation between the Stones and the neighboring school district. The Stones claimed the railroad had only an easement and, as such this was lost when the railroad was abandoned and the Stones now owned the fee estate unencumbered by the easement. The school district claimed that the railroad had held fee title which the railroad had, in turn, conveyed to the school district.

Rather than just provide a summary answer to this dispute, the Kansas Supreme Court, to the benefit of all with an interest in this issue, provided an exhaustive survey of more than a century of Kansas law on the issue. The Kansas Supreme Court in *STONE*[85] established several rules as long-settled law and harmonized prior Kansas case law and statute. The fundamental point upon which the Court's analysis turns is whether the land involved was a "strip of property" acquired for or used for a railroad right of way.[86] The Court distinguished cases involving strips of land used for a right of way upon which rails and ties were located from cases involving larger parcels of land or parcels used for station grounds, depots, switchyards and other such facilities.[87] For the first category of land – "strips of land" acquired by a railroad for a right of way or actually used for a right of way – the *STONE* Court noted that Kansas law was absolutely settled and the railroad acquired only an easement.[88] This is so for rights of way acquired by condemnation or private conveyance and this was so no matter what language was used in the conveyance instrument – even when it was a general warranty deed otherwise purporting to convey a fee simple estate in the land.

The *STONE* court affirmed this principle as expounded in the prior Kansas Supreme Court cases of *ABERCROMBIE V. SIMMONS*, 71, Kan. 538, 81 P. 208 (Kan., 1905), *BARKER V. LASHBROOK*, 128 Kan. 595, 279 P. 12 (Kan., 1929), *DANIELSON V. WOESTEMEYER*, 131 Kan. 796, 263 P. 507 (Kan., 1930), *FEDERAL FARM MORTG. CORP. V. SMITH*, 149 Kan. 789, 89 P.2d 838 (Kan., 1939),

---

[85] *STONE V. U.S.D. NO. 222*, 278 Kan. 166, 91 P.3d 1194 (Kan., 2004).

[86] STONE, 278 Kan. 180-181, 91 P. 3d 1203.

[87] *Id.*

[88] *Id.*

*BOWERS V. ATCHINSON, T. & S.F. RLY. CO.*, 119 Kan. 202, 237 P. 913 (Kan., 1925) and *HARVEST QUEEN MILL & ELEVATOR V. SANDERS*, 189 Kan. 536, 370 P.2d 419, 423-24 (Kan. 1962). *HARVEST QUEEN* provides one of the more quoted statements of the rule:

> We have held that when land is devoted to railroad purposes it is immaterial whether the railway company acquired it by virtue of an easement by condemnation, right-of-way deed, or other conveyance. If or when it ceases to be used for railway purposes the land concerned returns to its prior status as an integral part of the freehold to which it belonged prior to its subjection to use for railway purposes. **This court has uniformly held that railroads do not own fee title to narrow strips taken as right-of-way, regardless of whether they are taken by condemnation or right-of-way deed. The rule is in conformity with this state's long-standing public policy and gives full effect to the intent of the parties who execute right-of-way deeds rather than going through lengthy and expensive condemnation proceedings. Generally, a railroad company in acquiring land for railroad right-of-way, whether it be by grant or condemnation proceedings, is held to take not the fee, but only a special interest therein usually termed an "easement," which special interest or title is taken for railroad purposes**, that is, public purposes, so that the railroad has no right to take from such right-of-way any underlying minerals and appropriate them to its own use or convey them to others.[89]

The Court distinguished these cases from those in which the railroad obtained an interest in larger tracts of land that were not acquired for right of way.[90] The *STONE* Court cited *NOTT V.*

---

[89] *HARVEST QUEEN*, 370 P.2d at 423-34. (emphasis supplied) (numerous citations omitted). This presumption that a conveyance to a railroad for a "right-of-way" conveys only an easement (being the right to use the land and not a grant of fee title in the land itself) is widely and commonly held in other states as well as Kansas. Instruments virtually identical in relevant respect to those before the court in this case have been construed as conveying only an easement to the railroad by the Supreme Courts and lower courts of Florida Missouri, California, Michigan, Idaho, Kentucky, Indiana, Tennessee and a number of other states. We have assembled a short list of similar decisions by courts in other states – mostly other state supreme courts – which is attached at Appendix A.

[90] There is a related line of cases which we note more fully below in our discussion of abandonment. *HARVEY V. MISSOURI PAC. R. CO.*, 111 Kan. 371, 207 P. 761 (Kan., 1922), *ATICHSON, TOPEKA & SANTA FE RY. CO. V. HUMBERG*, 9 Kan. App. 2d 205, 675 P.2d 375 (Kan., 1984), *MILLER V. ST. LOUIS, SOUTHWESTERN RAILWAY COMPANY*, 239 Kan. 198, 718 P.2d 610 (Kan., 1986). These cases each involve the owner of land adjoining an active railroad right of way in which the landowner brought an adverse possession claim against an active railroad claiming that a parcel of land adjoining an active railroad intended to be used as grain

*BEIGHTEL*, 155 Kan. 94, 122 P.2d 747 (Kan., 1942) as an example of this, "The Nott court distinguished [that] case from *ABERCROMBIE* because the land was purchased without regard to its use or being designated as a right-of-way."[91]

The Federal Circuit similarly construed instruments conveying a right of way to a railroad as only passing an easement, even when the instrument purported to convey a fee simple estate in the land and did not use the term "right of way." See, *PRESEAULT V. UNITED STATES*, 100 F.3d 1525, 1535-36 (Fed. Cir. en banc, 1996), wherein the court considered the Manwell deed. The Federal Circuit noted, "The deed appears to be the standard form used to convey a fee simple title from grantor to grantee. But did it? *** Despite the apparent terms of the deed indicating a transfer in fee, the legal effect was to convey only an easement."

Kansas law is the same as Vermont law on this point. "We have held that when land is devoted to railway purposes it is immaterial whether the railway company acquired it by virtue of an easement, by right of way deed or other conveyance, or by condemnation. If or when it ceases to be used for railway purposes, or if such use never materialized, the land concerned returns to its prior status as an integral part of the freehold to which it belonged prior to its subjection to use for railway purposes." *FED FARM MORTG.*, 89 P.2d at 840.

Further, the Hutchinson & Southern Railway Company's [H & S] and the Atchison Topeka & Santa Fe Railway Company's [ATSF] activities as a corporation are (and were in

---

elevators, depots, stations or other terminal facilities had not been used as such by the railroad but, because the adjoining owner had used this land, the adjoining owner acquired fee title to the property by adverse possession. In each of the cases, the court denied the land owner's adverse possession claim because the owner was held to be the owner of the fee estate in the disputed property and the railroad held only an easement. The court held that this easement – which was being actively used for the operation of a railroad – could not be extinguished by adverse possession. *HARVEY, HUMBERG* and *MILLER* are notable in the immediate context for the finding that even when the land at issue is not used for a right of way but for related terminal, depot, and station facilities, Kansas courts still held that the railroad held only an easement and not the fee estate in the land.

[91] *STONE*, 91 P. 3d. at 1200.

1890) defined by Kansas statute. The legal authority of the H& S and ATSF at the time the rail line was established was defined by Gen. Stat. 1868 (currently codifed as Kan. Stat. Ann. §66-501) (defining the powers of railroad corporations).

The H & S and ATSF as railroad corporations were authorized to acquire and own real estate, but only for railroad purposes. The H & S and ATSF were not authorized to develop or speculate in real estate. Their ability to legally acquire and hold real estate was limited to doing so in furtherance of constructing and operating a railroad. It is proper to consider the railroad's authority when determining the nature of the interest conveyed to the railroad by these instruments drafted in the late 1890s to 1901. For a strip of land upon which a rail line is constructed (as opposed to land for the construction of a station house, depot or grain elevator) an easement conveys sufficient interest for the railroad to accomplish its authorized purpose. As noted by Justice Brennan in *PRESAULT I*, railroads do not ordinarily own the land upon which their rights of way are located. Customarily an easement is sufficient to provide the railroad the interest necessary to accomplish its purpose of operating a railroad. The Florida court in *Davis,* noted that point common to railroad rights of way in all states, "the railroads had no need or desire for any interest except 'right-of-way'".[92]

### *B. The Terms of the Conveyance Instruments Demonstrate the Grantor's Clear Intention to Convey Only an Easement.*

We turn now to the specific conveyance documents by which the right of way was originally established. The initial task is to determine if the fee owners intended to grant the railroad a right to use the land or to grant them ownership of the land itself. As we show below, under the specific terms of the four instruments and Kansas law, all of the instruments conveyed a strip of land used by a railroad for a railroad right of way upon which tracks and ties were located. None of the conveyances grant a large tract to the railroad and none convey land used for any purpose other than the location of a right of way. All were granted in the context of the railroad exercising condemnation of the rail corridor.

---

[92] *DAVIS V. MCI*, 606 So.2d 734, 738 (Fl.App. 1992).

Recall the statement of the Kansas Supreme Court in *HARVEST QUEEN*, "This court has uniformly held that railroads do not own fee titles to narrow strips taken as right-of-way, regardless of whether they are taken by condemnation or right-of-way deed. The rule is in conformity with this state's long-standing public policy and gives full effect to the intent of the parties who execute right-of-way deeds rather than go through lengthy and expensive proceedings."[93] The Kansas Supreme Court recognized that deeds to a railroad must be read in light of the surrounding authority of the railroad to condemn a right of way and a deed conveying a railroad a "narrow strip" of land used for a right of way is understood to give the railroad the same interest as if the strip had been condemned, an easement.

### i. The Rose J. Arnold Warranty Deed

The government contends that on or about 1895, the Atchison, Topeka & Santa Fe Railway Company ("Sante Fe") conveyed fee simple title to Rose J. Arnold, but retained for itself fee simple interest in the Reno County Right of Way abutting her land.[94] The warranty deed conveys to Ms. Arnold 80 acres of land and contains the following language:

> "[A]ll that tract, piece and parcel of land situated in the County of Reno *** Containing all Eighty (80) acres more or less according to the United States survey. Reserving, however, to the said Atchison, Topeka, & Santa Fe Railway Company, all that portion of the land *hereby conveyed*, (if there be any such) which lies within lines around parallel with and fifty feet on each side distant, from the center line of said railroad as now constructed, and any greater width where necessary permanently to include all its cuts, encumbrances and ditches and other [illegible] necessary to secure and protect the main line of said Railroad. "[95]

As the language of the warranty deed makes clear, the ATSF conveyed *all* of its interest in the full 80 acres of land to Ms. Arnold. The ATSF "reserved" for itself the use of a right of way along a strip of land described by reference to tracks which had already been constructed

---

[93] *HARVEST QUEEN*, 370 P.2d at 423.

[94] Govt's Memo, p. 22.

[95] See Govt. Ex. 22-2, and the transcribed version of this deed located at Tab 9 of Plaintiffs' PFUF in Response, and Appendix F.

over a portion the property being conveyed. Nothing in the language of the deed even remotely suggests the ATSF to have intended that it retain fee simple estate in the land 50 feet on either side of its right of way. The ATSF states that it reserves the 50 feet on either side of the railroad "now constructed." Finally, if the ATSF e intended to retain fee simple in its right of way across the land conveyed to Ms. Arnold, presumably the ATSF would have used the same language to describe the land retained in fee as it used to describe the land being conveyed in fee. It did not. Instead, the ATSF made reference only to its right of way as then constructed for the purpose to "secure and protect the main line of said Railroad."

### ii. Julia Fair Quitclaim Deed

In 1899, Julia Ann Fair quitclaimed to the Hutchison & Southern Railway Company "a strip of land one hundred (100) fee wide being fifty (50) way feet on each side of the center line of the railroad of the Hutchinson & Southern Railway as the same is now located and ___ *over and across* section thirty five (35) township twenty three (23) range six (6)."[96] This instrument is limited to the conveyance of an easement only for at least three reasons: (1) it describes a 100 foot wide "strip of land" referencing the centerline of an existing railroad upon which rails and ties were located, (2) it expressly uses the term "over and across" which are words describing an easement not an estate in the land; and (3) the railroad had already acquired an easement over this land by virtue of the condemnation decree. The condemnation decree, however, mentioned only Julia Fair's deceased husband, Thomas Fair,[97] and not Mrs. Fair. Accordingly, it would be common real estate practice to have the spouse not named in the condemnation decree execute a quit claim deed to resolve any ambiguity created by her omission from the Condemnation Decree.

---

[96] Govt. Ex. 22-4 and the transcribed version of this deed located at Tab 11 of Plaintiffs' PFUF in Response, and attached here at Appendix G.

[97] Govt's Memo at p. 23

### iii. Irrigation Loan & Trust Company Deed (March 1901)

In March 1901, the Irrigation Loan and Trust Company conveyed to the ATSF a 66-feet wide strip of land.[98] This strip of land was used for the right of way with rails and ties and not a station ground or other permanent structure. As such, this conveyance falls under the *ABERCROMBIE* and *HARVEST QUEEN* rule that it conveyed only an easement..

### iv. E.L. Rowland Quitclaim Deed

In 1896, E.L. Rowland quitclaimed to the Hutchison & Southern Railroad Corporation "all the following described premises, situated in Blanchard Third Addition to the City of South Hutchinson according to the plat thereof."[99] The deed states that "For and in consideration of $1.00 *and the convenience of all the right of way now occupied by said Railroad in Blanchard's Third Addition to the City of South Hutchinson*."[100] This reference to "the convenience of all the right of way now occupied by said Railroad" declares the purpose and intent of this instrument as conveying only a right of way easement. The only use ever made of this property was the location of the railroad tracks and ties. There is no suggestion that this involved station grounds or other such uses.

### v. Irrigation Loan & Trust Company Deed (March 1901)

In October 1901, the Irrigation Loan and Trust Company quitclaimed to the ATSF a series of lots in the City of South Hutchinson.[101] These same lots had been previously quitclaimed by E.L. Rowland to the Hutchinson & Southern Railway Company for right of way

---

[98] Govt. Ex. 22-5 and the transcribed version of this deed located at Tab 14 of Plaintiffs' PFUF in Response, and Appendix H.

[99] Govt. Ex. 22-6 and the transcribed version of this deed located at Tab 17 of Plaintiffs' PFUF in Response, and attached here at Appendix I.

[100] *Id.*

[101] Govt. Ex. 22-7 and the transcribed version of this deed located at Tab 18 of Plaintiffs' PFUF in Response, and attached here at Appendix J.

purposes as discussed above. This conveyance falls under the *ABERCROMBIE* and *HARVEST QUEEN* rule that it conveyed only an easement.

There is no Kansas case that has ever held that a railroad obtained a fee estate in a strip of land used for a right of way upon which just tracks and ties were located. And the government has not cited any case – in Kansas or elsewhere so holding. To the contrary, more than a century of Kansas Supreme Court decisions have specifically held that conveyances such as the five at issue here convey the railroad only an easement to use the referenced land and that when railroad use terminates, the fee estate is unburdened by the easement.

## VI. Part Two: Neither Public-Access Recreational Trail Use Nor "Railbanking" Are a "Railroad Purpose" Under Kansas Law.

In support of its contention that public-access recreational trail use and "railbanking" are a permissible use of the Plaintiffs' land the government makes three arguments: (1) "The uses of the subject rights-of-way authorized by the Trails Act – railbanking and interim trail use – are permissible present uses of those rights-of-way under Kansas law."[102] (2) "The railroads have not abandoned their property interest in the subject rights-of-way" because under the Trails Act some railroad at some indefinite time in the future may restore active railroad service on this corridor.[103] And, (3) Under the so-called "Shifting Public Use Doctrine" "a right-of-way acquired for a public purpose can be converted from one public use (active rail use) to another (railbanking and interim trail use) without infringing upon the rights of the servient estate holder and without causing an abandonment of the right of way."[104]

---

[102] Govt's Motion, p. 3.

[103] Govt's Motion, p. 3 and Govt's memo, p. 49.

[104] Govt's Motion, p. 3.

As we show below, the government is wrong on all three points. We consider each point *seriatim*.

### *A. The uses of the subject rights-of-way authorized by the Trails Act – railbanking and interim trail use – are NOT permissible present uses of those rights-of-way under Kansas law.*

The government argues, "the uses of the subject rights-of-way authorized by the Trails Act – railbanking and interim trail use – are permissible present uses of those rights-of-way under Kansas law."[105]

#### i. The government's "'railbanking' is a railroad purpose" argument has been repeatedly rejected by every court to consider the argument.

As an initial point we note that the government's argument that "recreational public-access trail use and 'railbanking' is a permissible 'railroad purpose'" in an argument the government makes in virtually every Trails Act taking case. This argument has been consistently and repeatedly rejected by every court that has ever considered the argument.[106]

---

[105] *Id.*

[106] See, *POLLNOW V. STATE*, 88 Wis. 2d 350, 276 N.W.2d 738 (Wisc., 1979), *LAWSON V. STATE*, 107 Wash.2d 444, 730 P.2d 1308 (Wash., 1986), *GLOSEMEYER V. UNITED STATES*, 45 Fed. Cl. 771 (2000), *TOEWS V. UNITED STATES*, 376 F. 3d 1371 (Fed. Cir., 2004), *PRESEAULT V. UNITED STATES*, 100 F.3d 1525 (Fed. Cir, 1996) (*PRESEAULT II*), *MICHIGAN DNR V. CARMODY-LAHTI REAL ESTATE, INC.* 472 Mich. 359, 699 N.W. 2d 272 (Mich., 2005), among other cases.

The government is fond of claiming that *CHEVY CHASE LAND CO. V. UNITED STATES*, 733 A.2d 1055 (Md., 1999), *CHEVY CHASE LAND V. UNITED STATES,* 230 F.3d 1375 (Fed. Cir., 2000), *WASHINGTON WILDLIFE PRES., INC. V. MINNESOTA*, 329 N.W. 2d 543 (Minn., 1983) and *REIGER V. PENN CENTRAL CORP.*, No. 85-CA-11, slip op. (Ct. App. Greene County, Ohio, May 21, 1985) [available on WESTLAW, 1985 WL 7919] holds that recreational trail use and "railbanking" are permissible uses of an easement for railroad purposes. This is absolutely a flat misrepresentation of these cases. As the D.C. Circuit noted, these cases specifically involved an easement that was <u>not</u> limited to railroad purposes. *NATIONAL WILDLIFE FOUNDATION V. ICC*, 850 F. 2d 694 (D.C. Cir., 1988) at 706. Indeed, the Maryland Supreme Court in *CHEVY CHASE LAND* took great pains to note that the easement at issue in *CHEVY CHASE LAND* was <u>not</u> an easement limited to railroad use. 733 A. 2d at 1073. See also, the Federal Circuit's application of the Maryland Supreme Court's decision holding that, "The court unanimously held that the 1911 conveyance was an easement, and that the terms of the

Today the government advances, yet again, this losing argument. It should be, once again, rejected as it is an argument contrary to both Kansas law and the decisions of the Federal Circuit. Indeed, in the prior Kansas Trails Act taking case involving the Union Pacific Railroad's conveyance of an abandoned railroad easement to the Central Kansas Conservancy for a recreational trail under the Trails Act the federal district court found that the landowners' reversionary interest in their land under Kansas law had been taken and they were "entitled to just compensation under the Fifth Amendment". *SWISHER V. UNITED STATES*, 176 F. Supp. 2d 1100 (D. Kan., 2001). The government provides no explanation why this same result should not also apply in this Kansas case.

In *PRESEAULT II*, the government sought to avoid paying compensation for the Trails Act conversion of a railroad right of way by arguing that "railbanking" was a permissible "railroad purpose" under federal law. The government lost this argument. The Federal Circuit "reject[ed] the Government's central thesis that general federal legislation providing for the governance of interstate railroads, enacted over the years of the Twentieth Century, somehow redefined state-created property rights and destroyed them without entitlement to compensation."[107]

---

original conveyance were sufficiently broad to embrace its use as a recreational trail. *** Citing its law, the court held that since the easement is not limited in scope to railroad purposes, and embraces the current trail use." 230 F.3d 1375. 1999 WL 1289099 at p. 2. (emphasis supplied). See also, *TOEWS* at 1380 where the Federal circuit noted this point that the easement in Chevy Chase Land was not limited to railroad purposes. See, *CHEVY CHASE LAND CO. V. UNITED STATES*, 158 F.3d 574 (Fed. Cir., 1998) (certification order); *CHEVY CHASE LAND CO. V. UNITED STATES*, 355 Md. 110, 733 A.2d 1055 (1999) (answer); *CHEVY CHASE LAND CO. V. UNITED STATES*, 230 F.3d 1375 (table), 1999 WL 1289099 (Fed. Cir., 1999) (nonprecedential) (final disposition).

As such it is fundamentally dishonest to claim that *CHEVY CHASE LAND* holds that "railbanking" and recreational trail use are within the scope of an easement limited to railroad purposes.

[107] *PRESEAULT*, 100 F.3d at 1530. See also, *WEBB'S FABULOUS PHARMACIES* at 164, "Neither the *** legislature by statuate, nor the ***courts by judicial decree, may accomplish the result the [government] seeks simply by recharacterizing the" private funds as "public money".

After losing the argument that federal railroad regulatory law redefined state property rights in the land used for railroad rights of way, the government attempted to claim that "railbanking" and recreational trail use were a "railroad purpose" within the scope of an easement granted for the operation of a railroad under state law – in that case Vermont law. The government lost this argument as well. The Federal Circuit wrote, "We find no support in Vermont law for the proposition *** that the scope of an easement limited to railroad purposes should be read to include public recreational hiking and biking trails."[108]

In *TOEWS*, the government argued that under California state law the "so-called shifting public use doctrine *** transmogrif[ed] one type of easement into another." The Federal Circuit rejected this attempt and wrote, "a public transportation easement defined as one for railroad purposes is not stretchable into an easement for a recreational trail and linear park for skateboarders and picnickers, however desirable such uses may be for these linear strips of land."[109]

In *GLOSEMEYER V. UNITED STATES*, (consolidated for decision with *MOORE V. UNITED STATES* and *TOWN OF GRANTWOOD VILLAGE V. UNITED STATES*), the government attempted to argue that "railbanking" and recreational trail use were a "railroad purpose" under Missouri law. Judge Bruggink rejected this argument and noted, "trail use, by itself, would not constitute a railroad purpose. The transportation use contemplated by a railroad purpose would clearly be the movement of trains over rails. Recreational hiking, jogging and cycling are not connected with railroad use in any meaningful way." GRANTWOOD, 95 F.3d at 778. "[The government] contends that holding out the possibility of a reactivation, even if remote and indefinite, is a railroad purpose in and of itself. This future potentiality thus becomes a present railroad purpose in the view of the government." GRANTWOOD, 95 F.3d at 781. The court rejected this contention, "In sum, neither component of railbanking – the preservation of the rail line for future use nor the

---

[108] *Id.* at 1530.

[109] *TOEWS*, 376 F.3d at 1379.