'interim' use of the easement as a recreational trail – constitutes a railroad purpose under Missouri law." GRANTWOOD, 95 F.3d at 781.

The Federal Circuit similarly held, "Realistically, nature trails are for recreation, not transportation. Thus when the State sought to convert the easement into a recreational trail, it exceeded the scope of the original easement and caused a reversion. *** the State's transparent attempt to retain property condemned for a narrow transportation use crumbled when it converted that property to a recreational trail. *** The United States and Vermont have converted a right to use the [landowners] land for a railroad into a right to hold the land in perpetuity. The vague notion that the State may at some time in the future return the property to the use for which it was originally granted, does not override its present use of that property inconsistent with the easement. That conversion demands compensation." *PRESEAULT II* at p. 1554 (concurring opinion of Judge Rader.)

As we show below, this "railbanking" is a "railroad purpose" argument similarly fails as a matter of federal and Kansas law. This dog not only doesn't hunt, it won't even get off the porch.

### ii. As a matter of plain English, "Railbanking" and recreational trail use are not a "railroad purpose".

As the government acknowledges, "The ultimate title to land subjected to railway purposes does not cease to be in the owner of the adjacent freehold from which it was derived, and the termination of its use for railway purposes has no effect upon the fee title. It merely relieves the underlying fee of the dominant estate."[110]

Thus, it is fair to ask the question: What does "use for railway purposes" mean and is the Plaintiffs' land still being used for such purposes? We start with the basic question – what is the definition of a "railroad" or "railway"? We can look to three sources for the definition; the common dictionary meaning, Kansas statutory law and federal statute.

---

[110] Govt's Memo at p. 25, quoting *FED FARM MORTGAGE*, 89 P.2d at 841.

### i. The definition of "Railway" and "Railroad"

The Oxford English Dictionary defines "railroad" as "a railway." "Railway" is, in turn, defined as "a way or road laid with rails."[111] Kansas law defines "railroad train" to "mean a steam engine, electric or other motor, with or without cars coupled thereto, operated upon rails." K.S.A. § 8-1454. "'Railroad' means a carrier of persons or property upon cars operated upon stationary rails." K.S.A. §8-1452. Kansas provides a specific criminal statute, K.S.A. § 21-3761, prohibiting trespass upon or damage to "railroad property." That statute defines "railroad property" as "include[ing] but not limited to, any train, locomotive, railroad car, caboose, rail-mounted work equipment, rolling stock, work equipment, safety device, switch, electronic signal, microwave communication equipment, connection, railroad track, rail, bridge, trestle, right-of-way or other property that is owned, leased, operated or possessed by a railroad company." The U.S. Congress has defined a railroad at 11 U.S.C.§ 101, (44) as follows, "The term 'railroad' means common carrier by railroad engaged in the transportation of individuals or property or owner of trackage facilities leased by such a common carrier."

As this court recognized in a similar Trails Act taking case, "The term 'railroad purpose' *** does not encompass other forms of transportation, such as walking or bicycling *** The proposed development of a hiking, biking, cross-country skiing , and nature trail is completely unrelated to the operation of a railway and consistent only with an intent to wholly and permanently cease railway operations." *GLOSEMEYER,* 45 Fed. Cl. at 779 (citing *BOYLES V. MISSOURI FRIENDS OF THE WABASH TRACE NATURE TRAIL, INC.*, 981 S. W. 2d 644 (Mo App, W.D., 1998).

### ii. The definition of a "recreational trail".

The Oxford English Dictionary defines "recreation" as "an activity or pastime pursued" and "trail" as "a beaten track or path or track, esp. in a wild or uninhabited region. Also, a marked route through countryside, around a town, etc., indicating points of interest or historical

[111] THE NEW SHORTER OXFORD ENGLISH DICTIONARY (1993).

significance."[112] "Hiking" is described as "to walk vigorously" and "Biking" is described as "ride on a bike."[113] None of these terms include or reference anything that can be remotely characterized as having to relate to the operation of a railroad. The Federal Circuit has recognized that these activities are very different that those of a railroad. "It appears beyond cavil that use of these easements for a recreational trail – for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway – is not the same use made by a railroad, involving tracks, depots, and the running of trains. *TOEWS*, 376 F.3d at 1376.

### iii. The definition of "railbanking"

"Railbanking" is not defined by The Oxford English Dictionary. "Railbanking" is a term created by federal law and is alien to Kansas (and other state law). There is no Kansas statute or state case that ever uses the term "railbanking" to describe Kansas law. Railbanking is the short-hand term that describes operation of 16 U.S.C. §1247(d), the 1983 amendments to the Trails Act.[114] Thus, by definition "railbanking" is not operating a railroad. At most it is the indefinite possibility to possibly operate a railroad at some future time. This is even further qualified by the fact that it is a "small "r" railroad. In other words, it is not specific to any existing operating railroad, such as the BNSF. The ability to construct a new rail line over this corridor in the future is not held by BNSF. Rather, it is held by the STB which has the authority to grant that request to any railroad.

### iv. Conclusion: "railbanking" and recreational trail use have nothing to do with the operation of a railroad and are not a "railroad purpose".

"When *I* use a word,' Humpty Dumpty said in rather a scornful tone, 'it means just what I choose it to mean — neither more nor less." "The question is," said Alice, "whether you *can*

---

[112] *Id.*

[113] *Id.*

[114] See generally, *GOOS v. I.C.C.*, 911 F.2d 1283 (8th Cir., 1990) and *NATIONAL WILDLIFE FEDERATION v. I.C.C.*, 850 F.2d 694 (D.C. Cir., 1988).

make words mean so many different things." "The question is," said Humpty Dumpty, "which is to be master— that's all."[115] The Lawyers Handbook teaches that, "With regard to definitions, do not hesitate to define things in improbable ways. A good lawyer feels no compunction about defining 'person' to mean 'corporations, partnerships, and livestock'; 'automobile' to mean 'airplanes, submarines, and bicycles'; and 'cash' to mean 'stocks, bonds, and whiskey.'"[116]

Were we to follow the counsel of Humpty Dumpty or the *LAWYERS HANDBOOK* it may be possible to contend that a "locomotive" is a "bike," a "railroad" is a "hiking trail" and "railbanking," the non-use of an abandoned right of way by a non-railroad, is a "railroad purpose." However, such use of language empties words of their meaning and is an attempt to do precisely what the Supreme Court has said the sovereign cannot do – to redefine state property interests by *ipsi dixit* in an effort to avoid paying compensation. The sovereign may indeed redefine state property interests. However, when doing so destroys the property interest, "just compensation" must be paid.

### iii. The 1983 Amendments To The Trails Act Provided For Railbanking and Recreational Trail Use of Abandoned Railroad Rights of Way Precisely Because Such Uses Were NOT A "Railroad Purpose" Under Existing State Law.

By arguing that both "railbanking" and recreational trail use are a "railroad purpose" the government is attempting to bootstrap into Kansas law a concept invented by Congress in the 1983 Amendments to the Trails Act. This effort fails for the additional reason that it misinterprets the intent and meaning of the Trails Act Amendments themselves. The 1983 Amendments to the Trails Act were adopted precisely because Congress understood that "railbanking" and recreational trail use were not a "railroad purpose" under state law. If "railbanking" and recreational trail use were a "railroad purpose" under state law, there would have been no need for the 1983 Amendments to the Trails Act.

---

[115] Carroll, Lewis, "*THROUGH THE LOOKING GLASS AND WHAT ALICE FOUND THERE*", 1871.

[116] D. Robert White, Esq. *THE OFFICIAL LAWYER'S HANDBOOK*. Simon & Schuster, Inc. (1983), p. 185-86.

The United States Supreme Court and the United States Courts of Appeal have detailed at length the intent and operation of the 1983 Amendments to the Trails Act and how the Trails Act operates to work a taking of a landowner's "reversionary" right in their property.[117] We do not

---

[117] See, *PRESEAULT V. ICC* 494 U.S. 1 (1990) (cited as "*PRESEAULT I*") (holding Trails Act to be constitutional but noting that the Fifth Amendment requires "Just Compensation" when §8(d) preempts a landowner's state law reversionary interest in land subject to rail to trail conversion.); *PRESEAULT V. U.S.* 100 F. 3d 1525 (Fed. Cir. *en banc*, 1996) (cited as *PRESEAULT II*) (holding that conversion of abandoned railroad easement to recreational trail use under the Trails Act was a compensable taking requiring payment of "just compensation"); *NATIONAL WILDLIFE FOUNDATION V. ICC*, 850 F2d 694 (D.C. Cir, 1988), (holding that Trails Act did not provide the ICC authority to compel a railroad to convert abandoned right of way to trail use when railroad did not agree to conversion and "that reversionary property owners whose property interests are defeated by the preemptive effect of the Trails Act upon state laws" have a claim for "just compensation" for the taking of their a taking of property); *CITIZENS AGAINST RAILS-TO-TRAILS V. SURFACE TRANSPORTATION BOARD*, 267 F. 3d 1144 (D.C. Cir, 2001), (STB's issuance of NITU is ministerial and is not subject to National Environmental Policy Act [NEPA]); *GOOS V. ICC*, 911 F.2d 1283 (8th Cir, 1990), (STB's issuance of NITU is ministerial and is not is not subject to NEPA); *JOST V. SURFACE TRANSP BD.* 194 F. 3d 79 (D.C. Cir, 1999) (holding that the STB "shall" impose a trail condition, and not permit abandonment of a line whenever a railroad is prepared to convey the right-of-way to a [trail sponsor]" the statute gives the [STB] 'little, if any, discretion to forstall a voluntary agreement to effect a conversion to trail use.'"); *NATIONAL ASSOCIATION OF REVERSIONARY PROPERTY OWNERS V. SURFACE TRANSPORTATION BOARD*, 158 F. 3d 135 (D.C. Cir, 1998) (holding that STB is not required to provide actual notice to landowners of a proposed rail-to-trail conversion and noting that, "[b]ut for the negotiation of a trail use agreement, state property law would be revived and, possibly, trigger the extinguishment of rights-of-way and the vesting of reversionary interests. When such a reversion is blocked, the interim trail use has been deemed a taking and the holder of a reversionary interest that does not vest because of a trail use may seek compensation in the United States Court of Federal Claims"); *RLTD V. SURFACE TRANSPORTATION BOARD*, 166 F. 3d 808 (6th Cir, 1999) STB does not retain jurisdiction of railroad lines that are not part of the national rail system and that "railbanking may be had only in conjunction with an abandonment application."); *BECKER V. SURFACE TRANSPORTATION BOARD*, 132 F. 3d 60 (D.C. Cir, 1997); *BIRT V. STB*, 90 F. 3d 580 (D.C. Cir, 1996) (the STB was without jurisdiction to issue a second NITU after its jurisdiction had terminated upon the railroad consummating abandonment under the original NITU.); *GRANTWOOD VILLAGE V. MO PAC*, 95 F. 3d 654 (8th Cir, 1996) ("ICC's determination of abandonment is plenary, pervasive and exclusive of state law and federal law preempts state law on question of abandonment. *** State law claims can only be brought *after* the ICC has authorized an abandonment."); *FRITSCH V. I.C.C.*, 59 F. 3d 248, (D.C. Cir., 1995) (STB lost jurisdiction over abandoned railroad right of way when railroad abandoned right of way);

need to re-plow this ground other than to note several settled points of law relevant to the government's claim that "railbanking" is a railroad purpose under the law of Kansas or that public recreational trail use is not inconsistent with the scope of an easement for a railroad purpose.

As the Court of Appeals for the D.C. Circuit noted in *National Wildlife Foundation v. ICC*, 850 F.2d 694, 698 (1988), "As originally enacted, the Trails Act made no specific provision for the conversion of abandoned railroad rights-of-way to trails. Congress's first effort to encourage this type of adaptive re-use appeared in § 809 of the Railroad Revitalization and Regulatory Reform ("4-R") Act of 1976."[118] Section 10906 of the 4-R Act authorized the ICC to delay disposition of abandoned railroad corridors for up to 180 days after an effective abandonment order "unless the property had been first offered on reasonable terms for sale for public purposes." *Id.* Section 10906 is referred to as a "Public Use Condition."

Section 10906 did not, however, achieve Congress's hoped-for result. As the D.C. Circuit noted, "Section 10906 has no railbanking provision that would preempt state laws that

---

*Hash v. United States*, 403 F. 3d 1308 (Fed. Cir., 2005) (the General Railroad Right-Of-Way Act of 1875 granted railroads only an easement across public lands and the fee title was conveyed to Homesteaders, and their successors in title, who subsequently acquired title from federal government. Trails Act conversion of these abandoned railroad rights of way to trail use required the government to pay landowners compensation for taking their property); *Toews v. United States*, 376 F. 3d 1371 (Fed. Cir., 2004) (grant of easement to railroad did not include right to use property for recreational trail use and the Fifth Amendment mandated that owners of "reversionary" interest in abutting property be paid just compensation.), *Caldwell v. United States*, 391 F. 3d 1226 (Fed. Cir., 2005) (Fifth Amendment taking claim for compensation in Trails Act taking arose upon STB's issuance of NITU); *Barclay v. United States* 443 F. 3d 1368 (Fed. Cir., 2006) (consolidated on appeal with *Renewal Body Works v. United States*) (reaffirmed holding in *Caldwell* that taking claim arose upon STB issuing NITU).

[118] P.L. 94-210, Title VIII, 90 Stat. 144 (codified as amended at 49 U.S.C. §10906 (1982)).

could otherwise result in reversion of rights-of-way to abutting landowners upon a cessation of rail service." [119]

The lack of a "railbanking" provision that preempted state laws providing for reversion created a "problem" in that railroad rights of way for which the railroad held an easement would be lost under state law when the railroad abandoned the right of way. For this reason, "Congress renewed its effort to promote the conversion of railroad rights-of-way to trail use when it enacted the current §8(d) as part of the 1983 Trails Act Amendments."[120] Section 8(d) was added to "reflect[] the concern that previous congressional efforts have not been successful in establishing a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes. *** [this provision] should eliminate many of the problems with this program. The concept of attempting to establish trails only after the formal abandonment of a railroad right-of-way is self-defeating; once a right-of-way is abandoned for railroad purposes there may be nothing left for trail use."[121] "One of the major impediments to preserving these rights-of-way existed in state property laws which prescribed that once rail service is discontinued after the ICC's approval of abandonment, such easements would

[119] *National Wildlife Foundation*, 850 F.2d at 701. The D.C. Circuit also noted that §10906 did offer potential advantage for a trail developer in those situations where the railroad owned the right of way. "[Section 10906] may be more desirable to the trail developer than §[8(d)] if the railroad owns the right of way because it could purchase the property outright and avoid risk of losing the right of way to restored rail service." *Id.* at 701-702.

[120] *National Wildlife Foundation*, 850 F.2d at 697

[121] H.R. Rep. No. 28, 98th Cong., 1st Sess. 8-9 (1983), *U.S. Code Cong. & Admin. News* 1983 at p. 112. Congress adopted the Trails Act and the 4-R Act to address the loss of railroad rights of way. Congress was not alone in noting the decline of railroads in the 1970's. *See,* Steve Goodman *The City of New Orleans* 1970 ("And the steel rail still ain't heard the news. The conductor sings his songs again 'The passengers will please refrain: This train got the disappearing railroad blues.'" (Sung most famously by Arlo Guthrie on the album Hobo's Lullaby (1972)).

automatically expire and the rights-of-way would revert to adjacent property owners. In response to this problem, Congress enacted the Trails Act Amendments of 1983."[122]

The 1983 Amendment to the Trails Act "is the culmination of congressional efforts to preserve shrinking rail trackage by converting unused rights-of-way to recreational trails."[123] "By deeming interim trail use to be like discontinuance rather than abandonment, Congress sought to prevent property interests from reverting to the landowners under state law."[124]

As the D.C. Circuit noted, "In sum, the language and legislative history of the Trails Act, as amended, plainly enough demonstrate that Congress intended to promote the transfer of railroad rights-of-way to trail operators by removing the impediment posed by existing reversionary interest. On this all hands agree." [125]

The United States Congress itself has made clear that the 1983 Amendments to the Trails Act were intended to pre-empt state law and that, when the Trails Act operated to preempt property rights enjoyed by landowners under state law, "just compensation" would be paid to the landowners. Congressmen Barr, then Chairman of the House Judiciary sub-committee holding hearings into the Trails Act noted:

> "[a]t first glance, it may appear Congress did not consider the fact that if the railroad land was not transferred in fee simple it may belong to the property owner, and not the railroad. However, Congress intended the railbanking aspect of this Federal law would preempt State law and hold the land essentially in perpetuity, until possible rail reactivation. In the 1996 *en banc* decision in *PRESEAULT v. UNITED STATES*, involving the same plaintiffs as in the Supreme Court case I just mentioned, the U.S. Court of Appeals for the Federal Circuit held that railroad abandonment constituted a *per se* taking, and

---

[122] *GRANTWOOD VILLAGE V. MISSOURI PACIFIC RAILROAD COMPANY*, 95 F.3d 654 (8th Cir., 1996).

[123] *PRESEAULT I* 494 U.S. at 5.

[124] *CITIZENS AGAINST RAILS-TO-TRAILS V. SURFACE TRANSPORTATION BOARD*, 267 F. 3d 1144 (D.C. Cir, 2001) at 1149. (citing, *PRESEAULT I* 494 U.S. 1 at 8).

[125] *NATIONAL WILDLIFE FOUNDATION*, 850 F.2d at 702.

therefore would require payment of just compensation to the affected land owners, under the Fifth Amendment.[126]

Here is the point. It is beyond dispute that Congress, the United States Supreme Court and the Courts of Appeal all understand that the "railbanking" provision of the 1983 Trails Act Amendment were intended to preempt contrary state law and, in so doing, to take the reversionary property owner's interest in their land. If "railbanking" and interim recreational trail use were understood to already be a "railroad purpose" under existing state law, there would have been no "problem" with the Trails Act that Congress needed to "fix" with the 1983 Amendments.

#### iv. *Harvey* and *Humberg* Provide No Support For The Government's Argument That "Railbanking" is a Railroad Purpose Under Kansas Law.

The government relies heavily upon two Kansas cases, *HARVEY V. MISSOURI PAC. R. CO.* 111 Kan. 371, 207 P. 761 (Kan., 1922)("Harvey"), and *ATICHISON, TOPEKA & SANTE FE RY. CO. V. HUMBERG*, 9 Kan. App. 2d 205, 675 P.2d 375 (Kan. App., 1984) ("*HUMBERG*"). These cases are part of a line of Kansas cases (which also include *MILLER V. ST. LOUIS SOUTHWESTERN RAILWAY CO.* 239 Kan. 198, 718 P.2d 610 (Kan., 1986)) involving the fee owner of land adjoining an active railroad corridor making an adverse possession claim against a railroad for land that adjoins the active right of way but which the railroad is not currently using in connection with the operation of the railroad corridor. In all these cases the railroad was actively using the land for the operation of a railroad and owner of the adjoining land sought to extinguish the railroad's interest in a portion of the adjoining land by asserting that the adjoining fee owner had been using the property in a manner adverse and hostile to the railroad's ownership of the land. In each case the court held that (1) the railroad only held an easement in the disputed property which was owned in fee by the adjoining owner; and (2) because the adjoining owner owned the fee estate in the land, he could not assert adverse possession against a railroad holding only an

---

[126] U.S. House of Representatives, Judiciary Committee, Subcommittee on Commercial and Administrative Law, "LITIGATION AND ITS EFFECT ON THE RAILS-TO-TRAILS PROGRAM," Statement of Chairman Barr, June 20, 2002.

easement because the owner of the fee estate (since he owned fee estate) had the right to use the land for any purpose not inconsistent with the railroad's right to use of the land for operation of a railroad. Thus, the fee estate owner's use of his land could not be "hostile" or "adverse" to the railroad's easement and the owner of the fee estate could not satisfy the elements necessary to prevail in an adverse possession claim.[127]

The government claims that *HARVEY* holds "that a railroad's use of land acquired by condemnation is not strictly limited to the actual running of trains across the land."[128] This is: (a) not the holding of *HARVEY;* and, (b) to the extent that this statement is dicta in *HARVEY*, it means nothing in the context of this case. To the extent that *HARVEY* notes that a railroad actively using a right of way easement for the operation of a railroad has the right to use the adjoining land which is also subject to an easement for railroad purposes for ancillary uses such as "railway side tracks, depots, workshops, water station, and stockyards" [129] it is utterly unremarkable. It is also utterly irrelevant to the issue before the court in this case.

The government wrongly contends, "The *HARVEY* decision makes clear that, under Kansas law, *** the [railroad] company need not be actively operating a railroad at all times in order to maintain that easement. Instead, Kansas law allows railroad easements to be maintained 'so long as the railroad has a potential need of them' in the future.'"[130]

---

[127] In reaching this holding, these three cases also provide significant further support for the Plaintiffs' point that a railroad obtains only an easement and not fee interest in land used for a railroad – even, as in *HARVEY, HUMBERG* and *MILLER*, when the interest in the land was acquired for ancillary railroad purposes such as depots and grain elevators or switching yards and side tracks.

[128] Govt's Memo at p. 40.

[129] *HARVEY* involved an easement for the "usual 100 foot right of way" and an adjoining 30 acre parcel of land for "depot grounds and terminal facilities". The railroad was actively using the right of way but had not used the adjoining non-right of way property. The court held that the fee owner could not assert adverse possession against the railroad for the portion of the easement set aside for "railway side tracks, depots, workshops, water station, and stockyards." HARVEY, 207 P.2d at 761.

[130] Govt's Memo at p. 41.

This characterization of *HARVEY* is absolutely and flatly wrong. *HARVEY* held no such thing. The railroad right of way in Harvey was being actively used as an operating railroad. Indeed, the Court in *HARVEY* affirmed precisely the contrary point that "If the railroad [in *HARVEY*] should be abandoned or relocated elsewhere than on plaintiff's property, the dominant estate would terminate, and the [railroad's] rights acquired by condemnation would terminate and revert to the plaintiff." HARVEY, 207 P.2d at 762.

By no stretch can *HARVEY* be read to support the proposition that a railroad corridor over which there has been no railroad traffic in more than a decade, in which the rails and ties have been removed, in which the last railroad to have an interest in the corridor has quit claimed whatever interest it may have had in the corridor to the county park department to use it as a public-access hiking and biking trail and for which the STB has approved the railroad's request to abandon railroad service is still property "maintained as a railroad easement".

Similarly, the government's recourse to *HUMBERG* is misplaced. The government contends that *HUMBERG* held, "that the railroad's nonuse of easements acquired and 'held as possible railroad expansion areas in the future' for more than thirty years did not constitute an abandonment of those easements." This is not an accurate representation of the holding in *HUMBERG*.

*HUMBERG*, similar to *HARVEY*, concerned a claim by the owner of the fee estate in land adjoining an active railroad right of way. The owner asserted an adverse possession claim against a railroad that held an easement to use his land. The property involved in *HUMBERG* was one of three tracts of land adjoining a 100-feet wide right of way that was being actively used by the railroad for operation of a railroad. One of the three adjoining parcels had not been used by the railroad for more than 30 years but the railroad continued to pay taxes on the property and the railroad leased the property "for elevators, warehouse, office and scales." The court held that the interest acquired by the railroad under the warranty deed in *HUMBERG* was only an easement in the property. As such, the railroads interest in the adjoining property was limited to use of the

land for "railroad purposes" and the fee owner's use of the land was not, therefore, "adverse to the right, title and interest of the railroad."[131]

The Kansas Supreme Court in *MILLER v. ST. LOUIS, SOUTHWESTERN RAILWAY COMPANY*, reaffirmed the holding of *HARVEY* and *HUMBERG*. To wit the Court wrote, "the principles discussed in *HARVEY* were still the law of this state and [the fee estate owner's] use and occupancy of the land were not adverse to the interest of the railroad. The court reaffirmed the rule that when a railroad acquires land by virtue of an easement, condemnation, right-of-way or other conveyance, the railroad does not obtain a fee simple title to the right of way. [The fee estate owner] may have enjoyed full use of the property since 1969 but such use was not hostile or adverse to the railroad." MILLER, 718 P.2d at 612.

As such, it is clear that the Kansas Supreme Court does not read *HARVEY* or *HUMBERG* as standing for the proposition for which the government cites them and they can certainly not be extended to the situation before this court involving the Reno and Butler County Rights of Way.

### v. Recreational Trail Use Is Absolutely and Decidedly NOT a "Railroad Purpose" Under Kansas Law.

The government claims, ""Under Kansas law, interim trail use is also a permissible use of the subject railroad easements."[132] The government continues, "Interim trail use falls within the scope of the easements acquired by the railroads for at least two reasons. First, interim trail use furthers and serves the original purpose of the easement by allowing preservation of the subject rights–of-way for possible future rail use through the railbanking process. *** and relieving the railroads of such responsibilities (and costs) during the railbanking period…" "Second, interim trail use falls within the scope of the easements because it is a permissible public use of the easements under Kansas law." [133] The government never cites any Kansas case – or for that matter any case from any court holding that a recreational trail is a permitted use of an easement

---

[131] HUMBERG, 675 P.2d at 379.

[132] Govt's Memo at p. 43.

[133] Govt's Memo at p. 44.

limited to "railroad purposes." The only case which the government cites is *ATCHINSON, TOPEKA & SANTA FE RAILWAY COMPANY V. O'LEARY*, 100 P.628 (Kan., 1909).

*O'LEARY* does not hold that recreational "trail use falls within the scope of easements." *O'LEARY* concerned a specific active railroad right of way in which the railroad opposed the city establishing a public road on a portion of the right of way. The right of way involved in *O'LEARY* was one established under the Act of Congress of March 3, 1863 (12 Stat. 772, c. 98).[134] As such, the railroad's interest in this right of way and correspondingly the city's ability to use a portion of that right of way were defined by the provisions of that Act and are unique to rights of way established under that Congressional Act. As it applies to rights of way established under the 1863 Act, the Kansas Court, citing the U.S. Supreme Court's decisions in *NORTHERN PACIFIC RY. V. TOWNSEND* 190 U.S. 267 (1903), *NORTHERN PACIFIC RAILROAD COMPANY V. SMITH*, 171 U.S. 261 (1898) and *NORTHERN PACIFIC RAILWAY CO. V. ELY*, 197 U.S 1 (1905) held that in the rights of way established by the Congressional Act of 1863, "Congress must have assumed when making this grant, *** [that] crossings of the right of way would become necessary." O'LEARY, 100 P.at 629 (quoting *NORTHERN PACIFIC V. SMITH.*) Interestingly, the court noted that a paved street was not a "railroad purpose". The Court made a distinction between a public "paved street" and "railroad purposes". The Court wrote, "The use of the land in question for street purposes with a pavement upon it will not affect the situation as a matter of law nor in fact. If the [Railroad] at any time has occasion to use this part of its right of way for railroad purposes, the presence of this pavement will not prevent it." O'LEARY, 100 P.at 629.

More to the point is the case that the government chooses to overlook. *PRATT V. GRIESE*, 196 Kan. 182, 409 P.2d 777 (Kan., 1966). Pratt involved the Kansas Supreme Court finding that a railroad had abandoned its right of way when the rails and ties were removed. (We discuss this aspect of the case more fully below.) However, of immediate note is that in *PRATT* the Kansas Supreme Court looked with approval to Kentucky for the proposition that when a railroad

---

[134] The nature and extent of the rights obtained under congressionally granted rights of way and other land grants are defined by the terms of the Act. See, *HASH V. UNITED STATES*, 403 F. 3d 1308 (Fed. Cir., 2005).

"removed the track" and "attempted to convey the right of way to an association for the purposes of a national park [i]t was held by these acts to have abandoned the right of way." PRATT, 409 P.2d at 781. (citing, *MAMMOTH CAVE NATIONAL PARK ASS'N V. STATE HIGHWAY COMMISSION*, 261 Ky. 769, 88 S.W.2d 931 (Ky. App., 1935)). This is not an unusual holding. See, *LAWSON V. STATE*, supra, *POLLNOW V. DNR*, supra, *MICHIGAN DNR V. CARMODY-LAHTI REAL ESTATE*, supra, *PRESEAULT II* and *LOVELAND V. CSX*, 620 So.2d 1120 (1993), all cases holding – or citing as authorities cases holding – that the sale of a railroad right of way for a hiking trail was not used for railroad purpose and it constituted abandonment of the right of way.

### ***B. It is not necessary to establish that the Railroad has abandoned the right of way. But, to the extent that abandonment is considered, it is absolute and unequivocal that the Reno and Butler County Rights of way have been abandoned for any railroad use as a matter of fact and as a matter of law.***

#### i. It is not necessary to establish that a railroad right of way was abandoned in order for landowners to bring a claim for the Trails Act Taking their Reversionary Interest in their land.

The government spends 16 pages in their memorandum of law contending that the railroad has not abandoned the Butler County and Reno County Rights of Way. This is both inaccurate and unnecessary.

The Federal Circuit in *PRESEAULT II* wrote, "we find the question of abandonment is not the defining issue, since whether abandoned or not the Government's use of the property for a public trail constitutes a new, unauthorized use." *PRESEAULT II,* 100 F.3d at 1549. The Federal Circuit again reiterated this point in *TOEWS*, "Further, it is the Government's view that, under California law, there was no abandonment or extinguishment of the easements caused by the federal actions under §8(d) of the [Trails Act]. The trial court concluded that, as a factual matter, the railroad's management had acted in an unequivocal and decisive manner clearly showing an intention to abandon that section of the line. *** However, just as the trial court itself indicated that its conclusion on this matter was not necessary to the result reached, for the reasons that follow we need not definitively decide this issue either." TOEWS, 376 F.3d at 1375 – 1376.

The Federal Circuit expressly held in a Kansas Trails Act taking cases involving three separate trails, the landowner's taking claim arose upon issuance of the NITU even though "the

railroad continued to use the right-of-way for railroad purposes after the NITU was issued" and the railroad had not abandoned the right of way. "But even if under Kansas law the reversion would not occur until after federal authorization of abandonment, that state law reversion was still delayed by the issuance of the NITU, and the claim still accrued with the issuance of the NITU. It similarly makes no difference that the railroad use may have continued after the NITU issued. The termination of railroad use was still delayed by the NITU." *BARCLAY V. UNITED STATES,* 4432 F.3d 1368 (Fed. Cir., 2006) at 1374.

#### ii. To the extent that a showing of abandonment is necessary, the Butler County and Reno County Railroad Rights Of Way have been absolutely and unequivocally abandoned as a matter of fact.

Both parties agree that "in order to constitute an abandonment there must be an intent to relinquish, together with external acts by which the intent is carried into effect." *PRATT V. GRIESE* 196 Kan. 182, 409 P.2d 777 (1966) at 780 – 781.[135] The focus on "intent" is important because it focuses on the "intent" of the specific railroad that hold the easement at issue. In the case of both the Reno County and Butler County Right of Way, the railroad is the BNSF. So, when determining whether this railroad easement was abandoned, we look to the actions of the BNSF.

The following facts are agreed for both the Reno County and the Butler County Rights of Way: (1) The BNSF filed an application with the STB seeking authority to abandon railroad service over the right of way; (2) the STB granted the BNSF authority to abandon railroad service over the rights of way, (3) no trains have run over the former railroad rights of way for more than six years (in the case of Reno County) and more than a decade (in the case of Butler County), (4) the rails and tires have been removed from the right of way, (5) in the case of Butler County the line is "stub ended" and incapable of being used for "overhead" traffic, (6) in the case of Reno County "there is now no demand for or prospect of rail service over the line", (7) for both Reno County and Butler County the BNSF quitclaimed whatever interest it had in the

---

[135] Govt's Memo at p. 46. The focus on "intent" is important because it focuses on the "intent of the railroad". This is important because it is a focus on a specific "Railroad". In the case of both the Reno County and Butler County Right of Way, that is the BNSF.

rail corridor to a non-railroad which does not have the legal ability to operate a railroad; (8) the BNSF has been relieved of any and all responsibility or obligation to maintain the right of way; (9) the BNSF no longer pays any taxes upon the right of way, the BNSF no longer pays real estate taxes for any portion of the rights of way; and, (10) no Railroad or Rail Carrier presently has either the obligation to (or the legal ability to) use either the Butler County or the Reno County right of way for operation of a railroad.

### iii. To the extent that a showing of abandonment is necessary, the Butler County and Reno County Railroad Rights Of Way have been absolutely and unequivocally abandoned as a matter of law.

*PRATT* is the leading Kansas case establishing when an easement for a railroad right of way is abandoned. The railroad line in *PRATT* connected a large tract of land to the Union Pacific Railroad main line in Walker, Kansas that was used for an Army airfield. The airbase closed and the government sold the land and the railroad easement to a private developer, Don Pratt, who removed the ballast form the right of way but "testified he had considered plans for using the right of way in the construction of a railroad." PRATT, 409 P. 2d at 780. Pratt sued Francis Griese who owned the land over upon which the easement was located "to declare and protect the" easement. PRATT, 409 P. 2d at 778. Griese responded by claiming the easement had been abandoned.

The Kansas Supreme Court agreed. The Court noted that the rails and ties had been removed, that railroad operations over the land had ceased and that the easement was in a state of disrepair and fences had not been maintained. On this basis, the Kansas Supreme Court considered the railroad easement abandoned. The court held that, "A rule in the overwhelming majority of cases[136] on the subject is that evidence of an intention to abandon an easement for a

---

[136] The Kansas Supreme Court's statement is correct. The overwhelming majority of jurisdictions hold that a railroad's intention to abandon a right of way has been established when the rails and ties are removed. We could compile literally hundreds of cases from almost every state (we have not researched the law in Hawaii) reaching such a holding. However, we focus on Kansas law. Should this court find it helpful, the Plaintiffs would gladly provide such a national summary of cases reaching this holding.

railroad right of way may be found in the deliberate removal of tracks rendering the operation of a railroad impossible." PRATT, 409 P. 2d at 781.

The Court specifically looked to the Maryland case, *MARYLAND & PA. R.R. CO. V. MER-SAFE, ETC.*, 224 Md. 34, 166 A. 2d 247 (Md., 1960) "wherein a right of way was used for railroad purposes until *** the company ceased all railroad operations over the land and removed the rails and ties therefrom. This was the only evidence of abandonment." At 781. The court also looked to the Kentucky case, *MAMMOTH CAVE NAT. PARK ASS'N V. STATE HIGH. COMM.*, 261 Ky. 769, 88 S.W. 2d 931 (Ky. App., 1935). Mammoth Cave is important for two points. (1) it is one of the cases holding that the railroad's conveyance of the right of way to a non-railroad is a further specific act establishing evidence of an intent to abandon. (2) the conveyance of a railroad right of way "for the purpose of a national park *** was held by these acts to have abandoned the right of way." PRATT, 409 P. 2d at 781.

The Federal Circuit *en banc* held that the railroad had abandoned the railroad easement when, in *PRESEAULT II*, the "Vermont Railway ceased using the easement for active transport operations and used the tracks solely to store railroad cars ** Vermont Railroad removed the rails and other track materials from the segment of line crossing the Preseault's property." at 1547. The Federal Circuit went on, en banc, to note that, "While it is not disputed that an easement will not be extinguished through mere non-use, removing the tracks and switches from a railway cannot be termed non-use. Non-use of the easement began in 1970; abandonment occurred, as evidenced by the more permanent lack of operability, in 1975 [upon removal of the tracks]." *PRESEAULT II*, 100 F.3d at 1553 (Concurring opinion of Judge Rader joined by Judge Lourie.)

The government, understandably, does not like *PRATT* (or *PRESEAULT II*). They seek to avoid the clear and directly on-point holding of *PRATT* by claiming that *PRATT* is limited to cases involving a railroad spur track serving military bases when the military base has been discontinued. (Govt's Memo at p. 51). This is akin to claiming that *PRATT* is limited to only cases involving railroad right of way in Walker, Kansas in which the owner's land name begins with "G". These may be features of the *PRATT* case but the Kansas Supreme Court's holding in *PRATT* was in no way so limited. Indeed, the Kansas Supreme Court expressly announced in

*PRATT* that the rule of law it applied was "a rule found in the overwhelming majority of cases." *PRESEAULT II*, 100 F.3d at 782. And, quoting from the *MARYLAND & PA. R.R.* [166 A.2d 250] decision, noted, "The next question is whether the removal of the rails and ties from the easement constituted an abandonment of it. We think it did." *PRESEAULT II*, 100 F.3d at 781. It is simply not correct to claim – as the government attempts to do – that the *PRATT* holding is only limited to railroad lines established to serve former military airbases.

The government goes on to say that *PRATT* is consistent with "well established Kansas law that an easement on land 'condemned for a public use does not revert to the fee owner unless its use for the *** condemned purpose has become impossible, or so highly improbable as to be practically impossible'." (Gov's Memo at p. 51). The government cites for its characterization of the Kansas rule on railroad abandonment two cases considering whether a public highway or street was abandoned by the city or highway department.[137]

The government is attempting to suggest that, so long as it is not impossible for a railroad – any railroad, it need not be railroad that currently holds the easement – to ever possibly rebuild a rail line over the land, the easement has not been abandoned. The government claims that by agreeing to negotiate a trail use of the right of way under the federal Trails Act "the railroad's actions contemplate that future rail service is a real possibility"[138] and, thus, the easement has not been abandoned.

This suggestion by the government is wrong for two reasons. First it is contrary to Kansas law. Second, it is a variation of the same misguided effort to redefine by *ipsi dixit* Kansas state law to be what Congress intended to achieve with the 1983 Amendments to the Trails Act and was, as such, explicitly rejected by the Federal Circuit – and every other court to consider the argument.

---

[137] The government cited, *MATLACK V. CITY OF WICHITA*, 407 P. 2d 510, 511 (Kan., 1965) and *WINKEL V. KANSAS DEP'T OF TRANSP.*, 131 P. 3d 570, No. 94,008, 2006 WL 903159, at 2 (Kan. Ct. Apr. 7, 2006).

[138] Govt's Memo at p. 53.

Oddly, the only Kansas case which the government cites in support of its contention that the BNSF did not abandon the rights of way in this case is a case in which the court held that the railroad *had* abandoned the railroad right of way when it stopped paying taxes on the land and disclaimed its interest in the right of way. Two facts which are unquestionably present in this case. The government cites *MARTELL v. STEWART,* 6 Kan. App. 2d 387, 628 P.2d 1069 (Kan. App., 1981).

The Atchinson, Topeka & Santa Fe Railroad abandoned a railroad line in Greenwood County Kansas. The ATSF stopped running trains over the right of way. In 1975 the ATSF contracted with a third party to remove the rails, ties and ballast. The railroad continued to pay real estate taxes on the right of way through January 1, 1978. In January 1978 the railroad stopped paying taxes and on January 24th the railroad "filed a Declaration of Abandonment of the right-of-way with the Register of Deeds of Greenwood County." MILLER, 620 P. 2d at 1069. Before this, however, George Stewart and some other owners of the land upon which the railroad right of way had been located wanted the ballast. (The case does not report why the landowners wanted the ballast, presumably it was of some value.) So, George Stewart began to remove the ballast. Henry Martell had bought the ballast from the contractor which the ATSF hired to remove the rails and ties. So, Henry Martell sued George Stewart claiming that he, Henry Martell, owned the ballast.

George Stewart and the other landowners defended their right to the ballast by claiming that the ATSF abandoned the right of way when the ATSF signed the agreement to remove the rails and ties. MILLER, 620 P. 2d at 1069. Henry Martell claimed that the Sante Fe had not abandoned the easement until the ATSF filed the notice disclaiming any interest with the recorder of deeds office. The Kansas Court of Appeals held that Henry Martell had the right to the ballast because the ATSF had not abandoned the right of way until January 1978. The Court of Appeals reasoned that the ATSF had not abandoned the right of way until January 1978 because, until then, the ATSF continued to pay taxes on the right of way and the ATSF's actions indicated that they intended to use the right-of-way until all their materials were removed. MILLER, 620 P. 2d at 1069.

In *MARTELL* there was never any dispute that the railroad easement had been abandoned. The debate was over *when* it was abandoned. Under any of the *MARTELL* criteria the railroad easement in this case has been abandoned. Four specific points are noteworthy in this case: (1) the rails and ties are removed, (2) railroad use of the property has ceased, (3) the railroad has filed a quit claim deed with the Recorder's Office disclaiming any interest in the right of way, (4) the railroad is not paying taxes on the right of way.[139]

Under any standard, the BNSF's actions are conclusive. As a matter of law and as a matter of fact the BNSF has abandoned the Butler County and the Reno County Rights of Way. The government's sole point in rebuttal is that – by virtue of the Trails Act and the STB's continued jurisdiction – it remains a possibility that some railroad may use this land at some indefinite point in the future for a railroad. Under Kansas law this does not mean that the BNSF has not abandoned the right of way. And, as the Federal Circuit noted, "The vague notion that the State [in this case the County] may at some time in the future return the property to the use for which it was originally granted, does not override its present use of the property inconsistent with the easement. That conversion demands compensation."[140]

### C. The So-Called "Shifting Public Use" doctrine has been rejected by the Supreme Court, the Federal Circuit and is Not Recognized Under Kansas Law

In a final "Hail Mary" the government marches out the argument that an abandoned railroad easement "may transmogrify into the public's use [of the land] as a recreational trail and linear park."[141] The government claims, "Kansas law follows this principle and allows a shift in use for a right of way so long as that use continues to be of a public nature."

---

[139] Tabs 3A, 4A, 5A, 6A, 7A, 8A, 30, 30A, and 30B of Plaintiffs' PFUFin Response.

[140] *PRESEAULT II*, 100 F.3d at 1354 (concurring opinion of J. Rader.)

[141] Taken from the Federal Circuit's characterization of the government's "Shifting Public Use doctrine". *TOEWS* at p. 1377.