# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DOROTHY L. BIERY, et al., and<br><br>JERRAMY and ERIN PANKRATZ, for Themselves and a Class of Similarly Situated Persons,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Case No. 1:07-cv-693<br>(Consolidated with<br>Case No. 1:07-cv-695)<br><br>Honorable Nancy B. Firestone |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

MARK F. (THOR) HEARNE, II
LINDSAY S.C. BRINTON
MEGHAN S. LARGENT
Lathrop & Gage, LC
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
314.613.2500 (Phone)
314.613-2550 (fax)
Thornet@ix.netcom.com

ATTORNEYS FOR PLAINTIFFS

**TABLE OF CONTENTS**


I. Introduction ..................................................................................................... 1

II. We agree on 4 essential points. ....................................................................... 2

A. For the Pankratz Landowners, the parties agree that all six landowners held fee title to an estate in the land abutting the Butler County Right of Way and the railroad held only an easement to use this land for railroad purposes. For one of the Pankratz Landowners, the Mar Trust, the parties agree that the Mar Trust also owned the land underlying the right of way. ........... 2

B. The parties agree that trains have not operated across the Butler County Right of Way since the 1990's, the rails and ties have been removed, the BNSF Quit Claimed any interest it had in the Right of Way to a non-railroad, the STB issued a NITU authorizing abandonment of railroad service on this corridor and conversion of the right of way to public recreational trail use and Butler County entered into a Trail Use Agreement for the conversion of the right of way to a public-access recreational trail. ......................................................................................... 4

C. The parties agree that six of the seven Biery Landowners held fee title to an estate in the land abutting the Reno County Right of Way and that (for those portions of the right of way acquired by condemnation) the railroad held only an easement to use the land for railroad purposes. ............................... 6

D. Trains have not operated across the Reno County Right of Way since before 2002, the rails and ties have been removed, the STB has authorized the BNSF to abandon railroad service, the BNSF Quit Claimed any interest it had in the right of way to a non-railroad stating specifically that it did not claim to hold anything more than an easement in the right of way, the STB issued a NITU authorizing abandonment of railroad service and conversion of the right of way to public recreational trail use, and the City of South Hutchinson entered into a Trail Use Agreement for the conversion of the right of way to public-access recreational trail use. ................... 7

E. We also agree on five essential points of law: (i) by condemnation a railroad only obtains an easement (and not a fee estate in the land), (ii) that the owner of the fee estate in land retains that fee estate and title to land subject to a railroad easement, (iii) that a conveyance of land abutting a railroad is presumed to carry title to the centerline of the abutting railroad; (iv) that when railroad use of an easement is terminated the fee owner's land is relieved of the burden of the easement; and, (v) that the Trails Act operates upon the STB's issuance of a NITU to preempt state law that would otherwise hold the railroad easement to be abandoned. ............................. 9

III. We disagree on four points which we present to this Court for resolution...................... 10

A. While the government and the Plaintiffs agree that the Biery and Pankratz Plaintiffs own the land <u>abutting</u> the right of way, and the parties agree that three of the Plaintiffs own the land underlying the right of way, the parties disagree whether four of the Biery Landowners and six of the Pankratz

Landowners have carried the burden of establishing their ownership of the land underlying the right of way. ..... 10

B. While the government and the Plaintiffs agree that the Butler and Reno County Rights of Way were "largely" established by condemnation and, as such, the railroad acquired only an easement to use the land and not ownership of the land; the parties disagree whether five instruments describing small segments of the Reno County Right of Way conveyed the railroad a fee simple estate in the land used for a right of way or an easement to use the land for a railroad right of way. ..... 12

C. Did the railroad's right to use the Plaintiffs' land for operation of a railroad include the ability of a non-railroad to use the land as a public-access recreational trail and indefinitely "railbank" this land under the federal Trails Act? ..... 13

D. Did the Pankratz Landowners claim for a taking of their land arise when the STB issued the original NITU invoking the Trails Act and authorizing conversion of the right of way to trail use or did this claim arise when the STB issued the second NITU? ..... 14

IV. PART ONE- POINT ONE: All The Plaintiffs Own The Land Upon Which The Former Railway Right Of Way Was Located. ..... 16

A. The government agrees that all the landowners hold title to the land abutting the right of way but argues that several of them have not carried the burden of establishing title to the land under the right of way because the deed by which they acquired title references the edge of the right of way as the boundary. ..... 16

B. Kansas has expressly adopted the well-established presumption that a deed describing land with a railroad right of way as a boundary carries title to the centerline of the adjoining railroad right of way. ..... 17

C. The Government Is Aware Of This Presumption of Real Estate Law And Has Acknowledged this Presumption In This As Well as Other Trails Act Taking Cases. ..... 18

D. All the Plaintiffs Have Satisfied the Presumption That They Hold Title To The Land Abutting AND Underlying The Right Of Way and the Government has Not Rebutted this Presumption. ..... 19

V. PART ONE – POINT TWO: The Five Specific Conveyances Referenced By The Government Did Not Convey A Fee Simple Estate In The Land To The Railroad. ..... 20

A. As A General Matter Of Kansas Law, A Conveyance to A Railroad for a "Right of Way" grants the railroad only an Easement to use the land and does not convey a fee estate in the land itself. ..... 20

B. The Terms of the Conveyance Instruments Demonstrate the Grantor's Clear Intention to Convey Only an Easement. ..... 26

i. The Rose J. Arnold Warranty Deed ..... 27

ii. Julia Fair Quitclaim Deed ..... 28

iii. Irrigation Loan & Trust Company Deed (March 1901) ..... 29

iv. E.L. Rowland Quitclaim Deed ..... 29

v. Irrigation Loan & Trust Company Deed (March 1901) ..... 29

VI. Part Two: Neither Public-Access Recreational Trail Use Nor "Railbanking" Are a "Railroad Purpose" Under Kansas Law. ..... 30

A. The uses of the subject rights-of-way authorized by the Trails Act – railbanking and interim trail use – are NOT permissible present uses of those rights-of-way under Kansas law. ..... 31

i. The government's "'railbanking' is a railroad purpose" argument has been repeatedly rejected by every court to consider the argument. ..... 31

ii. As a matter of plain English, "Railbanking" and recreational trail use are not a "railroad purpose". ..... 35

i. The definition of "Railway" and "Railroad" ..... 35

ii. The definition of a "recreational trail". ..... 36

iii. The definition of "railbanking" ..... 37

iv. Conclusion: "railbanking" and recreational trail use have nothing to do with the operation of a railroad and are not a "railroad purpose". ..... 37

iii. The 1983 Amendments To The Trails Act Provided For Railbanking and Recreational Trail Use of Abandoned Railroad Rights of Way Precisely Because Such Uses Were NOT A "Railroad Purpose" Under Existing State Law. ..... 38

iv. *Harvey* and *Humberg* Provide No Support For The Government's Argument That "Railbanking" is a Railroad Purpose Under Kansas Law. ..... 43

v. Recreational Trail Use Is Absolutely and Decidedly NOT a "Railroad Purpose" Under Kansas Law. ..... 46

B. It is not necessary to establish that the Railroad has abandoned the right of way. But, to the extent that abandonment is considered, it is absolute and unequivocal that the Reno and Butler County Rights of way have been abandoned for any railroad use as a matter of fact and as a matter of law. ..... 48

i. It is not necessary to establish that a railroad right of way was abandoned in order for landowners to bring a claim for the Trails Act Taking their Reversionary Interest in their land. ..... 48

ii. To the extent that a showing of abandonment is necessary, the Butler County and Reno County Railroad Rights Of Way have been absolutely and unequivocally abandoned as a matter of fact. ..... 49

iii. To the extent that a showing of abandonment is necessary, the Butler County and Reno County Railroad Rights Of Way have been absolutely and unequivocally abandoned as a matter of law. .......... 50

C. The So-Called "Shifting Public Use" doctrine has been rejected by the Supreme Court, the Federal Circuit and is Not Recognized Under Kansas Law .......... 55

i. The So-Called "Shifting Public Use Doctrine" Has Been Rejected by the U.S. Supreme Court, Federal Circuit, the D.C. Circuit and other Courts. .......... 55

ii. Kansas Does Not Recognize the "Shifting Public Use Doctrine" .......... 57

iii. Even Advocates of the So-Called Shifting Public Use Doctrine" Agree that it does not apply to Recreational Hiking Trails. .......... 59

VII. CONCLUSION .......... 60

# TABLE OF AUTHORITIES

## Cases

*ABERCROMBIE V. SIMMONS*, 71 Kan. 538, 81 P. 208 (Kan., 1905) .................................. 12, 23, 25

*ATCHINSON, TOPEKA & SANTA FE RAILWAY COMPANY V. O'LEARY*, 100 P.628 (Kan., 1909) .......... 47

*ATICHSON, TOPEKA & SANTA FE RY. CO. V. HUMBERG*, 9 Kan. App. 2d 205, 675 P.2d 375 (Kan., 1984) .................................................................................................. 24, 25, 43, 45

*BARCLAY V. UNITED STATES* 443 F.3d 1368 (Fed. Cir., 2006) .......................................... 15, 40, 49

*BARKER V. LASHBROOK*, 279 P. 12 (Kan., 1929)........................................................ 9, 11, 18, 23

*BECKER V. SURFACE TRANSPORTATION BOARD*, 132 F. 3d 0 (D.C. Cir, 1997)................................ 39

*BIRT V. STB*, 90 F.3d 580 (D.C. Cir., 1996)............................................................................ 10, 39

*BOWERS V. ATCHISON, T&S.F. RY. CO.*, 237 P. 913 (Kan., 1925)........................................... passim

*BOYLES V. MISSOURI FRIENDS OF THE WABASH TRACE NATURE TRAIL, INC.*, 981 S. W. 2d 644 (Mo App, W.D., 1998)........................................................................................................ 36

*BROWN V. PENN CENTRAL CORP.*, 510 N.E.2d 641 (Ind.1987) ............................................... 22, 62

*BROWN V. WEARE*, 348 Mo. 135 S.W. 2d 649 (1941) ............................................................... 61

*BUHL ET. AL V. U.S. SPRINT COMMUNICATIONS CO.* 840 S.W. 2d 904 (1992, Tenn)....................... 61

*CALDWELL V. UNITED STATES*, 391 F. 3d 1226 (Fed Cir., 2004) ............................................ 10, 40

*CHATHAM V. BRAINERD*, 11 Conn. 60-85 ................................................................................. 18

*CHEVY CHASE LAND CO. V. UNITED STATES*, 158 F.3d 574 (Fed. Cir., 1998) ................................ 32

*CHEVY CHASE LAND CO. V. UNITED STATES*, 355 Md. 110, 733 A.2d 1055 (1999) ........................ 32

*CHEVY CHASE LAND CO. V. UNITED STATES*, 733 A.2d 1055 (Md., 1999) ............................. 31, 32

*CHEVY CHASE LAND V. UNITED STATES*, 230 F.3d 1375 (Fed. Cir., 2000) .............................. 31, 32

*CITIZENS AGAINST RAILS-TO-TRAILS V. SURFACE TRANSPORTATION BOARD*, 267 F. 3d 1144 (D.C. Cir, 2001) ........................................................................................................ 39, 41, 42

*COON V. SONOMA MAGNESITE CO.* 183 Cal. 597 189 P. 271 (1920) ............................................ 61

*COOPER V. SELIG*, 48 Cal. App. 228, 191 P. 983 ................................................................... 61

*DANIELSON V. WOESTEMEYER*, 131 Kan. 796, 263 P. 507 (Kan., 1930) ........................................ 24

*Davis v. MCI* 606 So. 2d 734 (1992) ......................................................................................... 21

*DISNEY V. LANG*, 90 Kan. 309 P. 572 (Kan. 1913) ........................................................................ 13

*FAUS V. CITY OF LAS ANGELES*, 67 Cal.2d 350, 62 Cal.Rptr. 193, 431 P.2d 849 (1967) ................ 59

*FED. FARM MORTG. CORP. V. SMITH*, 89 P2d 838 (Kan., 1939) ............................................ passim

*FRITSCH V. I.C.C.*, 59 F. 3d 248, (D.C. Cir., 1995)........................................................................ 39

*GLOSEMEYER V. UNITED STATES*, 45 Fed. Cl. 771 (2000) .......................................... 31, 34, 36, 56

*GOOS V. ICC*, 911 F.2d 1283 (8th Cir., 1990) ........ 10, 37, 39

*GRANTWOOD VILLAGE V. MO PAC*, 95 F. 3d 654 (8th Cir, 1996) ........ 39, 41

*HARVEST QUEEN MILL & ELEVATOR V. SANDERS, 189 KAN. 536, 370 P.2D 419 (KAN. 1962)*12, 24, 27

*HARVEY V. MISSOURI PAC. R. CO.*, 111 Kan. 371, 207 P. 761 (Kan., 1922) ........ passim

*HASH V. UNITED STATES*, 403 F. 3d 1308 (Fed. Cir., 2005) ........ 39, 47, 57

*HASTINGS V. WHITNEY*, 132 U.S. 357 (1889) ........ 57

*HENRY V. COLUMBUS DEPOT CO.*, 135 Ohio St. 311, 20 N.E.2d 921 (1939) ........ 22

*HIGHLAND REALTY CO. V. CITY OF SAN RAFAEL, 46 CAL.2D 669, 298 P2D 15 (1956)* ........ 22, 61

*ILLIG V. UNITED STATES*, 58 Fed. Cl. 619 (2003) ........ 19

*JAPANESE WAR NOTES V. UNITED STATES*, 178 Ct. Cl. 630, 373 F. 2d 356 (1967) ........ 15

*JOHNSON V. OCEAN SHORE R.R.*, 16 Cal.App.3d 429, 94 Cal.Rptr. 68 (1971) ........ 22

*JOST V. SURFACE TRANSP BD.* 194 F. 3d 79 (D.C. Cir, 1999) ........ 39

*KANSAS ELECTRIC POWER CO. V. WALKER*, 142 Kan. 808, 51 P.2d 1002 (Kan., 1935) ........ 58, 59

*L&G REALTY & CONSTRUCTION CO. V. INDIANAPOLIS*, 127 Ind. App. 35, 139 N.E.2d 580 (1957) ........ 62

*LAWSON V. STATE*, 107 Wash.2d 444, 730 P.2d 1308 (Wash., 1986) ........ 31, 48, 56

*LEO SHEEP CO. V. UNITED STATES*, 440 U.S. 668 (1979) ........ 57

*LOVELAND V. CSX*, 620 So.2d 1120 (1993) ........ 48

*MAMMOTH CAVE NATIONAL PARK ASS'N V. STATE HIGHWAY COMMISSION*, 261 Ky. 769, 88 S.W.2d 931 (Ky. App., 1935) ........ 48, 51

*MARTELL V. STEWART,* 6 Kan. App. 2d 387, 628 P.2d 1069 (Kan. App., 1981) ........ 53

*MARYLAND & PA. R.R. CO. V. MER-SAFE, ETC.*, 224 Md. 34, 166 A. 2d 247 (Md., 1960) ........ 51, 52

*MATLACK V. CITY OF WICHITA*, 407 P. 2d 510, 511 (Kan., 1965) ........ 53

*MICHIGAN DNR V. CARMODY-LAHTI REAL ESTATE, INC.* 472 Mich. 359, 699 N.W. 2d 272 (Mich., 2005) ........ 31, 48, 56

*MILLER V. ST. LOUIS, SOUTHWESTERN RAILWAY COMPANY*, 239 Kan. 198, 718 P.2d 610 (Kan., 1986) ........ 24, 25, 43, 46

*MOAKLEY V. LOS ANGELES PACIFIC RY. CO.* 139 Cal App 421, 34 P2d 218 (1934) ........ 61

*NATIONAL ASSOCIATION OF REVERSIONARY PROPERTY OWNERS V. SURFACE TRANSPORTATION BOARD*, 158 F. 3d 135 (D.C. Cir, 1998) ........ 39

*NATIONAL WILDLIFE FOUNDATION V. ICC*, 850 F. 2d 694 (D.C. Cir., 1988) ........ passim

*NORTHERN PACIFIC RAILROAD COMPANY V. SMITH*, 171 U.S. 261 (1898) ........ 47

*NORTHERN PACIFIC RAILWAY CO. V. ELY*, 197 U.S 1 (1905) ........ 47

*NORTHERN PACIFIC RY. V. TOWNSEND* 190 U.S. 267 (1903) ........ 47

*NOTT V. BEIGHTEL*, 155 Kan. 94, P.2d 747 (Kan., 1942) ........ 25

*OCEAN SHORE RAILROAD V. DOELGER*, 127 Cal. App. 2d 392, 274 P.2d 23 (1954) ........ 61

*PECK V. DENNISTON*, 121 Mass. 17 ........ 18

*PENN. CENT. CORP. V. U.S.R.R. VEST CORP.* 955 F. 2d 1158. (1992, 7th Cir, Ind.) ........ 21

*PEOPLE, BY AND THROUGH DEPARTMENT OF PUBLIC WORKS V. THOMPSON*, 43 Cal 2d 13, 271 P 2d 507 (1954) ........ 61

*POLLNOW V. STATE*, 88 Wis. 2d 350, 276 N.W.2d 738 (Wisc., 1979) ........ 31, 48

*PRATT V. GRIESE*, 196 Kan. 182, 409 P.2d 777 (Kan., 1966) ........ 48, 49, 50, 52

*PRESEAULT V. UNITED STATES, 100 F.3D 1525 (FED.CIR. EN BANC 1996)* ........ passim

*REIGER V. PENN CENTRAL CORP.*, No. 85-CA-11, slip op. (Ct. App. Greene County, Ohio, May 21, 1985) ........ 31, 32

*RICHARD S. BRUNT TRUST V. PLANTZ*, Ind. App. 458 N.E.2d 251 (1983) ........ 62

*RLTD V. SURFACE TRANSPORTATION BOARD*, 166 F. 3d 808 (6th Cir, 1999) ........ 39

*ROSS, INC. V. LEGLER*, 245 Ind. 655, 199 N.E.2d 346 (1964) ........ 22

*SAN RAFAEL RANCH CO. V. RALPH ROGERS CO.* 154 Cal. 76, 96 P. 1092 (1908) ........ 61

*SCHUERMANN ENTERPRISES, INC. V. ST. LOUIS COUNTY*, 436 S.W. 2d 666 (Mo. 1969) ........ 61

*SHERMAN V. PETROLEUM EXPLORATION*, 280 Ky. 105, 132 S.W.2d 768 (1939) ........ 22, 62

*STONE V. U.S.D. NO. 222*, 278 Kan. 166, 91 P.3d 1194 (Kan., 2004) ........ 23

*SWISHER V. UNITED STATES*, 176 F. Supp. 2d 1100 (D. Kan., 2001) ........ 32

*TAMALPAIS LAND & WATER CO. V. NORTHWESTERN PAC. R. CO.* 73 Cal. App 2d 917, 167 P2d 825 (1946) ........ 61

*TOWES V. UNITED STATES*, 376 F.3d 1371 (Fed. Cir., 2004) ........ passim

*WASHINGTON WILDLIFE PRES., INC. V. MINNESOTA*, 329 N.W. 2d 543 (Minn., 1983) ........ 31, 32

*WILCOX V. JACKSON*, 13 Pet. 498, 10 L. Ed. 264 ........ 57

*WINKEL V. KANSAS DEP'T OF TRANSP.*, 131 P. 3d 570, No. 94,008, 2006 WL 903159 (Kan. Ct. Apr. 7, 2006) ........ 53

**Other Authorities**

11 U.S.C.§ 101 ........ 36

16. U.S.C. §1247 ........ 37

49 U.S.C. §10906 (1982) ........ 41

Carroll, Lewis, "*THROUGH THE LOOKING GLASS*" ........ 38

D. Robert White, Esq. *THE OFFICIAL LAWYER'S HANDBOOK.* Simon & Schuster, Inc. (1983), p. 185-86 ........ 38

H.R. Rep. No. 28, 98th Cong., 1st Sess. 8-9 (1983) ........ 41

Heftman, Jeffery M., RAILROAD RIGHT-OF-WAY EASEMENTS, UTILITY APPORTIONMENTS, AND SHIFTING TECHNOLOGICAL, REALITIES, Univ of Illinois L. Rev. Vol 2002, p. 1401........ 60

K. S. A. § 8-1454 ........ 36

K.S.A. § 21-3761 ........ 36

K.S.A. §8-1452 ........ 36

*Thompson on Real Property*, Perm Ed., Vol. 2, pp. 11-12, s 461 and p. 14, s 462 and 132 A.L.R. 142-187 ........ 62

*U.S. CODE CONG. & ADMIN. NEWS* 1983 ........ 41

U.S. House of Representatives, Judiciary Committee, Subcommittee on Commercial and Administrative Law, "Litigation and Its Effect on the Rails-to-Trails Program," June 20, 2002 ........ 43

*YEAR BOOK OF 17 EDWARD III,* A.D. 1343 ........ 17

# I. Introduction

The present matter involves two separate cases in which Kansas landowners claim the federal government, through operation of the Trails Act[1], took their "reversionary"[2] right to their land and burdened their land with two new easements, one for a public-access recreational trail and a second perpetual easement across the land for possible railroad use in the indefinite future. While the federal government has the ability to take private property in this manner, the Fifth Amendment requires that the landowners from whom the property is taken receive "just compensation".

The *PANKRATZ* case involves claims brought by six landowners in Butler County, Kansas who own land upon which the former St. Louis Wichita & Western Railway railroad right of way was located.[3] The *BIERY* case involves similar claims by seven landowners in Reno County, Kansas upon which the former Hutchinson, Oklahoma & Gulf Railroad and the Hutchinson & Southern Railroad right of way was located.[4] For many of these landowners, the property involved is a part of their home or a family business or farm.

---

[1] Pub.L. 98-11, 97 Stat. 48, to the National Trails System Act, Pub.L. 90-543, 82 Stat. 919 (certified, as amended, at 16 U.S.C. §1241 *et seq*. (Supp. II 1996).

[2] The use of the term "Reversionary" is in the generic sense as used by the Federal Circuit in *TOEWS V. UNITED STATES*, 376 F.3d 1371 (Fed. Cir. 2004) and is not meant to imply that the railroad held a fee simple determinable (or conditional) interest in the land.

[3] The *PANKRATZ* plaintiffs are Jerramy and Erin Pankratz, Donald E. and Evangeline Wedell, Thad J. Colling, Thick Gon Mar, Trustee of the Thick Gon Mar Revocable Trust, dated November 7, 1995, Michael A. and Marcia J. Woods, and Floyd E. and Becky Myers. The present motion for summary judgment concerns only these named plaintiffs. There is a pending motion for the Pankratz case to be certified as a class action pursuant to RCFC 23 (Docket No. 11).

[4] The *BIERY* Plaintiffs are Dorothy L. Biery, Gordon Holloway, as successor and representative of decedent George A. Holloway, Stacy E. Judy Trust dated March 7, 1994, Julia R. Chalfant Etvir Trust, K.A.K. Farms, Inc., American Packing Corporation, and Collins Industries, Inc. There is no motion for the *BIERY* case to be certified as a class action.

This Court has consolidated these two cases for briefing on the issue of liability – namely the government's obligation to pay "just compensation" to the named Plaintiffs for the taking of their property.[5] This memorandum is the Plaintiffs' response to the government's cross-motion for summary judgment.

## II. We agree on 4 essential points.

We commence our discussion from a point of common accord. We draw these points of agreement from the government's own pleadings and exhibits.

### *A. For the Pankratz Landowners, the parties agree that all six landowners held fee title to an estate in the land abutting the Butler County Right of Way and the railroad held only an easement to use this land for railroad purposes. For one of the Pankratz Landowners, the Mar Trust, the parties agree that the Mar Trust also owned the land underlying the right of way.*

1. The railroad right of way which is the subject of the *PANKRATZ* case is a 10.6 mile long right of way between Augusta, Kansas and Andover, Kansas in Butler County.[6] (the "Butler County Right of Way").

2. The Butler County Right of Way was originally established by a Condemnation Decree[7] dated November 4, 1879 and a conveyance from William and Ann Chase to the St. Louis Wichita & Western Railway, Co. dated November 3, 1879[8] and was constructed between 1879 and May 1880.[9]

---

[5] Order filed by this Court on May 9, 2008 in *BIERY V. U.S.* (07-693L) (Docket No. 29).

[6] Govt's Cross-Motion, 6.

[7] The Condemnation Decree is attached as Exhibit 10-1 to the Govt's Cross-Motion and a transcribed copy is attached to this memo as Appendix B.

[8] The Chase conveyance is attached as Exhibit 10-2 to the Gov's Cross-Motion, and a transcribed copy is attached as Appendix C.

[9] Govt's Cross-Motion, Exhibit 3 (historical report), 3.

3. Five of the *PANKRATZ* landowners own the land abutting the portion of the right of way established by the Condemnation Decree.[10]

4. *PANKRATZ* landowner Colling owns the land abutting the portion of the right of way established by the Chase conveyance.[11]

5. Each of the *PANKRATZ* landowners held title to a fee simple estate in the land abutting the right of way on September 14, 2004.[12]

6. *PANKRATZ* landowner Mar held fee simple estate in the land underlying the right of way.[13]

7. For that portion of the right of way subject to the Condemnation Decree, the railroad obtained only an easement to use the property and did not own a fee estate in the land.[14]

8. "Defendant concedes that the railroad acquired only an easement with regard to the small segment of the subject right-of-way [described in the Chase deed] because the legal description of the deed clearly shows that the use of the land was restricted for railroad purposes and the deed contains a reversionary clause."[15]

---

[10] Govt's Cross-Motion, 6 – 7. The specific *PANKRATZ* landowners abutting this portion of the right of way established by Condemnation Decree are Jerramy and Erin Pankratz, Donald E. and Evangeline Wedell, Thick Gon Mar, Trustee of the Thick Gon Mar Revocable Trust, dated November 7, 1995, Michael A. and Marcia J. Woods, and Floyd E. and Becky Myers

[11] Govt's Cross-Motion, 7 and Govt's Exhibit 10.

[12] "Defendant does not dispute that each of the Pankratz Plaintiffs owned a parcel of land that abuts the subject right-of-way as of September 13, 2004." Govt's Cross-Motion at 30; Govt's Proposed Finding of Uncontroverted Fact Nos. 18 through 24.

[13] "Defendant's review of the legal description of the Mar Trust's property and the county maps showing the location of that property confirm that the right-of-way traverses that property. (i.e. the Mar Trust owns the property on both sides of the right-of-way). Accordingly, the Defendant does not dispute that under Kansas law, the Mar Trust is the fee owner of the land subject to a railroad easement." Govt's Cross-Motion, 32.

[14] "Most of the segments of the rights-of-way at issue in *BIERY* and *PANKRATZ* were acquired by the railroad though condemnation proceedings between 1879 and 1899. As set forth below, under state law then in effect, the railroad acquired an easement to these segments by condemnation." Govt's Cross-Motion, 18.

[15] Govt's Cross-Motion, 22.

***B. The parties agree that trains have not operated across the Butler County Right of Way since the 1990's, the rails and ties have been removed, the BNSF Quit Claimed any interest it had in the Right of Way to a non-railroad, the STB issued a NITU authorizing abandonment of railroad service on this corridor and conversion of the right of way to public recreational trail use and Butler County entered into a Trail Use Agreement for the conversion of the right of way to a public-access recreational trail.***

9. The Burlington Northern Santa Fe Railroad ("BNSF") is the successor to the St. Louis Wichita & Western Railway Co.[16]

10. "By the mid-1990's, all operations on the Line had ceased. The line is in poor condition and has not seen any traffic in recent years. In order to restart freight operations, significant rehabilitation would be required. [N]o traffic has moved on the line in about ten years."[17]

11. The BNSF quit claimed to Butler County "all of [BNSF]'s rights, title and interest, if any, in real estate and improvements constituting [BNSF]'s rail corridor."[18]

12. Butler County was unable to find any "third party rail operator" to operate a railroad over the line and in 2004 filed a notice of abandonment with the STB in which the County stated that it sought to abandon railroad service over the entire 10.6-mile-long rail line and that, "no local [or overhead] traffic has moved over the line for at least 2 years since December 2001."[19] "The line is stub-ended and, therefore, not capable of handling overhead traffic."[20]

13. The rails and ties have been removed from the right of way.[21]

---

[16] Govt's Cross-Motion, Exhibit 3 (Historic Report), 3.

[17] Govt's Cross-Motion, Exhibit 3 (Historic Report), 3-4.

[18] Govt's Cross-Motion, Exhibit 11, 1, recorded at Book 1037, Page 67 *et seq.* of the Butler County Recorder of Deeds' Office.

[19] STB Docket No. AB-870X, Service Date, July 2, 2004, attached at Tab K of Pankratz Plaintiffs' PFUF.

[20] STB Docket No. AB-870X, Service Date July 9, 2004 (Environmental Assessment), attached at Tab L of Pankratz Plaintiffs' PFUF.

[21] Pankratz Plaintiffs' PFUF, No. 25.

14. "On September 14, 2004, a NITU was issued [by the STB] to Prairie Travelers, Inc. (PTI), to negotiate with the County for acquisition of the right-of-way for use as a recreational trail."[22] This order provided that "the County may discontinue service, and salvage track and related materials."

15. "The NITU issued to PTI expired on March 13, 2005, without an agreement being reached."[23]

16. "On May 2, 2005, Butler County Economic Development (BCED) late-filed a request for the issuance of a NITU for the entire line pursuant to the Trails Act." The STB granted this request and issued a second NITU ordering, *inter alia*, that "If an agreement for interim trail use/rail banking is reached by November 29, 2005 * * * interim trail use may be implemented."[24]

17. "On June 2, 2005, the County and BCED executed a trail use/railbanking agreement for the line."[25]

18. On April 2, 2008, the Butler County Planning and Development Department sent a letter to Jerramy Pankratz stating, "I can reconfirm that you do not have the right to make any improvements to the lands within the right of way (including fencing, erecting structures, or grading out the rail bed.)"[26]

---

[22] STB Docket No. AB-870X, Service Date, June 2, 2005 (citing prior STB NITU issued September 14, 2004), attached as Tab C to Pankratz Plaintiffs' PFUF.
[23] *Id.*
[24] *Id.*
[25] Govt's Cross-Motion, 8.
[26] Govt's Response to Plaintiffs' PFUF No. 38. A complete copy of the referenced letter is attached to Pankratz Plaintiffs' PFUF at Tab O.

### *C. The parties agree that six of the seven Biery Landowners held fee title to an estate in the land abutting the Reno County Right of Way and that (for those portions of the right of way acquired by condemnation) the railroad held only an easement to use the land for railroad purposes.*

19. The railroad right of way which is the subject of the *BIERY* landowners' claim is a 2.88-mile-long right of way near South Hutchinson, Kansas in Reno County.[27] (The "Reno County Right of Way".)

20. The Reno County railroad right of way was established by two Condemnation Decrees and five instruments from grantors that were fee owners of the land. To Wit: Condemnation Decree dated August 1, 1889,[28] Condemnation Decree dated October 27, 1899[29] and separate instruments, from: (a) Rose Arnold dated May 15, 1895,[30] (b) from Julia Ann Fair dated November 22, 1899,[31] (c)from the Irrigation Loan & Trust Co. dated November 1, 1901[32] (d) from E.L Rowland dated September 1, 1896,[33] and (e) another from the Irrigation Loan & Trust Company dated 1901.[34]

---

27 Govt's Cross-Motion, 8.

28 Govt's Cross-Motion, Exhibit 22, 2-3. A transcribed copy of the Condemnation Decree is attached as Appendix D.

29 Govt's Cross-Motion, Exhibit 22, 2-3. A transcribed copy of the Condemnation Decree is attached as Appendix E.

30 Govt's Cross-Motion, Exhibit 22, 2-3. A transcribed copy of the The Rose J. Arnold Warranty Deed is attached as Appendix F.

31 *Id.* A transcribed copy of the Julia Ann Fair instrument is attached as Exhibit F. Julia Ann Fair's husband, Thomas A. Fair was owner whose land was taken by Condemnation Decree on August 1, 1889.

32 *Id.* A transcribed copy of the Irrigation Loan & Trust Co. instrument is attached as Appendix H.

33 *Id.* A transcribed copy of the E.L. Rowland instrument is attached as Appendix I.

34 *Id.* A transcribed copy of the Irrigation Loan & Trust Co. instrument is attached as Appendix J.

21. Six of the seven *BIERY* landowners own title to a fee simple estate in the land that abuts the right of way.[35]

22. "[T]he railroad rights of way at issue in this case were established, largely by condemnation, between 1879 and 1899. Under Kansas law in effect at that time, the railroad acquired only an easement by condemnation meaning that the 'land condemned for a right of way for a railroad or other public purposes continues to be the property of its fee owner.'"[36]

***D. Trains have not operated across the Reno County Right of Way since before 2002, the rails and ties have been removed, the STB has authorized the BNSF to abandon railroad service, the BNSF Quit Claimed any interest it had in the right of way to a non-railroad stating specifically that it did not claim to hold anything more than an easement in the right of way, the STB issued a NITU authorizing abandonment of railroad service and conversion of the right of way to public recreational trail use, and the City of South Hutchinson entered into a Trail Use Agreement for the conversion of the right of way to public-access recreational trail use.***

23. In March 2004, the BNSF filed a notice of its intent to abandon the 2.88 mile long railroad line near South Hutchinson, Kansas. The BNSF certified that "no local traffic has moved over the line for at least 2 years."[37]

24. "All rail traffic across the line ended over two years ago (prior to 2004). As a result, there is now no demand for or prospect of rail service over the line, and no traffic has originated, terminated, or moved overhead on this segment for at least two years."[38]

---

[35] Govt's Cross-Motion, 24. "Each Plaintiff (with the exception of Collins Industries, Inc. ***) is the owner of a parcel of land that abuts the subject rights-of-way." Plaintiffs, however, maintain that Collins Industries Inc. exercised all the indicia of ownership of the parcel of land described in the deed attached at Tab J to Biery Plaintiffs' PFUF. See Plaintiffs' PFUF in Response to Defendant's Cross Motion for Summary Judgment [PFUF in Response], Tab 27.

[36] Govt's Cross-Motion, 25. (Citing *FED. FARM MORTG. CORP. V. SMITH*, 89 P.2d 838, 839 (Kan. 1939)).

[37] STB Docket No. AB-6 (Sub-No. 406X), Service Date, March 11, 2004, attached at Tab K to Biery Plaintiffs' PFUF.

25. "On February 25, 2004, the City of South Hutchinson, KS (the City), filed a request for the issuance of a NITU for the subject line under the Trails Act, in order to negotiate with BNSF for acquisition of the rights-of-way for use as a trail."[39]

26. The STB granted an extension to the NITU negotiating period "for an additional 180 days from October 7, 2004 (until April 5, 2005)."[40]

27. On March 23, 2005, the BNSF and the City of South Hutchinson entered into a "Railbanking And Donation Contract." This agreement provided that, the City of South Hutchinson expressly agreed that the BNSF may not have any interset in the land and agreed to release BNSF if the BNSF did not own any interest in the land.[41]

28. After the agreement between BNSF and the City of South Hutchinson, the City of South Hutchinson opened the South Hutchinson Nature Trail along the right of way.[42]

---

[38] STB Docket No. AB-6 (Sub. No. 406X), Service Date, March 16, 2004 (Environmental Assessment), attached at Tab K-1 to Biery Plaintiffs' PFUF.

[39] STB Docket No. AB-6 (Sub-No. 406X), Service Date April 8, 2004 (NITU), attached at Tab L to Biery Plaintiffs' PFUF.

[40] STB Docket No. AB-6 (Sub-No. 406X), Service Date October 4, 2004, attached at Tab M to Biery Plaintiffs' PFUF.

[41] Govt's Cross-Motion, Exhibit 20, 1-2, ¶1(b). Paragraph 1(b) of the agreement also stated that "Donee [the City of South Hutchinson] acknowledges and affirms that BNSF may not hold fee title or any other particular interest in the Property, that BNSF's interest in the Property, if any, may rise only to the level of an easement for railroad purposes. Donee is willing to accept BNSF's title to the property, if any, on this basis and expressly releases bnsf, its successors and assigns from any claims that donee or its successors may have as a result of the donation or conveyance to be made at closing. In light of BNSF's disclosure that it may not hold fee simple title or any other interest in the property, donee shall indemnify, defend and hold BNSF harmless from any suit or claim for damages, punitive or otherwise, expenses, attorneys' fees, or civil penalties that may be imposed on BNSF as the result of any person or entity claiming an interest in the property or claiming that bnsf did not have the right to transfer the property to donee." (In the original the forgoing was in all capitals and bold.)

[42] See Tab 31 of Plaintiffs' PFUF in Response.

***E. We also agree on five essential points of law: (i) by condemnation a railroad only obtains an easement (and not a fee estate in the land), (ii) that the owner of the fee estate in land retains that fee estate and title to land subject to a railroad easement, (iii) that a conveyance of land abutting a railroad is presumed to carry title to the centerline of the abutting railroad; (iv) that when railroad use of an easement is terminated the fee owner's land is relieved of the burden of the easement; and, (v) that the Trails Act operates upon the STB's issuance of a NITU to preempt state law that would otherwise hold the railroad easement to be abandoned.***

29. When a railroad acquires a right of way by condemnation, the railroad acquires only an easement to use the land for railroad purposes.[43]

30. "The ultimate title to land subject to railroad purposes does not cease to be in the owner of the adjacent freehold from which it was derived, and the termination of its use for railroad purposes has no effect upon fee title. It merely relieves the underlying fee of the dominant estate."[44]

31. As a matter of law and public policy, Kansas "disfavored 'separate ownership of long, narrow strips of land distinct from the territory adjoining on each side'" so the following rule of deed construction applies "to determine ownership of the fee subject to a railroad right-of-way: 'When an owner conveys a tract of land abutting on a railroad right of way tract, in which such grantor owns the servient estate and the railroad the dominant estate for right of way purposes, his conveyance passes to his grantee such servient estate, unless the intention not to do so be clearly indicated.'"[45]

---

[43] Govt's Cross-Motion, 25.

[44] Govt's Cross-Motion, 25 (Citing and quoting, *FED FARM MORTG,* 89 P. 2d at 841.)

[45] Govt's Cross-Motion, 25 (Citing and quoting *BOWERS V. ATCHISON, T&S.F. RY. CO.,* 237 P. 913 (Kan. 1925); and *BARKER V. LASHBROOK*, 279 P. 12, 14 (Kan. 1929)).

32. "There is no dispute that if the segments of the subject right-of-way that were acquired as easements (by condemnation or deed) were abandoned as a matter of state law, those segments would be returned to the fee owner of those lands (i.e. the owner of the servient estate.)"[46]

33. "The NITU operates to preserve the STB's jurisdiction, thereby preempting the application of applicable law that would otherwise apply in the event that the railroad were to fully abandon its rail line. If a railbanking and interim trailuse agreement is reached, the NITU automatically authorizes the interim trail use, the trail sponsor may then assume management of the right of way, subject only to the right of a railroad to restore active rail service."[47]

34. The Trails Act operates, *inter alia*, by authorizing a third party (trail sponsor) to assume management responsibility and liability for the corridor including the obligation to pay taxes and other costs and relieves the railroad of such responsibility and costs.[48]

## III. We disagree on four points which we present to this Court for resolution.

From these points of common agreement the parties cross motions for summary judgment present this court with four points of disagreement for this Court to resolve.

### *A. While the government and the Plaintiffs agree that the Biery and Pankratz Plaintiffs own the land abutting the right of way, and the parties agree that three of the Plaintiffs own the land underlying the right of way, the parties disagree whether four of the Biery Landowners and six of the Pankratz Landowners have carried the burden of establishing their ownership of the land underlying the right of way.*

While acknowledging that all of the *PANKRATZ* and all of the *BIERY* Plaintiffs own the land abutting the respective right of way and acknowledging that three of the *BIERY* Plaintiffs own the

[46] Govt's Cross-Motion, 26.

[47] Govt's Cross-Motion, 6 (citing, *CALDWELL V. UNITED STATES*, 391 F. 3d 1226, 1229-30 (Fed Cir. 2004); *GOOS V. ICC*, 911 F.2d 1283, 1295 (8th Cir. 1990); and *BIRT V. STB*, 90 F.3d 580, 583 (D.C. Cir. 1996).

[48] Govt's Cross-Motion, 44.

land underlying the respective right of way,[49] the government claims that all six of the *PANKRATZ* Plaintiffs and four of the *BIERY* Plaintiffs have not "carried the burden" of establishing that they own the land under the right of way. The government argues that the disputed Plaintiffs deeds "establish only that they own a parcel of land that abuts the right-of-way.[50] As such, the government contends that deeds describing the Plaintiffs' land as bordering the railroad right of way do not establish ownership of the land under the right of way.

The Plaintiffs respond by showing that the long-established principle of real estate law (repeatedly recognized in Kansas and acknowledged by the government[51]) holds that when a deed references a railroad as a boundary in the description of the land conveyed, the title to the land is presumed to extend to the centerline of the abutting right of way.[52] All of the Plaintiffs have satisfied this presumption and, accordingly, as a matter of Kansas law they have carried the burden of establishing title to the land underlying, as well as abutting, the former railroad right of way. The government requested, and was provided, opportunity to conduct extensive title research to rebut this presumption. The government does not advance any basis upon which it rebuts this presumption. (i.e. The government has not come forward with any deed or other instrument by which it asserts that some predecessor in title to the Plaintiff specifically exempted

---

[49] The government acknowledge that the Mar Trust has established ownership of the land underlying the right of way (Govt's Cross-Motion, 32) and is willing to concede that Holloway and Stacy Judy Trust have established ownership of the land underlying the right of way provided they submit an affidavit agreeing to the centerline as the boundary between their properties. (Govt's Cross-Motion, 28, n. 19). The Holloways and Stacy Judy Trust have provided this stipulation even though such stipulation is not necessary under Kansas law. Thus, the government has conceded the Holloway, Stacy Judy Trust and Mar Trust to have established their ownership of the fee estate in the land underlying the Reno County Right of Way. See Tab 21 (Holloway) and Tab 23 (Stacy E. Judy Trust) of Plaintiffs' PFUF in Response.

[50] Govt's Cross-Motion, 31.

[51] See n. 45, *supra*.

[52] *BOWERS V. ATCHISON, T & S.F. RY. CO.*, 237 P. 913 (Kan. 1925) and *BARKER V. LASHBROOK*, 279 P. 12 (Kan. 1929).

the land underlying the abutting right of way and retained title to this strip of land nor does the government contend that any other party acquired title to this land nor does the government contend that any other party acquired title to this land. Absent this, the presumption under Kansas law, lies with the *PANKRATZ* and *BIERY* landowners who have carried the burden of establishing their ownership of the land underlying the respective portion of the right of way.

### B. While the government and the Plaintiffs agree that the Butler and Reno County Rights of Way were "largely" established by condemnation and, as such, the railroad acquired only an easement to use the land and not ownership of the land; the parties disagree whether five instruments describing small segments of the Reno County Right of Way conveyed the railroad a fee simple estate in the land used for a right of way or an easement to use the land for a railroad right of way.

For the entirety of the Butler County Right of Way all agree that the railroad held only an easement and this is so for both the portion acquired by condemnation and by a private instrument. However, the government contends that for those portions of the Reno County Right of Way referenced in the Julia Fair, Rose Arnold, E.L. Rowland and Irrigation Loan & Trust Co. instruments the railroad acquired a fee simple estate in the land.

The Plaintiffs show that under Kansas law these instruments granted the railroad only an easement to use the land as a right of way for the purpose of operating a railroad. The Kansas Supreme Court has held it to be the long-settled law that,

> [W]hen land is devoted to railroad purposes it is immaterial whether the railroad company acquired it by virtue of an easement, by condemnation, right-of-way deed or other conveyance. If or when it ceases to be used for railway purposes, the land returns to its prior status as an integral part of the freehold to which it belongs prior to its subjection to use for railway purposes. This court has uniformly held that railroads do not own fee titles to narrow strips taken as right-of-way, regardless of whether they are taken by condemnation or right-of-way deed.[53]

---

[53] *HARVEST QUEEN MILL & ELEVATOR CO. V. SANDERS*, 189 Kan. 536, 370 P.2d 419 (Kan. 1962) (citing *ABERCROMBIE V. SIMMONS*, 71 Kan. 538, 81 P. 208 (Kan. 1905); *BOWERS V. ATCHINSON,*

The Federal Circuit has interpreted similar instruments as conveying only an easement and not a fee estate in the land.[54] The Plaintiffs further show that the government's citation to cases in which a railroad obtained fee title to land acquired for stations, depots, grain elevators and similar structures is distinguished from the present situation in which a strip of land was acquired and used as a right of way upon which only rails and ties were laid.

### C. Did the railroad's right to use the Plaintiffs' land for operation of a railroad include the ability of a non-railroad to use the land as a public-access recreational trail and indefinitely "railbank" this land under the federal Trails Act?

The government claims that: (a) "The uses of the subject rights-of-way authorized by the Trails Act – railbanking and interim trail use – are permissible present uses of those rights-of-way under Kansas law."[55] (b) "The railroads have not abandoned their property interest in the subject rights-of-way" because under the Trails Act some railroad at some indefinite time in the future may restore active railroad service on this corridor.[56] And, (c) under the so-called "shifting Public Use Doctrine" "a right-of-way acquired for a public purpose can be converted from one public use (active rail use) to another (railbanking and interim trail use) without infringing upon the rights of the servient estate holder and without causing an abandonment of the right of way."[57]

---

*T. &S. Rly. Co.* 119 Kan. 202, 237 P. 913 (Kan. 1925); *Federal Farm Mortg*, 149 Kan. at 792; and *Disney v. Lang*, 90 Kan. 309, 313, 133 P. 572 (Kan. 1913)).

[54] See discussion of Manwell Deed in *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. *en banc*, 1996), *(Preseault II)* at 1535; the conveyance in *Toews v. United States,* 376 F.3d 1371 (Fed. Cir. 2004); and Judge Bruggink's interpretation of deed at issue which was approved by Federal Circuit on appeal. *Toews v. United States*, 53 Fed. Cl. 58, 61-62 (2002).

[55] Govt's Motion, 3.

[56] Govt's Motion, 3, and Govt's Cross-Motion, 49.

[57] Govt's Motion, 3.

The Plaintiffs show that this argument - "public recreational trail use and "railbanking" is a railroad purpose" – is an argument that the government repeatedly makes and which has been repeatedly rejected by every court to ever consider the argument. This argument is flatly contrary to more than a century of Kansas law. It also makes absolutely no sense as a matter of linguistics, logic or law to claim that a hiking and biking trail operated by a county park department is a "railroad."

### *D. Did the Pankratz Landowners claim for a taking of their land arise when the STB issued the original NITU invoking the Trails Act and authorizing conversion of the right of way to trail use or did this claim arise when the STB issued the second NITU?*

For the *Biery* landowners, the parties agree that the Plaintiffs claim arose on April 8, 2004, the service date of the original NITU issued by the STB.[58] However, the government spills a great deal of ink contending that the *PANKRATZ* landowners' claim accrued on June 2, 2005, the date of the second NITU, not September 14, 2004, the date of the original NITU. The government contends that "any takings claim that accrued with the issuance of the first NITU was, at most, a temporary one."[59] Because the first NITU expired without the original trail sponsor reaching a trail use agreement, the government claims that "the correct claim accrual date for the permanent takings claims alleged [by the *PANKRATZ* landowners] is June 2, 1995 [sic], the date on which the second NITU was issued."[60]

The Plaintiffs respond by noting that – whether one agrees with the decisions or not – the Federal Circuit has clearly and unequivocally held in three Trails Act cases that there is a single

---

[58] The Plaintiffs previously referenced this NITU by the April 5, 2004 decision date. The Plaintiffs agree with the government that the effective date of the NITU is the April 8, 2004 Service Date.

[59] Govt's Cross-Motion, 15.

[60] Govt's Cross-Motion, 16. The reference to the date "1995" is an apparent typographical error because there is no dispute that the date of the second NITU is 2005 and the government in the previous sentence refers to the date of the "new" or second NITU as "June 2, 2005."

Trails Act taking claim which accrues upon the STB's issuance of the original NITU.[61] The Federal Circuit was presented with precisely the argument that the taking claim did not arise until a subsequent NITU was issued because the original NITU had expired without a trail use agreement being reached with the original trail sponsor. The Federal Circuit in *BARCLAY V. UNITED STATES* 443 F.3d 1368 (Fed. Cir. 2006) wrote,

> The Barclay appellants argue that the original NITUs issued to the Flint Hills trail were vacated and that a second taking occurred when a new NITU was issued. *** it is common that, if after issuance of the NITU the trail operator named in the original NITU becomes unwilling or unable to assume responsibility for the trail, a new operator will be able to be formally substituted by issuance of a new NITU before an agreement with the railroad is reached. *** the series of STB NITU orders must be viewed as part of a single and continuous government action rather than as a new taking. Any other approach would result in multiple potential takings of the same reversionary interest.[62]

Later in its decision the court reaffirmed this point, "This is merely another version of the argument - rejected in Caldwell - that the original NITU should not be viewed as the taking because subsequent events might render the NITU only temporary. The Sunflower Trail claims accrued when the original NITU issued. *** We adhere to *CALDWELL* and hold that the issuance of the original NITU triggers the accrual of the cause of action."[63]

---

[61] The government's contention in its Memo in Support at 8, fn. 8, asserting that a claim can accrue for purposes of the statute of limitations without liability for the claim having yet accrued is, frankly, an absurd statement. See *JAPANESE WAR NOTES V. UNITED STATES*, 178 Ct. Cl. 630, 373 F. 2d 356, 358 (1967) ("A claim first accrues when all events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action.")

[62] *BARCLAY*, 443 F.3d at 1375.

[63] *Id.* at 1378.

This fourth point of contention is largely academic for purpose of this motion. As both parties agree, the *PANKRATZ* landowners' claim was timely filed whether their claim accrued on the first or second NITU.[64]

## IV. PART ONE- POINT ONE: All The Plaintiffs Own The Land Upon Which The Former Railway Right Of Way Was Located

### *A. The government agrees that all the landowners hold title to the land abutting the right of way but argues that several of them have not carried the burden of establishing title to the land under the right of way because the deed by which they acquired title references the edge of the right of way as the boundary.*

The government expressly admits that all the Pankratz and Biery Landowners hold a fee simple estate in the land abutting the right of way.[65] The government contends, however, that the legal description in the deeds by which the Plaintiffs acquired title to their land only describes the land as a plat abutting the right of way or by a metes and bounds description with the right of way as the edge of the property boundary.[66] As such, the government argues that the deeds by which the challenged Plaintiffs acquired their land "establish only that they own a parcel of land that abuts that right-of-way. In order to establish ownership of the lands underlying he right-of-way, Plaintiffs must produce additional documents from their chains-of-

---

[64] "All of the Plaintiffs' claims are timely." Govt's Cross-Motion, 10. The date of taking does determine the date when the value of the land taken is determined and the date when the government's obligation to pay interest on the value of the property begins to run. So for two points the date of September 14, 2004, or June 2, 2005, is substantively important but concerns the damage phase of this case. The date of taking is also substantively important as it is the date upon which the plaintiff must have a property interest. However, because all the *PANKRATZ* landowners held title on both September 14, 2004, and June 2, 2005, the choice of the first or second NITU date as the date of taking makes no substantive difference on the issue of liability presently before this Court.

[65] The Plaintiffs rely on the government's express admissions (referenced above in n. 14 and n. 38, *supra*) for the point that the government has acknowledged the Plaintiffs' ownership of the land abutting the respective right of way.

[66] Govt's Cross-Motion, 26-32.

title establishing that their predecessors-in-title owned the lands underlying the right-of-way and that such land was conveyed to them."[67]

### B. Kansas has expressly adopted the well-established presumption that a deed describing land with a railroad right of way as a boundary carries title to the centerline of the adjoining railroad right of way.

Title to land described as bordering upon a road, right-of-way, river or similar physical boundary extends to the centerline of the referenced road, right-of-way or river. This is a longstanding presumption and principle of real estate law. Thus (as applied to this case) those landowners who acquired their title to land by a deed which describes the land conveyed as, for example, "the parcel as extending' to a point on the East right–of-way line of the A.T. & S.F. RR *** thence South along the said right-of-way line"[68] are presumed to have acquired fee title to the land extending to the centerline of the referenced right of way.

The Supreme Court of Kansas, drawing expressly upon the common law of England, held in *BOWERS V. ATCHISON, T. & S. F. RY. CO.* that since 1343 in the case reported in *YEAR BOOK OF 17 EDWARD III,* A.D. 1343,

> When ways commenced to mark boundaries between holdings, the presumption was that a way forming a boundary had originally been established equally on the land of each proprietor, and consequently that each had the *fee usque as medium filum viae*. The presumption was rebuttable that the way was wholly or chiefly on the land of one. The presumption of ownership to the middle of the road was applied to conveyances, and a deed of general words bounding land on a highway presumptively carried title to the center of the way.[69]

The *BOWERS* court applied this to land in which a railroad and an abandoned public highway boundary were in dispute. This was followed and similarly applied by the Kansas

---

[67] Govt's Cross-Motion, 31.

[68] Govt's Cross-Motion, 27, quoting from the deed to APC as an illustration of the government's argument.

[69] *BOWERS V. ATCHISON, T. & S. F. RY. CO.*, 119 Kan. 202, 237 P. 913, 914 (Kan. 1925).

Supreme Court in *FEDERAL FARM MORTG V. SMITH, . CORP.*[70] "The courts are generally agreed that when the long narrow strips of land taken from the adjacent freehold for a highway, railroad right of way, or for other public purpose, are no longer used for such purpose, the full dominion over then returns to the holder of the underlying fee. The public policy concerned in the legal aspects of this matter was well stated by Judge Taft in *PAINE V. CONSUMER'S FORWARDING & STORAGE*."[71] Judge Taft summarized the policy behind this presumption in his opinon." [72]

### C. The Government Is Aware Of This Presumption of Real Estate Law And Has Acknowledged this Presumption In This As Well as Other Trails Act Taking Cases.

The Government is aware of this fundamental principle that title describing land abutting a railroad right of way actually carries fee title to the center line. In a similar Trails Act taking

---

[70] *FEDERAL FARM MORTG V. SMITH*, 149 KAN. 789, 89 P.2d 838 (Kan. 1939).

[71] *FEDERAL FARM MORTG. CORP.*, 89 P.2d at 840; *BARKER V. LASHBROOK*, 128 Kan. 595, 279 P. 12 (Kan. 1929).

[72] For Taft's opinion detailing the policy underlying this well-founded presumption, see *PAINE, ET AL. V. CONSUMERS' FORWARDING & STORAGE CO, ET AL.*, 71 F. 626, 630-31, 632 (6th Cir. 1895).

> "The reasons for the rule in one case apply equally to [roads as well as rivers]. The existence of 'strips or gores' of land along the margin of nonnavigable lakes, to which the title may be held in abeyance for indefinite periods of time, is as great an evil as are 'strips and gores' of land along highways or running streams. The litigation that may arise therefrom after long years, or the happening of some unexpected event, is equally probable, and alike vexatious in each of the cases, and that public policy which would seek to prevent this by a construction that would carry the title to the center of a highway, running stream, or nonnavigable lake that may be made a boundary of the lands conveyed applies indifferently, and with equal force, to all of them. It would seem, also, that whatever inference might arise from the presumed intention of the parties against the reservation of the land underlying the water would be as strong in one case as in either of the others.' *** where the land conveyed was described as bounding upon a road, the deed carried the fee in the road to the center line, although the calls by distance carried the lot only to the road side. *** The evils resulting from the retention in remote dedicators of the fee in gores and strips, which for many years are valueless because of the public easement in them, and which then become valuable by reason of an abandonment of the public use, have led courts to strained constructions to include the fee of such gores and strips in deeds of the abutting lots. And modern decisions are even more radical in this regard than the older cases."

case, the government initially made the same argument that the land owners' title to the land abutting an abandoned railroad right of way did not include title to the property underlying the right of way. See *ILLIG V. UNITED STATES*, 58 Fed. Cl. 619 (2003). The government sought summary judgment on this basis. However, even before the Court had opportunity to consider this point, the government *sua sponte* withdrew its motion on this point and noted that its argument was contrary to this settled presumption and principle of real estate law.[73] The Government should have done likewise in this case.

### *D. All the Plaintiffs Have Satisfied the Presumption That They Hold Title To The Land Abutting AND Underlying The Right Of Way and the Government has Not Rebutted this Presumption.*

In this case, the Plaintiffs – as the undisputed owners of the abutting land – have established that, under Kansas law, they also own the fee estate in the land to the centerline of the abutting railroad right of way. For those owners holding title to land abutting each side of the right of way, they hold title to the entire right of way.[74]

The government has enjoyed almost a year – including multiple enlargements of time - during which they could conduct any title research the government deemed necessary to defeat the Plaintiffs' claim that the Plaintiffs owned the land underlying the Butler County and the Reno County Rights of Way. The government retained Cindi A.R. Straup who in two separate affidavits states that she is an experienced claims administrator with more than a decade of experience for the U.S. Justice Department in more than forty lawsuits and has researched the Plaintiffs' claims in this case using Valuation Schedules and Maps filed with the Interstate Commerce Commission, county and municipal tax maps, tax maps and tax cards obtained from

---

[73] See Appendix K – Copy of Government's motion withdrawing boundary line argument.
[74] The government has acknowledged this point for the *PANKRATZ* landowners Thick Gon Mar Trust. Similarly, the government has acknowledged this presumption for the *PANKRATZ* landowners Holloway and Stacy Judy Trust. See Govt's Cross-Motion, 28, n. 19 and 32.

Butler and Reno County, Kansas and documents from the Butler and Reno County Recorder of Deeds' Office.[75]

Neither the U.S. Department of Justice nor Ms. Straup have provided any document, instrument or other basis upon which they dispute the Plaintiffs' claim to own fee title to the land underlying the Butler County and Reno County Rights of Way.[76]

The government makes the bald conclusory statement that, "the evidence does not establish that each Plaintiff owns some or all of the servient estate subject to the right of way."[77] As we show above and in our statement of agreed facts, each Plaintiff has established ownership of a fee simple estate in the land abutting as well as underlying the right of way and the government has failed to dispute this fact.

## V. PART ONE – POINT TWO: The Five Specific Conveyances Referenced By The Government Did Not Convey A Fee Simple Estate In The Land To The Railroad.

### *A. As A General Matter Of Kansas Law, A Conveyance to A Railroad for a "Right of Way" grants the railroad only an Easement to use the land and does not convey a fee estate in the land itself.*

There is no dispute that the railroad held only an easement over the entirety of the Pankratz Right of Way. As such, the following discussion concerns only small segments of the Reno County Right of Way. The government contends that the railroad acquired a fee simple estate in small segments of the land upon which portions of the Reno County Right of Way was located. In making this argument the government is making a claim – that a Kansas railroad

---

[75] Govt's Cross-Motion, Exhibit 10 and 22 (Affidavits of Cindi Straup).

[76] The government's rebuttal of the Collins Industries claim referenced in n. 38 *supra* illustrates that he government has investigated the chain of title and, where they have found any instrument that rebuts a plaintiff's claim, they have addressed that claim. Collins Industries is the only plaintiff for which the government has found any instrument in the chain of title disputing any plaintiff's claim of ownership.

[77] Govt's Cross-Motion, 18.

acquired fee simple absolute title to a strip of land upon which only tracks and ties were located for a right of way – that no court has ever accepted. Literally, every court that has ever considered this question – including the Kansas Supreme Court on multiple occasions – has uniformly held that a railroad acquired only an easement to use the land for railroad purposes, not a fee simple estate in the land itself. To say the least, in making this argument the government is swimming up-stream.

As Justice Brennan observed in *PRESEAULT V. UNITED STATES,* 494 U.S. 1 (1990) ("*PRESEAULT I*"), "many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. *** [and] frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations."[78] As noted by the court in *DAVIS V. MCI*, 606 So. 2d 734, 738 (1992), "Except to site a station house or similar land use here and there, the railroads had no need or desire for any interest except 'right-of-way.'"

Judge Posner noted the fundamental presumption (recognized in Kansas as well as most other states) that a railroad's interest in land used for a right of way is only an easement. Judge Posner also noted the public policy underlying this presumption in *PENN. CENT. CORP. V. U.S.R.R. VEST CORP.*, 955 F. 2d 1158, 1160 (7th Cir. 1992):

> The presumption is that a deed to a railroad or other right of way company (pipeline company, telephone company, etc.) conveys a right of way, that is, an easement, terminable when the acquirer's use terminates, rather than a fee simple. Transaction costs are minimized by undivided ownership of a parcel of land, and such ownership is facilitated by the automatic reuniting of divided land once the reason for the division has ceased. If the railroad holds title in fee simple to a multitude of skinny strips of land now usable only by the owner of the surrounding or adjacent land, then before the strips can be put to their best use there must be expensive and time-consuming negotiation between

---

[78] *PRESEAULT I*, 494 U.S. at 9.

[79] This presumption flows from very similar policy considerations to those noted in by Judge Taft in *PAINE*, *supra* n. 70.

> the railroad and its neighbor-that or the gradual extinction of the railroad's interest through the operation of adverse possession. It is cleaner if the railroad's interest simply terminates upon the abandonment of railroad service. A further consideration is that railroads and other right of way companies have eminent domain powers, and they should not be encouraged to use those powers to take more than they need of another person's property-more, that is, than a right of way.[80]

This presumption that a grant of a right-of-way to a railroad conveys only an easement has been long-established in Kansas. This is so even when the form of the instrument used to convey the right of way to the railroad purports to be a deed conveying a fee simple estate in the land. Indeed, it is difficult to find a state in which this principle has been more firmly established than in Kansas.

Gary and Danielle Stone owned land in Washington County, Kansas. Their land adjoined a parcel of land that the school district claimed to own. The school district had acquired title to the land from the BNSF by a deed which described the land as a "trapezoid parcel" that had been part of the railroads "right–of-way and station ground property." (Both the Stones and the BNSF traced their common title back to Hugh and E.J. Little who had originally granted a large tract of land to the BNSF's predecessor railroad in 1883. The railroad conveyed most of this large parcel to others – including the Stone's predecessors in title. The railroad retained the trapezoid-shaped parcel that it used for a right of way and station grounds. This land was subsequently conveyed by the railroad to the school district when the railroad abandoned the associated rail line. These facts created a confrontation between the Stones and the neighboring

---

[80] Citing *Brown v. Penn Central Corp.*, 510 N.E.2d 641, 644 (Ind.1987); *Ross, Inc. v. Legler*, 245 Ind. 655, 199 N.E.2d 346 (1964); *Highland Realty Co. v. City of San Rafael*, 46 Cal.2d 669, 678, 298 P.2d 15, 20 (1956); *Sherman v. Petroleum Exploration*, 280 Ky. 105, 132 S.W.2d 768 (1939); *Johnson v. Ocean Shore R.R.*, 16 Cal.App.3d 429, 94 Cal.Rptr. 68 (1971), *Henry v. Columbus Depot Co.*, 135 Ohio St. 311, 20 N.E.2d 921 (1939). Judge Posner allowed that there is nothing preventing a farmer from conveying fee simple title to a railroad for the construction of a rail line, but observed that this is not commonly the manner in which a railroad will take title to land used for a right of way.

school district. The Stones claimed the railroad had only an easement and, as such, this was lost when the railroad was abandoned and the Stones now owned the fee estate unencumbered by the easement. The school district claimed that the railroad had held fee title which the railroad had conveyed to the school district.

Rather than just provide a summary answer to this dispute, the Kansas Supreme Court, to the benefit of all with an interest in this issue, provided an exhaustive survey of more than a century of Kansas law on the issue. The Kansas Supreme Court in *STONE*[81] established several rules as long-settled law and harmonized prior Kansas case law and statute. The fundamental point upon which the Court's analysis turns is whether the land involved was a "strip of property" acquired for or used for a railroad right of way.[82] The Court distinguished cases involving strips of land used for a right of way upon which rails and ties were located from cases involving larger parcels of land or parcels used for station grounds, depots, switchyards and other such facilities.[83] For the first category of land – "strips of land" acquired by a railroad for a right of way or actually used for a right of way – the *STONE* Court noted that Kansas law was absolutely settled and the railroad acquired only an easement.[84] This is so for rights of way acquired by condemnation or private conveyance and this was so no matter what language was used in the conveyance instrument – even when it was a general warranty deed otherwise purporting to convey a fee simple estate in the land.

The *STONE* court affirmed this principle as expounded in the prior Kansas Supreme Court cases of *ABERCROMBIE V. SIMMONS*, 71, Kan. 538, 81 P. 208 (Kan. 1905); *BARKER V. LASHBROOK*, 128 Kan. 595, 279 P. 12 (Kan. 1929); *DANIELSON V. WOESTEMEYER*, 131 Kan. 796, 263 P. 507

---

81 *STONE V. U.S.D. NO. 222*, 278 Kan. 166, 91 P.3d 1194 (Kan. 2004).
82 STONE, 278 Kan. at 180-181, 91 P. 3d at 1203.
83 *Id.*
84 *Id.*

(Kan. 1930), *FEDERAL FARM MORTG. CORP. V. SMITH*, 149 Kan. 789; 89 P.2d 838 (Kan. 1939), *BOWERS V. ATCHINSON, T. & S.F. RLY. CO.*, 119 Kan. 202, 237 P. 913 (Kan. 1925); and *HARVEST QUEEN MILL & ELEVATOR V. SANDERS*, 189 Kan. 536, 370 P.2d 419, 423-24 (Kan. 1962). *HARVEST QUEEN* provides one of the more quoted statements of the rule:

> We have held that when land is devoted to railroad purposes it is immaterial whether the railway company acquired it by virtue of an easement by condemnation, right-of-way deed, or other conveyance. If or when it ceases to be used for railway purposes the land concerned returns to its prior status as an integral part of the freehold to which it belonged prior to its subjection to use for railway purposes. **This court has uniformly held that railroads do not own fee title to narrow strips taken as right-of-way, regardless of whether they are taken by condemnation or right-of-way deed. The rule is in conformity with this state's long-standing public policy and gives full effect to the intent of the parties who execute right-of-way deeds rather than going through lengthy and expensive condemnation proceedings. Generally, a railroad company in acquiring land for railroad right-of-way, whether it be by grant or condemnation proceedings, is held to take not the fee, but only a special interest therein usually termed an "easement," which special interest or title is taken for railroad purposes**, that is, public purposes, so that the railroad has no right to take from such right-of-way any underlying minerals and appropriate them to its own use or convey them to others.[85]

The Court distinguished these cases from those in which the railroad obtained an interest in larger tracts of land that were not acquired for right of way. [86] The *STONE* Court cited *NOTT V.*

---

[85] *HARVEST QUEEN*, 370 P.2d at 423-34. (emphasis supplied) (numerous citations omitted). This presumption that a conveyance to a railroad for a "right-of-way" conveys only an easement (being the right to use the land and not a grant of fee title in the land itself) is widely and commonly held in other states as well as Kansas. Instruments virtually identical in relevant respect to those before the court in this case have been construed as conveying only an easement to the railroad by the Supreme Courts and lower courts of Florida Missouri, California, Michigan, Idaho, Kentucky, Indiana, Tennessee and a number of other states. We have assembled a short list of similar decisions by courts in other states – mostly other state supreme courts – which is attached at Appendix A.

[86] There is a related line of cases which we note more fully below in our discussion of abandonment. *HARVEY V. MISSOURI PAC. R. CO.*, 111 Kan. 371, 207 P. 761 (Kan. 1922); *ATICHSON, TOPEKA & SANTA FE RY. CO. V. HUMBERG*, 9 Kan. App. 2d 205, 675 P.2d 375 (Kan. 1984); and *MILLER V. ST. LOUIS, SOUTHWESTERN RAILWAY COMPANY*, 239 Kan. 198, 718 P.2d 610 (Kan. 1986). These cases each involve the owner of land adjoining an active railroad right of way in which the landowner brought an adverse possession claim against an active

*BEIGHTEL*, 155 Kan. 94, 122 P.2d 747 (Kan. 1942) as an example of this, "The Nott court distinguished [that] case from *ABERCROMBIE* because the land was purchased without regard to its use or being designated as a right-of-way."[87]

The Federal Circuit has similarly construed instruments conveying a right of way to a railroad as only passing an easement, even when the instrument purported to convey a fee simple estate in the land and did not use the term "right of way." See *PRESEAULT V. UNITED STATES*, 100 F.3d 1525, 1535-36 (Fed. Cir. 1996) (*en banc*). The Federal Circuit noted, "The deed appears to be the standard form used to convey a fee simple title from grantor to grantee. But did it? *** Despite the apparent terms of the deed indicating a transfer in fee, the legal effect was to convey only an easement."

The Kansas Supreme Court has held, "[W]hen land is devoted to railway purposes it is immaterial whether the railway company acquired it by virtue of an easement, by right of way deed or other conveyance, or by condemnation. If or when it ceases to be used for railway purposes, or if such use never materialized, the land concerned returns to its prior status as an integral part of the freehold to which it belonged prior to its subjection to use for railway purposes." *FED FARM MORTG.*, 89 P.2d at 840.

---

railroad claiming that a parcel of land adjoining an active railroad intended to be used as grain elevators, depots, stations or other terminal facilities had not been used as such by the railroad but, because the adjoining owner had used this land, the adjoining owner acquired fee title to the property by adverse possession. In each of the cases, the court denied the land owner's adverse possession claim because the owner was held to be the owner of the fee estate in the disputed property and the railroad held only an easement. The court held that this easement – which was being actively used for the operation of a railroad – could not be extinguished by adverse possession. *HARVEY, HUMBERG* and *MILLER* are notable in the immediate context for the finding that even when the land at issue is not used for a right of way but for related terminal, depot, and station facilities, Kansas courts still held that the railroad held only an easement and not the fee estate in the land.

[87] *STONE,* 91 P. 3d. at 1200.

Further, the Hutchinson & Southern Railway Company and the Hutchison, Oklahoma, and Gulf Railway Company, as corporations are (and were in 1890) defined by Kansas statute. The legal authority of the railroads at the time the rail line was established was defined by Gen. Stat. 1868 (currently codifed as Kan. Stat. Ann. §66-501) (defining the powers of railroad corporations). As a railroad corporation, the railroads were authorized to acquire and own real estate, but only for railroad purposes. The railroads were not authorized to develop or speculate in real estate. It is proper to consider the railroad's authority when determining the nature of the interest conveyed to the railroad by these instruments drafted in the late 1890s to 1901. For a strip of land upon which a rail line is constructed (as opposed to land for the construction of a station house, depot or grain elevator) an easement conveys sufficient interest for the railroad to accomplish its authorized purpose.[88]

### *B. The Terms of the Conveyance Instruments Demonstrate the Grantor's Clear Intention to Convey Only an Easement.*

We turn now to the specific conveyance documents by which the right of way was originally established. The initial task is to determine if the fee owners intended to grant the railroad a right to use the land or to grant them ownership of the land itself. As we show below, under the specific terms of the four instruments and Kansas law, all of the instruments conveyed a "strip of land" used by a railroad for a railroad right of way upon which rails and ties were located. None of the conveyances grant a large tract to the railroad and none convey land used for any purpose other than the location of a right of way. All were granted in the context of the railroad exercising condemnation of the rail corridor.

---

[88] As noted by Justice Brennan in *PRESAULT I*, railroads do not ordinarily own the land upon which their rights of way are located. Customarily an easement is sufficient to provide the railroad the interest necessary to accomplish its purpose of operating a railroad.

The Kansas Supreme Court stated in *HARVEST QUEEN*, Kansas courts have "uniformly held that railroads do not own fee titles to narrow strips taken as right-of-way, regardless of whether they are taken by condemnation or right-of-way deed. The rule is in conformity with this state's long-standing public policy and gives full effect to the intent of the parties who execute right-of-way deeds rather than go through lengthy and expensive condemnation proceedings."[89]

### i. The Rose J. Arnold Warranty Deed

The government contends that on or about 1895, the Atchison, Topeka, and Santa Fe Railway Company (Santa Fe) conveyed fee simple title to Rose J. Arnold, but retained for itself fee simple interest in the part of the Reno County Right of Way abutting her land.[90] The warranty deed conveys to Ms. Arnold 80 acres of land and contains the following language:

> "[A]ll that tract, piece and parcel of land situated in the County of Reno *** Containing all Eighty (80) acres more or less according to the United States survey. Reserving, however, to the said Atchison, Topeka, & Santa Fe Railway Company, all that portion of the land *hereby conveyed*, (if there be any such) which lies within lines around parallel with and fifty feet on each side distant, from the center line of said railroad as now constructed, and any greater width where necessary permanently to include all its cuts, encumbrances and ditches and other [illegible] necessary to secure and protect the main line of said Railroad. "[91]

As the language of the warranty deed makes clear, the Santa Fe conveyed *all* of its interest in the full 80 acres of land to Ms. Arnold. The Santa Fe "reserved" for itself the use of a right of way along a strip of land described by reference to tracks which had already been constructed over a portion the property being conveyed. Nothing in the language of the deed even remotely suggests the Santa Fe to have intended that it retain fee simple estate in the land

---

[89] *HARVEST QUEEN*, 370 P.2d at 423.
[90] Govt's Cross-Motion, 22.
[91] See Govt. Ex. 22-2, and the transcribed version of this deed located at Tab 9 of Plaintiffs' PFUF in Response, and Appendix F.

50 feet on either side of its right of way. The Santa Fe states that it reserves the 50 feet on either side of the railroad "now constructed." Finally, if the Santa Fe intended to retain fee simple in its right of way across the land conveyed to Ms. Arnold, presumably the Santa Fe would have used the same language to describe the land retained in fee as it used to describe the land being conveyed in fee. It did not. Instead, the Santa Fe made reference only to its right of way as then constructed for the purpose of "secure[ing] and protect[ing] the main line of said Railroad."

**ii. Julia Fair Quitclaim Deed**

In 1899, Julia Ann Fair quitclaimed to the Hutchison & Southern "a strip of land one hundred (100) feet wide being fifty (50) way feet on each side of the center line of the railroad of the Hutchinson & Southern Railway as the same is now located and ___ *over and across* section thirty five (35) township twenty three (23) range six (6)."[92] This instrument is the granting of an easement for at least three reasons: (1) it describes a 100 foot wide "strip of land" referencing the centerline of an existing railroad upon which rails and ties were located, (2) it expressly uses the term "over and across" which are words describing an easement not an estate in the land; and (3) the railroad had already acquired an easement over this land by virtue of the condemnation decree. The condemnation decree, however, mentioned only Julia Fair's deceased husband, Thomas Fair,[93] and not Mrs. Fair. Accordingly, it would be common real estate practice to have the spouse not named in the condemnation decree execute a quit claim deed to resolve any ambiguity created by her omission from the Condemnation Decree.

---

[92] Govt. Ex. 22-4 and the transcribed version of this deed located at Tab 11 of Plaintiffs' PFUF in Response, and attached here at Appendix G.
[93] Govt's Cross-Motion at 23

### iii. Irrigation Loan & Trust Company Deed (March 1901)

In March 1901, the Irrigation Loan and Trust Company conveyed to the Santa Fe a 66-feet wide strip of land.[94] This strip of land was used for the right of way with rails and ties and not a station ground or other permanent structure. As such, this conveyance falls under the *ABERCROMBIE* and *HARVEST QUEEN* rule that it conveyed only an easement.

### iv. E.L. Rowland Quitclaim Deed

In 1896, E.L. Rowland quitclaimed to the Hutchison & Southern "all the following described premises, situated in Blanchard Third Addition to the City of South Hutchinson according to the plat thereof."[95] The deed states that "For and in consideration of $1.00 *and the convenience of all the right of way now occupied by said Railroad in Blanchard's Third Addition to the City of South Hutchinson*."[96] This reference to "the convenience of all the right of way now occupied by said Railroad" declares the purpose and intent of this instrument as conveying only a right of way easement. The only use ever made of this property was the location of the railroad tracks and ties. There is no suggestion that this involved station grounds or other such uses.

### v. Irrigation Loan & Trust Company Deed (March 1901)

In October 1901, the Irrigation Loan and Trust Company quitclaimed to the Santa Fe a series of lots in the City of South Hutchinson.[97] These same lots had been previously quitclaimed by E.L. Rowland to the Hutchinson & Southern for right of way purposes as

---

[94] Govt. Ex. 22-5 and the transcribed version of this deed located at Tab 14 of Plaintiffs' PFUF in Response, and Appendix H.

[95] Govt. Ex. 22-6 and the transcribed version of this deed located at Tab 17 of Plaintiffs' PFUF in Response, and attached here at Appendix I.

[96] *Id.*

[97] Govt. Ex. 22-7 and the transcribed version of this deed located at Tab 18 of Plaintiffs' PFUF in Response, and attached here at Appendix J.

discussed above. This conveyance falls under the *ABERCROMBIE* and *HARVEST QUEEN* rule that it conveyed only an easement.

There is no Kansas case that has ever held that a railroad obtained a fee estate in a strip of land used for a right of way upon which just tracks and ties were located. And the government has not cited any case – in Kansas or elsewhere so holding. To the contrary, more than a century of Kansas Supreme Court decisions have specifically held that conveyances such as the five at issue here convey the railroad only an easement to use the referenced land and that when railroad use terminates, the fee estate is unburdened by the easement.

## VI. Part Two: Neither Public-Access Recreational Trail Use Nor "Railbanking" Are a "Railroad Purpose" Under Kansas Law.

In support of its contention that public-access recreational trail use and "railbanking" are a permissible use of the Plaintiffs' land, the government makes three arguments: (1) "The uses of the subject rights-of-way authorized by the Trails Act – railbanking and interim trail use – are permissible present uses of those rights-of-way under Kansas law."[98] (2) "The railroads have not abandoned their property interest in the subject rights-of-way" because under the Trails Act some railroad at some indefinite time in the future may restore active railroad service on this corridor.[99] And, (3) Under the so-called "Shifting Public Use Doctrine" "a right-of-way acquired for a public purpose can be converted from one public use (active rail use) to another (railbanking and interim trail use) without infringing upon the rights of the servient estate holder and without causing an abandonment of the right of way."[100]

---

[98] Govt's Motion, 3.
[99] Govt's Motion, 3 and Govt's Cross-Motion, 49.
[100] Govt's Motion, 3.

As we show below, the government is wrong on all three points. We consider each point *seriatim*.

### A. *The uses of the subject rights-of-way authorized by the Trails Act – railbanking and interim trail use – are NOT permissible present uses of those rights-of-way under Kansas law.*

The government argues, "the uses of the subject rights-of-way authorized by the Trails Act – railbanking and interim trail use – are permissible present uses of those rights-of-way under Kansas law."[101]

#### i. The government's "'railbanking' is a railroad purpose" argument has been repeatedly rejected by every court to consider the argument.

As an initial point we note that the government's argument that "recreational public-access trail use and 'railbanking' is a permissible 'railroad purpose'" in an argument the government makes in virtually every Trails Act taking case. This argument has been consistently and repeatedly rejected by every court that has ever considered the argument.[102]

---

[101] *Id.*

[102] See *POLLNOW V. STATE*, 88 Wis. 2d 350, 276 N.W.2d 738 (Wisc., 1979), *LAWSON V. STATE*, 107 Wash.2d 444, 730 P.2d 1308 (Wash., 1986), *GLOSEMEYER V. UNITED STATES*, 45 Fed. Cl. 771 (2000), *TOEWS V. UNITED STATES*, 376 F. 3d 1371 (Fed. Cir. 2004), *PRESEAULT V. UNITED STATES*, 100 F.3d 1525 (Fed. Cir, 1996) (*PRESEAULT II*), *MICHIGAN DNR V. CARMODY-LAHTI REAL ESTATE, INC.* 472 Mich. 359, 699 N.W. 2d 272 (Mich., 2005), among other cases.

The government cites *CHEVY CHASE LAND* for the proposition that, "the courts have found that railbanking and interim trail use fall within the scope of a railroad easement." Govt's Cross-Motion at17. The government is fond of this disingenuous argument claiming, as they do in this case, that *CHEVY CHASE LAND CO. V. UNITED STATES*, 733 A.2d 1055 (Md. 1999); *CHEVY CHASE LAND V. UNITED STATES,* 230 F.3d 1375 (Fed. Cir. 2000); *WASHINGTON WILDLIFE PRES., INC. V. MINNESOTA*, 329 N.W. 2d 543 (Minn. 1983); and *REIGER V. PENN CENTRAL CORP.*, No. 85-CA-11, slip op. (Ct. App. Greene County, Ohio, May 21, 1985) [available on WESTLAW, 1985 WL 7919] hold that recreational trail use and "railbanking" are permissible uses of an easement for railroad purposes.

However, these cases specifically involved an easement that was not limited to railroad purposes – a finding that was central to each holding. As such, it is fundamentally dishonest to claim that *CHEVY CHASE LAND* holds that "railbanking" and recreational trail use are within the scope of an easement limited to railroad purposes.

Indeed, the Maryland Supreme Court in *CHEVY CHASE LAND* took great pains to note that the easement at issue was not limited to railroad use. The Federal Circuit's application of the

Today the government advances, yet again, this losing argument. It should be, once again, rejected as it is an argument contrary to both Kansas law and the decisions of the Federal Circuit. Indeed, in a prior Kansas Trails Act takings case involving the Union Pacific Railroad's conveyance of an abandoned railroad easement to the Central Kansas Conservancy for a recreational trail, the federal district court found that the landowners' reversionary interest in their land under Kansas law had been taken and they were "entitled to just compensation under the Fifth Amendment". *SWISHER V. UNITED STATES*, 176 F. Supp. 2d 1100 (D. Kan. 2001). The

---

Maryland Supreme Court's decision held that, "The court unanimously held that the 1911 conveyance was an easement, and that the terms of the original conveyance were sufficiently broad to embrace its use as a recreational trail. *** Citing its law, the court held that since the easement is not limited in scope to railroad purposes, and embraces the current trail use." *CHEVY CHASE LAND*, 230 F.3d 1375. 1999 WL 1289099 at 2. (emphasis supplied). See also, *TOEWS*, 376 F. 3 at 1380 where the Federal circuit noted this point that the easement in CHEVY CHASE LAND was not limited to railroad purposes.

The government is fond of claiming that *CHEVY CHASE LAND CO. V. UNITED STATES*, 733 A.2d 1055 (Md., 1999), *CHEVY CHASE LAND V. UNITED STATES*, 230 F.3d 1375 (Fed. Cir. 2000), *WASHINGTON WILDLIFE PRES., INC. V. MINNESOTA*, 329 N.W. 2d 543 (Minn., 1983) and *REIGER V. PENN CENTRAL CORP*., No. 85-CA-11, slip op. (Ct. App. Greene County, Ohio, May 21, 1985) [available on WESTLAW, 1985 WL 7919] holds that recreational trail use and "railbanking" are permissible uses of an easement for railroad purposes. This is absolutely a flat misrepresentation of these cases. As the D.C. Circuit noted, these cases specifically involved an easement that was not limited to railroad purposes. *NATIONAL WILDLIFE FOUNDATION V. ICC*, 850 F. 2d 694 (D.C. Cir. 1988) at 706. Indeed, the Maryland Supreme Court in *CHEVY CHASE LAND* took great pains to note that the easement at issue in *CHEVY CHASE LAND* was not an easement limited to railroad use. 733 A. 2d at 1073. See also, the Federal Circuit's application of the Maryland Supreme Court's decision holding that, "The court unanimously held that the 1911 conveyance was an easement, and that the terms of the original conveyance were sufficiently broad to embrace its use as a recreational trail. *** Citing its law, the court held that since the easement is not limited in scope to railroad purposes, and embraces the current trail use." 230 F.3d 1375. 1999 WL 1289099 at 2. (emphasis supplied). See also, *TOEWS* at 1380 where the Federal circuit noted this point that the easement in Chevy Chase Land was not limited to railroad purposes. See *CHEVY CHASE LAND CO. V. UNITED STATES*, 158 F.3d 574 (Fed. Cir. 1998) (certification order); *CHEVY CHASE LAND CO. V. UNITED STATES*, 355 Md. 110, 733 A.2d 1055 (1999) (answer); *CHEVY CHASE LAND CO. V. UNITED STATES*, 230 F.3d 1375 (table), 1999 WL 1289099 (Fed. Cir. 1999) (nonprecedential) (final disposition).

As such it is fundamentally dishonest to claim that *CHEVY CHASE LAND* holds that "railbanking" and recreational trail use are within the scope of an easement limited to railroad purposes.

government provides no explanation why this same result should not also apply in this Kansas case.

In *PRESEAULT II*, the government sought to avoid paying compensation for the Trails Act conversion of a railroad right of way by arguing that "railbanking" was a permissible "railroad purpose" under federal law. The government lost this argument. The Federal Circuit "reject[ed] the Government's central thesis that general federal legislation providing for the governance of interstate railroads, enacted over the years of the Twentieth Century, somehow redefined state-created property rights and destroyed them without entitlement to compensation."[103]

After losing the argument that federal railroad regulatory law redefined state property rights in the land used for railroad rights of way, the government attempted to claim that "railbanking" and recreational trail use were a "railroad purpose" within the scope of an easement granted for the operation of a railroad under state law – in that case Vermont law. The government lost this argument as well. The Federal Circuit wrote, "We find no support in Vermont law for the proposition *** that the scope of an easement limited to railroad purposes should be read to include public recreational hiking and biking trails."[104]

In *TOEWS,* the government argued that under California state law the "so-called shifting public use doctrine *** transmogrif[ied] one type of easement into another." The Federal Circuit rejected this attempt and wrote, "a public transportation easement defined as one for railroad purposes is not stretchable into an easement for a recreational trail and linear park for

---

103 *PRESEAULT*, 100 F.3d at 1530. See also, *WEBB'S FABULOUS PHARMACIES* at 164, "Neither the *** legislature by statute, nor the ***courts by judicial decree, may accomplish the result the [government] seeks simply by recharacterizing the" private funds as "public money".

104 *Id.* at 1530.

skateboarders and picnickers, however desirable such uses may be for these linear strips of land."[105]

In *GLOSEMEYER V. UNITED STATES*, (consolidated for decision with *MOORE V. UNITED STATES* and *TOWN OF GRANTWOOD VILLAGE V. UNITED STATES*), the government attempted to argue that "railbanking" and recreational trail use were a "railroad purpose" under Missouri law. Judge Bruggink rejected this argument and noted, "trail use, by itself, would not constitute a railroad purpose. The transportation use contemplated by a railroad purpose would clearly be the movement of trains over rails. Recreational hiking, jogging and cycling are not connected with railroad use in any meaningful way." GRANTWOOD, 95 F.3d at 778. "[The government] contends that holding out the possibility of a reactivation, even if remote and indefinite, is a railroad purpose in and of itself. This future potentiality thus becomes a present railroad purpose in the view of the government." *Id.* at 781. The court rejected this contention, "In sum, neither component of railbanking – the preservation of the rail line for future use nor the 'interim' use of the easement as a recreational trail – constitutes a railroad purpose under Missouri law." *Id.*

The Federal Circuit in PRESEAULT II, 100 F. 3d at 1554 (J. Rader, concurring), similarly held:

> Realistically, nature trails are for recreation, not transportation. Thus when the State sought to convert the easement into a recreational trail, it exceeded the scope of the original easement and caused a reversion. *** the State's transparent attempt to retain property condemned for a narrow transportation use crumbled when it converted that property to a recreational trail. *** The United States and Vermont have converted a right to use the [landowners] land for a railroad into a right to hold the land in perpetuity. The vague notion that the State may at some time in the future return the property to the use for which it was originally granted, does not override its present use of that property inconsistent with the easement. That conversion demands compensation.

---

[105] *TOEWS*, 376 F.3d at 1379.

As we show below, this "railbanking" is a "railroad purpose" argument similarly fails as a matter of federal and Kansas law. This dog not only doesn't hunt, it won't even get off the porch.

### ii. As a matter of plain English, "Railbanking" and recreational trail use are not a "railroad purpose".

As the government acknowledges, "The ultimate title to land subjected to railway purposes does not cease to be in the owner of the adjacent freehold from which it was derived, and the termination of its use for railway purposes has no effect upon the fee title. It merely relieves the underlying fee of the dominant estate."[106]

Thus, it is fair to ask the question: What does "use for railway purposes" mean and is the Plaintiffs' land still being used for such purposes? We start with the basic question – what is the definition of a "railroad" or "railway"? We can look to three sources for the definition: the common dictionary meaning, Kansas statutory law, and federal statute.

### i. The definition of "Railway" and "Railroad"

The Oxford English Dictionary defines "railroad" as "a railway." "Railway" is, in turn, defined as "a way or road laid with rails."[107] Kansas law defines "railroad train" to "mean a steam engine, electric or other motor, with or without cars coupled thereto, operated upon rails." K.S.A. § 8-1454. "'Railroad' means a carrier of persons or property upon cars operated upon stationary rails." K.S.A. §8-1452. Kansas provides a specific criminal statute, K.S.A. § 21-3761, prohibiting trespass upon or damage to "railroad property." That statute defines "railroad property" as "include[ing] but not limited to, any train, locomotive, railroad car, caboose, rail-mounted work equipment, rolling stock, work equipment, safety device, switch, electronic signal, microwave communication equipment, connection, railroad track, rail, bridge, trestle,

---

[106] Govt's Cross-Motion at 25, quoting *FED FARM MORTGAGE*, 89 P.2d at 841.
[107] THE NEW SHORTER OXFORD ENGLISH DICTIONARY (1993).

right-of-way or other property that is owned, leased, operated or possessed by a railroad company." The U.S. Congress has defined a railroad at 11 U.S.C.§ 101, (44) as follows, "The term 'railroad' means common carrier by railroad engaged in the transportation of individuals or property or owner of trackage facilities leased by such a common carrier."

As this court recognized in a similar Trails Act taking case, "The term 'railroad purpose' *** does not encompass other forms of transportation, such as walking or bicycling *** The proposed development of a hiking, biking, cross-country skiing , and nature trail is completely unrelated to the operation of a railway and consistent only with an intent to wholly and permanently cease railway operations." *GLOSEMEYER,* 45 Fed. Cl. at 779 (citing *BOYLES V. MISSOURI FRIENDS OF THE WABASH TRACE NATURE TRAIL, INC.*, 981 S. W. 2d 644 (Mo App, W.D., 1998).

**ii. The definition of a "recreational trail".**

The Oxford English Dictionary defines "recreation" as "an activity or pastime pursued" and "trail" as "a beaten track or path or track, esp. in a wild or uninhabited region. Also, a marked route through countryside, around a town, etc., indicating points of interest or historical significance."[108] "Hiking" is described as "to walk vigorously" and "Biking" is described as "ride on a bike."[109] None of these terms include or reference anything that can be remotely characterized as relating to the operation of a railroad. The Federal Circuit has recognized that these activities are very different that those of a railroad. "It appears beyond cavil that use of these easements for a recreational trail – for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose

---

[108] *Id.*
[109] *Id.*

the trailway – is not the same use made by a railroad, involving tracks, depots, and the running of trains." *TOEWS*, 376 F.3d at 1376.

### iii. The definition of "railbanking"

"Railbanking" is not defined by The Oxford English Dictionary. "Railbanking" is a term created by federal law and is alien to Kansas (and other state law). There is no Kansas statute or state case that ever uses the term "railbanking" to describe Kansas law. Railbanking is the short-hand term that describes operation of 16 U.S.C. §1247(d), the 1983 Amendment to the Trails Act.[110] Thus, by definition "railbanking" is not operating a railroad. At most it is the possibility that the STB may authorize some unspecified railroad to build a rail line on the land at some indefinite time in the future. In other words, it is not specific to any existing operating railroad, such as the BNSF. The ability to construct a new rail line over this corridor in the future is not held by BNSF. Rather, it is held by the STB which has the authority to grant that request to <u>any</u> railroad. As such "railbanking" is, by definition, not using the land for active railroad operations.

### iv. Conclusion: "railbanking" and recreational trail use have nothing to do with the operation of a railroad and are not a "railroad purpose".

"'When *I* use a word,' Humpty Dumpty said in rather a scornful tone, 'it means just what I choose it to mean — neither more nor less.'" "'The question is,' said Alice, 'whether you *can* make words mean so many different things.'" "'The question is,' said Humpty Dumpty, 'which is to be master— that's all.'"[111] The LAWYERS HANDBOOK teaches that, "With regard to definitions, do not hesitate to define things in improbable ways. A good lawyer feels no compunction about

[110] See generally, *GOOS V. I.C.C.*, 911 F.2d 1283 (8th Cir. 1990) and *NATIONAL WILDLIFE FEDERATION V. I.C.C.*, 850 F.2d 694 (D.C. Cir. 1988).

[111] Carroll, Lewis, "*THROUGH THE LOOKING GLASS AND WHAT ALICE FOUND THERE*", 1871.

defining 'person' to mean 'corporations, partnerships, and livestock'; 'automobile' to mean 'airplanes, submarines, and bicycles'; and 'cash' to mean 'stocks, bonds, and whiskey.'"[112]

Were we to follow the counsel of Humpty Dumpty or the *LAWYERS HANDBOOK* it may be possible to contend that a "locomotive" is a "bike," a "railroad" is a "hiking trail," and "railbanking," the non-use of an abandoned right of way by a non-railroad, is a "railroad purpose." However, such use of language empties words of their meaning and is an attempt to do precisely what the Supreme Court has said the sovereign cannot do – to redefine state property interests by *ipsi dixit* in an effort to avoid paying compensation. The sovereign may indeed redefine state property interests. However, when doing so destroys the citizens property interest, "just compensation" must be paid.

### iii. The 1983 Amendments To The Trails Act Provided For Railbanking and Recreational Trail Use of Abandoned Railroad Rights of Way Precisely Because Such Uses Were NOT A "Railroad Purpose" Under Existing State Law.

By arguing that both "railbanking" and recreational trail use are a "railroad purpose" the government is attempting to bootstrap into Kansas law a concept invented by Congress in the 1983 Amendment to the Trails Act. This effort fails for the additional reason that it misinterprets the intent and meaning of the 1983 Trails Act Amendment. The Amendment was adopted precisely because Congress understood that "railbanking" and recreational trail use were not a "railroad purpose" under state law. If "railbanking" and recreational trail use were a "railroad purpose" under state law, there would have been no need for the Amendment.

The United States Supreme Court and the United States Courts of Appeal have detailed at length the intent and operation of the 1983 Amendment to the Trails Act and how the Trails Act

---

[112] D. Robert White, Esq. *THE OFFICIAL LAWYER'S HANDBOOK.* Simon & Schuster, Inc. (1983), 185-86.

operates to work a taking of a landowner's "reversionary" right in their property.[113] We do not need to re-plow this ground other than to note several settled points of law relevant to the

---

[113] See *PRESEAULT V. ICC* 494 U.S. 1 (1990) (cited as "*PRESEAULT I*") (holding Trails Act to be constitutional but noting that the Fifth Amendment requires "Just Compensation" when §8(d) preempts a landowner's state law reversionary interest in land subject to rail to trail conversion.); *PRESEAULT V. U.S.* 100 F. 3d 1525 (Fed. Cir. *en banc*, 1996) (cited as *PRESEAULT II*) (holding that conversion of abandoned railroad easement to recreational trail use under the Trails Act was a compensable taking requiring payment of "just compensation"); *NATIONAL WILDLIFE FOUNDATION V. ICC*, 850 F2d 694 (D.C. Cir, 1988), (holding that Trails Act did not provide the ICC authority to compel a railroad to convert abandoned right of way to trail use when railroad did not agree to conversion and "that reversionary property owners whose property interests are defeated by the preemptive effect of the Trails Act upon state laws" have a claim for "just compensation" for the taking of their a taking of property); *CITIZENS AGAINST RAILS-TO-TRAILS V. SURFACE TRANSPORTATION BOARD*, 267 F. 3d 1144 (D.C. Cir, 2001), (STB's issuance of NITU is ministerial and is not subject to National Environmental Policy Act [NEPA]); *GOOS V. ICC*, 911 F.2d 1283 (8th Cir, 1990), (STB's issuance of NITU is ministerial and is not is not subject to NEPA); *JOST V. SURFACE TRANSP BD.* 194 F. 3d 79 (D.C. Cir, 1999) (holding that the STB "shall" impose a trail condition, and not permit abandonment of a line whenever a railroad is prepared to convey the right-of-way to a [trail sponsor]" the statute gives the [STB] 'little, if any, discretion to forstall a voluntary agreement to effect a conversion to trail use.'"); *NATIONAL ASSOCIATION OF REVERSIONARY PROPERTY OWNERS V. SURFACE TRANSPORTATION BOARD*, 158 F. 3d 135 (D.C. Cir, 1998) (holding that STB is not required to provide actual notice to landowners of a proposed rail-to-trail conversion and noting that, "[b]ut for the negotiation of a trail use agreement, state property law would be revived and, possibly, trigger the extinguishment of rights-of-way and the vesting of reversionary interests. When such a reversion is blocked, the interim trail use has been deemed a taking and the holder of a reversionary interest that does not vest because of a trail use may seek compensation in the United States Court of Federal Claims"); *RLTD V. SURFACE TRANSPORTATION BOARD*, 166 F. 3d 808 (6th Cir, 1999) STB does not retain jurisdiction of railroad lines that are not part of the national rail system and that "railbanking may be had only in conjunction with an abandonment application."); *BECKER V. SURFACE TRANSPORTATION BOARD*, 132 F. 3d 60 (D.C. Cir, 1997); *BIRT V. STB*, 90 F. 3d 580 (D.C. Cir, 1996) (the STB was without jurisdiction to issue a second NITU after its jurisdiction had terminated upon the railroad consummating abandonment under the original NITU.); *GRANTWOOD VILLAGE V. MO PAC*, 95 F. 3d 654 (8th Cir, 1996) ("ICC's determination of abandonment is plenary, pervasive and exclusive of state law and federal law preempts state law on question of abandonment. *** State law claims can only be brought *after* the ICC has authorized an abandonment."); *FRITSCH V. I.C.C.*, 59 F. 3d 248, (D.C. Cir. 1995) (STB lost jurisdiction over abandoned railroad right of way when railroad abandoned right of way); *HASH V. UNITED STATES*, 403 F. 3d 1308 (Fed. Cir. 2005) (the General Railroad Right-Of-Way Act of 1875 granted railroads only an easement across public lands and the fee title was conveyed to Homesteaders, and their successors in title, who subsequently acquired title from federal government. Trails Act conversion of these abandoned railroad rights of way to trail

government's claim that "railbanking" is a railroad purpose under the law of Kansas or that public recreational trail use is not inconsistent with the scope of an easement for a railroad purpose.

As the Court of Appeals for the D.C. Circuit noted in *NATIONAL WILDLIFE FOUNDATION V. ICC*, 850 F.2d 694, 698 (1988), "As originally enacted, the Trails Act made no specific provision for the conversion of abandoned railroad rights-of-way to trails. Congress's first effort to encourage this type of adaptive re-use appeared in § 809 of the Railroad Revitalization and Regulatory Reform ("4-R") Act of 1976."[114] Section 10906 of the 4-R Act authorized the ICC to delay disposition of abandoned railroad corridors for up to 180 days after an effective abandonment order "unless the property had been first offered on reasonable terms for sale for public purposes." *Id.* Section 10906 is referred to as a "Public Use Condition."

Section 10906 did not, however, achieve Congress's hoped-for result. As the D.C. Circuit noted, "Section 10906 has no railbanking provision that would preempt state laws that could otherwise result in reversion of rights-of-way to abutting landowners upon a cessation of rail service."[115]

The lack of a "railbanking" provision that preempted state laws providing for reversion created a "problem" in that railroad rights of way for which the railroad held an easement would

---

use required the government to pay landowners compensation for taking their property); *TOEWS V. UNITED STATES*, 376 F. 3d 1371 (Fed. Cir. 2004) (grant of easement to railroad did not include right to use property for recreational trail use and the Fifth Amendment mandated that owners of "reversionary" interest in abutting property be paid just compensation.), *CALDWELL V. UNITED STATES*, 391 F. 3d 1226 (Fed. Cir. 2005) (Fifth Amendment taking claim for compensation in Trails Act taking arose upon STB's issuance of NITU); *BARCLAY V. UNITED STATES* 443 F. 3d 1368 (Fed. Cir. 2006) (consolidated on appeal with *RENEWAL BODY WORKS V. UNITED STATES*) (reaffirmed holding in *CALDWELL* that taking claim arose upon STB issuing NITU).

[114] P.L. 94-210, Title VIII, 90 Stat. 144 (codified as amended at 49 U.S.C. §10906 (1982)).

[115] *NATIONAL WILDLIFE FOUNDATION*, 850 F.2D at 701.

be lost under state law when the railroad abandoned the right of way. For this reason, "Congress renewed its effort to promote the conversion of railroad rights-of-way to trail use when it enacted the current §8(d) as part of the 1983 Trails Act Amendments."[116] Section 8(d) was added to:

"[R]eflect[] the concern that previous congressional efforts have not been successful in establishing a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes. *** [this provision] should eliminate many of the problems with this program. The concept of attempting to establish trails only after the formal abandonment of a railroad right-of-way is self-defeating; once a right-of-way is abandoned for railroad purposes there may be nothing left for trail use."[117] "One of the major impediments to preserving these rights-of-way existed in state property laws which prescribed that once rail service is discontinued after the ICC's approval of abandonment, such easements would automatically expire and the rights-of-way would revert to adjacent property owners. In response to this problem, Congress enacted the Trails Act Amendments of 1983."[118] "By

---

[116] *NATIONAL WILDLIFE FOUNDATION*, 850 F.2d at 697.

[117] H.R. Rep. No. 28, 98th Cong., 1st Sess. 8-9 (1983), *U.S. CODE CONG. & ADMIN. NEWS* 1983 at 112. Congress adopted the Trails Act and the 4-R Act to address the loss of railroad rights of way. Congress was not alone in noting the decline of railroads in the 1970's. *See* Steve Goodman *THE CITY OF NEW ORLEANS* 1970 ("And the steel rail still ain't heard the news. The conductor sings his songs again 'The passengers will please refrain: This train got the disappearing railroad blues.'" (Sung most famously by Arlo Guthrie on the album HOBO'S LULLABY (1972)). See *GRANTWOOD VILLAGE V. MISSOURI PACIFIC RAILROAD COMPANY*, 95 F.3d 654 (8th Cir. 1996); *CITIZENS AGAINST RAILS-TO-TRAILS V. SURFACE TRANSPORTATION BOARD*, 267 F. 3d 1144. 1149 (D.C. Cir, 2001); and *NATIONAL WILDLIFE FOUNDATION*, 850 F.2d at 702

[118] The court in GLOSSMEYER recognized this, stating:"One of the major impediments to preserving these rights-of-way existed in state property laws which prescribed that once rail service is discontinued after the ICC's approval of abandonment, such easements would automatically expire and the rights-of-way would revert to adjacent property owners. In response to this problem, Congress enacted the Trails Act Amendments of 1983."*GRANTWOOD VILLAGE V. MISSOURI PACIFIC RAILROAD COMPANY*, 95 F.3d 654 (8th Cir. 1996).

deeming interim trail use to be like discontinuance rather than abandonment, Congress sought to prevent property interests from reverting to the landowners under state law."[119]

Congress made clear that the 1983 Amendments to the Trails Act were intended to pre-empt state law and that, when the Trails Act operated to preempt property rights enjoyed by landowners under state law, "just compensation" would be paid to the landowners. Congressmen Barr, then Chairman of the House Judiciary sub-committee holding hearings into the Trails Act noted:

> "[a]t first glance, it may appear Congress did not consider the fact that if the railroad land was not transferred in fee simple it may belong to the property owner, and not the railroad. However, Congress intended the railbanking aspect of this Federal law would preempt State law and hold the land essentially in perpetuity, until possible rail reactivation. In the 1996 *en banc* decision in *PRESEAULT v. UNITED STATES*, involving the same plaintiffs as in the Supreme Court case I just mentioned, the U.S. Court of Appeals for the Federal Circuit held that railroad abandonment constituted a *per se* taking, and therefore would require payment of just compensation to the affected land owners, under the Fifth Amendment.[120]

It is, therefore, beyond dispute that Congress, the United States Supreme Court, and the Courts of Appeal all understand that the "railbanking" provision of the 1983 Trails Act Amendment were intended to preempt contrary state law and, in so doing, to take the reversionary property owner's interest in their land. If "railbanking" and interim recreational trail use were understood to already be a "railroad purpose" under existing state law, there would have been no "problem" with the Trails Act that Congress needed to "fix" with the 1983 Amendment.

---

[119] "By deeming interim trail use to be like discontinuance rather than abandonment, Congress sought to prevent property interests from reverting to the landowners under state law.*CITIZENS AGAINST RAILS-TO-TRAILS V. SURFACE TRANSPORTATION BOARD*, 267 F. 3d 1144 (D.C. Cir, 2001) at 1149. (citing, *PRESEAULT I* 494 U.S. 1 at 8). See also *NATIONAL WILDLIFE FOUNDATION*, 850 F.2d at 702.

[120] U.S. House of Representatives, Judiciary Committee, Subcommittee on Commercial and Administrative Law, "LITIGATION AND ITS EFFECT ON THE RAILS-TO-TRAILS PROGRAM," Statement of Chairman Barr, June 20, 2002.

### iv. *Harvey* and *Humberg* Provide No Support For The Government's Argument That "Railbanking" is a Railroad Purpose Under Kansas Law.

The government relies heavily upon two Kansas cases, *HARVEY V. MISSOURI PAC. R. CO.* 111 Kan. 371, 207 P. 761 (Kan. 1922)("Harvey"), and *ATICHISON, TOPEKA & SANTA FE RY. CO. V. HUMBERG*, 9 Kan. App. 2d 205, 675 P.2d 375 (Kan. App., 1984) ("*HUMBERG*"). These cases are part of a line of Kansas cases (which also include *MILLER V. ST. LOUIS SOUTHWESTERN RAILWAY CO.* 239 Kan. 198, 718 P.2d 610 (Kan. 1986)) involving the fee owner of land adjoining an active railroad corridor making an adverse possession claim against a railroad for land that adjoins the active right of way but which the railroad is not currently using in connection with the operation of the railroad corridor. In all these cases the railroad was actively using the land for the operation of a railroad and owner of the adjoining land sought to extinguish the railroad's interest in a portion of the adjoining land by asserting that (the adjoining fee owner) had been using the property in a manner adverse and hostile to the railroad's ownership of the land. In each case the court held that: (1) the railroad only held an easement in the disputed property which was owned in fee by the adjoining owner; and, (2) because the adjoining owner owned the fee estate in the land, he could not assert adverse possession against a railroad holding only an easement because the owner of the fee estate (since he owned fee estate) had the right to use the land for any purpose not inconsistent with the railroad's right to use of the land for operation of a railroad. Thus, the fee estate owner's use of his land could not be "hostile" or "adverse" to the railroad's easement and the owner of the fee estate could not satisfy the elements necessary to prevail in an adverse possession claim.[121]

---

[121] In reaching this holding, these three cases also provide significant further support for the Plaintiffs' point that a railroad obtains only an easement and not fee interest in land used for a railroad – even, as in *HARVEY, HUMBERG* and *MILLER*, when the interest in the land was

The government claims that *HARVEY* holds "that a railroad's use of land acquired by condemnation is not strictly limited to the actual running of trains across the land."[122] This is: (a) not the holding of *HARVEY;* and, (b) to the extent that this statement is dicta in *HARVEY*, it means nothing in the context of this case. To the extent that *HARVEY* notes that a railroad actively using a right of way easement for the operation of a railroad has the right to use the adjoining land which is also subject to an easement for railroad purposes for ancillary uses such as "railway side tracks, depots, workshops, water station, and stockyards" [123] it is utterly unremarkable. It is also utterly irrelevant to the issue before the court in this case.

The government wrongly contends, "The *HARVEY* decision makes clear that, under Kansas law, *** the [railroad] company need not be actively operating a railroad at all times in order to maintain that easement. Instead, Kansas law allows railroad easements to be maintained 'so long as the railroad has a potential need of them' in the future.'"[124]

This characterization of *HARVEY* is flat wrong. *HARVEY* held no such thing. The railroad right of way in Harvey <u>was being actively used</u> as an operating railroad. Indeed, the Court in *HARVEY* affirmed precisely the contrary point that "If the railroad [in *HARVEY*] should be abandoned or relocated elsewhere than on plaintiff's property, the dominant estate would terminate, and the [railroad's] rights acquired by condemnation would terminate and revert to the plaintiff." HARVEY, 207 P.2d at 762.

---

acquired for ancillary railroad purposes such as depots and grain elevators or switching yards and side tracks.

[122] Govt's Cross-Motion at 40.

[123] *HARVEY* involved an easement for the "usual 100 foot right of way" and an adjoining 30 acre parcel of land for "depot grounds and terminal facilities". The railroad was actively using the right of way but had not used the adjoining non-right of way property. The court held that the fee owner could not assert adverse possession against the railroad for the portion of the easement set aside for "railway side tracks, depots, workshops, water station, and stockyards." HARVEY, 207 P.2d at 761.

[124] Govt's Cross-Motion at 41.

By no stretch can *HARVEY* be read to support the proposition that a railroad corridor over which there has been no railroad traffic in more than a decade, in which the rails and ties have been removed, in which the last railroad to have an interest in the corridor has quit claimed whatever interest it may have had in the corridor to the county park department to use it as a public-access hiking and biking trail and for which the STB has approved the railroad's request to abandon railroad service is still "maintained as a railroad easement".

Similarly, the government's recourse to *HUMBERG* is misplaced. The government contends that *HUMBERG* held, "that the railroad's nonuse of easements acquired and 'held as possible railroad expansion areas in the future' for more than thirty years did not constitute an abandonment of those easements." This is not an accurate representation of the holding in *HUMBERG*.

*HUMBERG,* similar to *HARVEY*, concerned a claim by the owner of the fee estate in land adjoining an active railroad right of way. The owner asserted an adverse possession claim against a railroad that held an easement to use his land. The property involved in *HUMBERG* was one of three tracts of land adjoining a 100-feet wide right of way that was being actively used by the railroad for operation of a railroad. One of the three adjoining parcels had not been used by the railroad for more than 30 years but the railroad continued to pay taxes on the property and the railroad leased the property "for elevators, warehouse, office and scales." The court held that the interest acquired by the railroad under the warranty deed in *HUMBERG* was only an easement in the property. As such, the railroads interest in the adjoining property was limited to use of the land for "railroad purposes" and the fee owner's use of the land was not, therefore, "adverse to the right, title and interest of the railroad."[125]

---

[125] HUMBERG, 675 P.2d at 379.

The Kansas Supreme Court in *MILLER V. ST. LOUIS, SOUTHWESTERN RAILWAY COMPANY*, reaffirmed the holding of *HARVEY* and *HUMBERG*. To wit, the Court wrote, "the principles discussed in *HARVEY* were still the law of this state and [the fee estate owner's] use and occupancy of the land were not adverse to the interest of the railroad. The court reaffirmed the rule that when a railroad acquires land by virtue of an easement, condemnation, right-of-way or other conveyance, the railroad does not obtain a fee simple title to the right of way. [The fee estate owner] may have enjoyed full use of the property since 1969 but such use was not hostile or adverse to the railroad." MILLER, 718 P.2d at 612.

As such, it is clear that the Kansas Supreme Court does not read *HARVEY* or *HUMBERG* as standing for the proposition for which the government cites them and they can certainly not be extended to the situation before this Court involving the Reno and Butler County Rights of Way.

### v. Recreational Trail Use Is Absolutely and Decidedly NOT a "Railroad Purpose" Under Kansas Law.

The government claims, ""Under Kansas law, interim trail use is also a permissible use of the subject railroad easements."[126] The government contends that "interim trail use furthers and serves the original purpose of the easement by allowing preservation of the subject rights–of-way for possible future rail use through the railbanking process." and "interim trail use falls within the scope of the easements because it is a permissible public use of the easements under Kansas law." [127] The government never cites any Kansas case – or for that matter any case from any court of any state holding that a recreational trail is a permitted use of an easement limited to "railroad purposes." The only case the

---

[126] Govt's Cross-Motion at 43.
[127] Govt's Cross-Motion at 44.

government cites is *ATCHINSON, TOPEKA & SANTA FE RAILWAY COMPANY V. O'LEARY*, 100 P.628 (Kan. 1909).

*O'LEARY* does not hold that recreational "trail use falls within the scope of easements for a railroad." *O'LEARY* concerned a specific active railroad right of way in which the railroad opposed the city establishing a public road on a portion of the right of way. The right of way involved in *O'LEARY* was one established under the Act of Congress of March 3, 1863 (12 Stat. 772, c. 98).[128] As such, the railroad's interest in this right of way and correspondingly the city's ability to use a portion of that right of way were defined by the provisions of that Act and are unique to rights of way established under that Congressional Act. As it applies to rights of way established under the 1863 Act, the Kansas Supreme Court, citing the U.S. Supreme Court's decisions in *NORTHERN PACIFIC RY. V. TOWNSEND* 190 U.S. 267 (1903), *NORTHERN PACIFIC RAILROAD COMPANY V. SMITH*, 171 U.S. 261 (1898) and *NORTHERN PACIFIC RAILWAY CO. V. ELY*, 197 U.S 1 (1905) held that in the rights of way established by the Congressional Act of 1863, "Congress must have assumed when making this grant, *** [that street] crossings of the right of way would become necessary." O'LEARY, 100 P.at 629 (quoting *NORTHERN PACIFIC V. SMITH*.) Interestingly, the court noted that a paved street was not a "railroad purpose". The Court made a distinction between a public "paved street" and "railroad purposes". The Court wrote, "The use of the land in question for street purposes with a pavement upon it will not affect the situation as a matter of law nor in fact. If the [Railroad] at any time has occasion to use this part of its right of way for railroad purposes, the presence of this pavement will not prevent it." O'LEARY, 100 P.628 at 629.

---

[128] The nature and extent of the rights obtained under congressionally granted rights of way and other land grants are defined by the terms of the Act. See *HASH V. UNITED STATES*, 403 F. 3d 1308 (Fed. Cir. 2005).

More to the point, is the case that the government chooses to overlook *PRATT V. GRIESE*, 196 Kan. 182, 409 P.2d 777 (Kan. 1966). In *PRATT*, the Kansas Supreme Court found that a railroad had abandoned its right of way when the rails and ties were removed. (We discuss this aspect of the case more fully below.) However, of immediate note is that in *PRATT*, the Kansas Supreme Court looked with approval to Kentucky for the proposition that when a railroad "removed the track" and "attempted to convey the right of way to an association for the purposes of a national park [i]t was held by these acts to have abandoned the right of way." PRATT, 409 P.2d at 781 (citing, *MAMMOTH CAVE NATIONAL PARK ASS'N V. STATE HIGHWAY COMMISSION*, 261 Ky. 769, 88 S.W.2d 931 (Ky. App., 1935)). This is a common holding. See *LAWSON V. STATE*, *supra*, *POLLNOW V. DNR, supra*, *MICHIGAN DNR V. CARMODY-LAHTI REAL ESTATE*, *supra*, *PRESEAULT II*, and *LOVELAND V. CSX*, 620 So.2d 1120 (1993), all cases holding – or citing as authorities cases holding – that the sale of a railroad right of way for a hiking trail was not used for railroad purpose and it constituted abandonment of the right of way.

### ***B. It is not necessary to establish that the Railroad has abandoned the right of way. But, to the extent that abandonment is considered, it is absolute and unequivocal that the Reno and Butler County Rights of way have been abandoned for any railroad use as a matter of fact and as a matter of law.***

#### **i. It is not necessary to establish that a railroad right of way was abandoned in order for landowners to bring a claim for the Trails Act Taking their Reversionary Interest in their land.**

The government spends 16 pages in their memorandum of law contending that the railroad has not abandoned the Butler County and Reno County Rights of Way. This is both inaccurate and unnecessary.

The Federal Circuit in *PRESEAULT II* wrote, "we find the question of abandonment is not the defining issue, since whether abandoned or not the Government's use of the property for a public trail constitutes a new, unauthorized use." *PRESEAULT II,* 100 F.3d at 1549. The Federal Circuit again reiterated this point in *TOEWS*, "Further, it is the Government's view that, under

California law, there was no abandonment or extinguishment of the easements caused by the federal actions under §8(d) of the [Trails Act]. The trial court concluded that, as a factual matter, the railroad's management had acted in an unequivocal and decisive manner clearly showing an intention to abandon that section of the line. *** However, just as the trial court itself indicated that its conclusion on this matter was not necessary to the result reached, for the reasons that follow we need not definitively decide this issue either." TOEWS, 376 F.3d at 1375 – 1376.

The Federal Circuit expressly held in a Kansas Trails Act taking case involving three separate trails, the landowner's taking claim arose upon issuance of the NITU even though "the railroad continued to use the right-of-way for railroad purposes after the NITU was issued" and the railroad had not abandoned the right of way. "But even if under Kansas law the reversion would not occur until after federal authorization of abandonment, that state law reversion was still delayed by the issuance of the NITU, and the claim still accrued with the issuance of the NITU. It similarly makes no difference that the railroad use may have continued after the NITU issued. The termination of railroad use was still delayed by the NITU." *BARCLAY V. UNITED STATES*, 4432 F.3d 1368, 1374 (Fed. Cir. 2006).

**ii. To the extent that a showing of abandonment is necessary, the Butler County and Reno County Railroad Rights Of Way have been absolutely and unequivocally abandoned as a matter of fact.**

Both parties agree that "in order to constitute an abandonment there must be an intent to relinquish, together with external acts by which the intent is carried into effect." *PRATT*, 409 P.2d at 780-81.[129] The focus on "intent" is important because it focuses on the "intent" of the specific railroad that hold the easement at issue. In the case of both the Reno County and Butler

[129] Govt's Cross-Motion at 46.

County Right of Way, the railroad is the BNSF. So, when determining whether this railroad easement was abandoned, we look to the actions of the BNSF.

The following facts are agreed for both the Reno County and the Butler County Rights of Way: (1) The BNSF filed an application with the STB seeking authority to abandon railroad service over the right of way; (2) the STB granted the BNSF authority to abandon railroad service over the rights of way; (3) no trains have run over the former railroad rights of way for more than six years (in the case of Reno County) and more than a decade (in the case of Butler County); (4) the rails and tires have been removed from the right of way; (5) in the case of Butler County the line is "stub ended" and incapable of being used for "overhead" traffic; (6) in the case of Reno County "there is now no demand for or prospect of rail service over the line"; (7) for both Reno County and Butler County the BNSF quitclaimed whatever interest it had in the rail corridor to a non-railroad which does not have the legal ability to operate a railroad; (8) the BNSF has been relieved of any and all responsibility or obligation to maintain the right of way; (9) the BNSF no longer pays any taxes upon the right of way; and, (10) no Railroad presently has either the obligation to (or the legal ability to) use either the Butler County or the Reno County Right of Way for operation of a railroad.

### iii. To the extent that a showing of abandonment is necessary, the Butler County and Reno County Railroad Rights Of Way have been absolutely and unequivocally abandoned as a matter of law.

*PRATT* is the leading Kansas case establishing when an easement for a railroad right of way is abandoned. The railroad line in *PRATT* connected a large tract of land to the Union Pacific Railroad main line in Walker, Kansas that was used for an Army airfield. The airbase closed and the government sold the land and the railroad easement to a private developer, Don Pratt, who removed the ballast from the right of way but "testified he had considered plans for using the right of way in the construction of a railroad." PRATT, 409 P. 2d at 780. Pratt sued Francis

Griese who owned the land over upon which the easement was located "to declare and protect the" easement. *Id.* at 778. Griese responded by claiming the easement had been abandoned.

The Kansas Supreme Court agreed. The Court noted that the rails and ties had been removed, railroad operations over the land had ceased, and the easement was in a state of disrepair and fences had not been maintained. On this basis, the Court considered the railroad easement abandoned. The Court held that, "A rule in the overwhelming majority of cases[130] on the subject is that evidence of an intention to abandon an easement for a railroad right of way may be found in the deliberate removal of tracks rendering the operation of a railroad impossible." *Id.* 409 at 781.[131]

Likewise, Federal Circuit *en banc* held that the railroad had abandoned the railroad easement when, in *PRESEAULT II*, the "Vermont Railway ceased using the easement for active transport operations and used the tracks solely to store railroad cars ** Vermont Railroad removed the rails and other track materials from the segment of line crossing the Preseault's property." *PRESEAULT II*, 100 F.3d at 1547. The Federal Circuit went on, *en banc*, to note that,

---

[130] The overwhelming majority of jurisdictions hold that a railroad's intention to abandon a right of way has been established when the rails and ties are removed. We could compile literally hundreds of cases from almost every state (we have not researched the law in Hawaii) reaching such a holding. However, we focus on Kansas law. Should this court find it helpful, the Plaintiffs would gladly provide such a national summary of cases supporting the Kansas Supreme Court's statement that remaining rails and ties is widely held to be evidence the railroad has abandoned the right of way.

[131] The Court specifically looked to the Maryland case, *MARYLAND & PA. R.R. CO. V. MER-SAFE, ETC.*, 224 Md. 34, 166 A. 2d 247 (Md., 1960) "wherein a right of way was used for railroad purposes until *** the company ceased all railroad operations over the land and removed the rails and ties therefrom. This was the only evidence of abandonment." At 781. The court also looked to the Kentucky case, *MAMMOTH CAVE NAT. PARK ASS'N V. STATE HIGH. COMM.*, 261 Ky. 769, 88 S.W. 2d 931 (Ky. App., 1935). Mammoth Cave is important for two points. (1) it is one of the cases holding that the railroad's conveyance of the right of way to a non-railroad is a further specific act establishing evidence of an intent to abandon. (2) the conveyance of a railroad right of way "for the purpose of a national park *** was held by these acts to have abandoned the right of way." *PRATT*, 409 P. 2d at 781.

"While it is not disputed that an easement will not be extinguished through mere non-use, removing the tracks and switches from a railway cannot be termed non-use. Non-use of the easement began in 1970; abandonment occurred, as evidenced by the more permanent lack of operability, in 1975 [upon removal of the tracks]." *Id.* at 1553 (J. Rader, concurring).

The government, understandably, does not like *PRATT* (or *PRESEAULT II*). They seek to avoid the clear and directly on-point holding of *PRATT* by claiming that *PRATT* is limited to cases involving a railroad spur track serving military bases when the military base has been discontinued. (Govt's Cross-Motion at 51). This is akin to claiming that *PRATT* is limited to only cases involving railroad right of way in Walker, Kansas in which the landowner's name begins with "G". These may be features of the *PRATT* case but the Kansas Supreme Court's holding in *PRATT* was in no way so limited. Indeed, the Kansas Supreme Court expressly announced in *PRATT* that the rule of law it applied was "a rule found in the overwhelming majority of cases." *PRATT*, 409 P.2d at 78. And, quoting from the *MARYLAND & PA. R.R.* [166 A.2d 250] decision, noted, "The next question is whether the removal of the rails and ties from the easement constituted an abandonment of it. We think it did." *Id.* It is simply not correct to claim – as the government attempts to do – that the *PRATT* holding is only limited to railroad lines established to serve former military airbases.

The government goes on to say that *PRATT* is consistent with "well established Kansas law that an easement on land 'condemned for a public use does not revert to the fee owner unless its use for the *** condemned purpose has become impossible, or so highly improbable as to be practically impossible'." (Govt's Cross-Motion at 51). The government cites for its

characterization of the Kansas rule on railroad abandonment two cases considering whether a public highway or street was abandoned by the city or highway department.[132]

The government is attempting to suggest that, so long as it is not impossible for a railroad – any railroad, it need not be railroad that currently holds the easement – to ever possibly rebuild a rail line over the land, the easement has not been abandoned. The government claims that by agreeing to a trail use of the right of way under the federal Trails Act "the railroad's actions contemplate that future rail service is a real possibility"[133] and, thus, the easement has not been abandoned.

This suggestion by the government is wrong for two reasons. First, it is contrary to Kansas law. Second, it is a variation of the same misguided effort to redefine by *ipsi dixit* Kansas state law to be what Congress intended to achieve with the 1983 Amendment to the Trails Act and was, as such, explicitly rejected by the Federal Circuit – and every other court to consider the argument.

Oddly, the only Kansas case which the government cites in support of its contention that the BNSF did not abandon the rights of way -- *MARTELL V. STEWART,* 6 Kan. App. 2d 387, 628 P.2d 1069 (Kan. App., 1981) -- is a case in which the court held that the railroad *had* abandoned the railroad right of way when it stopped paying taxes on the land and disclaimed its interest in the right of way. Two facts which are unquestionably present in this case.

In MARTELL, the Santa Fe Railroad abandoned a railroad line. Santa Fe had stopped running trains over the right of way. In 1975, Santa Fe contracted with a third party to remove the rails, ties, and ballast. The railroad continued to pay real estate taxes on the right of way

---

[132] The government cited, *MATLACK V. CITY OF WICHITA*, 407 P. 2d 510, 511 (Kan. 1965) and *WINKEL V. KANSAS DEP'T OF TRANSP.*, 131 P. 3d 570, No. 94,008, 2006 WL 903159, at 2 (Kan. Ct. Apr. 7, 2006).

[133] Govt's Cross-Motion at 53.

through January 1, 1978. In January 1978, the railroad stopped paying taxes and "filed a Declaration of Abandonment of the right-of-way with the Register of Deeds of Greenwood County."[134] George Stewart and some other owners of the land upon which the railroad right of way had been located wanted the ballast. Henry Martell, however, had already purchased the ballast from the contractor hired by the Santa Fe to remove the tracks, ties, and ballast. The Kansas Court of Appeals held that Henry Martell had the right to the ballast because Santa Fe had not abandoned the right of way until January 1978, because, until then, Santa Fe continued to pay taxes on the right of way and Santa Fe's actions indicated that they intended to use the right-of-way until all their materials were removed.[135] *Id.*

In *MARTELL*, there was never any dispute that the railroad easement had been abandoned. The debate was over ***when*** it was abandoned. Under any of the *MARTELL* criteria the railroad easement in this case has been abandoned. Four specific points are noteworthy in this case: (1) the rails and ties are removed, (2) railroad use of the property has ceased, (3) the BNSF has filed a quit claim deed with the Recorder's Office disclaiming any interest in the right of way, and (4) the BNSF is not paying taxes on the right of way.[136]

Under any standard, the BNSF's actions are conclusive. As a matter of law and as a matter of fact, the BNSF has abandoned the Butler County and the Reno County Rights of Way. The government's sole point in rebuttal is that – by virtue of the Trails Act and the STB's continued jurisdiction – it remains a possibility that some railroad may use this land at some indefinite point in the future for a railroad. Under Kansas law this does not mean that the BNSF has not abandoned the right of way. And, as the Federal Circuit noted, "The vague notion that

---

[134] *MARTELL*, 628 P. 2d at 1069.

[135] *MILLER*, 620 P. 2d at 1069.

[136] Tabs 3A, 4A, 5A, 6A, 7A, 8A, 30, 30A, and 30B of Plaintiffs' PFUF in Response.

the State [in this case the County] may at some time in the future return the property to the use for which it was originally granted, does not override its present use of the property inconsistent with the easement. That conversion demands compensation."[137]

### C. *The So-Called "Shifting Public Use" doctrine has been rejected by the Supreme Court, the Federal Circuit, and is Not Recognized Under Kansas Law.*

In a final "Hail Mary" the government marches out the argument that an abandoned railroad easement "may transmogrify into the public's use [of the land] as a recreational trail and linear park."[138] The government claims, "Kansas law follows this principle and allows a shift in use for a right of way so long as that use continues to be of a public nature."

The government is wrong for three reasons: (1) this so-called "shifting public use doctrine" has been rejected by the Supreme Court, Federal Circuit, and the D.C. Circuit – among other courts, (2) Kansas law does not recognize the "Shifting Public Use Doctrine"; and (3) even advocates of the "Shifting Public Use Doctrine" agree that it does not apply to recreational trail use.[139]

#### i. The So-Called "Shifting Public Use Doctrine" Has Been Rejected by the U.S. Supreme Court, Federal Circuit, the D.C. Circuit and other Courts.

In suggesting that the so-called "Shifting Public Use Agreement" allows an abandoned railroad easement to be used for a public-access recreational trail, the government is making an

---

137 *PRESEAULT II*, 100 F.3d at 1354 (concurring opinion of J. Rader.)

138 Taken from the Federal Circuit's characterization of the government's "Shifting Public Use doctrine". *TOEWS*, 376 F.3d at 1377.

139 The government is also wrong for a fourth reason. The government's argument is an attempted logical and linguistic *ledger de main*. The government contends that since a "railroad serves a public purpose" the term "railroad" is equivalent to "public purpose" and, therefore, any "public purpose" such as a linear park is within the meaning of "railroad". Were this logic valid, use of the land for a sports stadium, court house or airport would be equally permissible. This is another attempt by the government to do, as Humpty Dumpty declared above at page 39, pour into a word whatever meaning serves its present interest.

argument that has been specifically considered and rejected by every court to consider the argument, including the U.S. Supreme Court, the Federal Circuit, and the D.C. Circuit, among others. Indeed, there is no decision of any court known to the Plaintiffs that has allowed a state or federal law to redefine property interests in the manner proposed under the "Shifting Public Use Doctrine" without requiring the payment of "just compensation".

Most directly, the Federal Circuit in *TOEWS* wrote, "[A] public transportation easement defined as one for railroad purposes is not stretchable into an easement for a recreational trail and linear park for skateboarders and picnickers, however desirable such uses may be for these linear strips of land." *TOEWS*, 376 F.3d at 1379.[140] Similarly, the Federal Circuit *en banc* held that "[property] interests were fixed at the time of their creation." *PRESEAULT II*, 100 F.3d at 1540. The Federal Circuit went on to a lengthy consideration – and rejection – of the so-called "Shifting Public Use Doctrine" applied to Trails Act conversions of railroad rights of way to public trail use. (See discussion at *PRESEAULT II*, 100 F.3d at 1541 – 1544.

The Federal Circuit specifically rejected the "Shifting Public Use Doctrine" in *PRESEAULT II* and noted with approval the state supreme court cases of *POLLNOW V. DNR*, 276 N.W. 2d. 738 (Wisc., 1979) and *LAWSON V. STATE*, 107 Wash. 2d 444, 730 P.2d1308 (1986) that rejected the "Shifting Public Use Doctrine". See especially the discussion of the Washington State Supreme Court in *POLLNOW*. (We could add to this *GLOSEMEYER V. UNITED STATES*, 45 Fed. Cl. 771 (2000), *MICHIGAN DNR V. CARMODY-LAHTI REAL ESTATE*, 472 Mich. 359, 699 N.W.2d 272 (Mich., 2005) and other cases that have reached a similar conclusion.) The D.C. Circuit has similarly rejected this argument. See *NATIONAL WILDLIFE FEDERATION*, 850 F.2d at 706 – 709.

---

140 In *TOEWS* the Federal Circuit applied California law. As we show below, Kansas is even more inhospitable to the "Public Use Doctrine" than is California.

The U.S. Supreme Court has rejected the notion that either Congress or a state may redefine existing property interests without incurring the Fifth Amendment's obligation to pay "just compensation" for the redefinition or destruction of the property.[141] In a sentence, the Federal Circuit and the Supreme Court (as well as state supreme courts) recognize the fundamental point that the Fifth Amendment means nothing if it allows the government to avoid paying "just compensation" by redefining a citizens' property interest out of existence. That is precisely what the so-called "Shifting Public Use Doctrine" seeks to accomplish. And, accordingly, it should be rejected.

#### ii. Kansas Does Not Recognize the "Shifting Public Use Doctrine"

The Federal Circuit rejected the government's "Shifting Public Use Doctrine" argument in *PRESEAULT II*. In doing so the Federal Circuit noted, "We have found no Vermont case, either in this century or the last, and the parties point to none, in which the Vermont courts establish or apply something called the 'shifting public use' doctrine." *PRESEAULT II*, 100 F.3d at 1541.

Similarly, there is no Kansas case that has recognized the so-called "Shifting Public Use Doctrine". The government points to only one Kansas case in support of their "shifting Public Use" argument, *KANSAS ELECTRIC POWER CO. V. WALKER*, 142 Kan. 808, 51 P.2d 1002 (Kan.

---

[141] *LEO SHEEP CO. V. UNITED STATES*, 440 U.S. 668 (1979), ("This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill-defined power to construct public thoroughfares without compensation.") and *HASTINGS V. WHITNEY*, 132 U.S. 357 (1889) ("The doctrine first announced in *WILCOX V. JACKSON*, 13 Pet. 498, 10 L. Ed. 264, that a tract lawfully appropriated to any purpose becomes thereafter severed from the mass of public lands, and that no subsequent law or proclamation will be construed to embrace it, or to operate upon it, although no exception be made of it, has been reaffirmed and applied by this court in such a great number and variety of cases that it may now be regarded as one of the fundamental principles underlying the land system of this country."). The Federal Circuit cited both of the forgoing cases and applied these holding to reject the government's attempt to argue that the federal Trails Act redefined a landowner's property interests. *HASH V. UNITED STATES*, 403 F.3d 1308 (Fed. Cir. 2005).

1935). The government contends that *KANSAS ELECTRIC POWER*, "involved a change in use from electric street car service to gasoline driven busses."[142] Based upon this single case the government argues that Kansas law recognizes that "a right-of-way may be converted from one public use (active rail service) to another (rail banking and interim trail use) without causing termination of the right-of-way and a corresponding reversion of any underlying interests in the land."[143]

*KANSAS ELECTRIC POWER* most definitely does NOT stand for this proposition. Rather, *KANSAS ELECTRIC POWER* held that a passenger bus line in Lawrence, Kansas with an easement to use land had abandoned the easement by using "gasoline driven rubber-tired busses" instead of "electric street cars". "The main question involved is whether the change of method of transportation by the substitution of gasoline driven rubber-tired busses for electric street car service with steel track is an abandonment of the right of way or privilege of the plaintiff company to cross over the property of the defendants." *KANSAS ELECTRIC POWER*, 51 P.2d at 1002.[144]

This is not unlike the same argument that the government made – and which was rejected – in *PRESEAULT II* and *TOEWS*. In *PRESEAULT II*, the Federal Circuit recognized that a railroad's ability to replace a "plank road" with rails was within the scope of a railroad's easement and did not warrant conversation of a railroad to a recreational trail. *PRESEAULT II*, 100 F.3d at 1541. Similarly, in *TOEWS*, the Federal Circuit rejected the argument that a California case, *FAUS V.*

---

[142] Govt's Cross-Motion at 54.
[143] *Id.*
[144] *KANSAS ELECTRIC POWER*, 51 P.2d AT 1003, is also distinguished on the point that the change from a steel wheeled trolley to a rubber-tired bus did not change the nature of the use of the property and specifically that this did not involve inviting the public onto the property. "Such use [of the property by the public as a street and by pedestrians] has not been authorized or encouraged by the plaintiff which posted signs advising the public against its use."

*CITY OF LAS ANGELES*, 67 Cal.2d 350, 62 Cal.Rptr. 193, 431 P.2d 849 (1967), which held that a "public motor coach service could be substituted for public electric railway service over rights of way that were granted for an electric railway", justified using a railroad easement for a recreational trail. The Federal Circuit specifically held that converting an electric railway to motor coach was precedent to convert a railroad to a trail. *TOEWS*, 376 F.3d at 1377. This is precisely the situation the government is arguing with *KANSAS ELECTRIC POWER CO. V. WALKER*.

**iii. Even Advocates of the So-Called Shifting Public Use Doctrine" Agree that it does not apply to Recreational Hiking Trails.**

The "Shifting Public Use Doctrine" contends that an easement granted in, say, 1900 for the purpose of providing a right of way to allow use of the property by a specific technology implicitly includes the right of the holder of the easement to use the land for the same purpose using new technology that was unknown at the time the easement was granted but which would have been allowed had the parties known of the technology at the time the easement was granted. The best example of the "Shifting Public Use Doctrine" is the use of easements granted for telegraph lines for the location of fiber-optic cables.

The flaw of the government's attempt to use the "Shifting Public Use Doctrine" to bootstrap recreational trail use into a railroad easement is that hiking and biking trails were "technology" known in the 1890's when the easements were created. Hiking trails were known before railroads. This point was noted by Heftman, Jeffery M., RAILROAD RIGHT-OF-WAY EASEMENTS, UTILITY APPORTIONMENTS, AND SHIFTING TECHNOLOGICAL, REALITIES, Univ. of Illinois L. Rev. Vol 2002, p1401, 1420 (2002), "the doctrine would prove inapplicable in the proposed transition of railroad right-of-ways to recreational trails, which cannot be construed as a new method of transportation."

## VII. CONCLUSION

By reason of the STB's issuance of the NITU pursuant to the Trails Act, the Plaintiffs' "reversionary" right to their land was taken and their land was burdened with new easements for a public recreational trail and "railbanked" for a possible future railroad. The Plaintiffs are entitled under the Fifth Amendment to "just compensation" for this taking of their property. Accordingly, the Plaintiffs motion for summary judgment on the question of the government's liability should be granted and the government's cross-motion seeking to exonerate the government from liability for this taking of property without paying "just compensation" should be denied.

Respectfully submitted,

LATHROP & GAGE L.C.

/s/ Mark F. (Thor) Hearne, II
MARK F. (THOR) HEARNE, II
LINDSAY S.C. BRINTON
MEGHAN S. LARGENT
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
(314) 613-2500
(314) 613-2550 (fax)
Thornet@ix.netcom.com

ATTORNEYS FOR PLAINTIFFS

# Appendix "A"

## Other state court decisions holding similar instruments as conveying only an easement and not a fee estate in the land.

---

*Brown v. Weare*, 348 Mo. 135, 152 S.W. 2d 649 (1941), ("There can be no dispute, nor is there any, that this deed so far as the right of way is concerned granted the railroad company an easement only. This is established by the terms of the deed granting a 'right of way' and then further clinched by the provision limiting the use of the grant for railroad purposes. The law is settled in this state that where a railroad acquires a right of way whether by condemnation, by voluntary grant or by a conveyance in fee upon a valuable consideration the railroad takes but a mere easement over the land and not the fee.") *Schuermann Enterprises, Inc. v. St. Louis County*, 436 S.W. 2d 666 (Mo. 1969) (In a case construing a Warranty Deed from a land owner to a railroad, the court held that only an easement was conveyed, notwithstanding the fact that the instrument was in the form of a general warranty deed and the railroad paid valuable consideration. "Railroads may hold, purchase, or convey the fee in land when the acquisition is by general warranty deed without any restriction on the quantum of title conveyed and for a valuable consideration, but where the acquisition is for right of way only, whether by condemnation, voluntary grant or conveyance in fee upon a valuable consideration, the railroad takes only an easement over the land and not the fee. Such easement is extinguished when the railroad ceases to run trains over the land, and, upon that occurrence, the use of the land is again in the original owner or his grantees, free of the burden of the easement." At 669 (citations omitted.),

*Buhl et. al v. U.S. Sprint Communications Co.* 840 S.W. 2d 904 (Tenn 1992), (Right-of-way acquired by condemnation "is a grant of an easement and the title to the easement, and nothing more... the fee, under this construction, remained with the owner, the railway acquiring a mere easement. *** An easement merely gives to a railroad company a right of way in the land – that is, the right to use the land for its purposes." At 909. (internal citations omitted),

*Highland Realty Co. v. City of San Rafael,* 46 Cal. 2d 669, 298 P.2d 15, 20 (1956) ("the grant of land as a right of way recognizes nothing but an easement. *** [T]he grant by [fee owner] to the railroad of a right of way 'upon, over, and along a strip of land' conveyed only an easement, and not the underlying land. Further, the general rule is that 'in construing contracts and deeds for railroad rights of way such deeds are usually construed as giving a mere right of way, although the terms of the deed would be otherwise apt to convey a fee." (citing, *Cooper v. Selig*, 48 Cal. App. 228, 191 P. 983, *San Rafael Ranch Co. v. Ralph Rogers Co.* 154 Cal. 76, 96 P. 1092 (1908), *Coon v. Sonoma Magnesite Co.* 183 Cal. 597 189 P. 271 (1920), *People, By and Through Department of Public Works v. Thompson,* 43 Cal 2d 13, 271 P. 2d 507 (1954), *Ocean Shore Railroad v. Doelger*, 127 Cal. App. 2d 392, 274 P.2d 23 (1954), *Moakley v. Los Angeles Pacific Ry. Co.* 139 Cal. App. 421, 34 P.2d 218 (1934), *Tamalpais Land & Water Co. v. Northwestern Pac. R. Co.* 73 Cal. App. 2d 917, 167 P.2d 825

(1946), *Thompson on Real Property*, Perm. Ed., Vol. 2, pp. 11-12, 461 and p. 14, 462 and 132 A.L.R. 142-187.)

*Brown v. Penn Central Corp.* 510 N.E. 2d 641, 644 (Ind. 1987), ("A deed that conveys a right generally conveys only an easement. The general rule is that a conveyance to a railroad of a strip, piece or parcel of land, without additional language as to the use or purpose to which the land is to be put or in other ways limiting the estate conveyed, is to be construed as passing an estate in fee, but reference to a right-of-way in such a conveyance generally leads to its construction as conveying only an easement." Citing *Richard S. Brunt Trust v. Plantz,* Ind. App. 458 N.E.2d 251 (1983), *L&G Realty & Construction Co. v. Indianapolis*, 127 Ind. App. 35, 139 N.E.2d 580 (1957).

*Neider v. Shaw* 138 Idaho 503, 530, 65 P.3d 525 (Idaho 2003) ("[A] substantive provision of the conveyance instrument, in handwriting, grants a "right of way" to the Railroad, which this Court has identified as language that creates an easement. The conveyance instrument from the Bows to the Railroad granted an easement to the Railroad rather than a fee simple."

*Sherman v. Petroleum Exploration,* 280 Ky. 105, 132 S.W.2d 768, 770 (1930) ("In the problem of construction of any deed, the test is that of intention, which is to be gathered from the context of the instrument, read in those lights which are properly employed in construing writings. We think it may be well said that an indefinite or ambiguous conveyance of land specifically for a railroad right of way is in its 100 F.3d at 1547 interpretation subject to the influence of a general knowledge that much railroad right of way is expressly or by operation of law limited to an easement, which has been usually found sufficient for the purpose desired.")

*Michigan Dept. of Natural Resources v. Carmody-Lahti Real Estate, Inc.*, 699 N.W.2d 272 (Mich. 2005). ("We think the court below was correct in holding that the deed conveyed an easement only, and not a fee. It does not purport to convey a strip of land 40 feet wide, etc., but the right of way over a strip 40 feet wide. *** Although our sole concern is the intent of the parties as manifested in the plain language of the deed at issue here, it is worth noting that this analysis of the deed is consistent with our prior jurisprudence in this area. In general, this Court has construed deeds that purport to convey a right-of-way as transferring an easement. In fact, we have been unable to discover a *single* case in which this Court construed a deed conveying a "right of way" as transferring a fee estate, and plaintiff has directed us to none.

In *Jones v. Van Bochove,* 103 Mich. 98, 61 N.W. 342 (1894) for example, the court considered a deed with a granting clause that conveyed

> "[a]ll that certain piece or parcel of land situate * * * and described as follows, to wit: The right of way for a railroad, running from the marl bed of said cement company to their works, on the west side of the Kalamazoo river, and described as follows: 'A strip of land 40 feet wide * * * and 952 feet in length.['] *Id.* at 100, 61 N.W. 342. See also *Westman v. Kiell,* 183 Mich. App. 489, 494, 455 N.W.2d 45 (1990), holding that a deed conveying a " 'right of way *upon* and *across* lands of Henry Salee ... for the uses and purposes of said

> Railroad Company' " transferred an easement rather than a fee. (Emphasis in original).

The court held that this granting clause conveyed an easement rather than a fee, noting that the deed "does not purport to convey a strip of land 40 feet wide, etc., but *the right of way over a strip 40 feet wide." Jones*, 103 Mich. at 100, 61 N.W. 342. (Emphasis added). The court determined that the following language conveyed an easement rather than a fee estate:

> "That the said parties of the first part, for and in consideration of the future construction, continued maintenance and operation of a first-class, standard-gauge steam railroad (over which shall be transported passengers and freight) within the time, limits and conditions hereinafter to be defined, ... have granted, bargained, sold and conveyed and by these presents do grant, bargain, sell, convey and quitclaim unto the party of the second part, his successors or assigns, *for a right of way for a railroad forever* ...." (citing *Jones v. Van Bochove*, 103 Mich. 98, 61 N.W. 342 (1894)).

*See generally*, "Deed to Railroad Company As Conveying Fee or Easement", 6 A.L.R. 3d 973.