IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DOROTHY L. BIERY, et al., | ) |
| and | ) |
| JERRAMY PANKRATZ and ERIN PANKRATZ, et al., | ) |
| Plaintiffs, | ) Case No. 07-693L |
| | ) (consolidated with: Case No. 07-675L) |
| v. | ) Honorable Nancy B. Firestone |
| THE UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

**DEFENDANT'S REPLY IN SUPPORT**
**OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

KRISTINE S. TARDIFF
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL:(603) 230-2583/FAX: (603) 225-1577
E-MAIL: kristine.tardiff@usdoj.gov

AYAKO SATO
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
TEL:(202) 305-0239/FAX: (202) 305-0506
E-MAIL: ayako.sato@usdoj.gov

Electronically filed on August 21, 2008

# TABLE OF CONTENTS


I. The Claim Accrual Question Is Properly Presented and Should Be Decided.................... 1

II. The Plaintiffs Do Not Have Any Ownership Interest in the Portions of the Subject Right-of-Way That the Railroad Acquired in Fee............................................................ 3

- A. Railroads Can Acquire Fee Title to Land by Voluntary Grant . ............................ 3
- B. Plaintiffs KAK Farms and the Chalfant Trust Do Not Have Any Ownership Interest in the Lands Conveyed to the Railroad by the 1899 Quitclaim Deed from Julia Ann Fair.......................................................................................... 6
- C. Plaintiff Dorothy Biery Does Not Have Any Ownership Interest in the Lands Conveyed to the Railroad by the 1899 Warranty Deed from Phillips Investment Company. ....................................................................................... 8
- D. Plaintiffs American Packaging Corporation and Collins Industries Have No Ownership Interest in the Lands Conveyed to the Railroad by Their Predecessors in Interest....................................................................................... 10

III. Plaintiffs Cannot Satisfy Their Burden of Proof on Title By Relying on Presumption Rather Than Available Title Evidence ......................................................................... 12

- A. Plaintiff Collins Industries Has Not Met Its Burden of Proving an Ownership Interest in the Right-of-Way Lands on the Alleged Date of Taking.................... 16

IV. Kansas Law Determines Whether Railbanking and/or Interim Trail Use Are Permissible Uses of the Easements in this Case. ........................................................... 17

- A. Plaintiffs' Contention That Railbanking and Interim Trail Use Are Not Permissible Uses Is Unsupported By Kansas Law............................................... 18
- B. Harvey and Humberg Support the Proposition that Railbanking Is a Permissible Use of the Rights-of-way Under Kansas Law. ................................. 20
- C. O'Leary Supports the Proposition That Interim Trail Use is a Permissible Use of the Rights-of-way. ........................................................................... 22

V. The Issue of Abandonment is Central in Establishing Whether the Easements Revert to the Servient Estate Holders........................................................................................ 23

- A. The Railroads' Actions Do Not Evince Abandonment of the Easement............. 24

B. Pratt v. Griese Does Not Support Plaintiffs' Claim that the Railroads Abandoned the Rights-of-Way. .......... 27

VI. Shifting Public Use Has Been Recognized in Other Courts and Kansas Law Allows for a Change in Use of the Railroads' Easements. .......... 28

# TABLE OF AUTHORITIES

## FEDERAL CASES

Barclay v. United States,
443 F.3d 1368 (Fed. Cir. 2006)........................................................................ 2

Caldwell v. United States,
391 F.3d 1226 (Fed. Cir. 2004) ...................................................................... 1, 2

Glosemeyer v. United States,
45 Fed. Cl. 771 (2000). ..................................................................................... 23

Preseault v. ICC,
494 U.S. 1 (1990)........................................................................................ 17, 19, 20

Preseault v. United States,
100 F.3d 1525 (Fed. Cir. 1996)........................................................................ 17

Sternberger v. United States,
401 F.2d 1012 (1968)........................................................................................ 19

Swisher v. United States,
176 F. Supp.2d 1100 (D. Kan. 2001). .............................................................. 18

Swisher vs. United States,
189 F.R.D. 638 (D. Kan. 1999)........................................................................18

Swisher vs. United States,
No. 98-1352-CM, 2003 WL 2006818 (D. Kan. Mar. 3, 2003)..................................... 18

Toews v. United States,
376 F.3d 1371 (Fed. Cir. 2004)........................................................................ 17

## STATE CASES

Abercrombie v. Simmons,
81 P. 208 (Kan. 1905). ................................................................................... 5, 22

Atchison, T. & S. F. Ry. Co. v. O'Leary,
100 P. 628 (Kan. 1909). ................................................................................... 22

Atchison, Topeka & Santa Fe Ry. Co., v. Humberg,
675 P.2d 375 (Kan. 1984). ............ 4, 20, 21, 22, 25

Barker v. Lashbrook,
279 P. 12 (Kan. 1929). ............ 13

Bowers v. Atchison, T. & S. F. Ry. Co.,
237 P. 913 (Kan. 1925). ............ 13, 14, 16

Danielson v. Woestemeyer,
293 P. 507 (Kan. 1930). ............ 5

Fed. Farm Mortg. Corp. v. Smith,
89 P.2d 838 (Kan. 1939). ............ 13

Gauger v. Kansas,
815 P.2d 501 (Kan. 1991). ............ 24

Harvest Queen Mill & Elevator Company v. Sanders,
370 P.2d 419 (Kan. 1962) ............ 6, 22

Harvey v. Missouri Pac. R. Co.,
207 P. 761 (Kan. 1922). ............ 4, 20, 21

Kansas Electric Power Company v. Walker,
51 P.2d 1002 (Kan. 1935). ............ 28

Martell v. Stewart,
628 P.2d 1069 (Kan. Ct. App. 1981). ............ 24-27

Matlack v. City of Wichita,
407 P.2d 510 (Kan. 1965). ............ 24, 25

Miller v. St. Louis, Southwestern Ry. Co.,
718 P.2d 610 (Kan. 1986). ............ 4, 21, 25, 27

Platt v. Woodland,
246 P. 1017 (Kan. 1926). ............ 6, 12

Pratt v. Griese,
409 P.2d 777 (Kan. 1966). ............ 25, 27, 28

Rieger v. Penn Central Corp.,
Case No. 85-CA-11, 1985 WL 7919 (Ohio App. 2 Dist. May 21, 1985). ............ 17

Renensland v. Ellenberger,
574 P.2d 217 (Kan. Ct. App. 1977). .................................................................... 16

Stone v. U.S.D. No. 222,
91 P.3d 1194 (Kan. 2004). ........................................................................... 4-6, 22

Williams Telecomms. Co. v. Gragg,
750 P.2d 398 (Kan. 1988). .................................................................................. 25

Winkel v. Kansas Dep't of Transp.,
131 P.3d 570,
No. 94,008, 2006 WL 903159 2 (Kan. Ct. App. Apr. 7, 2006). ....................................... 24

**FEDERAL STATUTES**

16 U.S.C. § 1247(d). ............................................................................................ 19, 20

Pub. L. 109-59, 119 Stat. 1144 (Aug. 10, 2005). ............................................................ 29

**STATE STATUTES**

Kan. Gen. Stat. 1868. ............................................................................................ 22

**REGULATIONS**

49 C.F.R. § 1152.29(e)(2). ..................................................................................... 24

## DEFENDANT'S INDEX OF SUPPLEMENTAL EXHIBITS

| Exhibit Number* | Description |
|---|---|
| 26 | Deed from Atchison, Topeka & Santa Fe Railroad Company to Thomas Fair, dated July 28, 1882, recorded in Book 3, Page 204 |
| 27 | Warranty Deed from the Phillips Investment Company to the Hutchinson and Southern Railway Company, dated August 4, 1899, recorded August 11, 1899 in Book 66, Page 192 |

* Defendant's Exhibits 1 through 25 are included in the appendix of exhibits filed on June 2, 2008.

Defendant United States submits this reply in support of its cross-motion for summary judgment (Doc. 31-2), and to Plaintiffs' summary judgment response brief (Doc. 47).

## I. The Claim Accrual Question Is Properly Presented and Should Be Decided

Plaintiffs' claims and their motions for summary judgment are premised on incorrect claim accrual dates. Nonetheless, Plaintiffs criticize Defendant for addressing the claim accrual issue, which they dismiss as "largely academic." Pls.' SJ Resp. at 14-16. Although Plaintiffs' takings claims are timely, the question of when those claims accrued is far from academic given that the claim accrual date – which is the date of the alleged taking – is critical to standing, the threshold question of whether each plaintiff owned the property alleged to have been taken on the date of taking, and the calculation of just compensation, if any. In addition, if the Pankratz Plaintiffs move for class certification, the proposed class must be defined by reference to the alleged date of taking, and the qualification of potential class members to opt-in to any class certified under RCFC 23 would turn, in part, on whether those individuals could establish ownership of property on the alleged date of taking. Defendant's cross-motion on this issue is thus proper.

**Biery.** Defendant has established that the takings claims alleged by the Biery Plaintiffs accrued on April 8, 2005. The Biery Plaintiffs agree this is the correct claim accrual date. Pls.' SJ Resp. at 14 n.58. The Court should therefore grant Defendant's motion on this issue.

**Pankratz.** The Pankratz Plaintiffs allege a permanent taking of their property as of September 13, 2004, the date of the first Notice of Interim Trail Use ("NITU") issued by the Surface Transportation Board ("STB") in that case. It is undisputed that this NITU expired by its own terms on March 13, 2005 and that the County was thereafter authorized to abandon the line. Def.'s Mem. at 12-13; Pls.' Resp. to Def. Fact Nos. 12-13 (Doc. 40). Accordingly, the

only takings claim that could be alleged based on the September 2004 NITU is a temporary one. See Caldwell v. United States, 391 F.3d 1226, 1234 (Fed. Cir. 2004) (when negotiations fail and the NITU converts into a notice of abandonment, "a temporary taking may have occurred"). Plaintiffs have not alleged such a claim in this case.

Approximately 2 ½ months after the first NITU expired, a new NITU was issued that authorized the County and BCED to negotiate a railbanking and interim trail use agreement, which they did. Def.'s Mem. at 13-15; Pls.' Resp. to Def. Fact No. 16 (Doc. 40). This second NITU thus gives rise to a potential permanent takings claim that accrued on June 2, 2005. Caldwell, 391 F.3d at 1234. Plaintiffs, however, continue to argue that their permanent takings claims accrued on September 13, 2004 when the first NITU was issued. In so doing, Plaintiffs ignore the gap in time between the expiration of the first NITU and the issuance of the second NITU, and fail to address Defendant's arguments explaining that this gap is legally significant and factually distinguishes this case from both Caldwell, *supra*, and Barclay v. United States, 443 F.3d 1368 (Fed. Cir. 2006). Def.'s Mem. at 12-16. Instead, Plaintiffs continue to assert, without any analysis whatsoever, that "the Federal Circuit has clearly unequivocally held in three Trails Act cases that there is a single Trails Act taking claim and that single claim accrues upon the STB's issuance of the original NITU." Pls.' SJ Resp. at 14-15. To the contrary, the determination in Barclay that the multiple NITUs issued by the STB "must be viewed as part of a single and continuous government action rather than as a new taking" was premised on the factual finding that there was "no gap between the original and replacement NITUs" at issue in that case. Barclay, 443 F.3d at 1375 (emphasis added). Thus, Barclay stands for the proposition that "any extensions or modifications of the original NITU [are] not separate potential takings." Id. at 1376. In contrast to the facts in Barclay, the first NITU issued in this case expired and

there was then a 2 ½-month gap between that expiration and the issuance of a new NITU. Accordingly, the second NITU in this case is not simply an extension or modification of an existing NITU; it is a new NITU and under the specific facts of this case, that new NITU gives rise to a new takings claim. For these reasons, the Court should rule that the permanent takings claims alleged by the Pankratz Plaintiffs accrued on June 2, 2005.

## II. The Plaintiffs Do Not Have Any Ownership Interest in the Portions of the Subject Right-of-Way That the Railroad Acquired in Fee

Plaintiffs bear the burden of proof on each element of their Fifth Amendment takings claims, including the threshold question of whether each Plaintiff had an ownership interest in the property they allege has been taken. Def.'s Mem. at 16 (citing cases). Plaintiffs have not met this burden with respect to several of the Plaintiffs. That failure is fatal to their claims and requires the entry of summary judgment in favor of Defendant.

### A. Railroads Can Acquire Fee Title to Land by Voluntary Grant

In their response brief, Plaintiffs assert that the Kansas Supreme Court has "uniformly held" that when a railroad acquires a strip of land and then uses that land for its tracks and ties, the company acquires "only an easement to use the land for railroad purposes, not a fee simple estate in the land itself." Pls.' SJ Resp. at 21. Plaintiffs further contend that this strict rule applies "no matter what language was used in the conveyance instrument – even when it was a general warranty deed otherwise purporting to convey a fee simple estate in the land." Id. at 23. In other words, the rule articulated by Plaintiffs ignores the actual intent of the parties to a conveyance instrument, as evidenced by the language used in that instrument.[1] This narrow

---

[1] However, Plaintiffs acknowledge elsewhere that "the intent and effect" of the deeds before the Court "is to be taken from the instrument as a whole and not from just extracted portions of the instrument." Pls.' Resp. to Def. Prop Facts Nos. 18-20, 23-24, 38-39 (Doc. 40).

interpretation of state law is contradicted by the decisions of the Kansas Supreme Court, including its recent decision in Stone v. U.S.D. No. 222, 91 P.3d 1194 (Kan. 2004).

In Stone, the Kansas Supreme Court examined and reconciled its prior decisions in several cases holding that a railroad had acquired fee title by a particular deed with its prior decisions in other cases holding that a railroad had acquired only an easement, and concluded that the difference in the outcome for these cases turned on whether it was clear from the language of the conveyance instrument that the railroad acquired fee title. The Stone court succinctly summarized the common theme running throughout the cases as follows:

> The general rule is that deeds purporting to convey to railroads a strip, piece, parcel, or tract of land which do not describe or refer to its use or purpose or directly or indirectly limit the estate conveyed are generally construed as passing an estate in fee.

Id., 91 P.3d at 1203-04 (internal citation omitted). Thus, contrary to Plaintiffs' arguments, the Stone court did not establish a hard and fast rule that a railroad acquires only an easement "no matter what language was used in the conveyance instrument[.]" Pls.' SJ Resp. at 23.

Plaintiffs also assert that the Stone court's holding turned on "whether the land involved was a 'strip of property' acquired for or used for a railroad right-of-way."[2] Id. To the contrary,

[2] Plaintiffs also appear to contend that a parcel of property acquired by voluntary grant for terminal, depot, or station facilities, which would presumably be larger than a "strip of property," are still only acquired as an easement. See Pls.' SJ Resp. at 25 n.86. To support this claim, Plaintiffs rely on Harvey, Humberg, and Miller. Plaintiffs reliance on these cases is misplaced. First, Harvey and Miller involved situations in which the railroads acquired the rights-of-way through condemnation, not by voluntary grant. Harvey v. Missouri Pac. R. Co., 207 P. 761 (Kan. 1922); Miller v. St. Louis, Southwestern Ry. Co., 718 P.2d 610 (Kan. 1986). Thus, Harvey and Miller shed no light on the issue of whether a railroad owns fee title to lands obtained by voluntary grant. With regard to Atchison, Topeka & Santa Fe Ry. Co., v. Humberg, 675 P.2d 375 (Kan. 1984), the court held that the railroad acquired only an easement because, upon inspection of the warranty deed at issue, the court determined that the deed restricted the railroad's use of the parcel for railroad purposes, namely for use as station grounds. Humberg, 675 P.2d at 378. Thus, Humberg does not support the blanket proposition that a railroad's

the court's focus was on the language contained in the deed as a whole, not just the size or shape of the parcel described therein. In reconciling its prior decisions, the Stone court specifically noted that the size of the parcel alone is not determinative of the outcome:

> In Abercrombie, Harvest Queen, and Humberg, all of the deeds referred to the land being used as a right-of-way or for some other railroad purpose and all of the cases found that the land had been conveyed as an easement. In contrast, Danielson, Nott, and Schoenberger, all found that property which was conveyed by deed that did not limit the use of the land to right-of-way purposes had been conveyed in fee simple. This was true despite the fact that the land in Nott and Danielson was used for railroad purposes, and the land in Danielson and Schoenberger was, in both cases, small in size.

Stone, 91 P.3d at 1204. The Stone court's discussion on this point is consistent with prior Kansas cases, such as Danielson v. Woestemeyer, 293 P. 507 (Kan. 1930), which involved two 100-foot wide strips of property. The court found that the deed to the southern 100-foot strip conveyed only an easement to the railroad because the deed limited the railroad's use of that parcel to a right-of-way, but found that the deed for the northern 100-foot strip conveyed fee title because the deed lacked the same kind of limiting language. 293 P. at 511. Although both parcels are "strips of property" under Plaintiffs' narrow interpretation, the court's decision turned on an interpretation of the deed as a whole, not just the size and shape of the parcel conveyed.

In sum, Kansas case law supports the position that a railroad can acquire fee title to lands, even lands that it uses for its tracks and ties, so long as the conveyance instrument does not expressly limit the railroad's use of land to a particular purpose or contain a reversionary clause that serves to limit the estate granted to the railroad. The Kansas cases relied upon by

---

acquisition of property by voluntary grant only confers an easement.

Plaintiffs are distinguishable based on the specific language used in the conveyance instruments interpreted in those decisions. In Abercrombie v. Simmons, the court simply explained that when a deed to a railroad contains express or implied restrictions on the railroad's use of the property, such deeds will be interpreted as conveying only an easement. 81 P. 208, 210 (Kan. 1905). Nor does Harvest Queen Mill & Elevator Company v. Sanders help Plaintiffs in their argument because, as in Abercrombie, the court's ruling turned on the specific language of the deed before the court. 370 P.2d 419, 423 (Kan. 1962) ("[The] deed and those things to which we may look in its interpretation plainly show that the strips were sold by the grantor and purchased by the grantee railway company as and for a right-of-way for a railroad.") (emphasis added).

Defendant has identified several segments of the right-of-way that the railroad acquired full fee title to through several quitclaim and warranty deeds. Def.'s Mem. at 22-24. Plaintiffs contend that these deeds conveyed only an easement. Pls.' SJ Resp. at 22. Under Kansas law, the interpretation and legal effect of written instruments, such as the deeds at issue in this case, is a question of law. Stone v. U.S.D. No. 222, 91 P.3d 1194, 1203 (Kan. 2004). Accordingly, the interpretation of the subject deeds can be resolved by the Court at summary judgment.

### B. Plaintiffs KAK Farms and the Chalfant Trust Do Not Have Any Ownership Interest in the Lands Conveyed to the Railroad by the 1899 Quitclaim Deed from Julia Ann Fair

The parties agree that in 1899 the railroad condemned an easement for its right-of-way across Section 35 from Thomas Fair for $645.70 for the land plus $30 for damages. Pls.' Resp. to Def.'s Prop. Fact No. 49 (Doc. 40, pp. 24-25 of 32). The parties also agree that 10 years later, Julia Ann Fair, the widow of Thomas Fair, conveyed by quitclaim deed to the railroad the same strip of land that was the subject of the earlier condemnation. Def.'s Mem. at 23; Pls.' SJ Resp. at 28. Under Kansas law a quitclaim deed "'will convey to the grantee all the rights, interests,

title and estate of the grantor in and to the land, unless otherwise specified by the deed itself.'" Platt v. Woodland, 246 P. 1017, 1019 (Kan. 1926) (citation omitted). Consistent with this general principle, the quitclaim deed from Julia Ann Fair expressly and unambiguously conveyed "all of the estate, title and interest of the party of the first part [Fair] therein." Def. Ex. 22-4 (Doc. 31-8, pp. 1-2). The parties agree that this 1899 deed contained no use restrictions or other limitations on the interest conveyed, and that the railroad paid Julia Ann Fair an additional $3,500, or approximately $296 per acre, for the interest conveyed by this deed. See Pls.' Resp. to Def.'s Proposed Fact No. 50 (Doc. 40, pp. 25-26).

Plaintiffs' contention that Julia Ann Fair conveyed only an easement by this quitclaim deed is contradicted by the plain and unambiguous language of the deed, the absence of any use restrictions or other limitations in the deed, and the substantial consideration paid by the railroad for Fair's interest in the strip of land conveyed by the deed. The fact that the physical location of the land conveyed by this quitclaim deed is described by reference to the existing railroad is not surprising, nor does it serve as a limitation on the interest otherwise conveyed. Plaintiffs also speculate, without any supporting legal citations, that the quitclaim deed was simply a corrective measure "to resolve any ambiguity created by [Julia Ann's] omission from the Condemnation Decree." Pls.' SJ Resp. at 28. Plaintiffs' argument assumes that Julia Ann Fair was an owner of lands within Section 35 at the time of the condemnation. To the contrary, the deed by which Thomas Fair acquired his title to Section 35 shows that he was the sole grantee. Def. Ex. 26. This is consistent with the latter quitclaim deed from Julia Ann Fair to the railroad, which identifies her as the "widow of Thomas Fair," suggesting that she inherited the lands within Section 35 when her husband died. Def. Ex. 22-4. More importantly, if the quitclaim deed had been merely a corrective measure, there would have been no need for the railroad to pay an

additional $3,500 in consideration to Julia Ann Fair, which is more than five times the amount paid to Thomas Fair to condemn an easement across the same property ten years earlier.

In sum, the plain and unambiguous language of the 1899 quitclaim deed from Julia Ann Fair to the railroad supports but one conclusion: that Fair intended to and did convey all of her "estate, title and interest" in the strip of land described in that deed to the railroad, and thus had no remaining interest in those lands to convey to her successors-in-interest, including Plaintiffs KAK Farms and the Julia R. Chalfant Trust. Accordingly, summary judgment must be entered in favor of Defendant as to the claims of those Plaintiffs.

### C. Plaintiff Dorothy Biery Does Not Have Any Ownership Interest in the Lands Conveyed to the Railroad by the 1899 Warranty Deed from Phillips Investment Company

**The Arnold Deed.** Plaintiffs erroneously state that Dorothy Biery is a successor in interest to Rose Arnold. Pls.' Prop. Facts ¶ 21 (Doc. 42, p. 6). Biery owns a 2-acre parcel of property located in the Northwest 1/4 of Section 23 in Township 23 South, Range 6 West, in Reno County. Pls.' Prop. Facts, Tab D (Doc. 24). The deed to Rose Arnold conveys an 80-acre parcel described as the North ½ of the Northwest 1/4 of Section 11 in Township 22 Range 7 West of Reno County. Def. Ex. 22-2. Accordingly, Plaintiffs' interpretation of the Arnold deed has no bearing on the claim of Dorothy Biery, or any of the other Plaintiffs in this case.

**The Phillips Deed.** The parties agree that the right-of-way abutting the property owned by Biery was first acquired by the railroad by condemnation in 1899, and that another portion was acquired by a warranty deed dated August 11, 1899 from the Phillips Investment Company. Pls.' Resp. to Def.'s Prop. Fact No. 42 (Doc. 40, pp. 21-22). Defendant was previously unable to find a copy of this warranty deed. Def. Ex. 22 (Straup Decl., ¶ 6, Doc. 31-7, pp. 3-4). Plaintiffs also did not include a copy of the Phillips deed in their submissions, but nonetheless assert that

the Phillips deed "conveyed only an easement to the railroad." Pls.' Resp. to Def.'s Prop. Fact No. 42. Defendant has since located a copy of the Phillips deed and a review of this deed shows that the Phillips conveyed fee title to the railroad to the lands described therein.[3]

The Phillips deed is a warranty deed that coveys the following "Real Estate":

> "All of that part of the East half of the North West Quarter of Section Twenty three (23) . . . , lying South of the South line of Tenth Avenue extended and East of a line thirty-five (35) feet west and parallel to the center of the track of the Hutchinson and Southern Railway Company, containing 1 16/100 acres, more or less, and being the tract on which condemnation proceedings were filed on July 25th 1899.
>
> Also, Lots one hundred and sixty eight (168) and one hundred and seventy (170) Sixth Avenue west in Blanchard's Second Addition [in] the City of Hutchinson.

Def. Ex. 27. The stated consideration for this property was $117. There are no restrictions or limitations on use of the property stated in the deed. The deed grants the "real estate" described in the deed, rather than simply a right of way across that real estate. In addition, the grantor did not retain any reversionary interest in the lands conveyed. Under applicable Kansas law discussed in Defendant's opening memorandum, the Phillips deed clearly and unambiguously conveyed fee title to the railroad to the lands described therein. Accordingly, the Phillips Company had no remaining interest in these lands to convey to its successors in interest, including Dorothy Biery. See Pls.' Tab 10 (Biery Title Abstract) (Doc. 42-6, pp. 1-2).[4] It

---

[3]The listing of conveyance instruments on the ICC Valuation Schedule incorrectly identified the Phillips deed as having been recorded in Book 55 at page 192. See Def. Ex. 22 (Straup Decl. ¶ 7) and Def. Ex. 22-8 (Val Schedule, entry for Parcel No. 17). The same Phillips deed was also identified on this list as recorded in Book 66 at page 192. Def. Ex. 22-8 (Val. Schedule, entry for Parcel No. 11). The deed found at Book 66, page 192, is the Phillips deed.

[4]Although Plaintiffs have not produced the deeds summarized in the abstract of title produced for Dorothy Biery, the description of the deeds in that abstract does not reveal that Phillips Investment Company conveyed any interest to Biery's predecessors in the property it conveyed

follows that Dorothy Biery has no ownership interest in the portion of the subject right-of-way and the additional lands that were conveyed to the railroad by the 1899 Phillips deed, and summary judgment should be granted in favor of the United States as to that portion of her claim.[5]

### D. Plaintiffs American Packaging Corporation and Collins Industries Have No Ownership Interest in the Lands Conveyed to the Railroad by Their Predecessors in Interest

The parties agree that the segments of right-of-way that abut the property in Section 23 presently owned by Plaintiffs American Packaging Corporation ("APC") and Collins Industries were acquired by the railroad by condemnation in 1899, and by several quitclaim deeds executed in 1896 and 1901.[6] Pls.' Resp. to Def. Prop. Fact No. 60 (Doc. 40, p. 30); Pls.' Tab 15-16 (APC and Collins chains of title) (Doc. 42-8, p. 3; Doc. 42-9, p. 1). The parties agree that the railroad acquired only an easement by condemnation, but dispute the proper interpretation of the additional quitclaim deeds. Plaintiffs erroneously contend that these quitclaim deeds conveyed only an easement to the railroad. Pls.' SJ Resp. at 29-30. A closer look at the chain of title and the deeds in question demonstrates that the railroad acquired fee title to these lands.

---

to the railroad in 1899. To the contrary, the deed from Phillips to the railroad is not listed in Biery's chain of title. See Pls.' Tab 10 (Doc. 42-6, pp. 1-2).

[5]Defendant has been unable to determine based on the record before the Court whether the Phillips conveyance affects all of Dorothy Biery's claim. It is possible that Biery abuts only property that the railroad owned in fee, which would preclude her from bringing a takings claim in this case. A further survey may be necessary to resolve this factual issue.

[6]As discussed in Section III.A, *infra*, Collins Industries did not own the land abutting the subject right-of-way on the alleged date of taking. Accordingly, even if the right-of-way at this location had been acquired as an easement, Collins Industries cannot establish an ownership interest in the lands subject to that right-of-way as of the alleged date of taking.

On September 2, 1896, Ella L. Rowland quitclaimed several lots located within Blanchard's Third Addition to the City of South Hutchinson to the railroad. Def. Ex. 22-6. Plaintiffs contend that this deed conveys "only a right of way easement." Pls.' SJ Resp. at 29. However, the deed does not convey a right of way, or even a strip of land to be used as a right of way; it conveys a series of lots described by reference to a subdivision plat.

Moreover, the record reveals that Ella L. Rowland may not have been the sole owner of the property she quitclaimed to the railroad. Specifically, on October 27, 1896, the Irrigation Loan & Trust Company ("Irrigation Company") acquired fee title to 80 acres described as the West ½ of the Southeast 1/4 of Section 23 by a quitclaim deed from S.G. Bailey and his wife. Pls.' Tab 15 (Doc. 42-8, pp. 3 and 8). On January 25, 1900, the Irrigation Company and several other grantees, including Ella Rowland, conveyed all of this 80 acre parcel "except 66 feet off the West side of said West half, which is expressly reserved <u>and not conveyed</u>" to H. Edwards Rowland. Pls.' Tab 15 (Doc. 42-8, p. 10) (emphasis added). Then, on March 22, 1901, the Irrigation Company conveyed the west 66 feet of this 80 acre parcel (i.e., the land that was "not conveyed" to H. Edwards Rowland) to the railroad by a quitclaim deed for $144. Def. Ex. 22-5; Pls.' Tab 15 (Doc. 42-8, pp. 3 and 9). There are no use restrictions or limitations in this deed, nor did the Irrigation Company retain any reversionary interest in the lands conveyed. Thus, contrary to Plaintiffs' assertion, this quitclaim deed conveyed fee title to the 66-foot wide parcel of land described therein.

The next relevant conveyance in the chain of title is a quitclaim deed dated October 8, 1901, from the Irrigation Company to the railroad. Def. Ex. 22-7 (Doc. 31-8, p. 8). For stated consideration of $65, this deed conveyed the Irrigation Company's interest in the same lots that were previously identified in the 1896 quitclaim deed from Ella L. Rowland to the railroad.

Compare Def. Ex. 22-6 with Def. Ex. 22-7. Plaintiffs contend that these lots were conveyed for right of way purposes only, Pls.' SJ Resp. at 29-30, but there is no such limiting language or use restrictions in the deed. Instead, under Kansas law, this quitclaim deed operated to convey all of the Irrigation Company's rights, interest and title to the lots conveyed. Platt, 246 P. at 1019.

The maps prepared by Defendant show that the right-of-way condemned in 1899 overlaps with the separately conveyed lots of lands. See Def. Ex. 22; Def. Ex. 22-14 (APC map); Def. Ex. 22-15 (Collins Industries map). In addition, the legal descriptions in the deeds described above indicate that the 66-foot wide parcel conveyed to the railroad in fee on March 22, 1901, also overlaps these properties. Because the railroad acquired fee title to the 66-foot wide strip of land conveyed by the quitclaim deed of March 22, 1901, as well as to the separately described lots identified in the quitclaim deed of October 8, 1901, the Irrigation Company had no remaining interest to convey to its successors in interest for the abutting lands, here APC and Collins Industries. Accordingly, Plaintiffs APC and Collins Industries have no ownership interest in the strip of land and the overlapping lots described above that fall within or overlap with the railroad right-of-way and abut their property in Section 23. For that reason, the Plaintiffs have not and cannot establish an ownership interest in the subject right-of-way and summary judgment must be granted in favor of Defendant.

## III. Plaintiffs Cannot Satisfy Their Burden of Proof on Title By Relying on Presumption Rather Than Available Title Evidence

With the exceptions noted above, most of the Plaintiffs have established that they owned property abutting the subject right-of-way on the alleged date of taking. However, as Defendant previously explained, proof that these Plaintiffs owned land abutting the subject right-of-way is insufficient to meet their burden of proving that they owned some or all of the lands within that

right-of-way. See Def.'s Mem. at 24-32. In their response brief, Plaintiffs clarify that, with the exception of the Mar Trust, they are only claiming ownership of the right-of-way that abuts their property to the centerline. Pls.' SJ Resp. at 10-12, 19. Plaintiffs further assert that their burden of proving ownership of the lands within the abutting right-of-way is met because of a legal presumption used to aid deed interpretation under Kansas law.[7] Id. at 17-19.

The presumption relied upon by Plaintiffs arises from several different rules of deed construction. The first rule is that when the "'owner conveys a tract of land abutting on a railroad right of way tract, *in which such grantor owns the servient estate* and the railroad the dominant estate for right of way purposes, his conveyance passes to his grantee such servient estate, unless the intention not to do so be clearly indicated.'" Barker v. Lashbrook, 279 P. 12, 14 (Kan. 1929) (citation omitted). In addition, because "[t]he ultimate title to land subjected to railway purposes does not cease to be in the owner of the adjacent freehold *from which it was derived*, . . . the termination of its use for railway purposes has no effect upon the fee title. It merely relieves the underlying fee of the dominant estate . . . ." Fed. Farm Mortg. Corp. v. Smith, 89 P.2d 838, 841 (Kan. 1939) (emphasis added). The converse of this rule is that a grantor cannot convey that which he does not own. Accordingly, if a right of way "was wholly upon the land of one, the deed of the other could not convey any part of the soil beneath the way . . . ." Bowers v. Atchison, T. & S. F. Ry. Co., 237 P. 913, 914 (Kan. 1925). It follows that

---

[7]Plaintiffs' criticism of Defendant for not rebutting this presumption (Pls.' SJ Resp. at 11, 19) is misplaced given that Plaintiffs did not invoke this presumption in their motions and supporting memoranda. See Biery Pls.' SJ Mem. at 2, 5-6 (Doc. 23). Defendant acknowledged the existence of the presumption in its opening memorandum at 27 n.18, but noted that the evidence submitted by Plaintiffs was insufficient to invoke the presumption in this case.

when an easement is extinguished, an abutting landowner who never owned any portion of the servient estate does not gain title to those lands simply because he is an abutter.

Related to these rules is the following presumption or inference that has been applied by Kansas courts to aid in the construction of deeds in the context of title disputes:

> When ways commenced to mark boundaries between holdings, the presumption was that a way forming a boundary had originally been established equally on the land of each proprietor, and consequently that each had the fee usque ad medium filum viae. The presumption was rebuttable, however, by proof that the way was wholly or chiefly on the land of one.

Bowers, 237 P. at 914. Here, Plaintiffs seek to prove that they own lands within the right-of-way (to the centerline) by establishing that they own land that abuts the right-of-way and then relying on this presumption. Plaintiffs' invocation of this presumption is defective for several reasons.

To begin with, the rules of deed construction articulated above have been applied by the courts to resolve title disputes between a grantor or a grantee, as was the case in Barker v. Lashbrook, *supra*, or between abutting landowners on either side of a right-of-way, as was the case in Bowers v. Atchinson, *supra.* For example, in Bowers, a 40-foot highway was established in 1897 across land owned by Eben Baldwin. 237 P. at 913. Baldwin subsequently conveyed the land he owned on the north side of the highway to a railroad company that owned a right-of-way located parallel to the highway. Id. When the highway was vacated, a title dispute over the highway lands arose between Baldwin's successors on the south side of the highway and the railroad company, as Baldwin's successor on the north side. The court applied the center line presumption to aid in its interpretation of Baldwin's deed to the railroad and held that because the deed did not express any intention to exclude half of the highway from the grant to the railroad, the railroad's ownership extended to the center line of the highway. Id. at 914-18.

The center line presumption cannot be applied in the same manner in this case because the Plaintiffs only own land on one side of the subject right-of-way and, with one exception, the owner of the lands abutting the right-of-way on the other side are not parties to the litigation.[8] Defendant is not an abutting landowner. In addition, Defendant does not claim any ownership interest in the segments of the rights-of-way at issue in this case, and does not stand in the shoes of the abutting landowners who are not parties to this litigation. It would be patently unfair to those non-party landowners for the Court to allow Plaintiffs to meet their burden of proof on title by invoking the center line presumption in a manner that is potentially adverse to the interests these non-parties.

Moreover, Plaintiffs' attempted application of the center line presumption is inconsistent with the established rule of Kansas law providing that when an easement is extinguished, the lands return to the owner of the servient estate. Although Plaintiffs acknowledge this rule, Pls.' SJ Resp. at 18, they have not established that they are the owners of the servient estate subject to the railroad right-of-way except by reliance on the presumption. Plaintiffs can make this showing by reference to the deeds in their chains-of-title by which the lands on either side of the subject right-of-way were first subdivided and conveyed to different parties, as was done by the parties in the Bowers case, discussed above. The center line presumption should not be applied

---

[8] Plaintiffs Gordon Holloway and the Stacy Judy Trust own land on opposite sides of the subject right-of-way. Def.'s Mem. at 28 n.19. We noted that the question of which Plaintiff owns the servient estate subject to the railroad's easement at this location could be resolved if the Plaintiffs were each willing to stipulate that their respective ownership interest extends only to the center line. Plaintiffs' most recent submission includes such stipulations from both Holloway and the Stacy Judy Trust. Pls.' Prop. Facts at 10, ¶ 41 and ¶ 43 (Doc. 42).

in a manner that conflicts with the other rules of deed construction articulated above, particularly when doing so enlarges Plaintiffs' ownership interest to the potential detriment of non-parties.[9]

For these reasons, the Court should find that, with the exception of the Mar Trust, Holloway and the Stacy Judy Trust, Plaintiffs have not met their burden of proving that they own the lands within the right-of-way that they allege to have been taken from them.[10]

### A. Plaintiff Collins Industries Has Not Met Its Burden of Proving an Ownership Interest in the Right-of-Way Lands on the Alleged Date of Taking

Plaintiffs' allegation that Collins Industries owned fee title to property that abuts and underlies the subject right-of-way as of the alleged date of taking (April 8, 2004) is clearly contradicted by the record. Def.'s Mem. at 29. Indeed, Plaintiffs now admit that Collins Industries conveyed its property to the City of South Hutchinson on July 1, 1984, and that the property was not conveyed back until October 31, 2006. Pls.' Prop. Fact No. 51 (Doc. 42).

Despite these undisputed facts, Plaintiffs contend that Collins Industries "maintained all of the indicia of ownership" by paying taxes on the subject property. Pls.' SJ Resp. at 7 n.35. Plaintiffs offer no explanation as to why Collins Industries was paying taxes on land that it did not own, nor do they cite any law to support their contention that such is the legal equivalent of ownership. Defendant's review of Kansas state law on this point reveals that Plaintiffs' payment

---

[9] Plaintiffs explain in their response submissions that they have only produced "those Plaintiffs' Chains of Title that are in dispute." Pls.' Prop. Facts at 6 n.1 (Doc. 42, p. 6). Defendant disputed Plaintiffs' claim that they own the lands within the right-of-way for all of the Plaintiffs except for the Mar Trust. It is Plaintiffs' burden to establish their ownership of the lands within the right-of-way, even if they are only claiming ownership to the center line. They have only met that burden in their response brief as to Holloway and the Stacy Judy Trust. Their failure to do so as to the remaining Plaintiffs is a failure of proof as to a required element of their takings claim.

[10] Plaintiffs' submission of tax records for the other Plaintiffs likewise fails to establish ownership of anything other than a parcel of land that abuts the subject right-of-way.

of taxes might help support a claim of title by adverse possession under Kansas law. Renensland v. Ellenberger, 574 P.2d 217, 222 (Kan. Ct. App. 1977). However, Collins Industries has made no such claim in this case, nor could it as against its grantee, the City, because under Kansas law, "it is deemed that the possession of the grantor is held in subserviency to the grantee, and that [the grantor] does not intend to deny the title he has conveyed . . . ." Bowers, 237 P. at 917 (citation omitted). Accordingly, the factual record conclusively establishes that Collins Industries did not own property abutting the subject right-of-way on the alleged date of taking. Summary judgment must therefore be entered in favor of Defendant as to this claim.

## IV. Kansas Law Determines Whether Railbanking and/or Interim Trail Use Are Permissible Uses of the Easements in this Case

Where the railroad acquired only an easement, and the Plaintiffs have met their burden of proving that they own the servient estate subject to some or all of that easement, the question of liability then turns on whether the uses of the easements authorized by the Trails Act – railbanking and interim trail use – are permissible uses under Kansas state law. See Preseault v. ICC, 494 U.S. 1, 8 (1990) ("State law generally governs the disposition of reversionary interests . . . "); Preseault v. United States, 100 F.3d 1525, 1552 (Fed. Cir. 1996) ("if the terms of the easement when first granted are broad enough under then-existing state law to encompass trail use, the servient estate holder would not be in a position to complain about [that use]"). Plaintiffs concede that Kansas state law controls, but continue to rely heavily on decisions that involved the interpretation of specific deeds under the law of different states. See Pls.' SJ Resp. at 33-35. Those decisions do not control the outcome here.[11] Instead, as set forth in Defendant's

[11] Plaintiffs' assertion that "every court" has"consistently and repeatedly rejected" the argument that railbanking and/or interim trail use are permissible uses of railroad easements is misleading and incorrect. Pls.' SJ Resp. at 34. As noted above, the court decisions that Plaintiffs rely on

opening memorandum and below, under Kansas law, railbanking and interim trail use do not exceed the scope of the easements at issue in this case.

### A. Plaintiffs' Contention That Railbanking and Interim Trail Use Are Not Permissible Uses Is Unsupported By Kansas Law

Plaintiffs erroneously contend that the government's liability arguments are contrary to Kansas law. In support of this argument, Plaintiffs cite Swisher v. United States, 176 F. Supp.2d 1100 (D. Kan. 2001), and incorrectly state that the court "found that the landowners' reversionary interest in their land under Kansas law had been taken and that they were 'entitled to just compensation under the Fifth Amendment.'" Pls.' SJ Resp. at 32 (Doc. 47) (quoting Swisher, 176 F. Supp. 2d at 1102). After the Swisher court denied the plaintiffs' motion for certification of a nationwide class, Swisher, 189 F.R.D. 638 (D. Kan. 1999), the case proceeded with respect to the plaintiffs' single claim, which was settled for $10,000. See Swisher, No. 98-1352-CM, 2003 WL 2006818, *1 (D. Kan. Mar. 3, 2003). In the decision relied upon by Plaintiffs, the Swisher court had incorrectly decided the plaintiffs' motion for summary judgment on liability. The United States moved to amend that decision, noting that "at no time has Defendant had the opportunity to file a response on the liability issue," and further stating that "Defendant has not conceded on the issue of liability or failed to oppose any pending motion

---

involve the interpretation of specific deeds under the laws of other states. In addition, the court decisions have been mixed on this issue precisely because the laws of each state, as they apply to the specific conveyance instrument in question, differ. Compare Toews v. United States, 376 F.3d 1371, 1380 (Fed. Cir. 2004) (noting that the easements created by the grant under Vermont law in Preseault "were not broad enough to encompass a recreational trail") with Rieger v. Penn Central Corp., Case No. 85-CA-11, 1985 WL 7919, * at 5 (Ohio App. 2 Dist. May 21, 1985) ("Following a thorough review of the rationale underlying these cases and based upon Ohio statutory authority, we hold that conveyance of a railroad right-of-way to the State of Ohio for use as a recreation trail does not constitute an abandonment of the right-of-way for public travel.") (emphasis added). See also Def.'s Mem. at 32-35.

on liability. Liability was not on August 21, 2001, and has never been, pending before this Court." Swisher, 201 F. Supp.2d 1131, 1133 (D. Kan. 2001). In a subsequent published opinion that Plaintiffs do not cite, the court amended its earlier decision "[f]or the reasons stated in" the government's motion to amend and supporting memorandum. Id. at 1132. The court's amendments removed all of the language related to summary judgment and the question of liability, including the language Plaintiffs quote and rely upon on page 35 of their response brief. Id. Accordingly, Plaintiffs' representation that the Swisher court found the United States liable for a taking in that case is legally incorrect. The court's rulings in that case lack any discussion on the scope of the railroad's property interest as defined by Kansas law. Moreover, it is well established that offers of payment to settle a case are not admissions of liability. See, e.g., Sternberger v. United States, 185 401 F.2d 1012, 1018 (1968) ("An offer in settlement is ordinarily not admissible, for it is deemed to be an indication only of a desire for peace and not an admission."). Thus, Plaintiffs' reliance on Swisher sheds no light on the question of liability under the specific facts of this case.

Plaintiffs' reliance on dictionary definitions in an attempt to show that railbanking and interim trail use are not permissible uses of a railroad easement also misses the mark. Pls.' SJ Resp. at 35-37. The correct inquiry is whether, under Kansas state law, railbanking or interim trail use exceed the scope of the specific easements acquired by the railroad either by condemnation or deed. This can only be determined, not by looking at dictionary terms, but through an analysis of the specific conveyance instruments under applicable Kansas state law.

Finally, Plaintiffs point to the legislative history of the Trails Act provision at issue and contend that 16 U.S.C. § 1247(d) was enacted "because Congress understood that 'railbanking' and recreational trail use were not a 'railroad purpose' under state law." Pls.' SJ Resp. at 38.

Plaintiffs imply that this legislation was drafted because railbanking and interim trail use were not recognized under any state law, and then make a complete leap in logic by concluding that the enactment of this section is proof that not a single state recognizes railbanking or recreational trail use. Id. at 38-42. This circular argument is defeated by the fact when the Supreme Court reviewed the legislative history of this statute, it expressly noted that railbanking and interim trail use would not always result in a taking. See Preseault v. ICC, 494 U.S. at 16 ("under any view of takings law, only some rail-to-trail conversions will amount to takings [because some rights-of-way] are held as easements that do not even as a matter of state law revert upon interim use as nature trails"); id. at 16 n.9 (noting that some state courts have held that trail use of railroad easements "does not constitute abandonment of a right-of-way for public travel so as to trigger reversionary rights.") See also Def.'s Mem. at 32-34. Moreover, railroads have always had the right to retain and hold their rights-of-way for future active rail use under both federal regulatory law and Kansas state property law. Under federal law, even before the enactment of Section 1247(d), railroads could apply for a discontinuance, which would allow it "to cease operating for an indefinite period while preserving the rail corridor for possible reactivation of service in the future." Preseault v. ICC, 494 U.S. at 6 n.3. Likewise, under Kansas law, a railroad does not lose its easements during a period of non-use. See Section IV.B., *infra*. None of the above points raised by Plaintiffs are germane to the central question at hand – are railbanking and interim trail use permissible uses of the easements in this case under Kansas state law? As discussed below, under Kansas law, railbanking and interim trail use do not exceed the scope of the easements acquired by the railroad in this case.

**B. Harvey and Humberg Support the Proposition that Railbanking Is a Permissible Use of the Rights-of-way Under Kansas Law**

Kansas case law fully supports the proposition that railbanking is a permissible use of the railroads' rights-of-way. Cases such as Harvey v. Missouri Pacific Railway Company, 207 P. 761 (Kan. 1922), and Atchison, Topka & Santa Fe Railway Company v. Humberg, 675 P.2d 375 (Kan. 1984), recognize that when a railroad company leaves an easement in non-use, the easement is not extinguished because the railroads can reserve the right to retain the easement for future railroad use. Harvey, 207 P. at 763 ("[I]t seems more logical to hold that rights acquired under [condemnation proceedings] are not lost through lapse of time and nonuse, so long as the railway has a potential need of them."); Humberg, 675 P.2d at 379 (holding that the railroad's nonuse of easements acquired and "held as possible railroad expansion areas in the future" for more than thirty years did not constitute an abandonment).

Plaintiffs try to distinguish these cases by highlighting that the fee owners were making adverse possession claims against the railroad. Pls.' SJ Resp. at 45. However, the legal theory underlying the plaintiffs' claims is of no consequence because the Kansas Supreme Court, in both cases, discussed whether the preservation of the right-of-way for future rail use was itself a permissible use of the right-of-way. Harvey, 207 P.2d at 762; Humberg, 675 P.2d at 379. The same conclusion was reached in Miller v. St. Louis Southwestern Ry Co., 718 P.2d 610, 613 (Kan. 1986), a case in which the plaintiffs alleged both adverse possession and abandonment claims based on the railroad's non-use of a tract of land for over a decade. The Miller court found that the railroad lacked the intent to abandon the property, in part, because the railroad made an attempt to use the property after it was left dormant for over a decade. Id. at 613. In

other words, there is no abandonment when the railroad retains its right over the easement for future use.

Plaintiffs also try to distinguish this case from Harvey and Humberg by claiming that in these cases, the easements were used for "ancillary" railroad purposes and did not involve a "railroad actively using a right of way easement for the operation of a railroad." Pls.' SJ Resp. at 44. Plaintiffs seem to imply that "active" operation of a railroad is limited to the running of trains across the land. However, Kansas law does not make a distinction between "ancillary" and "non-ancillary" railroad uses.[12]

### C. O'Leary Supports the Proposition That Interim Trail Use is a Permissible Use of the Rights-of-way

The case of Atchison, T. & S. F. Ry. Co. v. O'Leary, 100 P. 628 (Kan. 1909), supports the proposition that when a railroad easement is in non-use, another public use, such as a recreational trail, can be made of the easement so long as it does not interfere or obstruct rail use. In O'Leary, the court found that paving a road within a railroad right-of-way did not interfere with the railroad's continued right to use that same strip for "railroad purposes." Id. at 629. Likewise, in this case, trail use will in no way impact the use of the rights-of-way for active rail use because rail service can be reinstituted at any time. In fact, establishment of an interim trail actually helps to preserve the railroad corridor for future possible railroad use.

[12] The Kansas statutes confer to the railroads "the right to occupy the land so embraced within such route, for the purposes necessary to the construction and use of its road; and to such portions of such road over which a railroad shall be actually constructed . . . ." Kan. Gen. Stat. 1868, ch. 23, § 81 (emphasis added). Nor do the Kansas courts recognize such a distinction. See Stone, 91 P.3d at 1204 (Kan. 2004) (finding that the railroad easements were extinguished "[i]n Abercrombie, Harvest Queen, and Humberg, [because] all of the deeds referred to the land being used as a right-of-way or for some other railroad purpose, and all of the cases found that the land had been conveyed as an easement.") (emphasis added).

Plaintiffs assert that "O'Leary does not hold that recreational 'trail use falls within the scope of easements.'" Pls.' SJ Resp. at 47. Yet, Plaintiffs provide no basis for this conclusory statement.[13] Rather than address the holding in O'Leary, Plaintiffs again rely on case law outside of Kansas. Plaintiffs allege that the railroads abandoned the rights-of-way because the railroads conveyed the easements for a hiking trail, and thus, the easements were abandoned. Pls.' SJ Resp. at 48. As discussed more fully in Section V, *infra*, Plaintiffs argument fails because the railroads lacked the intent to abandon and did not take the necessary affirmative actions that would indicate that they have unequivocally abandoned the rights-of-way.

Plaintiffs present no viable argument that O'Leary is inapplicable to the present situation. Thus, Plaintiffs fail to demonstrate that interim trail use is an impermissible railroad purpose. As such, Defendant's motion for summary judgment on this point should be granted.

## V. The Issue of Abandonment is Central in Establishing Whether the Easements Revert to the Servient Estate Holders

It is curious that Plaintiffs now contend that "it is not necessary to establish a railroad right of way was abandoned," Pls.' SJ Resp. at 48, when they stated unequivocally in their initial brief that "there is no question that the railroad has abandoned the right-of-way easement," Biery Pls.' SJ Mem. at 24; Pankratz Pls.' SJ Mem. at 25. The Court of Federal Claims has explained the relevance of the abandonment issue as follows:

---

[13] Plaintiffs seem to raise two points, for which Plaintiffs fall short in explaining their relevance: (1) the right-of-way in O'Leary was established through an Act of Congress; and (2) a paved street was not considered a "railroad purpose" in O'Leary. Pls.' SJ Resp. at 47. First, the way in which a right-of-way is acquired by a railroad has no bearing on whether or not that right-of-way will extinguish if another public use, such as a recreational trail, is made of it. Indeed, Plaintiffs cite no authority that would indicate as much. Moreover, the fact that the court in O'Leary did not consider "street purposes" and "railroad purposes" as synonymous is of no consequence. The key point is that interim trail use is a permissible "railroad purpose," not that these terms should be one and the same.

> While [the question of whether "railbanking" pursuant to the Rails-to-Trails Act is a "railroad purpose" under Missouri law] is an essential part of the inquiry, it can only be answered in the larger context of whether there was an abandonment under state law. If there was not, then there would be no taking, because the easements would continue to burden the plaintiffs' lands.*** Plaintiffs, in other words, must establish that the railroad easements, absent the application of the Rails-to-Trails Act, would no longer burden the land, i.e. that they would have been deemed abandoned or otherwise extinguished under Missouri law. It is only as a defense to the larger question of abandonment that railbanking becomes relevant.

Glosemeyer v. United States, 45 Fed. Cl. 771, 776 (2000).

**A. The Railroads' Actions Do Not Evince Abandonment of the Easement**

Under Kansas law, the intent to abandon must be "clear and unmistakable," Gauger v. Kansas, 815 P.2d 501, 503 (Kan. 1991), and abandonment will not be recognized if the railroad plans "to use [or] to retake the property," Martell v. Stewart, 628 P.2d 1069, 1070-71 (Kan. Ct. App. 1981) (internal citation and quotation omitted). Moreover, the railroad's action must render the original use for which the railroad acquired the easement impossible. Matlack v. City of Wichita, 407 P.2d 510, 511 (Kan. 1965); Winkel v. Kansas Dep't of Transp., 131 P.3d 570, No. 94,008, 2006 WL 903159, at *2 (Kan. Ct. App. Apr. 7, 2006). Plaintiffs point to a series of facts to support their claim that the railroads have abandoned the rights-of-way, but these facts taken alone or in total show, at most, that the railroads had the intent to cease active rail service at present, but not to permanently abandon the rights-of-way.

First, Plaintiffs claim that BNSF's filing of an application with the STB seeking authority to abandon and the STB's granting of the requests are actions indicative of the railroads' intent to abandon. Pls.' SJ Resp. at 50. As explained in Defendant's opening memorandum, the fact that the railroads participated in regulatory abandonment proceedings before the STB only demonstrates that the railroads requested authorization to cease active rail service on the lines. Def.'s SJ Mem. at 47. Such action is also a necessary step before the railroad can enter into a

trail use agreement to preserve the right-of-way for future rail use. Id. at 47-49. If the railroads truly intended to abandon the rights-of-way, they would have taken the extra step of consummating the abandonment by filing a "notice of consummation," which is required to abandon these rail lines permanently. See 49 C.F.R. § 1152.29(e)(2). The railroads did not do so here.

Second, the Plaintiffs claim that because the rights-of-way have not had active rail service for a number of years, the railroads have abandoned the rights-of-way. Pls.' SJ Resp. at 50. It is without question under Kansas law that mere non-use without more does not constitute an abandonment. Pratt v. Griese, 409 P.2d 777, 780 (Kan. 1966); see also Williams Telecomms. Co. v. Gragg, 750 P.2d 398, 400 (Kan. 1988). Plaintiffs further allege that because, in the case of Reno County, there is now no demand for or prospect of rail service over the line," the right-of-way has been abandoned. Pls.' SJ Resp. at 50. However, this only indicates that at this time, there is no prospect for rail service, but does nothing to prove that future rail service will never occur. Even where a railroad has not used an easement for "railroad purposes" for a long stretch of time, the Kansas courts have found that the easement was not abandoned. Miller, 718 P.2d at 613; Humberg, 675 P.2d at 379.

Third, Plaintiffs appear to argue that because there has been a physical alteration to the rail line, such as removing the rails and ties and stub ending the line, the railroads intended to permanently abandon the lines. Pls.' SJ Resp. at 50. However, under Kansas law, removal of rails and ties alone is not enough to demonstrate abandonment. Martell, 628 P.2d at 1071 ("Even if the record before us showed when the tracks were removed, that would not be conclusive; many cases hold that track removal alone is not sufficient to support a finding of abandonment"). Instead, a physical alteration of the rail line will not constitute an abandonment

unless rail service is rendered "impossible, or so highly improbable as to be practically impossible." See, e.g., Matlack, 407 P.2d at 511. Here, although the rails and ties have been removed to facilitate railbanking and interim trail use, the NITUs required that the foundations, or the permanent elements, of the corridor, such as the "right-of-way underlying the tracks, including bridges, trestles, culverts, and tunnels" be kept intact so that future rail service can be reactivated. Biery Pls.' Proposed Facts, Tab M; Pankratz Pls.' Proposed Facts, Tab D. Thus, the removal of rails and ties or the stub ending of the line are not actions that make rail service "impossible, or so highly improbable as to be practically impossible."

Plaintiffs next contend that the following facts are significant: the railroads quitclaimed their interest to the authorized trail operators, the railroads no longer have the responsibility or authority to maintain the rights-of-way, the railroads no longer pay real estate taxes on the property, and the railroads do not have the legal obligation to use either of the rights-of-way for operation of the railroad. Pls.' SJ Resp. at 50. However, both the Railbanking and Donation Contract and the Quitclaim Deed contain provisions that the railroads have reserved the right to reinstitute active rail service. Biery Pls.' Proposed Facts, Tab N; Def. Ex. 20. Under Kansas law, abandonment will not be recognized if the railroad plans "to use [or] to retake the property," Martell, 628 P.2d at 1070-71 Such is the case here. And although the railroads do not have the responsibility to maintain the rights-of-way or to pay property taxes, another entity has assumed those obligations until the corridor is needed again for active rail service.

Plaintiffs also contend that the railroad's non-payment of taxes indicates its intent to abandon, relying on Martell, *supra*. Pls.' SJ Resp. at 55. However, the railroad's non-payment of taxes in this case is directly tied to the railbanking process. Indeed, one of the key advantages to a railroad in preserving its rights-of-way under the railbanking provisions of the Trails Act

instead of utilizing the discontinuance option (see Def.'s Mem. at 3-4) is that railbanking allows the railroad to transfer responsibility for the right-of-way, including the payment of any taxes assessed on the right-of-way, to another entity that meets the requirements of the Trails Act. In contrast, the railroad in Martell had filed a "formal declaration of abandonment" that the court viewed as a "clear and unmistakable act indicating a purpose to repudiate ownership." Martell, 628 P.2d at 1071 (internal punctuation omitted). Moreover, the non-payment of taxes does not compel the conclusion that a railroad has abandoned its right-of-way. In Miller, for instance, the railroad had not paid taxes on the disputed property starting from 1969 to the 1980s, yet the court did not find that the railroad had abandoned the right-of-way. 718 P.2d at 611, 613.

In sum, the railroads' actions as a whole do not demonstrate abandonment because it cannot be said that the railroads' actions evinced a "clear and unmistakable" intent to permanently abandon. Moreover, the railroads' actions have not rendered the use of the rights-of-way "impossible, or so highly improbable as to be practically impossible." Thus, the Court should grant Defendant's cross-motion on summary judgment on this issue.

### B. Pratt v. Griese Does Not Support Plaintiffs' Claim that the Railroads Abandoned the Rights-of-Way

Plaintiffs misconstrue and over-simplify the decision in Pratt v. Griese, 409 P.2d 777 (Kan. 1966), when they assert that the court's decision was based on the fact that the "rails and ties had been removed, that railroad operations over the land had ceased and that the easement was in a state of disrepair and fences had not been maintained." Pls.' SJ Resp. at 51. These facts alone were not decisive to the court's ruling in Pratt; rather these actions were made relevant when evaluated against the purpose for which the land was condemned. In Pratt, the court discussed at great length and in great detail that the easement was for a "specific purpose,"

namely "to provide for a railroad spur track to a military airfield and for related military purposes." 409 P.2d at 782 (emphasis in original). In this context, the court found that the government's discontinuance of the military airfield, removal of the tracks from the right-of-way and conveyance of the airfield to a private individual were "acts of a decisive character" by which " the government has conclusively rendered it impossible for the easement to be used for the purpose for which it was taken, viz., any military purpose, thereby constituting an abandonment of the easement and causing defendant's land to be relieved of it." Id. This case is distinguishable because, unlike Pratt, the railroads' actions have not rendered the "railroad purpose" impossible, and the railroads' actions to temporarily cease rail service are not "acts of a decisive character" indicative of abandonment. Here, the railroads can at any time reactivate rail service, whereas in Pratt, the government could never use the easement for military purposes because the military airbase was closed and the property sold.

## VI. Shifting Public Use Has Been Recognized in Other Courts and Kansas Law Allows for a Change in Use of the Railroads' Easements

Plaintiffs state that they are not aware of any court decision that recognizes "the soc-called Shifting Public Use Doctrine." Pls.' SJ Resp. at 57. However, as set forth in Defendant's initial brief, Kansas law does allow for a shift in the use of an easement or right-of-way acquired for public purposes, so long as the use is still of a public nature. Def.'s SJ. Mem. at 54-55. In Kansas Electric Power Company v. Walker, 51 P.2d 1002 (Kan. 1935), the court declined to find an abandonment when the city shifted the use of the street from electric street car service to gasoline driven buses. Id. at 1005. The court noted that the change in use of the street to a "new and different way" did not affect the rights of the parties with regard to the use of the easement.

Id. at 1002. Although the court did not use the term "shifting public use doctrine," the concept was squarely applied in that case to allow a change in public use.

Plaintiffs never explain how Kansas Electric Power is inapplicable to the present case, beyond stating that a similar argument was rejected under Vermont law in Preseault and under California law in Toews. Pls.' SJ Resp. at 58-9. As with the deed interpretation issues addressed above, these cases do not speak to the whether Kansas law allows for a change in the use of an easement acquired for a public use, and thus do not control the outcome in this case.

Finally, Plaintiffs argue that the shifting public use doctrine is limited to those situations where the new use was technologically unavailable at the time the easement was granted. Pls.' SJ Resp. at 59. Under Plaintiffs' interpretation, the addition of a bike lane or a sidewalk to a road easement would not be permissible simply because they would be used to transport people by non-motorized means instead of by motorized vehicles. Kansas Electric Power imposes no such limitations on changes in public use, nor do Plaintiffs cite any other Kansas case law to support this proposition. Kansas law imposes no such limitations on the use of rights-of-way acquired for public purposes.[14]

---

[14]Moreover, the narrow view advocated by Plaintiffs does not reflect the realities that shape today's transportation systems. Urban planning today increasingly emphasizes non-motorized forms of transportation, such as walking and biking, to alleviate the common problems associated with transportation, including traffic congestion and urban sprawl. See generally Zovanyi Gabor, *The Role of Initial Statewide Smart-Growth Legislation in Advancing the Tenets of Smart-Growth*, URBAN LAWYER (2007). Likewise, bicycle and pedestrian corridors are recognized under federal law as an important component of the national transportation system. For example, under the Safe Accountable Flexible Efficient Transportation Equity Act ("SAFETEA-LU", Pub. L. 109-59, 119 Stat. 1144 (Aug. 10, 2005), $370 million is allocated over a five year period to provide funds to States "to develop and maintain recreational trails and trail-related facilities for both non-motorized and motorized recreational uses." See http://www.fhwa.dot.gov/safetealu/factsheets/rectrails.htm (last visited on August 15, 2008). This law also requires that metropolitan and statewide transportation planning processes include consideration of bicycle and pedestrian facilities as part of a national intermodal transportation

In sum, Kansas law recognizes the concept of shifting public uses, and the shift from active rail service to railbanking and trail use is permissible under Kansas law. The application of this legal concept to the facts of this case provides an alternative ground for the Court to grant Defendant's motion on summary judgment.

Respectfully submitted this 21st day of August, 2008,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

s/ Kristine S. Tardiff
KRISTINE S. TARDIFF
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL: (603) 230-2583
FAX: (603) 225-1577
E-MAIL: kristine.tardiff@usdoj.gov

AYAKO SATO
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
TEL: (202) 305-0239
FAX: (202) 305-0506
E-MAIL: ayako.sato@usdoj.gov

Attorneys for Defendant

Of Counsel:
ELLEN D. HANSON, General Counsel
EVELYN KITAY, Attorney
Surface Transportation Board, Washington, DC

---

system. SAFETEA-LU, Sec. 3006; see also http://www.fhwa.dot.gov/safetealu/summary.htm (Transportation Planning) (last visited on August 15, 2008). There can be no dispute that rail-trails serve a public transportation purpose.