# In the United States Court of Federal Claims

No. 07-693L and No. 07-675L
**CONSOLIDATED**
**(Filed: June 9, 2011)**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * | * |
| | * |
| **DOROTHY L. BIERY, et al.,** | * |
| | * |
| **and** | * |
| | * **Fifth Amendment Takings Clause;** |
| **JERRAMY and ERIN** | * **Rails-to-Trails; National Trails System** |
| **PANKRATZ, et al.,** | * **Act Amendments of 1983, 16 U.S.C. §** |
| | * **1247(d); Kansas Law; Scope of** |
| **Plaintiffs,** | * **Railroad Easements; Railroad** |
| | * **Easement Abandonment** |
| **v.** | * |
| | * |
| **THE UNITED STATES,** | * |
| | * |
| **Defendant.** | * |
| | * |
| * * * * * * * * * * * * * * * * * * * | * |

*Mark Fernlund Hearne, II*, Clayton, MO, with whom were *Meghan S. Largent* and *Lindsay S.C. Brinton*, Clayton, MO, and *Debra Albin-Riley*, Los Angeles, CA, for plaintiffs.

*Kristine Sears Tardiff,* U.S. Department of Justice, Concord, NH, with whom were *Ignacia S. Moreno,* Assistant Attorney General, and *Ayako Sato*, Washington, D.C., for defendant.

**O P I N I O N**

**FIRESTONE**, *Judge*.

The plaintiffs in these consolidated cases are fourteen Kansas landowners who

claim to own the fee interests in land underlying two previously-operating sections of a

railroad line.[1]  The plaintiffs claim that the defendant ("government") effected a taking of the plaintiffs' fee interest in the railroad corridor when the government approved the conversion of the subject railroad line to a recreational trail pursuant to the "railbanking" provision of the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act").  The plaintiffs, whose fee interest was encumbered by the railroad right-of-way, claim that, but for the Trails Act, the railroad easements held by the Burlington Northern Santa Fe Railway ("BNSF") over their fee land would have expired now that the easement is no longer being used for train travel.  They argue that the government's authorization of a recreational trail within the railroad corridor and continued control over the corridor for potential future rail activation has prevented reversion of the easements to the plaintiffs.  The plaintiffs are now seeking just compensation pursuant to the Takings Clause of the Fifth Amendment to the United States Constitution for the alleged taking associated with the government's authorization of railbanking and trail use under the Trails Act.

Pending before the court are the parties' cross-motions for summary judgment as

---

[1]The court granted the defendant's unopposed motion to consolidate the cases on May 9, 2008.  Order Consolidating Cases, May 9, 2008, ECF No. 29.  Biery v. United States, 07-693L, is the lead case, and all relevant citations in this opinion are to pleadings and orders in that case unless otherwise indicated.  See id.

The plaintiffs at one time numbered eighteen between the two cases, but the court dismissed the claims of four of the Biery plaintiffs, having found that those plaintiffs had no property right or interest upon which to base their takings claims in this action.  Order on the Nature of the Property Interests Acquired by the Railroads, Aug. 20, 2009, ECF No. 74.  The plaintiffs sought to appeal this order, but the appeal was dismissed as premature because this court had not yet entered a final judgment.  Biery v. United States, 2009-5134 (Fed. Cir. Dec. 18, 2009).

to whether there has been a taking of their property interests by virtue of the

government's authorization of railbanking pursuant to the Trails Act.  Resolution of these

motions requires the court to opine on the scope of the railroad easements under Kansas

law.[2]  For the reasons set forth below, the plaintiffs' motions for summary judgment are

---

[2]The parties filed their cross-motions for summary judgment on April 30 and June 2, 2008, respectively.  After holding oral argument on the motions on December 18, 2008, the court, having "determined . . . that resolution of the liability issues in this case turns in large part on questions of Kansas state law as to which it appears to this court that there is no controlling precedent in the decisions of the Kansas Supreme Court and the Kansas Court of Appeals," certified three questions of state law to the Kansas Supreme Court.  Certification Order, Feb. 27, 2009, ECF No. 68.  The parties submitted briefs to the Kansas Supreme Court, which held oral argument on the certified questions on October 30, 2009.  On September 23, 2010, the Kansas Supreme Court issued an order dismissing the case, noting that the Kansas statute regarding certification of state law questions, Kan. Stat. Ann. § 60-3201, does not specifically mention the Court of Federal Claims as a court from which the Kansas Supreme Court may answer certified questions of law.  Pls.' Notice of Decision by Kan. Sup. Ct., Ex. A, ECF No. 77 (Sept. 27, 2010).  This court ordered the parties to submit copies of all briefs filed and the transcript of the oral argument before the Kansas Supreme Court.  The parties were also permitted to submit supplemental briefs.

Thus, the court now has before it the following submissions in Biery: Pls.' Mot. Summ. J., April 30, 2008, ECF No. 23, 25; Def.'s Cross-Mot. Summ. J. & Resp. to Pls.' Mot. Summ. J, June 2, 2008, ECF No. 31; Pls.' Resp. to Def.'s Cross-Mot. Summ. J. & Reply in Supp. of Mot. Summ. J., Aug. 7, 2008, ECF No. 47; Def.'s Reply in Supp. of Cross-Mot. Summ. J., Aug. 21, 2008, ECF No. 51; Joint Statement of Facts & J.A., ECF No. 66; Pls.' Notice of Filings in Kan. Sup. Ct., Oct. 7, 2010, ECF No. 82 (includes Pls.' Opening Br., App. A; Pls.' Reply Br., App. B; Pls.' Letter Re. Moody v. Allegheny Valley Land Trust, 976 A.2d 484 (Pa. 2009), App. D; Pls.' Letter Re. Bittner v. Watco Cos., 226 P.3d 563 (Kan. App. 2010), App. E; Unofficial Tr. Kan. Sup. Ct. Oral Arg., App. F); Def.'s Notice of Filings in Kan. Sup. Ct., Oct. 12, 2010, ECF No. 83 (includes Def.'s Br., Ex. 1; Def.'s Letter Re. Moody, 976 A.2d 484, Ex. 2; Def.'s Resp. to Amici Brs., Ex. 3; Def.'s Letter Re. Troha v. United States, 692 F. Supp. 2d 550 (W.D. Pa. Feb. 25, 2010), Ex. 4); Pls.' Supp'l Br., Nov. 8, 2010, ECF No. 89; Pls.' Notice of Supp'l Auth. Re. Ladd v. United States, 630 F.3d 1015 (Fed. Cir. 2010), Dec. 14, 2010, ECF No. 90; Def.'s Supp'l Br., Dec. 20, 2010, ECF No. 91; Pls.' Reply in Supp. of Supp'l Br., Dec. 30, 2010, ECF No. 92; Pls.' Notice of Supp'l Auth. Re. Navajo Nation v. United States, 631 F.3d 1268 (Fed. Cir. 2011), Feb. 4, 2011, ECF No. 93; Def.'s Resp. to Pls.' Notice of Supp'l Auth. Re. Navajo, Feb. 15, 2011, ECF No. 94; Pls.' Reply in Supp. of Notice of Supp'l Auth. Re. Navajo, Feb. 21, 2011, ECF No. 96; Pls.' Notice of Supp'l Auth. Re. Nordhus v. United States, No. 09-042L, 2011 WL 1467940 (Fed. Cl. Apr. 12, 2011), Apr. 18, 2011, ECF No. 99; Pls.' Notice of Supp'l Auth. Re. Capreal,

**GRANTED** and the defendant's cross-motions for summary judgment are **DENIED**.

I.      **BACKGROUND**

A.      **The Trails Act**

In this court's recent decision in <u>Macy Elevator, Inc. v. United States</u>, No. 09-

515L, 2011 WL 1319026 (Fed. Cl. Apr. 7, 2011), the court summarized the general

purposes and operation of the Trails Act as follows:

> Congress enacted the Trails Act to address the national problem of a reduction
> in rail tracks.  <u>Preseault v. Interstate Commerce Comm'n</u>, 494 U.S. 1, 5 (1990)
> ("<u>Preseault I</u>").  The Trails Act authorizes the Surface Transportation Board
> ("STB")[3] to preserve railroad corridors or rights-of-way not currently in use
> for train service for possible future rail use by converting those rights-of-way
> into recreational trails.  <u>Id.</u> at 5-6; 16 U.S.C. § 1241 (2006).  In essence, the
> Trails Act allows a railroad to relinquish responsibility for a rail line by
> transferring the corridor to an entity that will use it as a recreational trail.
> Although the corridor is not used as a railroad during the period of interim trail
> use, it remains intact for potential future use for rail service.  This process is
> called "railbanking."

<u>Macy Elevator</u>, 2011 WL 1319026 at *1 (renumbered footnote in original).  The court

then explained that STB approval of railbanking and recreational trail use are authorized

---

Inc. v. United States, No. 09-186L, 2011 WL 1740543 (Fed. Cl. May 6, 2011), May 9, 2011,
ECF No. 100; and Def.'s Notice of Supp'l Auth. Re. <u>Enbridge Pipelines (Illinois) L.L.C. v.
Moore</u>, 633 F.3d 602 (7th Cir. 2011), May 18, 2011, ECF No. 103.  Also before the court is the
plaintiffs' Motion for Partial Summary Judgment filed in <u>Pankratz</u>, filed April 14, 2008, prior to
consolidation.
    Although all of these relevant briefs are in the record and before the court, the court has
focused primarily on the parties' briefs submitted to the Kansas Supreme Court and the parties'
subsequent supplemental briefs filed in this court.

    [3]The Transportation Act of 1920, 41 Stat. 477-78, initially gave the Interstate Commerce
Commission ("ICC") authority over railroad abandonments; this authority is now held by the
STB following enactment of the ICC Termination Act of 1995, 49 U.S.C. § 10501 (1996).

in connection with the STB's abandonment approval authority.  In particular, the court explained that in cases where a railroad and a trail provider reach an agreement over recreational trail use of the rail line, the STB will retain jurisdiction over the rail corridor and the corridor will be railbanked for possible future rail use.  In such cases, the rail corridor will not be returned to the underlying fee owner:

> Before a railroad corridor may be converted into a recreational trail, the railroad must either initiate abandonment proceedings with STB under 49 U.S.C. § 10903 (2006) (where the railroad has recently had operating train service) or seek an exemption from the ordinary abandonment procedures under 49 U.S.C. § 10502 (2006) (where the railroad has had no local rail service for at least two years).[4] Caldwell v. United States, 57 Fed. Cl. 193, 195 (2003) ("Caldwell I"), aff'd, 391 F.3d 1226 (Fed. Cir. 2004) ("Caldwell II"). Under either procedure, abandonment of the rail line and right-of-way will not be approved by the STB if a qualified trail provider[5] submits to the STB a

---

[4]STB's regulations provide:

An abandonment or discontinuance of service or trackage rights is exempt if the carrier certifies that no local traffic has moved over the line for at least 2 years and any overhead traffic on the line can be rerouted over other lines and that no formal complaint filed by a user of rail service on the line (or a state or local government entity acting on behalf of such user) regarding cessation of service over the line either is pending with the Board or any U.S. District Court or has been decided in favor of the complainant within the 2-year period.  The complaint must allege (if pending), or prove (if decided) that the carrier has imposed an illegal embargo or other unlawful impediment to service.

49 C.F.R. § 1152.50(b) (2010).  The STB must also find that the line is not necessary to carry out the government's rail transportation policy, the line is of limited scope, and continued regulation is unnecessary to protect shippers from abuse of market power.  Id. § 1152.50(c).

The railbanking process works in largely the same manner, whether the proceeding is exempt from the abandonment process or non-exempt.

[5]The statute defines "qualified trail provider" as a "state, political subdivision, or qualified private organization that is prepared to assume full responsibility for management of [railroad] rights-of-way and for any legal liability arising out of such transfer or such use, and for the payment of any and all taxes that may be levied or assessed against the [railroad] rights-of-

request to use the right-of-way as a recreational trail. If the trail provider submits a statement of willingness to assume financial and legal responsibility to the STB and the railroad, the STB will, in the case of an operating railroad issue a Certificate of Interim Trail Use or Abandonment ("CITU") which preserves the STB's jurisdiction over the rail corridor while the parties negotiate an Interim Trail Use Agreement. See 49 C.F.R. § 1152.29(c) (2010). In cases involving the exemption procedure, such as the present case, the STB issues a Notice of Interim Trail Use or Abandonment ("NITU"), which also preserves the STB's jurisdiction over the rail corridor, allows the railroad to discontinue operations and remove track and equipment, and affords the railroad and the trail provider 180 days to negotiate a railbanking and interim Trails Act Agreement. Caldwell II, 391 F.3d at 1229-30; Caldwell I, 57 Fed. Cl. at 195; 49 C.F.R. § 1152.29(d). During this period, the railroad will also negotiate an agreement for the transfer of the corridor to the trail operator. [footnote omitted] "If an agreement is reached, the NITU [or CITU] automatically authorizes the interim trail use. If the [STB] takes no further action, the trail sponsor then may assume management of the right-of-way, subject only to the right of a railroad to reassert control of the property for restoration of rail service." Caldwell I, 57 Fed. Cl. at 195 (internal citations omitted); see also 49 C.F.R. § 1152.29(d)(2). If an agreement is not reached, the railroad will be allowed to abandon the line, at which time the STB's jurisdiction over the right-of-way terminates.[6]

Id. (renumbered footnotes in original). If there is no agreement between the railroad and trail operator, the railroad may abandon the line and the STB will no longer have jurisdiction over the rail corridor.

---

way." 16 U.S.C. § 1247(d).

[6]As explained above, issuance of a CITU or a NITU is an alternative to the standard process of approving the railroad's application for abandonment. Where the STB issues an order authorizing the railroad to abandon the line and the railroad carries out the abandonment, the STB's jurisdiction over the railroad right-of-way terminates. Hayfield N. R.R. Co. v. Chicago & N.W. Transp. Co., 467 U.S. 622, 633-34 (1984); Preseault I, 494 U.S. at 7; Caldwell I, 57 Fed. Cl. at 195 (citing Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd., 158 F.3d 135, 139 (D.C. Cir. 1998)).

B.   **Pankratz**–Butler County, Kansas[7]

1.   **Railroad Corridor Acquisition**

The property at issue in Pankratz v. United States, No. 07-675L, is a 10.6-mile-long, 100-foot-wide strip of railroad corridor lying between milepost 483.62 in Augusta, Kansas and milepost 494.22 near Andover, Kansas.  The corridor was initially acquired largely through condemnation in 1879 by the St. Louis, Wichita & Western Railway Company[8] pursuant to a charter granted that same year and Kansas statutes.[9]  For one segment of this corridor, the railroad acquired its rights via voluntary conveyance from William and Anna Chase.  The Chase deed provides that the grantors convey "a strip of land one hundred feet wide . . . for the purpose of constructing and operating said Railway. . . . Should Railway Company fail or cease to use said land for said purpose or fail to establish the Station and build a depot on [illegible] this grant and said title shall revert back to the undersigned grantors, their heirs or assigns."  J.A. A-2, ECF No. 66-1. The parties agree that under Kansas law in effect at the time, the railroad acquired an easement, rather than a fee interest, through its condemnation and the voluntary grant.

2.   **STB Proceedings and Railbanking**

In the mid to late 1990s, BNSF ceased using the right-of-way for active rail

_____

[7]The following facts are not in dispute unless otherwise noted.

[8]BNSF is the successor in interest to this railroad company.

[9]The charter further provided that the corporation was also formed for the purpose of constructing, maintaining, and operating a magnetic telegraph in connection therewith.  Pls.' Mot. to Supp. R., Ex. A, ECF No. 69-1.

service.  In January 2002, Butler County acquired the right-of-way from BNSF by a quitclaim deed as part of its desire to restore active rail service.  The STB, pursuant to its plenary jurisdiction over such acquisitions, approved the transfer of the right-of-way and trackage.  Contrary to its plans, Butler County was unable to locate a railroad operator to restore service on the rail line.  On June 15, 2004, Butler County filed a Notice of Exemption with the STB, seeking authority to abandon the line.  On July 2, 2004, the STB granted the exemption–effective August 4, 2004–giving the railroad authority to consummate abandonment by removing tracks and equipment.  The STB's Environmental Report, which accompanied the Abandonment Exemption, noted, "The Line is stub-ended and, therefore, not capable of handling overhead traffic.  The Line has had no traffic in recent years.  In addition, no maintenance has been performed on this dormant Line for some time."  J.A. B-4, ECF No. 66-2.  The STB's historic report noted, "By the mid-1990's, all operations on the Line had ceased.  The Line is in poor condition and has not seen any traffic in recent years.  In order to restart freight operations, significant rehabilitation would be required."  J.A. B-5, ECF No. 66-3.

On July 28, 2004, Prairie Travelers, Inc. late-filed an expression of interest in negotiating a trail use agreement with Butler County pursuant to the Trails Act.  Butler County had not yet consummated abandonment of the line by removing the tracks and equipment and agreed to negotiate an agreement.  Accordingly, on September 14, 2004, the STB issued a NITU, providing a 180-day period during which the parties could

negotiate an agreement and the County could remove tracks.  Butler County and Prairie Travelers were unable to negotiate an agreement, and the NITU expired by its terms on March 13, 2005.  At that time, Butler County was authorized to exercise its authority to abandon the line, but it did not take steps to do so.

On May 2, 2005, Butler County Economic Development ("BCED"), an agency of the County government, requested a second NITU from the STB.  The STB granted that request and issued a NITU on June 2, 2005.  On June 3, 2005, Butler County notified the STB that a trail use agreement had been reached with the Economic Development agency. On November 5, 2009, the STB vacated the NITU issued to BCED and issued a new NITU with the City of Augusta, Kansas replacing BCED as the trail manager.

## C.    <u>Biery</u>–Reno County, Kansas[10]

### 1.    Railroad Corridor Acquisition

The property at issue in <u>Biery v. United States,</u> No. 07-693L, is a 2.8-mile-long, 100-foot-wide strip of railroad corridor adjacent to South Hutchinson between milepost 0.62 and milepost 3.50 in Reno County, Kansas.  The corridor was initially acquired through two condemnation proceedings between 1889 and 1899 by the Hutchinson, Oklahoma & Gulf Railway Company and its successor in interest, the Hutchinson & Southern Railway Company.[11]  The parties agree that under Kansas law in effect at the

---

[10]The following facts are not in dispute unless otherwise noted.

[11]Hutchinson & Southern became part of BNSF in 1995.  The charter for the Oswego and State Line Railroad company says that the corporation was for the purpose of constructing and

time, the railroad acquired an easement, rather than a fee interest, through its

condemnation proceedings.

### 2. STB Proceedings and Railbanking

On February 20, 2004, BNSF filed a Notice of Exemption with the STB, seeking

authority to abandon the line.  Shortly thereafter, the City of South Hutchinson sent a

letter to the STB expressing interest in negotiating a trail use agreement for the corridor.

The STB granted the abandonment exemption on March 11, 2004, effective April 10,

2004; the STB's Environmental Assessment stated that "there is now no demand for or

prospect of rail service over the line, and no traffic has originated, terminated, or moved

overhead on this line segment for two years."  J.A. E-7, ECF No. 66-8.  BNSF then

indicated that it was willing to enter into a trail use agreement, and on April 8, 2004, the

STB issued a NITU, providing a 180-day period during which BNSF and the City could

negotiate.  The STB extended the negotiation period until April 5, 2005.  On March 23,

2005, BNSF and the City of South Hutchinson entered into a railbanking and interim trail

use agreement pursuant to which BNSF transferred to the City on February 17, 2006 a

quitclaim deed of its interest in the railroad corridor.

---

maintaining a "railroad" for "public use."  Pls.' Mot. to Supp. R., Ex. B, ECF No. 69-1. The
charter for the Hutchinson Oklahoma & Gulf Railroad likewise states that it is also authorized to
operate a "telegraph" line and other lines of "railroad and telegraph in connection therewith."  Id.

## II.   DISCUSSION

### A.   Standard of Review

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  RCFC 56(c)(1); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008); Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed. Cir. 2001) (citation omitted).  In considering a motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Liberty Lobby, 477 U.S. at 249.  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Casitas Mun. Water Dist., 543 F.3d at 1283; Lathan Co., Inc. v. United States, 20 Cl. Ct. 122, 125 (1990).

### B.   The Trails Act and the Fifth Amendment Takings Clause

The interaction between the Trails Act and the Takings Clause has been explained as follows:

> The Takings Clause of the Fifth Amendment provides in relevant part that "private property [shall not] be taken for public use, without just

compensation." U.S. Const. Amend. V.  "The Amendment 'does not prohibit the taking of private property, but instead places a condition on the exercise of that power.'"  Preseault I, 494 U.S. at 11 (quoting First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles, 482 U.S. 304, 314 (1987)).  In cases involving the Trails Act, it is now settled that if the government takes private property by authorizing recreational trail use of a railroad right-of-way, the government must provide just compensation. Preseault I, 494 U.S. at 12-16.  It is equally settled that "only those individuals 'with a valid property interest at the time of the taking are entitled to compensation.'" Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001) . . . . Because real property rights arise from state law, the extent of the plaintiffs' property interests in the right-of-way depend on the law of the state in which the property is located. [footnote omitted] See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 130 S. Ct. 2592, 2597 (2010) . . . . Thus, the Federal Circuit has determined that a taking occurs where the issuance of the CITU or NITU authorizing recreational trail use effectively extinguishes the state property rights of reversion of the right-of-way to the fee owner.[12]  As the [Federal] Circuit has recently stated, "it is settled law that a Fifth Amendment taking occurs in Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement."  Ladd v. United States, 630 F.3d 1015, 1019 (Fed. Cir. 2010).

Macy Elevator, 2011 WL 1319026 at *7 (renumbered footnote in original).

In this connection, the Federal Circuit has explained that these Rails-to-Trails

cases present three primary questions:

(1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails;

---

[12]Regarding the government action that gives rise to a taking, the Federal Circuit has held that "[t]he issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way."  Caldwell II, 391 F.3d at 1233-34; see also Ladd v. United States, 630 F.3d 1015, 1023-24 (Fed. Cir. 2010).

(3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

Preseault v United States, 100 F.3d 1525, 1533 (Fed. Cir. 1996) ("Preseault II"); see also Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1373 (Fed. Cir. 2009).  In sum, if the railroad did not receive a fee interest but only a railroad purpose easement and if the recreational trail use and railbanking authorized by the NITU exceed the scope of that easement and prevented expiration of the easement and reversionary interests from vesting in the fee owners, then a taking has occurred.  See Ladd, 630 F.3d at 1019, reh'g denied, No. 2010-5010, 2011 WL 2043242 (Fed. Cir. May 26, 2011).

It is not disputed that the railroads in these cases did not acquire fee interests in the property that is the subject of these cases, and the plaintiffs do not allege that the easements expired prior to issuance of the NITUs.  Thus, these cases turn on the scope of the railroad easements acquired by the railroad in each of the relevant conveyance instruments and whether the Trails Act has prevented the reversion of the plaintiffs' property rights under Kansas law.

### C.    Scope of the Railroad Easements

The initial question the court must answer in these cases is whether under Kansas law the railroad's easements authorize recreational trail use and railbanking.  As noted, the Kansas courts have not directly opined on this question.  Significantly, this court recently found in another case that a compensable taking resulted under Kansas law from

the issuance of a NITU where the railroad held only a "railroad purpose easement."  See

Nordhus Family Trust v. United States, No. 09-042L, 2011 WL 1467940 (Fed. Cl. April

12, 2011).  Courts have reached the same result in connection with railroad purpose

easements in Vermont, Preseault II, 100 F.3d 1525; Washington, Lawson v. State, 730

P.2d 1308 (Wash. 1986); Wisconsin, Pollnow v. State Department of Natural Resources,

276 N.W.2d 738 (Wisc. 1979); Missouri, Glosemeyer v. United States, 45 Fed. Cl. 771

(2000); California, Toews v. United States, 53 Fed. Cl. 58 (2002); Florida, Rogers v.

United States, 90 Fed. Cl. 418 (2009); Indiana, Macy Elevator, 2011 WL 1319026;

Massachusetts, Capreal, Inc. v. United States, No. 09-186L, 2011 WL 1740543 (Fed. Cl.

May 6, 2011); and Texas, Ybanez v. United States, No. 09-172L, 2011 WL 1957687

(Fed. Cl. May 20, 2011).

  In several other states, courts have found that the STB's authorization of

railbanking and recreational trail use does not give rise to a taking based on the terms of

the railroad's easements in those cases and the applicable state law.  See Moody v.

Allegheny Valley Land Trust, 976 A.2d 484 (Pa. 2009) (Pennsylvania); Chevy Chase

Land Co. v. United States, 733 A.2d 1055 (Md. 1999) (Maryland); State by Wash.

Wildlife Pres., Inc. v. State, 329 N.W.2d 543 (Minn. 1983) (Minnesota); and Rieger v.

Penn Cent. Corp., No. 85-CA-11, 1985 WL 7919 (Ohio App. 1985) (Ohio).

  The plaintiffs contend that the railroad easements at issue in this case, whether

obtained through condemnation or voluntary conveyance, are limited to railroad

purposes.  They argue further that "railroad purposes" includes only active use as a railroad in connection with train use, under Kansas law.  More specifically, the plaintiffs argue that, under Kansas law, an easement for railroad purposes may not be used as a recreational trail or maintained through railbanking.  The government contends that recreational trail use and railbanking are within the scope of the easements at issue in this case under Kansas law.  The government relies on Kansas cases that it contends recognize that an easement acquired for one public use may shift to another public use without being extinguished and cases that recognize that an easement is not lost if it is being maintained for the purposes for which it was obtained, even if there is no active use.

### 1.    Easements Acquired Through Condemnation

The parties agree that the easements at issue in these cases were created for "railroad purposes."  Indeed, this view is compelled by Kansas law.  At the time of the subject condemnations, railroads were authorized to take property under the power of eminent domain and to take and hold voluntary grants of real estate only "to aid in the construction, maintenance and accommodation of its railway."  Kan. Gen. Stat. 1868, ch. 23, § 47 (currently codified as Kan. Stat. Ann. § 66-501).  Further, Kansas law provides that the extent of permissible uses of easements acquired by condemnation is determined by reference to the statutes authorizing the condemnation and commissioners' reports. See Kan. Power & Light Co. v. Ritchie, 722 P.2d 1120, 1123 (Kan. Ct. App. 1986); State

v. Armell, 8 Kan. 288 (1871).

The process by which the subject railroads exercised their authorization to acquire

easements by condemnation for their railroads is set forth in Kansas General Statutes

1868, chapter 23, sections 81 through 86.  In pertinent part, section 81 provides:

> Any duly chartered and organized railway corporation may apply to the board
> of county commissioners . . . to lay off . . . a route for such proposed railroad,
> not exceeding one hundred feet in width . . . and also such land as may be
> deemed necessary for side-tracks, depots and workshops, and water stations,
> materials for construction . . . <u>a right of way over adjacent lands sufficient to
> enable such company to construct and repair its roads and stations, and a right
> to conduct water by aqueducts, and the right of making proper drains.</u>

Kan. Gen. Stat. 1868, ch. 23, § 81 (emphasis added).  The commissioners have the route

surveyed, determine the quantity of land necessary, and appraise the value of the land

and damages to it.  Id. § 82.  The commissioners' determinations are to be set forth in a

written report, which is filed with the county clerk.  Id.  The county clerk then files the

report with the county treasurer, who certifies the report upon the railroad corporation's

payment in full of the appraisal.  Id. § 83.  Upon filing a copy of this certified report with

the register of deeds for the county in question, the railroad:

> shall have the right to occupy the land so embraced within such route, <u>for the
> purposes necessary to the construction and use of its road</u>; and to such portions
> of such road over which a railroad shall be actually constructed within such
> time, <u>the perpetual use of such lands shall vest in such company, its successors
> and assigns, for the use of the railroad, as soon as so much of such railroad
> shall have been constructed fit for use.</u>

Id. § 84 (emphasis added).

The court agrees with the parties based on these statutes and the limitations

specified in the condemnation reports, that the easements at issue in these cases were

condemned for the purpose of constructing and operating a railroad.[13]

## 2.      Easement Created by Voluntary Conveyance

There is no dispute that the one easement created by voluntary conveyance at

issue in these cases was also limited to "railroad purposes."  Under Kansas law, the

interest conveyed to a railroad by a voluntary grant depends on the interpretation of the

deed.  Stone v. U.S.D. No. 222, 91 P.3d 1194, 1203-04 (Kan. 2004).  The Chase deed at

issue in Pankratz states the conveyance was "for the purpose of constructing and

operating said Railway" and that "Should Railway Company fail or cease to use said

land for said purpose or fail to establish the Station and build a depot on [illegible] this

grant and said title shall revert back to the undersigned grantors, their heirs or assigns."

J.A. A-2, ECF No. 66-1.  The limitations in this deed are consistent with the Kansas

statute on voluntary grants for railroad rights-of-way, which stated that a grant may be

made "to aid in the construction, maintenance and accommodation" of a railway, but that

---

[13]Although the charters for the railroads also indicated that they were created to operate both railroads and telegraph lines, in Kansas the commissioners' report in a condemnation proceeding establishes the purposes for which the property can be used.  See Roberts v. Upper Verdigris Watershed Joint Dist. No. 24l, 392 P.2d 914, 920 (Kan. 1964); Armell, 8 Kan. 288. The commissioners' report relevant to Pankratz states the condemnation was of land "through which proposed railroad shall be located by reason of the location, construction and operation of said railroad in accordance with the provisions, regulations, and restrictions of the State of Kansas[.]" J.A. A-1, ECF No. 66-1.  The commissioners' report relevant to Biery similarly limits the interest condemned to "a route for such proposed railroad" and such land that was necessary for certain ancillary uses such as side-tracks, depots, and water stations.  J.A. D-1, D-2, ECF No. 66-6.  Thus, the reports at issue in these cases establish that these lines were created for railroad use only.

"the real estate received by voluntary grant[] shall be held and used for the purpose of such grant only." Kan. Gen. Stat. 1868, ch. 23, § 47. Thus, the court agrees with the parties that the Chase easement is also for railroad purposes only.

### D.    Recreational Trail Use Is Not a Railroad Purpose

Having determined that the easements at issue in these cases were created for "railroad purposes," the court now turns to the first question of whether recreational trail use falls within the scope of "railroad purpose" under Kansas law. If it does, the court's inquiry ends because even in the absence of the Trails Act such use would maintain the railroad easements under Kansas law, preventing their reversion to the plaintiffs, and thus there has not been anything taken by the government by its issuance of the NITUs. A finding that trail use is within the scope of the easements at issue would also defeat the plaintiffs' argument that authorization of trail use in a sense imposed a new easement on the plaintiffs' property. If, however, recreational trail use falls outside the scope of the easement, a taking may have occurred.

The parties rely on separate Kansas Supreme Court cases to support their respective views. The plaintiffs argue that railroad purposes include only use for train traffic and that any other use falls outside the scope of a railroad purpose easement. The government argues that the Kansas courts have recognized that easements may be construed to allow for the advancement of any legitimate public purpose, including additional uses not identified in the original easement.

The court finds that the Kansas Supreme Court's view is more restrictive than the government argues and that Kansas precedent would not support a reading of "railroad purposes" to include "recreational trail use."  In addition, as discussed below, the court finds that the Kansas Supreme Court decisions regarding the scope of public utility and road easements relied upon by the government are distinguishable and do not support the broad construction of "railroad purpose" advocated by the government.

The Kansas Supreme Court's relatively restrictive interpretation of railroad easements was established in Armell.  In that case the Kansas Supreme Court considered whether, when acquiring a 100-foot-wide right-of-way, the railroad had also acquired the right to dig drainage ditches across adjoining lands.  The Court held that although the railroad had the right under the condemnation statute to acquire more than a 100-foot-wide right-of-way for purposes of maintaining the railroad bed, where it had not done so in the condemnation, the court would not extend the easement to accommodate the railroad's needs:

> [I]t does not follow, because these are necessary appendages of the road, that the company obtained them as rights incidental to its condemnation of the right of way 100 feet in breadth.  On the contrary, when the rights or easements are taken by condemnation, the proceedings must show definitely and precisely what is taken, and what the owner parts with.  Nothing is taken by implication or intendment. . . .
>
> The land appropriated by the railroad company was just 100 feet in width, and no more.  That is just what was condemned[–]what was paid for[–]and beyond that limit they obtained no right whatever, not even an easement which would authorize them to run a wheelbarrow over the adjacent lands to repair their road.

Armell, 8 Kan. 288 (emphasis added).  Armell makes clear that Kansas courts will look closely at what has in fact been granted when a railroad acquires an easement.

More recently, the Kansas Supreme Court has recognized that easements should be construed to advance the purposes of the easement granted.  For example, in Spears v. Kansas City Power & Light Co., 455 P.2d 496 (Kan. 1969), the Kansas Supreme Court explained that "an easement or a servitude imposed upon another's land extends to all uses directly or indirectly conducive to advance the purposes for which it was obtained." Spears, 455 P.2d at 502.  In this connection, the Kansas Supreme Court cited with approval a decision of the Missouri Supreme Court, which applied this rule in a railroad context.  Id. (citing Hennick v. Kan. City S. Ry. Co., 269 S.W.2d 646 (Mo. 1954)).

In Hennick the Missouri Supreme Court was called upon to construe the scope of a railroad purposes easement which had been initially granted to a steam railway in 1908 for the operation of a "through" railroad between specified points; many years later another railroad acquired the easement, which it used for "industrial track purposes." Hennick, 269 S.W.2d at 652-53.  The Missouri Supreme Court rejected the fee owner's contention that the easement authorized only a "certain type of railroad between certain points in certain counties."  Id. at 652.  Rather, the Missouri Supreme Court stated:

> [W]e construe the easement originally obtained as one authorizing the use of the land in question for . . . the purpose of operating a railroad over that particular land, and for any legitimate railroad purpose incidental to the use of that land for operating trains over it.  [citation omitted]  In our view, so long as the instant right-of-way continues to be used for legitimate right-of-way purposes in connection with the operation of a railroad, the easement

<u>continues</u>.

<u>Id.</u> (emphasis added).  The Missouri Supreme Court went on to hold that use of the right-of-way for industrial track fell within the scope of the original railroad purpose easement.  The Missouri Court concluded that "defendant's use of the tract is one of the uses for which the land was condemned."  <u>Id.</u> at 653.  Thus, the Kansas Supreme Court has apparently agreed that "so long as the right-of-way continues to be used for . . . purposes in connection with the operation of a railroad," the use is within the scope of a railroad purpose easement.  <u>Id.</u> at 652.

Based on these precedents, the court concludes that easements in Kansas may be used to "advance" their original purpose, but all uses must be tied to that original purpose.  Here, the court finds that recreational trail use is not a use contemplated by the original easements because it is not a use that advances the operation of trains.  Indeed, a recreational trail is only viable where the operation of trains has ceased.  As such, recreational trail use is outside the scope of a railroad purpose easement.  This court therefore concurs in the conclusions of the court in <u>Nordhus</u>, which also held that recreational trail use is not a use included in the scope of a railroad purpose easement under Kansas law.  <u>Nordhus</u>, 2011 WL 1467940 at *9.

In addition, the court finds that the Kansas cases relied upon by the government do not alter this conclusion regarding the scope of railroad purpose easements under Kansas law.  The government relies on <u>Atchison, Topeka & Sante Fe Railway Co. v.</u>

O'Leary, 100 P. 628 (Kan. 1909), in which the Kansas Supreme Court refused to enjoin a city from paving a public road that encroached upon a railroad right-of-way.  The government contends that this decision establishes that a right-of-way acquired for railroad purposes may be put to other public uses so long as those uses do not interfere with the railroad purpose.  The government argues that it follows from O'Leary that use of a former railroad corridor as a recreational trail is permissible because the current trail use does not interfere with potential future railroad use.  The court disagrees with the government's broad characterization of O'Leary.  First, O'Leary involved the situation in which the railroad, the owner of the right-of-way easement, sued to prevent a portion of its right-of-way from being put to another public use.  Rather than opining on the breadth of the permissive uses of an easement, the court's decision reflects a notion that the railroad's ownership of a right-of-way is subject to certain limits, and that "the natural order of events" could lead to the need for new crossings such that "other limitations in favor of the general public upon an exclusive right of occupancy by the railroad of its right of way might be justly imposed."  O'Leary, 100 P. at 629 (quoting No. Pac. Ry. Co. v. Townsend, 190 U.S. 267, 272 (1903)).  The court does not find this holding regarding the need for increased public crossings over railroad rights-of-way to be analogous to the issue in these cases, in which railroad use has stopped altogether.  Second, O'Leary involved the paving of a road that had been in existence for more than twenty years; it is unlike the current situation in which all of the railroad's tracks are removed and its bed is

-22-

converted into a completely different use.  The Kansas Court's holding in O'Leary does not support the conclusion that in Kansas a railroad easement may be put to any public purpose regardless of the purposes identified in the original easement.

For these same reasons, the court disagrees with the government's contention that Kansas law allows for a broad shifting of public uses from one public use to another public use.  The government relies upon Kansas Electric Power Co. v. Walker, 51 P.2d 1002 (Kan. 1935), to support its view that Kansas law allows for a broad interpretation of public use easements.  In Kansas Electric, the use of an easement across private property for an electric street car line was changed by the operator to a right-of-way for gas-powered buses.  The Kansas Supreme Court considered whether the changed method of transportation constituted an abandonment of the right-of-way for electric street car service.  The Court held:

> [T]he granting of the privilege of making such change and the right to use the streets of the city in the new and different way will not in any way affect the rights of these parties as to the passageway over private property within the city limits.
> . . . .
> [T]he additional noise and vibration found by the court is not such an element as should wholly hinder and prevent the taking of a forward or progressive step, so recognized by the general public, when not in itself injurious or destructive.

Kan. Elec., 51 P.2d at 1002, 1004-05 (emphasis added) (citing, e.g., In re Int'l Ry. Co., 275 N.Y.S. 5, 9 (N.Y. App. Div. 1934) ("Its enjoyment should continue, though the obsolete methods of transportation named in the franchise be replaced by modern ones,

unless some right of the public is interfered with, and unless the utility's affirmative servitude over the streets is increased.")).

The court finds that Kansas Electric does not support the conclusion that Kansas law supports a broad shifting use approach to construing railroad purpose easements. First, the Kansas Supreme Court's decision in Kansas Electric rested on its reasoning that technological development will necessitate "progressive" changes in the use of transportation easements. See id. The cases before this court, however, do not involve a "forward or progressive step" in the use of the railroad easement. See id. Rather, there has been a cessation of technologically advanced use (i.e. railroad use) and a transition to a less advanced use (i.e. trail use) more akin to a "leap" than a "step." Further, in contrast to Kansas Electric, in which the court found the burden imposed by electric streetcar use and gas-powered bus use to be similar, the court finds the use of a right-of-way for railroad traffic and for foot traffic to be wholly dissimilar. In the latter situation, the landowner's fee is burdened in a manner fundamentally different from the bargained-for use. As this court stated in Toews, decided under California law:

> [T]he use [as a trail] is different in kind. The purpose is fundamentally recreational, not the movement of goods or people in commerce. In the past, plaintiffs' land was subject to the isolated passage of a freight train. Now their land is available to any member of the public for any legal purpose. The current use, a linear park, is, in short, fundamentally different in kind than a railroad purpose. Hence, a new easement has been imposed irrespective of railbanking.

Toews, 53 Fed. Cl. at 62 (citing Pollnow, 276 N.W.2d 738); see also Preseault II, 100

F.3d at 1554 (Rader, J., concurring) ("Realistically, nature trails are for recreation, not transportation. Thus, when the State sought to convert the easement into a recreational trail, it exceeded the scope of the original easement . . . .").

In view of the foregoing, the court concludes that use of the railroad purpose easements for recreational trail purposes is not related to train travel (nor does it "advance the purposes" for which the easements were created, see Spears, 455 P.2d at 502), and imposes a different burden on the plaintiffs' estates beyond that reasonably contemplated at the time of conveyance or condemnation. Thus the court concludes that recreational trail use amounts to a use outside the scope of the easement granted.

While the court finds that recreational trail use is outside the scope of the easement, the court must next examine whether railbanking is also outside the scope of the railroad purpose easements at issue. The plaintiffs argue that the court need not address this issue because recreational trail use outside the scope of the railroad purpose easements resulted in forfeiture of the easements and thus, but for the Trails Act, the underlying fee would have reverted back to the plaintiffs without anything more.[14] The government argues that Kansas law does not support a finding that railroad easements are forfeited by conversion to trail use. Rather, the government contends that if

_____

[14]The plaintiffs argue that imposition of a use outside the scope of the easement is a misuse that would have caused the easement to terminate under state law but for the operation of the Trails Act. The plaintiffs have not presented, and the court has not found, any Kansas law to support this proposition. Because the court concludes, infra, that the NITUs preempted abandonment under state law, the court does not reach the plaintiffs' argument regarding termination.

railbanking is a railroad purpose under Kansas law, the railroad easements would have

remained in existence regardless of the Trails Act, and thus the STB has not interfered

with the plaintiffs' property interests by retaining jurisdiction over the railroad corridor.

Put another way, the government contends that if railbanking–the maintenance of the

corridor for future potential rail service–is a use within the scope of the easement, then

the Trails Act has not effected a taking by preempting abandonment under Kansas law.[15]

### E.   Railbanking Is Not a Railroad Purpose That Works to Preserve Railroad Purpose Easements

Although, for the reasons discussed above, the plaintiffs do not believe the court

need reach this issue,[16] the plaintiffs nonetheless argue that railbanking is not a railroad

purpose where, as here, the rights-of-way are owned by a non-railroad, the tracks are

removed, and the possibility of future rail use is at most "a vague existential notion that

maybe someday a railroad might possibly come back."  Pls.' Opening Br. 31, ECF No.

82-1.  Thus, the plaintiffs argue, the government's actions in authorizing railbanking

have taken the plaintiffs' right to hold unencumbered fee.  The government argues that

railbanking is a railroad purpose under Kansas law and therefore the Trails Act had not

---

[15]The government argues that if trail use is outside the scope of the easement but railbanking is a permissible use of the railroad purpose easement, then the holder of the easement, and not the federal government, is liable for any damages resulting from trail use.

[16]Indeed, the Federal Circuit suggested in Preseault II that such a consideration is irrelevant to the question of whether a taking has occurred: "The fact that restoration of [a] portion of the line would be technically feasible tells us little.  The question is not what is technically possible to do in the future, but what was done in the past."  Preseault II, 100 F.3d at 1547.

prevented the subject easements from expiring under Kansas law.  The government

contends that it therefore has not taken away any of the plaintiffs' property rights under

Kansas law.

For the reasons that follow, the court finds that the plaintiffs have the better

argument under Kansas law.  The Kansas Supreme Court has ruled on several occasions

that an easement acquired for railroad purposes is effective only so long as the easement

is used for or in connection with active rail service.  As the court held in Abercrombie v.

Simmons, 81 P. 208 (Kan. 1905):

> "[T]he grant does not ordinarily vest a fee in the company, but vests such an
> estate–usually an easement–as is requisite to effect the purpose for which the
> property is required. . . ."
> . . . [T]he interest was taken for use as a right of way, it is limited to that use,
> and must revert when the use is abandoned.

Abercrombie, 81 P. at 210-11 (holding that where railroad acquired railroad purpose

easement but never graded and constructed the track, the railroad's subsequent

conveyance was void because the easement had expired) (quoting 2 Byron K. Elliott &

William F. Elliott, Treatise on the Law of Railroads, §400 (1897)).  The Kansas Supreme

Court has further stated:

> We have held that when land is devoted to railroad purposes it is immaterial
> whether the railway company acquired it by virtue of an easement, by
> condemnation, right-of-way deed, or other conveyance.  If or when it ceases
> to be used for railway purposes, the land concerned returns to its prior status
> as an integral part of the free-hold to which it belonged prior to its subjection
> to use for railway purposes.

Harvest Queen Mill & Elevator Co. v. Sanders, 370 P.2d 419, 423 (Kan. 1962) (emphasis

added).  While these decisions do not directly answer the question of whether railbanking

may be a "railway purpose," the decisions make clear that continued rail use and

cessation of rail use by the railroad are treated differently under Kansas law.  As the

Kansas Supreme Court held in <u>Abercrombie</u>, an easement created by a railroad company

that is not put to actual use as a railroad will expire.  Thus, once a railroad stops all train

traffic on its tracks, the easement expires.

The Kansas Supreme Court decision in <u>Harvey v. Missouri Pacific Railroad</u>, 207

P. 761 (Kan. 1922), relied upon by the government is not inconsistent with the court's

conclusion.  In <u>Harvey</u> the fee owner of land over which an easement for "railway side

tracks, depots, workshops, water station, and stockyards" was created through

condemnation proceedings sued to quiet title on the grounds that the contested easement

had "yet been used or needed for railway purposes" but was adjacent to a 100-foot-wide

right-of-way under current use for a rail line.  <u>Harvey</u>, 207 P. at 761-62.  In this context,

the Kansas Supreme Court held that the railroad's "rights acquired under [condemnation]

proceedings are not lost through lapse of time and nonuse, so long as the railway has a

potential need of them."  <u>Id.</u> at 763.  The Kansas Supreme Court went on to hold,

however, that its conclusion was based on the fact that an actual railroad was operating

next to the subject strip.  The Kansas Court stated, "If the [operating] railway . . . should

be abandoned or relocated elsewhere than on plaintiff's property, the dominant estate

would terminate, and the defendant's rights acquired by condemnation would terminate

and revert to the plaintiff." Id. at 762. Critical in Harvey was the fact that the railroad easement was being held in conjunction with actual and operating rail service. It was because of that "potential need" only that the Kansas Supreme Court held that the railroad could continue to hold its easement over lands not yet in use; once the need vanished, the easement would terminate. Id. at 763. In the cases before the court, however, there is no active rail line in operation to support the "potential need" of any existing railroad. To the contrary, the subject rights-of-way are no longer even owned by a railroad company.

The government's reliance on Matlack v. City of Wichita, 407 P.2d 510 (Kan. 1965), and similar cases involving easement "nonuse" is also misplaced. In Matlack the court considered whether an easement condemned by a city for a public street had expired because it had not been put to use. The Kansas Supreme Court held:

> Mere nonuse, for a limited time, of the land condemned for public purposes, unless accompanied by failure to pay compensation, does not constitute abandonment. An easement on land dedicated to or condemned for a public use does not revert to the fee owner unless its use for the dedicated or condemned purpose has become impossible, or so highly improbable as to be practically impossible.

Matlack, 407 P.2d at 511 (citing McAlpine v. Chicago Great W. Ry. Co., 75 P. 73 (Kan. 1904)). The court found that there was nothing in the record before it that suggested that "use of the land for some street purpose is impossible or even highly improbable." Id.; see also Riverside Drainage Dist. of Sedgwick Cnty. v. Hunt, 99 P.3d 1135, 1139 (Kan. App. 2004) (no abandonment of easement for maintenance of drainage ditch because use was not "impossible, or so highly improbable as to be practically impossible" where

"[t]he drainage ditch exists and will need maintenance from time to time" (citing

Matlack)).  These cases stand in marked contrast, however, to the subject cases, where

there has not been active rail traffic for years and the STB found that there is no

foreseeable demand for rail service on the lines.[17]  In addition, the corridors are now

owned and maintained by non-railroad entities that maintain and pay taxes in connection

with the easements.  Given these undisputed facts, the court finds that future use as a

railroad is indeed "highly improbable" and thus railbanking is not, under Kansas law and

the facts of these cases, a railroad purpose sufficient to preserve the subject easements

and prevent the abandonment of a railroad easement.

## F.    Abandonment of the Easement Under State Law

Given the court's conclusions regarding the scope of the easements at issue, the

court agrees with the plaintiffs that, but for the STB's issuance of the NITUs, the subject

easements would have been abandoned by the railroads and the plaintiffs' property would

have no longer been encumbered by a railroad purpose easement.  There is no dispute that

since the 1986 enactment of the Kansas abandonment statute, if the STB issues a NITU,

---

[17]Regarding the line at issue in Biery, the STB found that "there is now no demand for or prospect of rail service over the line, and no traffic has originated, terminated, or moved overhead on this line segment for two years."  J.A. E-7, ECF No. 66-7.  Regarding the line at issue in Pankratz, the STB found, "The Line is stub-ended and, therefore, not capable of handling overhead traffic.  The Line has had no traffic in recent years.  In addition, no maintenance has been performed on this dormant Line for some time."  J.A. B-4, ECF No. 66-2.  The STB's historic report noted, "By the mid-1990's, all operations on the Line had ceased.  The Line is in poor condition and has not seen any traffic in recent years.  In order to restart freight operations, significant rehabilitation would be required."  J.A. B-5, ECF No. 66-3.

legal abandonment of the easement cannot occur under Kansas law despite all appearances that would otherwise support such a finding.  See Bitner v. Watco Cos., 226 P.3d 563, 566 (Kan. App. 2010) (no abandonment of railroad right-of-way despite nonuse where railroad did not file for an abandonment order with the STB).  However, it is also not disputed that, but for the NITUs and the trail use agreements, Butler County (in Pankratz) and BNSF (in Biery) would have been authorized to consummate abandonment of the rail line.[18]  Butler County tried in vain to reestablish rail service after it purchased the line and, after it was unable to find an operator to do so, took steps to abandon the line.  BNSF relinquished all liability and responsibility for maintenance of the corridor and payment of taxes, evidenced no intent to maintain an active role in maintaining the corridor, and retains no right to re-enter the corridor.[19]  After entering into trail use agreements, Butler County and BNSF removed the tracks, rendering present use as a railroad impossible and future use improbable.  In such circumstances, the court finds that under Kansas law these railroad rights-of-way were effectively abandoned for state law purposes, and only the STB's issuance of the NITUs prevented the plaintiffs from enjoying their underlying fee unencumbered by the easements.

---

[18]The plaintiffs note also that "discontinu[ance]" is regulated separately from "abandon[ment]" under 49 U.S.C § 10903(a)(1)(A) and (a)(1)(B), respectively.  Thus, the process for abandonment will result in abandonment, rather than merely discontinuing railroad operation.

[19]In Pankratz, Butler County was both the corridor owner at the time of the issuance of the NITU and also the trail operator after issuance of the NITU.  BNSF had severed its ties to the corridor at issue in that case in 2002, when it sold the corridor to Butler County.

The court finds that the issuance of the NITUs prevented the expiration of the railroad easements that would have otherwise been abandoned and thus the issuance of the NITUs resulted in a taking of the plaintiffs' reversionary interests.  By operation of the Trails Act in these cases, the plaintiffs have been deprived of the unencumbered fee they would have otherwise enjoyed under state property law.

### G.   <u>Pankratz</u>: Temporary Versus Permanent Taking

Having concluded that the issuance of the NITUs gave rise to takings in these cases, the court must now decide whether the facts of <u>Pankratz</u> give rise to a single permanent taking or a temporary taking followed by a permanent taking.  The plaintiffs contend that the issuance of the first NITU, on September 14, 2004, effected a permanent taking of their property interest.[20]  The government contends that the September 14, 2004 NITU effected, at most, a temporary taking that extended only until that NITU expired by its terms on March 13, 2005.  The government argues that any permanent taking accrued on June 2, 2005 when the STB issued the second NITU, which remains in effect.

The Federal Circuit has explained:

[T]he NITU operates as a single trigger to several possible outcomes.  It may, as in this case, trigger a process that results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked.  <u>Preseault II</u>, 100 F.3d at 1552; <u>see also</u> [<u>Toews v. United States</u>, 376 F.3d, 1371, 1376 (Fed. Cir. 2004)].  Alternatively, negotiations may fail, and the NITU would then convert into a notice of abandonment.  In these circumstances, a temporary taking may have occurred.  It is not unusual

---

[20]The plaintiffs concede that an adjacent owner who acquired fee after the date of this initial NITU is not entitled to compensation.

that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues.

<u>Caldwell II</u>, 391 F.3d at 1234 (footnotes omitted); <u>see also</u> <u>Illig v. United States</u>, 67 Fed. Cl. 47, 52 (2005).  In <u>Barclay v. United States</u>, 443 F.3d 1368 (Fed. Cir. 2006), the Circuit examined the question of whether a single permanent taking or a temporary taking and a later permanent taking occurred where ten days passed between the expiration of one NITU and the issuance of a second.  Finding that the taking, if any, stemmed from the issuance of the first NITU, the Circuit explained, "[T]he new NITU in substance merely extended the original NITU and listed a new potential trail operator."  <u>Barclay</u>, 443 F.3d at 1376.  While <u>Pankratz</u> involves a more lengthy gap between the expiration of the first NITU and the issuance of the second than did <u>Barclay</u>, the court finds that the Circuit's reasoning in <u>Barclay</u> is applicable here.  The second NITU was in effect a modification and extension of the original NITU issued September 14, 2004.  Indeed, just as was the case in <u>Barclay</u>, in issuing the June 2, 2005 NITU, the STB stated, "[T]he decision and notice served on September 14, 2004 . . . is <u>modified</u> to the extent necessary to . . . permit BCED to negotiate with the County for trail use of the entire line . . . ."  J.A. B-15, ECF No. 66-4 (emphasis added).  For these reasons, the court finds that there has been a single taking in <u>Pankratz</u> which accrued on September 14, 2004.

## III.    CONCLUSIONS

For the forgoing reasons, the plaintiffs' motions for summary judgment are **GRANTED** and the defendant's motions for summary judgment are **DENIED**.  The

parties shall file a joint status report detailing next steps for resolving the remaining issues in these cases by **July 11, 2011**.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge