# In the United States Court of Federal Claims

NOT FOR PUBLICAITON
No. 07-693L and No. 07-675L
CONSOLIDATED
(Filed: November 27, 2012)

| | |
|---|---|
| DOROTHY L. BIERY, et al., | ) |
| and | ) |
| JERRAMY and ERIN PANKRATZ, et al., | ) |
| Plaintiffs, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

# O P I N I O N

Pending before the court are the parties' cross-motions for partial summary judgment on the appropriate interest rate necessary to provide just compensation. The court has previously ruled on the issue of liability, finding that the government affected a taking of the plaintiffs' reversionary interest in land underlying two recreational trail segments previously used as a railroad corridor. See Biery v. United States, 99 Fed. Cl.

1

565, 580 (2011). The takings can be dated to the issuance of the Notice of Interim Trail Use ("NITU") in 2004.[1]

The Supreme Court has long held that in cases where there is a delay between the government's taking and its subsequent payment, just compensation under the Fifth Amendment requires the government to pay interest on the property subject to the taking. Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984) ("[T]he owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation."). The defendant ("United States" or "government") contends that the appropriate interest rate is set by the Declaration of Takings Act, 40 U.S.C. § 3116 (2006) ("DTA"), which pegs its rate to the one-year Treasury yield ("52-week T-bill" or "Treasuries") rate set by the Federal Reserve. The plaintiffs argue that the government Treasury rate on which the DTA rate is based is too low to provide just compensation. The plaintiffs argue that the court should instead set an interest rate based on the prudent investor rule ("PIR"). Under this rule, the proper interest rate is calculated "based not on an assessment of how a particular plaintiff would have invested any recovery, but rather on how 'a reasonably prudent person' would have invested the funds to 'produce a reasonable return while maintaining the safety of principal.'" Tulare Lake Basin Water Storage Dist. v. United States, 61 Fed. Cl. 624, 627 (2004) (quoting United States v. 429.59 Acres of Land, 612

---

[1] The Biery plaintiffs' property interests were subject to an April 8, 2004 NITU, while the Pankratz plaintiffs' property interests were subject to a September 14, 2004 NITU. Joint Statement of Facts at 3, 6, ECF No. 62.

F.2d 459, 464-65 (9th Cir. 1980)). The plaintiffs specifically urge the court to apply the Moody's Composite Index of Yields on Aaa Long Term Corporate Bonds ("Moody's rate" or "Moody's Index") as the appropriate rate under the PIR.

For the reasons discussed below, the plaintiffs' motion is **GRANTED in part and DENIED in part** and the government's motion is **DENIED**. The court will apply a rate consistent with the Moody's Composite Index of Yields on Aaa Long Term Corporate Bonds.

I. Discussion

   A. Standard of Review

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." RCFC 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49 (1986); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008). The moving party carries the burden of establishing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A "genuine" dispute is one that "may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. A material fact is one that "might affect the outcome of the suit under the governing law." Id. at 248. In considering the existence of a genuine issue of material fact, a court must draw all inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). If no rational trier of fact could find for the non-moving party, a genuine issue of material fact does not exist and the motion for summary judgment may be granted. Id. With respect to cross-motions for

summary judgment, each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered. Marriot Intern. Resorts, L.P. v. United States, 586 F.3d 962, 968-69 (Fed. Cir. 2009).

**B. The Moody's Index is the Appropriate Measure by which to Determine Delay Compensation in this Case.**

The plaintiffs argue that the United States Court of Claims has previously adopted the Moody's Index as a proper measure by which to determine delay compensation in situations where the government Treasury rate under the DTA has been held inadequate.[2] Id. at 29. In Pitcairn v. United States, 547 F.2d 1106, 1122-24 (Ct. Cl. 1976), the Court of Claims, in departing from the then-DTA rate, approved a set of interest rates adopted by the trial court based on historic and current Moody's rates. The Court of Claims noted that "long-term corporate bond yields are an indicator of broad trends and relative levels of investment yields or interest rates." Id. at 1124. The Court of Claims also has mandated—although prior to the 1986 amendments to the DTA that established the DTA rate at issue here—that the Moody's rates should be utilized in just compensation cases absent an affirmative showing of the need to depart from those rates.[3] Tektronix, Inc. v. United States, 552 F.2d 343, 352-53 (Ct. Cl. 1977); see also Georgia-Pacific Corp. v. United States, 640 F.2d 328, 365-66 (1980) (Ct. Cl. 1980) (applying the Pitcairn rates in a

---

[2] The parties have tentatively agreed that the total value of the property subject to the taking was $175,473. Pls.' Resp. at 5. The total interest, calculated through September 2012 for the Pankratz plaintiffs and through April 2012 for the Biery plaintiffs, comes to $85,157 if using the particular Moody's rate defined by the plaintiffs and to $33,375 if using the DTA rate. Id.

[3] As noted, these cases were decided prior to the 1986 amendments to the DTA, which allowed for compounding interest and annual recalculation of the rate.

takings case); Miller v. United States, 620 F.2d 812, 839-40 (Ct. Cl. 1980) (same) ("Miller I").  More recently, this court has used the Moody's Index over the DTA rate, reasoning that it provides a reasonable return while maintaining "safety of capital." Miller v. United States, No. 03-2489L, at *2 (unpublished opinion) (citing Pitcairn, 547 F.2d at 1122-23) ("Miller II").

In support of using the Moody's rate, the plaintiffs proffer the testimony of their expert witness, Dr. Paul Wazzan, a Director with Berkley Research Group, an economic, finance, and statistics consulting organization.  In his declaration, he states that the DTA rate would not provide an adequate return under the PIR[4] and is thus not appropriate to use as a measure of just compensation.  Wazzan Decl. at 7, ECF No. 123-1.  Dr. Wazzan holds a Ph.D. in Finance from the University of California, Los Angeles and a B.A. in Economics from the University of California, Berkeley.  Id. at 1.  Dr. Wazzan concludes that a manager investing under the PIR would never have invested exclusively in 52-week T-bills over the course of this litigation, noting that such an investment "would not provide meaningful protection from inflationary risk."  Id. at 7.  Dr. Wazzan opines that a

---

[4] Dr. Wazzan defines the PIR as follows:

> The Prudent Investor Rule marries the ideas of modern portfolio theory (creating the most efficient portfolio according to the client's risk tolerance) and fiduciary duty.  The PIR stipulates that the "manager" should protect the invested capital while considering both the potential for current income and the need for growth in excess of inflation.  The PIR requires the "manager" to diversify holdings into longer term securities and other investments that provide the potential to generate capital growth.  No investment is prohibited, but each investment needs to be evaluated in the context of the entire portfolio and the risk tolerance of the client.

Wazzan Decl. at 6 (footnotes omitted).

portfolio consisting exclusively of 52-week T-bills would be, contrary to the PIR, "highly undiversified" and place "very little importance" on generating returns.  Id.

To determine the appropriate interest rate under the PIR, Dr. Wazzan selected what he identifies as the five largest investment funds[5] available on the dates of the takings and calculated their annual rates of return over the course of this litigation through May 2012.  He used these funds to determine the rate of return a prudent investor would have expected over this timeframe.  Wazzan 2nd Report at 19-20, ECF No. 154-4.  He identified the average annual return provided using the Moody's rate beginning with each plaintiff's accrual date (the dates of the takings) and compared those rates to the average annual return for the basket of large mutual funds he identified as reasonable investment vehicles, concluding that the former rate was in line with the latter.  Id.  According to Dr. Wazzan, the Moody's Aaa average annual return, assuming accrual on April 8, 2004 (Biery) and September 14, 2004 (Pankratz), were 5.62 percent and 5.49 percent respectively, while the average annual returns for the mutual fund indices were 5.16 percent and 5.42 percent respectively.  Id. at 20 & n.32.  Dr. Wazzan found the annual rates of return over the same period for 52-week T-bills were 2.16 percent for the Biery plaintiffs and 2.32 percent for the Pankratz plaintiffs.  Pls.' Ex. 4, ECF No 154-4.  In addition, Dr. Wazzan found that the cumulative return for each set of plaintiffs using the Moody's Index was 55.45 percent for the Biery plaintiffs and 50.37 percent for the

---

[5] Dr. Wazzan reasoned that a prudent investor would have a "statistically higher probability of selecting a large [mutual] fund (by asset size)" and excluded illiquid asset classes and exotic asset classes from his analysis.  Wazzan Decl. at 8 & n.14.

Pankratz plaintiffs, while the cumulative return under the DTA rate would have been 18.78 percent and 19.11 percent respectively.  Id.  Dr. Wazzan determined, therefore, that the Moody's Index serves as a reasonable proxy for the rate of return a prudent investor would expect given initial investments on the dates of the NITUs, while further concluding that the DTA rate falls short.  Wazzan Decl. at 9.

The government argues that the Moody's rate is not appropriate and that the DTA rate should be followed in this case.  In support of its argument, the government relies on the testimony provided by its expert, Dr. Brett Dickey, Senior Vice President of Compass Lexecon, an economic consulting firm.  Dr. Dickey holds both a Ph.D. and M.A. in Economics from Stanford University and a B.A. in Economics from the University of Pennsylvania.  Dr. Dickey opines that it is inappropriate to conclude that one investment is more "prudent" than another without an understanding of the investment goals, time horizon, and risk tolerance of the particular investor.  Dickey Expert Rep. at 11, ECF No. 139-1 ("Dickey Rep.").  Dr. Dickey notes that Dr. Wazzan's analysis does not integrate the plaintiffs' subjective investment profiles—a consideration the government contends is required under the PIR—into his determination that a basket of five specific mutual funds is more "prudent" for these investors in particular compared to the relatively safe 52-week T-bills.  Id. at 12 (noting that Dr. Wazzan's exhibits show a negative return for the Moody's Index for a period of time).  Such potentially risky investments, according to the government, Def.'s Cross-Mot. Summ J. at 33 (citing United States v. 50.50 Acres of Land, 931 F.2d 1349, 1355 (9th Cir. 1991); Tulare, 61 Fed, Cl. at 628), are antithetical to protecting principal and therefore do not represent a prudent investment.

Instead, Dr. Dickey found that 52-week T-bills represent just compensation under a "coerced loan" theory,[6] wherein the defendant "forced" the plaintiffs to lend the government money when it took their property interests in 2004. Dickey Rep. at 5. The government's unsecured cost of borrowing, therefore, represents the risk the plaintiffs bore for the time period during which the government held their money. Id. at 7. According to Dr. Dickey, this cost is most accurately captured by the DTA rate. Further, Dr. Dickey contests Dr. Wazzan's claim that the DTA rate fails to provide "meaningful protection" from inflationary risk, noting that the cumulative return of 52-week T-bills over the relevant period exceeded cumulative inflation.[7] Id. at 15. The DTA rate, Dr. Dickey concludes, better protects principal and represents a prudent investment. Dickey Rep. at 14.

Lastly, the government argues that the Pitcairn line of cases cited by the plaintiffs is of limited precedential value because they were decided before the DTA was amended in 1986. More specifically, Pitcairn and its progeny were decided in the 1970's and 1980's during a period of high real interest rates. Def.'s Reply at 9. The pre-1986 version of the DTA provided a set simple fixed interest rate for compensation and was not adjustable. Id. Application of the Pitcairn rates (based on the Moody's Index) was to continue "unless and until it is affirmatively demonstrated that . . . the rate for years after

---

[6] The plaintiffs contest the relevance of the coerced loan theory, instead arguing that the proper measure of just compensation should be determined by what "the owner lost, not what the government gained." Pls. Resp. at 14.

[7] Dr. Dickey notes that from 2004-2011, cumulative inflation as measured by the Chained Consumer Price Index was 14.2 percent, while the cumulative return on investment in 52-week T-bills was 19.1 percent. Dickey Rep. at 15.

1965 should differ from the 7 1/2% rate set for 1971-1975." Id. (quoting Tektronix, Inc., 552 F.2d at 352-53). The government notes that the 1986 DTA amendments adopted a compounding interest rate pegged to rates that adjust annually depending on market conditions, which, the government argues, further reduces the relevance of the Pitcairn line of cases.[8]

After considering the parties' arguments, the court concludes that the Moody's rate should be applied in this case. This court has wide discretion in determining what interest rate should apply. Hughes Aircraft Co. v. United States, 86 F.3d 1566, 1574 (9th Cir. 1996). The court's primary goal in determining a correct interest rate is to employ an interest calculation that does not just "yiel[d] a higher or lower interest payment, but rather . . . is the more accurate measure of the economic harm of the property owners." NRG Co. v. United States, 31 Fed. Cl. 659, 670 n.8 (1994). In making this determination, the court is to choose an interest rate that "ensure[s] that [the property owner] is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." Kirby Forest Indus. at 467 U.S. at 10. Although courts have recognized the "strong judicial policy in favor of the establishment of a uniform rate of interest applicable to condemnation cases in order to avoid discrimination among litigants," Miller I, 620 F.2d at 838, no one rate serves as the bellwether for just compensation in all cases since "[t]he method of determining delay

---

[8] The government, in support of its argument that the court should apply only a simple interest rate if it should use the Moody's rate here, also notes that the rate adopted by the Pitcairn and Tektronix courts did not compound annually.

compensation should be justified by the evidence, and the rate should be responsive to the ends of justice." Pitcairn, 547 F.2d at 1121.

With these standards in mind, and after considering the expert reports, the court finds that the government-proposed DTA interest rate is not the proper interest rate to apply in light of present economic circumstances and those prevalent over the course of this litigation. In Georgia-Pacific v. United States, the Federal Circuit counseled this court to consider changing economic conditions in the time between the taking and the payment when calculating the proper delay compensation. 640 F.2d at 365. The court is persuaded that in this instance an objective "reasonably prudent investor" would not have invested exclusively in Treasury bills over this litigation's timeframe given the particular investment environment. Wazzan Decl. at 7. The DTA rate currently stands at well below 1 percent.[9] The court agrees with the plaintiffs that applying the DTA rate would not place the plaintiffs "in as good a position pecuniarily as [they] would have occupied if the payment had coincided with the appropriation." Kirby Forest Indus. at 467 U.S. at 10. This court concludes, therefore, that the DTA rate is not an accurate reflection of just compensation in this case where the litigation has taken place through very difficult economic times and where the Treasury rate on which the DTA's rate is based has been used to address specific economic issues.

In this connection, the issue before the court is not whether the prudent investor rule is the appropriate basis on which to determine the delay compensation component of

[9] At oral argument, the parties agreed that the court could take judicial notice of the current interest rate and its use as a lever for monetary policy.

just compensation. Rather, the issue is whether, given the economic circumstances presented in this case, the DTA rate provides just compensation under the Constitution. At oral argument, the parties indicated agreement that the interest rate on which the DTA pegs its rate has been held artificially low for much of the relevant timeframe. The court has discretion to ascertain adequate "just compensation," Langenegger v. United States, 756 F.2d 1565, 1569 (Fed. Cir. 1985), and the court, where appropriate, will depart from the DTA rate where economic circumstances necessitate. See Pitcairn, 547 F.2d at 1124 (adopting the Moody's rate in light of economic circumstance rendering the DTA rate inappropriate). The court, therefore, departs from the DTA consistent with the holding in Georgia-Pacific v. United States, 640 F.3d at 365, recognizing that changing economic circumstances as reflected by artificially low government interest rates counsel in favor of an interest rate consistent with the PIR.

The court also finds that based on the evidence presented and the history surrounding use of the Moody's Index, the Moody's Composite Index of Yields on Aaa Long Term Corporate Bonds compounding annually is an appropriate rate to apply in this case.[10] While the particular holdings in the Pitcairn line of cases are cabined by their reliance on dated versions of the DTA and on particular market conditions prevalent at

---

[10] The court recognizes the government's argument proffering the 7-year STRIP rate should the court reject the DTA rate for this case. Upon maturity, a 7-year STRIP provides a single lump-sum payment consisting of both the principal and interest accruing over the relevant time frame, while standard Treasury bonds pay semi-annual coupon payments each year and only the principal upon maturity. Def.'s Reply at 16 n.10. The court rejects use of 7-year STRIP Treasuries because, as the government concedes, their reliance on fixed rates do not adequately account for changing economic circumstances over the ensuing years after the date of the taking. See Georgia-Pacific, 640 F.2d at 365 (noting that courts should consider economic circumstances "prevailing in the years between the date of the taking and the date of payment.").

the time, they still stand for the proposition that rates based on the Moody's Index may provide just compensation when economic circumstances render the statutory rate unjust. Specifically, the Pitcairn court found that the statutory rate of 4 percent—set in 1944— failed to provide just compensation for a time period—the 1970s and 1980s—during which the prime interest rate spiked as high as 12 percent. Pitcairn, 547 F.2d at 1124. It was within this economic climate—and indeed until the DTA was later amended—that the court opted for the Moody's Index as a better measure of delay compensation. Now, as then, much of the period between the takings and payment has been marked by almost unprecedented economic conditions, underscored now by an artificially low interest rate. Similarly, now as then, the court finds that the Moody's Index represents a reasonable alternative to the DTA rate for this case. See Pitcairn, 547 F.2d at 1124 ("[L]ong-term corporate bond yields are an indicator of broad trends and relative levels of investment yields or interest rates. They cover the broadest segment of the interest rate spectrum."). The plaintiffs' choice of five large investment funds adequately serves as a proxy for how a prudent investor would diversify investments under the changing market conditions associated with this case's timeframe. That the average annual rate of return for the Moody's Index tracks closely to this diversified set of funds counsels this court to accept the Moody's rate as a reasonable option for determining delay compensation.[11]

---

[11] The court rejects, however, the plaintiffs' proffered rate to the extent that they suggest adoption of a single fixed Moody's rate staked to the dates of the takings. Instead, the final delay compensation calculation will be based on the average annual Moody's rate for each year of the litigation consistent with Federal Circuit precedent and with the approach Congress adopted in the DTA by pegging that rate to 52-week T-bills for multi-year delay compensation. See 40 U.S.C. § 3116(a)(2).

Lastly, the court finds that it is appropriate to compound interest annually. Compound interest may be necessary "to accomplish complete justice" under the Just Compensation Clause. Dynamics Corp. of America v. United States, 766 F.2d 518, 519 (Fed. Cir. 1985) (quotation marks omitted) (citation omitted). Compound interest is also in accord with prudent investment practices. Brunswick Corp. v. United States, 36 Fed. Cl. 204, 219 (1996) ("[I]nterest rates shall be compounded annually since no prudent, commercially reasonable investor would invest at simple interest."). The 1986 amendments to the DTA provide for compound interest, which has now replaced simple interest as the usual approach to calculating the delay component.[12]  See, e.g., NRG Co., 31 Fed. Cl. at 670. As such, this court holds that compound interest in this case provides the plaintiffs with the just compensation required under the Fifth Amendment, given the now and ongoing delay between the dates the NITUs were issued and the date of eventual payment.

## II. Conclusion

For the foregoing reasons, the court finds that the Moody's Composite Index of Yields on Aaa Long Term Corporate Bonds rate compounding annually is the proper rate to determine the delay compensation component of just compensation in this case. The rate will not be staked to the rates on the dates of the takings but rather to the annual

---

[12] While the government notes that the Moody's-based Pitcairn rates were calculated as simple interest rates, Def.'s Reply at 10, these holdings precede the 1986 amendments to the DTA. Tellingly, every case the government cites adopting a simple interest rate was decided prior to the 1986 amendments to the DTA, which parties do not contest adopted compounding interest. See id. at 10 n.8.

average Moody's rates for each year of this litigation.  The plaintiffs' motion is

**GRANTED in part and DENIED in part**.  The government's motion is **DENIED**.

**IT IS SO ORDERED.**

<div style="text-align: right;">
s/Nancy B. Firestone<br>
NANCY B. FIRESTONE<br>
Judge
</div>